**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

ALAN EUGENE MILLER,

        *Plaintiff*,

  v.

JOHN Q. HAMM, COMMISSIONER
OF ALABAMA DEPARTMENT OF
CORRECTIONS; TERRY RAYBON,
HOLMAN WARDEN; and STEVE
MARSHALL, ALABAMA ATTORNEY
GENERAL

Civil Action.: 2:22-cv-00506-RAH

**CAPITAL CASE**

**SCHEDULED FOR EXECUTION ON
SEPTEMBER 22, 2022**

**MOTION FOR PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS
FROM EXECUTING MR. MILLER VIA LETHAL INJECTION**

Alan Eugene Miller did exactly what Alabama law allowed him to do: submit in writing his election to be executed by nitrogen hypoxia rather than lethal injection. Through no fault of his own, Defendants lost Mr. Miller's election form in the midst of a messy and chaotic period at Holman Correctional Facility in which no formal or reliable process was in place for distributing, collecting, or storing such forms. Defendants now refuse to honor Mr. Miller's election, even though they have honored the election of another person whose form was lost. Defendants plan to carry out Mr. Miller's execution on September 22, 2022 by lethal injection rather than nitrogen hypoxia.

In doing so, Defendants intend to deprive Mr. Miller of his constitutional rights. **First**, Mr. Miller's constitutionally protected interest under the Fourteenth Amendment to choose nitrogen hypoxia as the method of his execution will be deprived if he is executed by lethal injection on September 22. **Second**, Mr. Miller's equal protection rights under the Fourteenth Amendment will be deprived if he is not treated the same as another death-row inmate at Holman whose election

form was also lost by Defendants but whose decision to be executed by nitrogen hypoxia is nonetheless being honored. ***Third***, Mr. Miller's right under the Eighth Amendment to have his execution not carried out in an "arbitrary and capricious" manner will be violated if he is executed by lethal injection.

Defendants' constitutional violations are especially egregious in light of the intense public scrutiny Defendants are facing for their responsibility in several botched executions, including the recent execution of Mr. James Nathan Jones, which lasted ***three hours long***. The fallout from that execution continues to unfold as new developments surface nearly every day. The Alabama Department of Corrections very recently admitted that it "cannot confirm" whether Mr. Jones was fully conscious immediately before the execution, which would suggest that the execution violated the State's own lethal injection procedures.[1] And more recently, the State refused to disclose autopsy records to the public, which would show how Mr. Jones's execution is quickly becoming known as one of "the worst botches in the modern history of the U.S. death penalty." *See* Ivana Hrynkiw, Montgomery Real-Time News, *Autopsy records on 'botched' Alabama execution of Joe Nathan James Jr. to remain secret for months*, Aug. 19, 2022, https://www.al.com/news/montgomery/2022/08/autopsy-records-on-botched-alabama-execution-of-joe-nathan-james-jr-to-remain-secret-for-months.html. The information that is publicly available to date shows that Mr. James's body was in "great distress" during the execution as

---

[1] More specifically, the Execution Procedures regarding lethal injection include several steps that require first speaking to a *conscious* inmate, including reading the warrant to the inmate, and asking if he has any last words. *See* Execution Procedures § IX(L-M), https://files.deathpenaltyinfo.org/documents/AL-Execution-Protocol-April-2019.pdf. The procedures at § IX(P)(2) state that after the inmate has had the opportunity to give his last words and it is clear no court had granted a last-minute stay, then the warden must administer midazolam hydrochloride to cause sedation, and then must perform a series of physical checks to ensure the inmate is unconscious, before administering the lethal drugs. Together these procedures show that the inmate is meant to be fully conscious before the execution begins.

executioners *sliced into his skin several times* to find a vein, and that he suffered many "unusual punctures" that do not normally appear on an executed body. *See* Joel Zivot, *Death by lethal injection: It is time for more transparency*, Aug. 22, 2022, https://www.aljazeera.com/ opinions/2022/8/22/death-by-lethal-injection-its-time-for-more-transparency.

