IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ALAN EUGENE MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. **2:22-cv-00506-RAH** |
| | ) |
| JOHN Q. HAMM, Commissioner, | ) |
| Alabama Department of Corrections, | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

**Defendants' Response in Opposition to
Plaintiff's Motion for a Preliminary Injunction**

Defendants oppose Plaintiff Miller's request for a preliminary injunction (Doc. 28). Defendants' opposition is grounded (1) in the fact that Miller has not, and cannot, establish a likelihood of success on the merits, (2) in the doctrine of laches, and (3) in the fact that Miller has indicated that he seeks to stay his execution, even if this Court grants the requested relief of recognizing his nitrogen hypoxia election.

**I.     The requested injunction should be denied because Miller has not shown, and cannot show, a substantial likelihood of success on the merits.**

Miller's § 1983 lawsuit is predicated on a single allegation: that he elected nitrogen hypoxia during the election period in June 2018. But that allegation, even if true, does not entitle Miller to the relief he requested for the reasons set forth in Defendant Hamm's motion to dismiss. (Doc. 35.) As explained therein (and herby incorporated), the statute of limitations bars Miller's claims, *see id.* at 6-13, and they

also fail on their merits, *id.* at 2-6, and 14-17, even assuming Miller did make a proper election.

But Miller's request for a preliminary injunction should also be denied because he is not substantially likely to show that he did make such an election. On September 7, 2022, Defendants deposed Miller at Holman Correctional Facility. His testimony establishes that preliminary injunctive relief is not warranted in this case.

In May 2022, Miller filed an affidavit in the Alabama Supreme Court claiming that he signed a nitrogen hypoxia election form in May 2022. (*See* Doc. 18-1.) Specifically, Miller attested that he completed and signed an election form and returned it to an unnamed correctional officer "at the same time [the officer] was collecting forms from everyone else." (*Id.* at 3.) When asked for the names of "everyone else" who submitted a form to the correctional officer during his deposition, Miller stated he had no personal knowledge of any other inmate providing a form to this unnamed correctional officer.[1] When asked how he knew that the officer "was collecting forms from everyone else," Miller stated that he was simply making an assumption. When asked for the names of any other inmate who

---

1. Although Miller reserved the right to review and sign his deposition, Defendants informed his counsel that they would seek to use his deposition transcript to oppose the request for injunctive relief. Counsel for Defendants agreed they would inform this Court of Miller's reservation. It is expected that the transcript of Miller's deposition will be available on Friday and will be capable of being submitted to the Court at the hearing on Monday, September 12, 2022.

2

elected from the death row tier to which Miller was assigned in June 2018, Miller admitted he did not know if any other inmate elected.

The amended complaint makes factual allegations about election forms being distributed by ADOC Captain Jeff Emberton at the direction of then-Warden Cynthia Stewart. (Doc. 18 ¶¶ 38–41.) Importantly, the amended complaint does not allege that these factual averments apply to Miller's claims; rather, the amended complaint cites *Reeves v. Commissioner, Alabama Department of Corrections*, 23 F.4th 1308, 1314 (11th Cir. 2022), *vacated*, *Hamm v. Reeves*, 142 S. Ct. 743 (2022), without further pleading that these facts directly apply to Miller's claim. During his deposition on September 7, Miller indicated that his affidavit referred to "a correctional officer" because he could not identify the person who collected the nitrogen hypoxia election form he claims to have completed and signed. He testified that he was told the name "Captain Emberton" by death row inmate Bobby Wayne Waldrop *after* Miller signed and submitted his affidavit in the Alabama Supreme Court. Miller then admitted that Waldrop was not assigned to his death row tier in June 2018, and Miller could not testify under oath that Captain Emberton was the officer who distributed or collected forms on his death row tier.

When Miller was asked to describe the "correctional officer" he references in his affidavit and amended complaint, he could not (1) state whether the correctional officer was white or black; (2) describe the type of ADOC uniform worn by the

3

correctional officer; (3) describe whether the correctional officer was short or tall; (4) describe whether the correctional officer was fat, skinny, or muscular; or (5) provide an approximate age of the correctional officer. The best that Miller could do was to state that he "thought" the correctional officer was male. When Miller was asked to describe Captain Emberton, Miller admitted that he did not know Captain Emberton and could not describe his appearance.