Despite these deeply concerning accounts—which raise serious questions about Defendants' ability to competently carry out their lethal injection protocol—Defendants are moving forward with their plans to execute Mr. Miller by lethal injection in less than a month. Not only have Defendants not fixed the problems that caused Mr. James's execution by lethal injection to go terribly wrong, but Defendants cannot execute Mr. Miller by lethal injection without violating his Constitutional rights since Mr. Miller timely elected to be executed by nitrogen hypoxia. Given the significant life interests at stake, the likelihood that Mr. Miller is entitled to relief, and Defendants' minimal interest in moving forward with a constitutionally deficient execution, this Court should grant Mr. Miller's motion and allow for resolution of his claims.[2]

## **BACKGROUND**

### A.    **Procedural Background**

In June 2000, Mr. Miller was convicted of capital murder. Mr. Miller's convictions and sentence were affirmed by the Alabama Court of Criminal Appeals. The Alabama Supreme Court and the United States Supreme Court later denied certiorari.

---

[2] The Court can order briefing and a hearing on Mr. Miller's Motion for Preliminary Injunction before Defendant Marshall's Motion to Dismiss is resolved. *See* Dkt. 21. No federal or local rule prevents the Court from doing so. *See Kohmetscher v. NextEra Energy Res*., LLC, No. 19-80281-CIV, 2020 WL 5639950, at *5 (S.D. Fla. Sept. 22, 2020) ("There is nothing 'procedurally impossible' about asking for a preliminary injunction while a motion to dismiss is pending."). Indeed, a Motion for Preliminary Injunction is appropriately heard before a Motion to Dismiss when there is an immediate risk of irreparable harm. Since Defendants appear to be responding to Mr. Miller's amended complaint in piecemeal, the most prudent course of action is to brief this Motion before waiting for all Defendants to respond to Mr. Miller's amended complaint.

On May 19, 2006, Mr. Miller filed a petition under Alabama Rule of Criminal Procedure 32 for postconviction relief, and subsequently filed an amended petition on April 4, 2007. On May 5, 2009, the Alabama circuit court denied Mr. Miller's petition, which the Alabama Court of Criminal Appeals later affirmed. After initially granting certiorari, the Alabama Supreme Court quashed the grant and denied certiorari on June 22, 2012.

Mr. Miller then filed a petition for habeas corpus in the District Court for the Northern District of Alabama in January 2013. The district court denied Mr. Miller's petition in March 2017. *Miller v. Dunn*, 2017 WL 1164811, at *3 (N.D. Ala. Mar. 29, 2017). Mr. Miller then moved for a certificate of appealability in the U.S. Court of Appeals for the Eleventh Circuit. While the Eleventh Circuit granted a certificate on a number of claims, the court affirmed the district court's denial of habeas relief in August 2020. *Miller v. Comm'r, Alabama Dep't of Corr.*, 826 F. App'x 743, 746 (11th Cir. 2020). The United States Supreme Court denied certiorari in October 2021. *See Miller v. Dunn,* 142 S. Ct. 123 (2021).

On April 19, 2022, the State of Alabama, by and through the Office of the State Attorney General, moved the Alabama Supreme Court to set Mr. Miller's execution date. Mr. Miller filed a brief in opposition, attesting in a sworn affidavit that he completed and returned the election form, choosing to be executed by nitrogen hypoxia. Defendant Attorney General Marshall responded to Mr. Miller's opposition on May 27, 2022. Through an affidavit signed by Defendant Raybon, the State claimed that it has not found a record of Mr. Miller's form. Mr. Miller then filed a reply brief, emphasizing that the State's response had created a quintessential factual dispute regarding the existence of Mr. Miller's form that must be resolved by an Alabama trial court before he can be executed by lethal injection. On July 18, 2022, the Alabama Supreme Court granted the State's motion (Chief Justice Parker dissented) and set Mr. Miller's execution for September 22, 2022.

B.   **Factual Background**

1.   The Nitrogen Hypoxia Election

Lethal injection is Alabama's default method of execution. Ala. Code § 15-18-82.1(a). On June 1, 2018, Alabama amended its laws to allow death-sentenced inmates to choose the manner by which they would be executed: by Alabama's default method of lethal injection or by nitrogen hypoxia. *See id.* § 15-18-82.1(b)(2). Inmates whose death sentences had become final prior to the amendment's enactment, like Mr. Miller, were given 30 days to make this election. *Id.* After June 30, 2018, inmates who did not opt into death by nitrogen hypoxia would be deemed to have waived their right to make such election.