Miller's amended complaint alleges that "[w]hen Mr. Miller gave the election form to the [corrections] official, Mr. Miller asked the official that the form be copied and notarized so as to record his election." (Doc. 18 ¶ 51.) During his deposition, Miller testified that his requests were made to the official at the time the forms were handed out, not collected. This distinction is important because Miller testified that he did not pay attention to the official collecting the form. Instead, Miller says he placed the form in the bars of his cell to be picked up by the officer as he walked by. According to Miller, this partially explains why he can offer no description or information that would aid in the identification of the person he says collected his form.

During his deposition, Miller listened to the first phone call he made to his brother after being informed that the State had requested the date be set for his execution. In that conversation, neither Miller nor his brother discussed nitrogen hypoxia. At the two minute, forty-eight second mark, Miller's brother asked Miller

if he was all right with what his lawyers told him. Miller responded, "Oh, yeah, there ain't nothing else I can do about it. What can I do?"

Miller's next phone call to his brother began, "Hey, I called those [expletive] lawyers, *some other inmates* signed a piece of paper about using some kind of gas stuff. I called my lawyers and told them they need to call the Equal Justice [Initiative] and stuff, and the public [Federal] defenders, that they might be able to halt, put a hold on that. I don't know if they can or not, *but my lawyer did not even know what I was talking about.*"[2] This was the first time that execution by "some type of gas stuff" came up in conversation.

During his deposition, Miller indicated that he had not seen a copy of the complaint in his case until after it had been filed. When asked if he had read the news article cited in paragraph 34 of the complaint, Miller indicated that he had not. Asked if he could explain what aspects of that article applied to his claims, or his situation, Miller could not answer because he did not know what was reported in the article.

Miller indicated that the factual allegations in his lawsuit came from Jarrod Taylor, Milton Eugene Clemmons, and Bobby Wayne Waldrop, other death row inmates housed at Holman Correctional Facility. He testified that this information was provided to him *after* the State moved to set his execution date in the Alabama

---

2. Miller went on to say, "I said [to my lawyers], 'I told y'all a way long time ago.'" If this is true, it appears that Miller's legal counsel also lost his nitrogen election information.

Supreme Court and, in one instance, after the Alabama Supreme Court issued the execution warrant.

Additionally, it is expected that Miller's deposition transcript will reflect that Miller subconsciously admitted the falsity of his claim to have elected nitrogen hypoxia in June 2018. While explaining why he did not think that a narrowly tailored injunction limiting the State to conducting his execution by means of nitrogen hypoxia would be "fair," Miller stated that he thought all of the inmates who elected nitrogen hypoxia "before" him should have to be executed first. Specifically, Miller said he believes that inmates such as Waldrop, Taylor, and Clemons—those inmates who provided Miller the factual information he asserts—should be executed before him because they elected "before" him. Miller, however, conceded that he had no personal knowledge of when any other inmate elected, and he did not know the date he claims to have elected. Thus, Miller cannot be referring to having personal knowledge of inmates who completed election forms before him but for the fact that Miller *knows* he did not complete an election form in 2018.

Further, Miller cannot show a likelihood of success on the merits because he has asserted the attorney–client privilege in response to questions regarding whether he communicated his nitrogen hypoxia election to his lawyers after the fact. While this reality applies most forcefully to Miller's equal protection claim, it also has application to his complete lack of evidence and testimonial specificity that would

6

establish his having made a nitrogen hypoxia election in June 2018. Miller's assertion of attorney–client privilege is a direct indication that if any such communication was made, it was with the expectation that it would remain confidential and not be communicated to third parties. As Miller bears the burden of proof in this case, and in his pursuit of injunctive relief, this means that legal communications will not be a source of evidence in this matter.

As to Miller's equal protection claim, the invocation of the privilege indicates his decision to refrain from making the type of limited waiver of the privilege in this case that inmate Jarrod Taylor made in the Alabama Supreme Court in 2019. This decision highlights and cements that Taylor's situation was markedly different than Miller's. Taylor had corroborating evidence of his claim of having made a timely election. Miller has none and has now indicated that even if he did have privileged evidence similar to Taylor, he does not intend to offer it in these proceedings.