The statute providing for the election states that an inmate must make his election "in writing," but the statute does not specify the type or manner of writing required to elect nitrogen hypoxia, nor does it delineate a process for distributing, collecting or storing records of an election. *See id.* In the absence of such guidance—and given the fact that Defendants did not establish a process or procedure outlining a method for distributing, collecting, or storing records of an election form (or even determining whether an election had been made)—the 30-day election period at Holman in June 2018 has been publicly described as extremely disorganized. *See, e.g.,* Melissa Brown, *In 2018, Alabama approved death by nitrogen for executions. When did it inform its inmates?*, The Montgomery Advertiser, June 25, 2019, https://www.montgomeryadvertiser.com/story/news/crime/2019/06/25/alabama-says-didnt-have-inform-its-inmate-new-execution-method/1276330001/.

Indeed, the warden at Holman at the time, Cynthia Stewart, never made election forms for the people on death row. *See* Pl.'s First Am. Compl. ("FAC") ¶ 36. As a result, the Federal Public Defender's Office for the Middle District of Alabama created a form and distributed it to clients. *See Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308, 1315 (11th Cir.), *application granted*

*sub nom. Hamm v. Reeves*, 142 S. Ct. 743 (2022). After Warden Stewart obtained the Federal Defender's form, she received instructions from the Alabama Department of Corrections ("ADOC") to distribute the form to the people on death row at Holman, *see* FAC ¶ 38, and thereafter directed Captain Jeff Emberton to distribute the form accordingly, *Reeves*, 23 F.4th at 1314.

Within a few days of the election period coming to a close, Captain Emberton distributed more than one hundred copies of the election form with over one hundred envelopes. *Reeves*, 23 F.4th at 1315. But rather than track who received a form and when, neither Captain Emberton nor anyone else created a list or otherwise recorded the names of people who received a copy of the form. FAC ¶ 41. In fact, Warden Stewart explicitly told Captain Emberton not to log the names of the individuals from whom he collected a form. *Id.* Captain Emberton therefore simply returned a box with the forms to Warden Stewart, *id.*, and no Defendant ever put in place a reliable system to memorialize which inmates opted into execution by nitrogen hypoxia, *id.* ¶ 45.

Against this messy backdrop, Mr. Miller received an election form from a prison official in June 2018. *See* Ex. A to FAC ¶¶ 3-5. Mr. Miller completed and signed the form. *Id.* ¶ 5. Mr. Miller then returned the form to the official who was collecting completed forms from other inmates. *Id.* ¶ 6. The official collected Mr. Miller's form at the same time that he collected election forms from others.  *Id.* ¶ 7.

When Mr. Miller gave the election form to the official, Mr. Miller asked the official that the form be copied and notarized so as to record his election. *Id.* ¶¶ 9-10. The official refused both of Mr. Miller's requests. *Id.* Mr. Miller does not know what the official did with the election form after collecting it from Mr. Miller, *id.* ¶ 8, and Defendants Marshall and Raybon now claim that the State has no record of Mr. Miller's form.

2.      The State Has Lost or Misplaced Other Election Forms

Other election forms submitted by other people on death row have also been lost. More specifically, in addition to Mr. Miller's form, Jarrod Taylor's form has also been lost.

Like Mr. Miller's form, the situation involving Mr. Taylor's form came to light after Defendant Marshall moved the Alabama Supreme Court to schedule Mr. Taylor's execution. *See* Ex. B to FAC. As part of that motion filed on July 29, 2019, Defendant Marshall represented that Mr. Taylor had not made a timely election of death by nitrogen hypoxia. *See id.* ¶ 1.

Mr. Taylor's counsel responded to the motion by informing Defendant Marshall that Mr. Taylor had, in fact, timely elected death by nitrogen hypoxia, *id.* ¶ 2, and purportedly provided Defendant Marshall with attorney-client communications from around the time of the election period, *id.* ¶ 3. Defendant Marshall subsequently moved to withdraw the motion to set Mr. Taylor's execution date. *Id.* ¶ 5.