Finally, Miller's equal protection and Eighth Amendment claims are due to be dismissed for the reasons set forth in the Defendants' motions to dismiss pending before the Court. (Doc. 21 at 14–24; Doc. 30 at 19–30; Doc. 35 at 14–17.) The entitlement of Defendants to dismissal of these claims for relief on Rule 12(b)(6) grounds illustrates that Miller cannot show a likelihood of success on the merits warranting injunctive relief.

## II. Miller's request for injunctive relief is due to be denied under the doctrine of laches.

Earlier this year, the Supreme Court once again emphasized that federal courts should not "for a moment countenance 'last minute' claims relied upon to forestall an execution." *Nance v. Ward*, 142 S. Ct. 2214 (2022). The Court recognized that the statute of limitations governing § 1983 lawsuits, discussed in the previous section, is one important aspect of protecting states against manipulative inmates seeking to hinder the timely enforcement of their sentences. That recognition reaches back to the Court's 2006 instruction to federal courts to "apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Miller's lawsuit was brought thirty days prior to his scheduled execution. As noted in the State's partial opposition to Miller's request for expedited discovery (Doc. 33), in early August, Miller indicated that he was being told by his counsel that he would have to "wait" to file this legal challenge. (Docs. 33-1, 33-2, 33-3.) That fact alone suggests a dilatory filing that "leaves little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out." *Grayson v. Allen*, 491 F.3d 1318, 1326 (11th Cir. 2007) (quoting *Jones v. Allen*, 485 F.3d 635, 640 (11th Cir. 2007)).

Here, however, the Court should not be faced with even "little doubt" about Miller's purpose. During his deposition, Miller authenticated a phone call made to his brother in April 2022. In that call, Miller told his brother that he had called his lawyers and "told them that they need to call the Equal Justice [Initiative] and stuff, and the public [Federal] defenders, that they might be able to halt, put a hold on" his execution. When directly asked if he would be satisfied with entry of a preliminary injunction that resulted in his execution by nitrogen hypoxia on September 22, 2022, Miller said he did not think such an outcome would be "fair." Instead, he said he wanted all other inmates who elected nitrogen hypoxia "before" him to be executed. When asked if it would be a problem for ADOC employees to check the fit of a mask on his face, or whether he would voluntarily cooperate, Miller replied that it would be a problem. Miller indicated that he did not think he should be executed by nitrogen hypoxia until the State of Alabama received permission to proceed with such executions from an "independent" evaluator.

Miller's responses are highly relevant to Defendants' assertion of laches. Preliminary injunctive relief as to prison conditions "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). In this case, the most narrowly drawn, least intrusive means to correct the alleged harm—the supposed negligent loss of Miller's nitrogen

9

hypoxia election form—would be an order prohibiting Miller's execution by any means other than nitrogen hypoxia. Miller, however, wants any injunction to respect his claimed election, but also to prohibit his execution by nitrogen hypoxia until inmates who elected "before" him are executed and until an "Independent" expert approves of Alabama's nitrogen hypoxia system. In short, Miller wants to prevent his execution from occurring on September 22, 2022.

## CONCLUSION

Defendants oppose the injunctive relief requested by Miller and, for the above-mentioned reasons, preliminary injunctive relief should be denied. In the event the Court determines that preliminary injunctive relief is warranted, any injunction should be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). In this case, such an injunction would be limited in scope so as to permit Miller's September 22, 2022, execution to be conducted by nitrogen hypoxia.

Respectfully submitted,

Steve Marshall
*Attorney General*
BY—

*s/ James R. Houts*
James R. Houts
*Deputy Attorney General*

*/s Audrey Jordan*
Audrey Jordan
*Assistant Attorney General*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2022, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which shall cause the same to be transmitted to all counsel of record.

*s/ James R. Houts*
James R. Houts
*Deputy Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Office (334) 353-1513
Fax (334) 353-8400
James.Houts@AlabamaAG.gov