In his withdraw motion, Defendant Marshall admitted that neither the Attorney General's office nor counsel for ADOC had Mr. Taylor's election form in their files. *Id.* ¶ 4. Defendant Marshall nevertheless decided to honor Mr. Taylor's election because the documentation provided by Mr. Taylor's counsel supported the "assertion that [Mr. Taylor] made a timely election of nitrogen hypoxia." *Id.*

3.      The State's Execution of Inmates by Lethal Injection—the Alternative to Nitrogen Hypoxia—Has Proven Problematic

The State's primary method of execution, lethal injection, has proven to be deeply problematic in recent years. In February 2018, the team responsible for carrying out Doyle Lee Hamm's execution failed to access any peripheral or central veins. *See* Liliana Segura, *Another Failed Execution: The Torture of Doyle Lee Hamm*, The Intercept, March 3, 2018, https://theintercept.com/2018/03/03/doyle-hamm-alabama-execution-lethal-injection. The State

decided to stop the execution after several hours, but by then, the damage had already been done—the team punctured Mr. Hamm with a needle at least 11 times in his limbs and groin, and he bled profusely on the gurney. When he was finally relieved of the physical and mental torture, Mr. Hamm collapsed coming off the table. *Id.*

More recently, and as mentioned *supra*, Joe Nathan James Jr. was executed on July 28, 2022, following an initially ***unexplained three-hour delay*** during which the ADOC's execution team repeatedly failed to establish an intravenous line. *See* Evan Mealins, *ADOC 'cannot confirm' if Joe Nathan James Jr. was fully conscious before his execution*, The Montgomery Advertiser, Aug. 2, 2022, https://www.montgomeryadvertiser.com/story/news/2022/08/02/joe-nathan-james-jr-execution-adoc-cannot-confirm-if-conscious/10168003002/. Witnesses to the execution have publicly stated that before his execution began, Mr. James did not open his eyes and did not move on the gurney. *Id.* The witnesses have also said that Mr. James was silent when asked for his final words. *Id.* Defendant Hamm has recently claimed that Mr. James was not sedated prior to the flow of the lethal injection, and other prison officials have said that they "cannot confirm" whether Mr. James was fully conscious before his execution began, *id.*, all of which suggests that the State's own procedures were not followed*, see supra* at n.1.

In addition to those reports, *The Atlantic* has revealed that, despite ADOC's public statements that "nothing out of the ordinary" happened in the course Mr. James's execution, an independent autopsy showed that he "suffered a long death" and that his body showed "pool[s] of deep bruising" as well as a deep surgical incision on his arm called a vein "cutdown" that indicated "the IV team was unqualified for the task in a most dramatic way." *See* Elizabeth Bruenig, *Dead to Rights: What did the state of Alabama do to Joe Nathan James in the three hours before his*

*execution?*, The Atlantic, Aug. 14, 2022, https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-execution-alabama/671127/.

To date, neither ADOC nor any of the Defendants have explained the discrepancy between the statement that "nothing out of the ordinary" occurred with Mr. James's execution and the devastating facts revealed at Mr. James's independent autopsy. Even worse, neither ADOC nor any of the Defendants have explained what steps they are taking to prevent what transpired in Mr. James's execution from transpiring in Mr. Miller's upcoming execution. Defendants are asking this Court, Mr. Miller, and the public to simply trust them that nothing will go wrong when they repeat the exact same procedure that they botched in July, even as new facts continue to emerge about Mr. James's execution and as ADOC withholds critical information about what happened in the execution chamber.

## **LEGAL STANDARD**

A court may grant a preliminary injunction if the plaintiff establishes "(1) a substantial likelihood of success on the merits; (2) that irreparable injury would result unless the injunction were issued; (3) that the threatened injury to him outweighs whatever damage the proposed injunction might cause the defendants; and (4) that, if issued, the injunction would not be adverse to the public interest." *Reeves*, 23 F.4th at 1319. While such relief is not available as a matter of right, the Supreme Court has granted a preliminary injunction staying an execution where, as here, the totality of equities favor doing so. *See*, *e.g., Bucklew v. Precythe*, 139 S. Ct. 1112, 1118 (2019) (noting the inmate "received a stay of execution and five years to pursue the argument" that Missouri's lethal injection protocol was unconstitutional as applied to him); *Bucklew v. Lombardi*, 572 U.S. 1131 (2014) (granting stay).

**<u>ARGUMENT</u>**

In moving for a preliminary injunction, Mr. Miller seeks only to preserve the status quo while he litigates his constitutional claims. Mr. Miller is likely to prevail on the merits of those claims for the reasons described below. Moreover, absent relief, he undoubtedly will suffer irreparable harm—namely, execution by lethal injection. A preliminary injunction would not substantially injure Defendants because they will still be able to carry out their execution of Mr. Miller via nitrogen hypoxia. Finally, the public interest counsels in favor of a preliminary injunction, since it would allow the Court to resolve Mr. Miller's important and timely constitutional challenges while having minimal, if any, impact on Defendants' interests. A preliminary injunction is also in the public's interest to ensure that another botched execution via lethal injection does not occur. This Court should accordingly grant Mr. Miller's motion.

**I.    Mr. Miller is Likely to Succeed on the Merits of His Claims.**

Mr. Miller's claims against Defendants are brought under the Fourteenth and Eighth Amendments. Count I asserts that the execution of Mr. Miller via lethal injection will violate his right to procedural due process. Count II asserts that the execution of Mr. Miller via lethal injection will violate his right to equal protection under the law. And Count III asserts that the execution of Mr. Miller via lethal injection will violate his right not to be subject to an "arbitrary and capricious" execution. While all three claims are likely to succeed on the merits, Mr. Miller need only show that one claim is likely to succeed in order for the Court to grant his motion. *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005) (explaining that "a petitioner must demonstrate a substantial likelihood of prevailing on at least one of the causes of action he has asserted").

A.      The Procedural Due Process Claim Is Likely to Succeed

A claim alleging a denial of procedural due process includes three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). All three requirements are likely to be satisfied here.

***First***, Defendants intend to deprive Mr. Miller of his liberty interest to choose one of two state-sanctioned execution methods. The State of Alabama created that interest in enacting Ala. Code § 15-18-82.1(b)(2), which provides death-row inmates, including Mr. Miller, an opportunity to choose the means by which they are to be executed. *See Saunders v. Hamm*, 2022 WL 493693, at *4 (M.D. Ala. Feb. 17, 2022) (finding that plaintiff had plausibly alleged that Ala. Code § 15-18-82.1(b)(2) created a protected interest under the Fourteenth Amendment). Mr. Miller signed a sworn affidavit explaining that he did everything required of him under the statute. *See* Ex. A to FAC ¶¶ 3-7. Specifically, he filled out the written form and returned it to the prison official at Holman. *Id.* ¶¶ 5-7. Mr. Miller even asked that a copy of the form be copied and notarized. *Id.* ¶¶ 9-10.

Defendants have now lost that form as the result of failing to create and maintain an accurate process for determining which inmates timely submitted election forms and whether an election had been made. Yet rather than correct this grievous error and honor Mr. Miller's election of nitrogen hypoxia—as Defendant Marshall has for other inmates whose forms have been lost— Defendants are instead moving forward with execution by lethal injection on September 22, 2022. In doing so, Defendants are essentially putting Mr. Miller in the same position as an inmate who was never permitted to make a timely election in the first place, thereby depriving him of his protected interest to choose the method of his execution pursuant to the statute. Mr. Miller is entitled to have his liberty interest recognized. *See, e.g., Nance v. Ward*, 142 S. Ct. 2214, 2219

(2022) (explaining that inmates are entitled to select method of execution, particularly to reduce risk of severe pain). And while Defendant Marshall may insist that he sought Mr. Miller's execution date before his office was informed of Mr. Miller's election, he cannot escape the fact that he *continued to seek* Mr. Miller's execution even after learning about the missing form, *see* Ex. C to FAC, and that he has withdrawn similar motions in substantially the same circumstances, *see* Ex. B to FAC.

*Second*, the state action requirement is easily satisfied here because Defendants are responsible for initiating the execution process in a constitutional manner, setting up the election process at Holman, honoring Mr. Miller's election, and/or for carrying out Mr. Miller's execution. *See* FAC ¶¶ 11-19.

*Third,* the processes at issue in this case fall woefully short of what is required under the Constitution. *See Grayden v. Rhodes*, 345 F.3d 1225, 1242 (11th Cir. 2003) (explaining that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). As explained in Mr. Miller's complaint, there were no written rules or guidance governing the nitrogen hypoxia election process. There were no written rules or guidance regarding the distribution of election forms. And there were no written rules or guidance for collecting or storing such forms. Defendants now refuse to honor Mr. Miller's election and have failed to put in place any notice or process concerning how that refusal should be resolved. *See Saunders*, 2022 WL 493693, at *6 (questioning the adequacy of notice provided to death-row inmates at Holman regarding the election forms). The processes involved here are constitutionally inadequate.

Additionally, Defendants have no reliable process in place for determining whether to honor an election in cases where the election form was lost. As mentioned, Mr. Miller has

presented evidence in the form of a sworn-affidavit stating that he turned in his form. The statements in Mr. Miller's affidavit should be taken as true at this stage in the proceeding, as the Eleventh Circuit has repeatedly stressed in similar situations that an inmate's sworn-affidavit must be assumed as true at the pleading stage. *See, e.g., Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008); *Jenkins v. Sloan*, 826 F. App'x 833, 839-40 (11th Cir. 2020) (per curiam) (concluding that district court erred by failing to "credit[] the plaintiff's versions of events as true"); *White v. Staten*, 672 F. App'x 919, 923-24 (11th Cir. 2016) (per curiam) (similar); *Palmore v. Tucker*, 522 F. App'x 717, 719 (11th Cir. 2013) ("[T]he district court was required, at least initially, to take Mr. Palmore's version of events as true. But that does not appear to have happened in this case.") (citations omitted).

In response to Mr. Miller's affidavit, Defendant Marshall did not present a sworn statement from Captain Emberton disputing Mr. Miller's assertions. Nor did Defendant Marshall present anything from Warden Stewart disputing the same. Instead, Defendant Marshall merely presented an affidavit from Defendant Raybon, the current warden, stating that he couldn't locate Mr. Miller's form nearly four years after the fact. The State is not denying that Mr. Miller elected nitrogen hypoxia, and instead is simply proceeding with his execution without providing any reliable means to determine whether Mr. Miller's election should be honored.

All of this is occurring as Defendant Marshall has honored the nitrogen hypoxia election of inmates whose forms it did lose. And, in light of the recent examples of Mr. Hamm and Mr. James, Defendants are now exposing Mr. Miller to an increased risk that his scheduled execution via lethal injection will be botched, further adding to the arbitrary and capricious nature of the punishment. Indeed, Mr. Miller will be forced to undergo an extremely painful and unwarranted

execution, all while having properly elected to be executed by nitrogen hypoxia. There is simply no justification for proceeding with Mr. Miller's execution under these circumstances.

        B.    <u>The Equal Protection Claim Is Likely to Succeed</u>

An equal protection claim requires showing that Defendants are treating Mr. Miller "disparately from other similarly situated persons," and that the disparate treatment is not "rationally related to a legitimate government interest." *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (per curiam) (citation marks omitted). For two people to be "similarly situated" in contexts where the challenged government action is one-dimensional—that is, the action involves a single answer to a single question—the two people need not be absolutely identical. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1264-65 (11th Cir. 2010); *see also id.* at n.36 (cautioning that "too narrow a definition of 'similarly situated' could exclude from the zone of equal protection those who are plainly treated disparately and without a rational basis").

Mr. Taylor and Mr. Miller are both death-row inmates at Holman who submitted election forms. Defendants lost or misplaced the nitrogen hypoxia election forms that both men submitted. But rather than treat Mr. Taylor and Mr. Miller equally, Defendants are recognizing Mr. Taylor's election (and not Mr. Miller's election) because Defendant Marshall received a copy of privileged attorney-client communications from around the time of Mr. Taylor's election. *See* Ex. B to FAC ¶ 3. Yet nowhere in Ala. Code § 15-18-82.1(b), or anywhere else for that matter, are Defendants permitted to replace a missing nitrogen hypoxia election form with privileged attorney-client communications. In fact, the statute makes it clear that the only relevant consideration in determining whether to honor an inmate's election is if the inmate submitted that election in writing. *See* Ala. Code § 15-18-82.1(b). But now Defendants have changed that requirement by providing themselves with unlimited discretion to determine what quantum of evidence is sufficient to honor an election absent writing submitted to the warden. To treat Mr. Miller

differently because he has not submitted privileged attorney-client communications is unconstitutional. *See, e.g., Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing that plaintiff plausibly stated equal protection claim and explaining that "the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents"); *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325 (11th Cir. 2019) (per curiam) (implying that inmates who timely elected execution by nitrogen hypoxia would be similarly situated for purposes of equal protection claim); *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012) (per curiam) (recognizing inmate had equal protection rights and had plausibly alleged equal protection claim based on the ways in which execution could deviate from established protocol).

Defendants' decision to recognize Mr. Taylor's nitrogen hypoxia election but not Mr. Miller's has no rational basis. *See Arthur*, 674 F.3d at 1262 (reversing trial court's dismissal of plaintiff's equal protection claim and explaining that disparate treatment must be rationally related to legitimate government interest). The government does not gain or protect anything by requiring inmates to show privileged attorney-client communications while punishing those who do not. Moreover, Defendants' actions invite perverse incentives by encouraging inmates to turn over attorney-client materials to the very same people who oversee their incarceration and execution. Under Defendants' ad hoc rules, inmates who did everything that was required of them under the statute but whose nitrogen hypoxia forms were lost will nevertheless be executed via lethal injection unless they share with the State their privileged communications. There is no rational basis to support that action.

And while Mr. Miller does not deny that the State has an interest in the enforcement of its criminal judgements and sentences, the relief that he seeks—*e.g.*, an injunction preventing his execution by lethal injection and a declaration that his nitrogen hypoxia election must be honored—will not undermine that interest since the State will still have an opportunity to carry out its execution. Mr. Miller simply asks that he be treated the same as other similarly-situated inmates on death row who timely submitted their election forms, and that his execution be carried out via nitrogen hypoxia rather than lethal injection.

C.    The Eighth Amendment Claim Is Likely to Succeed

The Eighth Amendment prohibits "cruel and unusual punishments." The execution of an inmate may be "cruel and unusual" when it is carried out arbitrarily or capriciously. *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153, 194-95 (1976). The State of Alabama therefore has a "constitutional responsibility" to "apply its [capital punishment statutes] in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). As part of that responsibility, "procedures" are to be in place to prevent the arbitrary execution of an inmate. *Foster v. Strickland*, 707 F.2d 1339, 1347 n.16 (11th Cir. 1983). The State must also "make rationally reviewable the process for imposing a sentence of death." *Godfrey*, 446 U.S. at 428.

The decision to execute Mr. Miller by lethal injection rather than nitrogen hypoxia is unconstitutionally arbitrary. The only basis for executing Mr. Miller by lethal injection instead of nitrogen hypoxia is that Defendants failed to retain his election form. If Mr. Miller's form had not been lost, Mr. Miller would otherwise be executed by nitrogen hypoxia. Mr. Miller's election form was lost because adequate procedures for distributing, collecting, and storing such forms were never created, let alone implemented. Now, some inmates who elected to be executed by nitrogen hypoxia will have their elections honored by Defendants, while other inmates—who also elected

16

to be executed by nitrogen hypoxia—will not. Even worse, among the group of inmates whose forms have been lost (*e.g.*, Mr. Miller and Mr. Taylor), Defendants are picking and choosing who will be executed by nitrogen hypoxia and who will be executed by lethal injection. The failure to put any reliable procedures in place regarding the election process also prevents courts, including this Court, from rationally reviewing Defendants' efforts to carry out executions. *See Godfrey*, 446 U.S. at 428. Perhaps the most important responsibility Defendants undertake as stewards of the State is ensuring that executions meet the stringent requirements imposed under the Constitution. That includes creating and implementing procedures to avoid arbitrary or capricious results. Defendants have skirted their responsibilities by neglecting to produce anything that even vaguely resembles a reliable system for determining whether a timely nitrogen hypoxia election has been made, including by failing to create a reliable system for distributing, collecting, or storing forms that determine how an inmate's life will come to an end. Defendants should not be permitted to further prevent courts from rationally reviewing—as they must—whether their efforts to carry out Mr. Miller's execution satisfies the protections afforded to him under the Eighth Amendment.

## II.   Mr. Miller Will Suffer Irreparable Injury if a Preliminary Injunction Is Not Granted.

If Defendants are not enjoined from executing Mr. Miller by lethal injection and are not required to recognize Mr. Miller's election before this Court can resolve the merits of his claims, Mr. Miller will suffer irreparable harm. Most obviously, as a result of Defendants' conduct, Mr. Miller will be executed by lethal injection rather than nitrogen hypoxia. Mr. Miller stands to suffer a needlessly painful execution when a viable alternative exists to which he is statutorily entitled. This is especially critical in light of the ongoing investigation into the State's terribly-botched execution of Mr. James. While the State continues to withhold information from the public, this much is known:

- The execution lasted three hours and witnesses said that Mr. James did not open his eyes nor did he move on the gurney at the start of the execution;

- The State "cannot confirm" whether Mr. James was conscious at the start of the execution, which suggests that the State's own lethal injection procedures were not followed;

- Defendant Hamm claims that Mr. James was not sedated prior to the flow of the injection;

- An independent autopsy has revealed that Mr. James's body was in "great distress";

- The State sliced into Mr. James' skin several times in an attempt to find a vein;

- Mr. James suffered many "unusual punctures" from State executioners; and

- The State refuses to turn over information due to an investigation that may last until October.

Mr. Miller is next in line to be executed by the same exact method. A preliminary injunction will ensure that Mr. Miller does not needlessly suffer the same irreparable injury as Mr. James.

### III.    A Preliminary Injunction Will Not Substantially Harm Defendants or Be Adverse to the Public Interest.

Compared to the irreversible harm that Mr. Miller will suffer if his request is denied, the harm to Defendants is slight. Indeed, while Defendants have an interest in the execution of the State's judgments, any minimal delay resulting from granting temporary relief sought here will have little adverse effect upon that interest. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to [violate the Eighth Amendment], they suffer injury that can never be undone, and the Constitution suffers an injury that can be never be repaired.").

Additionally, Defendants and the public have an interest in conducting executions in a manner that does not violate Mr. Miller's constitutional rights. *See Ray v. Comm'r, Ala. Dep't*

*of Corr.*, 915 F.3d 689, 702 (11th Cir. 2019) ("[N]either Alabama nor the public has any interest in carrying out an execution in a manner that violates . . . the laws of the United States."); *Arthur v. Myers*, 2015 WL 668007, at \*5 (M.D. Ala. Feb. 17, 2015) (the State has an interest in "carrying out criminal judgments, particularly executions, in a constitutionally acceptable manner"). Mr. Miller's execution has been set despite not having afforded him due process and despite treating him disparately compared to other death-sentenced inmates. Thus, it is in the public's interest to ensure that Defendants—who oversee the execution process in Alabama and who are charged with carrying out state and federal law—have complied with the protections afforded to Mr. Miller in the U.S. Constitution. It is also in the public's interest to ensure that Mr. Miller is not executed by the very same method that Defendants recently botched, especially as terrifying facts about that execution continue to come to light.

## CONCLUSION

For all these reasons, the Court should grant Mr. Miller's motion for a preliminary injunction, enjoin Defendants from executing Mr. Miller via lethal injection, and declare that his nitrogen hypoxia election be honored.

Dated: September 1, 2022

Respectfully submitted,

/s/   *J. Bradley Robertson*
J. Bradley Robertson
Bradley, Arant, Boult, Cummings LLP
One Federal Plaza
1819 5th Ave. N., Birmingham, AL 35203
Tel: (205) 521-8188
Fax: (205) 488-6188
Email: brobertson@bradley.com

Daniel J. Neppl
Mara Klebanar
Stephen Spector
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email: dneppl@sidley.com
Email: mklebaner@sidley.com
Email: sspector@sidley.com

Marisol Ramirez
SIDLEY AUSTIN LLP
555 West Fifth Street
Suite 4000
Los Angeles, CA
Tel: (213) 896-6000
Fax: (213) 896-6600
Email: marisol.ramirez@sidley.com

*Attorneys for Plaintiff Alan Eugene Miller*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 1, 2022, I served a copy of the foregoing via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to all counsel of record.

*/s/ J. Bradley Robertson*
J. Bradley Robertson