# Exhibit 19

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF ALABAMA

 3                        NORTHERN DIVISION

 4

 5      MATTHEW REEVES

 6             Plaintiff,

 7         v.                        CASE NO:  2:20-CV-27-RAH

 8      JEFFERSON DUNN, et al.,

 9             Defendants.

10      *************************************************

11                        MOTION HEARING

12      *************************************************

13         BEFORE THE HONORABLE R. AUSTIN HUFFAKER, JR., UNITED

14      STATES DISTRICT JUDGE, at Montgomery, Alabama, on Thursday,

15      December 9, 2021, commencing at 8:34 a.m.

16                           APPEARANCES

17      FOR THE PLAINTIFF:      Mr. Spencer Jay Hahn
                                Ms. Allyson Renee DuLac
18                              Mr. John Anthony Palombi
                                Ms. Lucie T. Butner
19                              FEDERAL DEFENDERS
                                817 South Court Street
20                              Montgomery, Alabama  36104

21

22      FOR THE DEFENDANTS:     Mr. Richard Dearman Anderson
                                Ms. Beth Jackson Hughes
23                              Ms. Polly Spencer Kenny
                                OFFICE OF THE ATTORNEY GENERAL
24                              Capital Litigation Division
                                501 Washington Avenue
25                              Montgomery, Alabama  36130
```

PL EX 19

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0455

```
1      ************************************************************

2                  Proceedings reported stenographically;

3                    transcript produced by computer

4      ************************************************************

5          (The following proceedings were heard before the Honorable

6   R. Austin Huffaker, Jr., at Montgomery, Alabama, on Thursday,

7   December 9, 2021, commencing at 8:34 a.m.)

8          (Call to order of the Court.)

9              THE COURT:  You can be seated.

10             All right.  Let's go ahead and take appearances this

11  morning.  For Mr. Reeves?

12             MS. DULAC:  Allyson DuLac on behalf of Matthew Reeves.

13             MR. HAHN:  Spencer Hahn on behalf of Matthew Reeves.

14             MR. PALOMBI:  John Palombi on behalf of Matthew

15  Reeves.

16             MS. BUTNER:  Lucie Butner on behalf of Matthew Reeves.

17             THE COURT:  It's good to finally see some faces.  I

18  know we've talked on the telephone a few times over the past

19  year.

20             Okay.  For DOC defendants?

21             MS. HUGHES:  Beth Hughes.

22             MS. KENNY:  Polly Kenny.

23             MR. ANDERSON:  Richard Anderson.

24             THE COURT:  All right.  I've got really three motions

25  today.  Two are discovery related.  One is the preliminary
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0456

1    injunction.

2            Let me ask you, on the preliminary injunction,

3    obviously we're going to have a witness here by video.  Who is

4    that going to be?

5            MS. BUTNER:  That's Dr. Kathleen Fahey, Your Honor.

6            THE COURT:  Any other witnesses from your end today?

7            MR. HAHN:  Yes, Your Honor.  We'll be calling Richard

8    Lewis.

9            THE COURT:  He's the ADA coordinator?

10           MR. HAHN:  Yes, sir.

11           Isaac Moody, who's a correctional officer; Jeff

12   Emberton, who is a correctional captain; Deidre Prevo, she is

13   with the ADOC; Cheryl Price, also with the ADOC; Lori McCulloch

14   with the ADOC; and Cynthia Stewart, also with the ADOC.

15           Thank you, Your Honor.

16           THE COURT:  Okay.  How about from DOC's end?

17           MS. HUGHES:  Judge, we may call -- we are calling Jody

18   Stewart from the Department of Corrections, and we may call Mr.

19   Palombi.  That's it.

20           MR. ANDERSON:  In addition to -- it's possible that we

21   might call one of the witnesses identified by the plaintiff if

22   they don't end up calling them.

23           THE COURT:  Now, you said Mr. Palombi.  What would be

24   the purpose for calling him?

25           MR. ANDERSON:  Your Honor, the purpose of calling

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0457

1  Mr. Palombi would be to inquire into one issue that's kind of

2  threaded throughout this case, which is the origin of the

3  election form and how it got to Holman Prison.  It is -- as

4  plaintiff has acknowledged, it is a form that was prepared by

5  the Federal Defenders, and part of this Court's inquiry is into

6  whether the form itself, distribution of the form, was a

7  program.

8         I think a relevant factor in that is the question of

9  where the forms came from.  We would like to see -- you know,

10  we've done some investigation on our end and haven't been able

11  to determine where the forms that were distributed came from,

12  and we wanted to inquire of Mr. Palombi, who was one of the

13  people who took them to Holman, about that process.

14         Also, there's a secondary issue in this case which

15  deals with the question of Mr. Reeves' ability to read.

16  Mr. Reeves, in his complaint, has put into issue the question

17  of whether he has the ability to read, and we believe that

18  Mr. Palombi may have some relevant information regarding

19  reading materials that if there were any privilege to it, it

20  would be waived by injecting the issue into the lawsuit.

21         THE COURT:  Have you two talked about calling

22  Mr. Palombi?

23         MR. ANDERSON:  We, a week ago during our informal

24  telephone conference, brought up the fact that we may be

25  calling Mr. Palombi.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0458

1          THE COURT:  Mr. Palombi?

2          MR. PALOMBI:  Your Honor, while Mr. Anderson is

3   correct that a week ago they mentioned it, there had been no

4   reference to, again, any discussion about any of those topics

5   until just now.  This is the first time we're actually hearing

6   the topics that they suggest that I would testify on.  In fact,

7   we didn't learn until 4:40 yesterday afternoon that they were

8   actually continuing to think to call me.

9          We would object.  Where that form came from is --

10  obviously, that form was prepared for our clients, and

11  therefore we would object on work product privilege.

12         And as for anything concerning my discussions with

13  Mr. Reeves or whether -- or my observations with Mr. Reeves, we

14  certainly have not waived any of those subjects by the fact

15  that we question whether Mr. Reeves can read a specific form.

16  Rather, this is about his ADA disability.  This is about

17  whether he has a cognitive disability that would have prevented

18  him from reading that form.

19         My knowledge is absolutely gained through this

20  representation and would be privileged, and we would object to

21  me being called in any way, shape, or form, particularly as I

22  am also counsel of record for Mr. Reeves and have been counsel

23  of record for Mr. Reeves since this case began.

24         THE COURT:  Would it be correct that each and every

25  occasion in which you met with Mr. Reeves in person or spoke

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0459

```
 1   with him on the telephone, you were acting in an

 2   attorney-client relationship capacity?

 3           MR. PALOMBI:  Yes, Your Honor.  We've met with him at

 4   Holman, I have had phone conversations with him, and those were

 5   all as attorney-client.

 6           THE COURT:  Okay.  Well, we'll get more into the weeds

 7   on this later.

 8           Is there something else on this, Mr. Anderson, that

 9   you want --

10           MR. ANDERSON:  Yes, Your Honor.  Just briefly, a

11   couple of things.

12           One, during our phone conference we did discuss that

13   we wanted to inquire into the origins of the form and how it

14   was created, how it got to Holman Prison.

15           A couple other things I'd like to point out --

16           THE COURT:  What's the relevance of that?  Because

17   you've been down this road already in the Smith case to some

18   extent, and at least from my observation of what's been filed

19   with me is that Federal Defenders drafted this form, presented

20   it to their clients.  Obviously they probably sat down and

21   talked about it with some of their clients, maybe not with

22   others.  But your client gave an order or a directive or an

23   instruction from Montgomery -- we don't know who it was,

24   necessarily -- down to Holman, and from there the form was

25   copied, what, 50 times, put in an envelope, and then handed out
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0460

1    to everybody on death row.

2            Isn't that -- I mean, that's undisputed, isn't it?

3            MR. ANDERSON:  Well, that's just it, Your Honor.

4    We've come across some evidence that suggests that the form was

5    not copied by ADOC, and in fact, the Federal Defenders may have

6    brought enough copies of the form for everyone on death row,

7    not simply their clients, and that's the evidence that I want

8    to ask --

9            THE COURT:  Well, did your client make the decision to

10   put these forms in the hands of everybody on death row?

11           MR. ANDERSON:  Yes, Your Honor.  Ms. Stewart is the

12   one who directed Captain Emberton to distribute it.

13           THE COURT:  And the purpose of that was to assist

14   these individuals who were on death row who fell within the

15   30-day election window, to assist them with the ability to make

16   the election timely if they so chose?

17           MR. ANDERSON:  I can't speculate as to what the

18   purpose was or certainly not testify as to what the purpose was

19   at this point.  I know that that was done, Your Honor.  We

20   simply believe that it was relevant to determine how -- you

21   know, if these were passed out, if these were forms that were

22   delivered to the prison by another entity, I thought that could

23   affect the calculus of whether this was a program.

24           THE COURT:  It seems to me if we're going to talk

25   about relevance, the real inquiry is why your client did what

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0461

1    it did.  Because when I look at it, I know we can argue about

2    whether it was a service or a program, but they were trying --

3    they did decide to do it.  And when they decided to do it, they

4    stepped into the world of the ADA, and we probably wouldn't be

5    here today and we probably wouldn't have been having the

6    disputes -- or at least Judge Marks wouldn't have been having

7    the disputes in the Smith case that she did had DOC never

8    handed those forms out.  But unfortunately, what's been done is

9    done and ADOC's having to deal with the consequences of that.

10          MR. ANDERSON:  And the second part of the thing I

11   wanted to add to this, Your Honor, is regarding waiver of

12   privilege.  Much like in the Strickland case, ineffective

13   assistance of counsel case where a plaintiff or petitioner in

14   those cases puts into question the effectiveness of his counsel

15   and puts things having to do with representation into

16   controversy, you can have a limited waiver of the privilege to

17   the extent that it's relevant.  We think that it's in this case

18   a very narrow, very narrow waiver.

19          One of the things we would like to ask Mr. Palombi

20   about is manifestly not an attorney-client communication.  It

21   has to do with reading material that is not related to this

22   case.

23          The second issue is that if plaintiff is contending

24   that he's unable to read or has limited reading ability, we

25   just really believe that it is very highly relevant, the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0462

1   question of whether he has -- you know, what he's been reading

2   and whether he has reading materials provided to him, wherever

3   the source is from.  And in this case we've, again, found some

4   indications that he may have received non-case-related reading

5   materials from counsel, which we think is relevant.

6          THE COURT:  Is the evidence going to be that the form

7   that was handed to him, that it came from DOC or from

8   Mr. Palombi?

9          MR. ANDERSON:  As to the first point on the

10  distribution, no, Your Honor, we do not have any evidence that

11  Mr. Palombi handed Mr. Reeves a form.

12         THE COURT:  We'll talk about it later.  I think you've

13  got an uphill battle on being able to ask Mr. Palombi those

14  kinds of questions.

15         MR. ANDERSON:  Okay.

16         THE COURT:  And if you've got some case law to support

17  it, I'll take a look at it, but I do think you've got an uphill

18  battle on it.

19         Okay.  Let's talk about these two discovery motions.

20         First, Mr. Anderson, on the motion to limit discovery,

21  I've read through it.  You've got this request that's

22  triggered -- was it OIT with the State that goes and pulls all

23  these e-mails, and you've got at least 50,000 hits?

24         MS. HUGHES:  Yes, sir.

25         THE COURT:  And you're having to go through all of

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0463

1    those?

2            MS. HUGHES:  Correct.

3            THE COURT:  Because there are lawyers who have had the

4    last name Reeves, among other things.

5            MS. HUGHES:  There was a correctional officer who had

6    the name Reeves.  It was overwhelming.

7            THE COURT:  So what has been produced so far?

8            MS. HUGHES:  We have produced 325 e-mails.  We

9    withheld 155 as privileged, and we've provided the privilege

10   log to the plaintiffs.  That left us with 1,721 e-mails.  640

11   of those, I think -- it's either 640 or 670 -- were cube

12   e-mails that we would not turn over.  We have not had an

13   opportunity to review them all, but those are something that we

14   would not turn over because they're a security risk.

15           We've got 634 of the Holman agenda e-mails.  That's a

16   daily use letter which contains menus, updates on facility

17   rules, and a copy of the daily activities list.

18           We've got 408 mental health e-mails with a list of

19   appointments for each inmate for that day, and that would, of

20   course, require extensive redactions because of the other

21   inmates that are listed on that.

22           We have 106 daily activities e-mails, and that also

23   includes inmates who have medical appointments who would also

24   have to be redacted, the random inmate drug test sheets,

25   mailroom logs of mail received by the inmates, and single walk

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0464

1   list.  And a lot of that would also have to be redacted.

2          THE COURT:  So is the issue at this point redaction of

3   e-mails?

4          MS. HUGHES:  And just going through the -- still going

5   through the 1,721.  We would also, if we were going to produce

6   this, we would have to copy each e-mail, we have to Bates stamp

7   each e-mail, they have to be redacted, and then another

8   privilege log created.

9          THE COURT:  So this is not a circumstance -- when I

10  stepped out here, I was thinking there's 50 or 60,000 e-mails

11  that still need to be searched through.  You've done that

12  search.  You've now --

13         MS. HUGHES:  Narrowed it.

14         THE COURT:  -- put them in buckets, whether you call

15  them cube logs or mental health.

16         MS. HUGHES:  Right.

17         THE COURT:  So really what we're talking about is the

18  time and the effort that it takes to go through those, redact,

19  print them, et cetera.

20         MS. HUGHES:  Right.  And we think that there's very

21  little relevance to the plaintiff's case.

22         THE COURT:  Well, what you may think is relevant or

23  not relevant may be -- you know, opinions differ on that.

24         MS. HUGHES:  Right.

25         THE COURT:  Are you still undertaking efforts to

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0465

1    review and produce those records?

2          MS. HUGHES:  We have not done that.

3          THE COURT:  You have not?

4          MS. HUGHES:  We have not continued to do that.

5          THE COURT:  Why is that?

6          MS. HUGHES:  Because we've been preparing for the

7    hearing, and we've got attorneys that were -- the attorneys

8    that were doing that have an Eleventh Circuit brief due and a

9    hearing next week herself.

10          THE COURT:  Well, just because you've got this hearing

11   and because you have other work going on is not an excuse to

12   bring things to a halt.

13          When you were reviewing the e-mails, who was involved

14   in that?

15          MS. HUGHES:  Lauren Simpson.

16          THE COURT:  Okay.  Is she still involved?

17          MS. HUGHES:  Yes.

18          THE COURT:  Who on your side wants to respond?

19          MS. DULAC:  Your Honor, I think really you've touched

20   upon kind of the key issue, which is that, one, you know, it's

21   not as though we filed a motion to compel, and we're not

22   claiming that they have failed to turn something over timely.

23   It's that they have said they're not going to turn these things

24   over because they didn't think they are useful or that they are

25   material to us.  And my response has always been to Ms. Hughes,

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0466

1  we make that determination whether they're useful to us or not.

2  I mean, I certainly could walk through this list and tell you

3  why they could be useful to our case.

4            THE COURT:  All right.  Why don't you do that.

5            MS. DULAC:  Well, the daily activities, as far as

6  Mr. Reeves' medical appointments, I mean, did he see mental

7  health?  On what day?  For what?  You know, mental health is at

8  issue here.

9            Did he -- you know, the Holman agenda, what did he do?

10  They raised an issue in their reply about Project Hope.  What

11  knowledge did he have regarding the nitrogen hypoxia in

12  meetings that they had?

13            The inmate drug test.  They've submitted an affidavit

14  that said that he was -- you know, they believe that he was

15  selling narcotics.  Is he a narcotics user?

16            I mean, the mail room, legal mail.  Was he receiving

17  legal mail?  They assert that he could have talked to his

18  lawyer.  What day did he get legal mail?

19            I mean, besides that, what I would say is that in the

20  Smith case, for example, they produced all these documents to

21  us pursuant to a confidentiality that we have signed.

22            THE COURT:  Were these documents produced in the Smith

23  case, Ms. Hughes?

24            MS. HUGHES:  I'm not -- I don't know the answer to

25  that, Judge.  I produced everything --

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0467

1          THE COURT:  Will a confidentiality order address some

2     of your concerns at least as it relates to the information that

3     you want to redact?

4          MS. HUGHES:  Sir?  I'm sorry.

5          THE COURT:  Would a confidentiality order -- maybe

6     there's one already entered in the case, but --

7          MS. HUGHES:  I don't think so, Judge, because we still

8     have to review them for relevance and privilege, and I can't

9     just turn over DOC records that we have not reviewed.

10          And as far as the mental health files, that's all in

11     his institutional file, which we have turned over to the

12     plaintiffs.

13          THE COURT:  Does DOC maintain logs, for example, that

14     show if Mr. Reeves attended some meetings by Project Hope?

15          MS. HUGHES:  They do not.

16          THE COURT:  They do not maintain those logs?

17          MS. HUGHES:  They do not have -- they do not keep a

18     record of who attends.

19          And another thing, Judge, when we -- on December 1st

20     when we first talked to the plaintiffs, we didn't ask -- we

21     asked that they help us narrow the search, and what we got was

22     useless, basically, because they said to start in 1998.  Well,

23     that's when he entered the prison, and we have all those

24     e-mails.  And also to search all the relevant people at Holman.

25     That's 23 years' worth of people who have had contact with Mr.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0468

1    Reeves since he's been incarcerated.

2          THE COURT:  Well, I think what we're going to be

3    hearing about today is his lifetime of interactions with the

4    mental health system, so whether he's been in the system 23

5    years or 2 years, it seems to me it's all kind of fair game and

6    somewhat relevant.

7          Part of the problem, at least my observation, is that

8    these requests have been made, but the time window for

9    production is so narrow that I think both of y'all -- both

10   parties are at fault for the timeframe because this lawsuit's

11   been going on since 2020, and the discovery request should have

12   been -- could have been made last year.

13         Flip side, you know, the State's the one that asked

14   for the death warrant to be issued knowing that this lawsuit

15   was out there.  And when they did that, it doesn't take a

16   rocket scientist to know that it's going to require everybody

17   to devote the manpower to litigate the issues that are going to

18   come with this.

19         So here's what I'm going to do at least with respect

20   to that.  I want DOC to continue reviewing these records.  I

21   want you to devote the appropriate time to review these

22   records, meaning no sandbagging on it.  If Ms. Simpson is the

23   one tasked with reviewing these, then that's going to be what

24   she needs to -- start when she gets to work in the morning, and

25   that's what she's going to do all day until it's time to go

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0469

1    home.

2            And then at the end of every day, I want there to be a

3    production to Mr. Reeves' side as to what is ready to be

4    produced in terms of a redacted form, and I want this going on

5    every day.

6            MS. HUGHES:  Yes, sir.

7            THE COURT:  And then I want a certification or

8    something filed with me so that I can monitor and make sure

9    that your end is doing what they're supposed to be doing.

10           MS. HUGHES:  Yes, sir.

11           THE COURT:  And that means if there is a log that's to

12   be -- if you're maintaining a privilege log and you're updating

13   it daily, turn that over.  That way we can just keep this

14   moving on a rollout basis.  I don't see there being any other

15   way to kind of move through these kind of records.

16           MS. HUGHES:  Yes, sir.

17           THE COURT:  Ms. DuLac, anything else on that

18   particular issue?

19           MS. DULAC:  No, Your Honor.  Thank you.

20           THE COURT:  Okay.  The other issue is the 30(b)(6)

21   deposition.  I've read it.

22           Is there anything else -- Ms. DuLac, you filed the

23   motion -- that your end wants to say on the 30(b)(6) deposition

24   of Ms. Price?

25           MS. DULAC:  Your Honor, the only other thing I would

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0470

1   say is, as you point out, we are in a very compressed

2   timeframe.  I understand that.  And that's why we only asked

3   for one deposition when we asked for expedited discovery, and

4   we did so because we had not previously had a Rule 30(b)(6)

5   deposition in this case or in Mr. Smith's case.  And as you can

6   see today and probably will see going forward, there is a lot

7   of discrepancies in what witnesses have testified and what the

8   theory is from the defendants regarding events that have

9   happened at Holman over the years, like the distribution of

10  forms and so on.  And so it was very important to us to have

11  the deposition testimony from a 30(b)(6) witness to bind the

12  Department.

13          THE COURT:  Here's the problem I've got, okay.  It may

14  have been Mr. Palombi that said it on a telephone call that you

15  all are not ADA lawyers -- maybe Mr. Hahn.  I don't want to put

16  words in Mr. Palombi's mouth.

17          MR. HAHN:  No, Your Honor.  I profess my ignorance a

18  lot, and that was me.

19          THE COURT:  Your 30(b)(6) notice was not a compliant

20  30(b)(6) notice.  It did not contain a list of topics that I

21  would typically expect there to be.  So when I read through

22  your motion and then I read through the deposition where you

23  criticize DOC's witness for not being prepared to answer

24  certain questions, the first thing I started looking for is the

25  30(b)(6) notice and the list of topics that went along with it,

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0471

1   and there wasn't.  So I have a hard time seeing how you can

2   criticize DOC for putting up a witness who is unable to address

3   particular topics when those topics were never specifically

4   asked for to begin with.

5       MS. DULAC:  Your Honor, if I could address that just

6   for a moment.  And I agree; it was a very generic 30(b)(6)

7   notice.  However, it was filed with our motion to expedite, and

8   the defendants did not file any objection to it.  When you

9   issued your order and you granted us the ability to serve it on

10  them, they didn't file any objection.  When we had our meet and

11  confer conference in advance of the deposition, they did not

12  file -- they did not raise any objection.

13      They are the ones that advised us they were going to

14  produce Ms. Price and that she would be able to speak on behalf

15  of the Department.  And so to halfway through the deposition

16  then say, well, your deposition notice wasn't appropriately

17  specific I think is not necessarily in good faith.  And if that

18  was the objection, then you would object and allow the witness

19  to answer that she didn't know.  But instead, Mr. Anderson

20  objected and instructed the witness not to answer, and that is

21  improper.

22      THE COURT:  What question did he actually instruct her

23  not to answer?  Because I didn't really see a flat-out

24  instruction like that.  I thought I saw at least on some of

25  those "to the extent you know, you can answer," but we're not

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0472

```
 1   going to get in there and argue about admissions and denials

 2   with respect to allegations made in your complaint.  You know,

 3   because answers are -- those are not drafted up by clients.

 4   They're drafted up by lawyers and it's work product, and

 5   usually it's a culmination of the lawyer's knowledge base that

 6   that lawyer is getting from a variety of sources.  But I didn't

 7   necessarily see a question that was asked that was

 8   fact-specific.  It seemed to me that you were just arguing with

 9   the witness.

10        MS. DULAC:  Well, what I asked Ms. Price was about her

11   answer or the Department's answer where they made the

12   statement, "Defendants deny that Reeves' placement was due to

13   any intellectual/cognitive deficiency."

14        I mean, that's a factual statement and it's not, by

15   the way, even really responsive to the complaint.  The

16   allegation in the amended complaint was Mr. Reeves was placed

17   in special education classes.  That's it.  One sentence.

18        THE COURT:  Well, here's why I say it's argumentative,

19   because that's not necessarily knowledge or a burden of proof

20   that the DOC has.  That's really more of an evidentiary

21   allegation -- or a factual allegation from your end.  I'm

22   struggling with why you were quarrelling with the DOC witness

23   over something that's really your burden of proof.

24        But here's going to be my ruling on the motion.  I'm

25   going to deny it.  I don't think it was a proper 30(b)(6)
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0473

1    notice.  The burden is on you to provide a proper 30(b)(6)

2    notice on it, and when you send a very nonspecific one, it does

3    not surprise me at all that you're going to get "I don't know"

4    answers or "I can't answer that" to particular categories of

5    questions if you never asked for those to begin with.

6         Now, I understand we may hear from Ms. Price today,

7    and you can ask some of those questions again today and we'll

8    just kind of go along with that.  A lot of those questions -- I

9    think some of the questions you were asking of Ms. Price were

10   questions that really would have been more appropriate to ask

11   of an ADA coordinator that I think you're going to call as a

12   witness today, so you may very well get the answers that you

13   were seeking to begin with.

14        Anything else on those two discovery motions?

15        MS. DULAC:  Your Honor, what I would say is that today

16   the defendants have provided us with notice that the person

17   they're going to put on for the Department with the most

18   knowledge of the defendants' answer, affirmative defenses, and

19   discovery responses are Ms. Price.

20        THE COURT:  Okay.

21        MR. ANDERSON:  And may I speak on that briefly, Your

22   Honor?  This is in regard to a notice they provided us

23   yesterday about wanting to call 30(b)(6) witnesses.  And I

24   think Your Honor has already got the point I was going to make,

25   which is that we as counsel have independent knowledge that the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0474

1   defendants don't have.  Counsel in answering a pleading has a

2   duty under Rule 11 to make sure that the factual allegations

3   and the admissions are founded on the evidence and that denials

4   are founded on the evidence.

5           There are many objective allegations of fact in the

6   answer that are based on information -- and, you know, that

7   call for information outside of the knowledge of ADOC.  And

8   counsel in their duty to the Court and just out of even just

9   sheer judicial economy as a practical matter, if we know

10  there's evidence of something that's alleged in a complaint,

11  we're not going to deny it just because our client doesn't have

12  information on it.

13          So in this case I do want to make sure -- I think the

14  Court gets this -- that the State does not contend -- excuse

15  me.  The defendants do not contend that Ms. Price has full

16  knowledge of the factual basis of every denial or admission in

17  the complaint, but she is familiar with the fact that counsel

18  assisted in drafting this document, if that makes any sense.

19          THE COURT:  Well, here's my point on it.  Ms. DuLac,

20  if you wanted a 30(b)(6) witness from DOC to testify to

21  particular factual assertions in the answer, that should have

22  been set out in the notice to begin with.  That way they can go

23  track down the particular witness who can address those

24  questions, whether it's how many ADA claims have been filed on

25  the cell block or who the ADA coordinator is, whatever it is.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0475

1   I think it begins with an obligation on your end to properly

2   identify it, even if they don't call you out later.  So that's

3   why I'm denying that motion.

4           Okay.  Anything else on discovery issues?

5           Okay.  Mr. Hahn, Mr. Palombi, I don't know who's

6   taking the lead on your end, but this is your motion for

7   preliminary injunction, so we can move into that.

8           MR. HAHN:  Yes, Your Honor.  I believe that Ms. Butner

9   is going to examine Dr. Fahey.  Thank you, Your Honor.

10          THE COURT:  So we're going to begin with Dr. Fahey; is

11  that correct?

12          MS. BUTNER:  Mr. Reeves, the plaintiff, calls

13  Dr. Kathleen Fahey.

14                    DR. KATHLEEN FAHEY

15          The witness, having been duly sworn to speak the

16  truth, the whole truth and nothing but the truth, testified as

17  follows:

18          THE COURT:  Let me ask this while it's sticking in my

19  mind.  Has Mr. Reeves been given the Beta III test by anybody

20  at any time?

21          MR. ANDERSON:  Not that the defendants are aware of,

22  Your Honor.

23          THE COURT:  Okay.

24          MR. HAHN:  Not that we're aware of, Your Honor.

25          THE COURT:  Okay.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0476

1   short because of what's going on today, so if I can get out

2   there and do what I need to do at 11:30, I can be back here

3   pretty quick.

4          MR. HAHN:  Thank you, Your Honor.  And again, I don't

5   want to rush --

6          THE COURT:  I've set aside the entire day today for

7   this.

8          MR. HAHN:  Thank you, Your Honor.  I appreciate it.

9          THE COURT:  Okay.

10          MR. HAHN:  We will call Issac Moody.

11          And, Your Honor, just to be clear, now that we're

12   getting into fact witnesses, we're going to invoke the rule to

13   the extent anyone's in the courtroom.

14          THE COURT:  The rule is invoked.  I don't see anybody

15   else in here.

16          MR. HAHN:  Thank you, Your Honor.

17          THE COURT:  If you all see somebody that's going to be

18   a witness come in here, I'll have to defer to you to call it to

19   my attention.

20          MR. HAHN:  Absolutely, Your Honor.  Thank you.

21                          ISSAC MOODY

22          The witness, having been duly sworn to speak the

23   truth, the whole truth and nothing but the truth, testified as

24   follows:

25                       DIRECT EXAMINATION

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0477

1   BY MR. HAHN:

2   Q.   Good morning, Mr. Moody.

3   A.   Good morning.

4   Q.   Would you please state and spell your name for the record.

5   A.   Issac Moody.  I-s-s-a-c, M-o-o-d-y.

6   Q.   Mr. Moody, do you recall signing an affidavit concerning

7   the Mr. Reeves -- the Matthew Reeves case?

8   A.   Yes, sir, I do.

9   Q.   Okay.  And that was on November 19th?

10  A.   Yes, sir.

11  Q.   Of this year?

12  A.   Uh-huh.

13  Q.   Did you read it carefully before you signed it?

14  A.   I did.

15  Q.   Okay.

16      MR. HAHN:  I'm going to go ahead and put up on the

17  Elmo what is in the record as Document 42-8.

18  Q.   Mr. Moody, if you could look at this.  Does this appear to

19  be the document that you signed?

20  A.   Yes, sir, it is.

21  Q.   Okay.  Mr. Moody, I'm a little bit confused.  In this

22  document, your name is spelled -- your first name is spelled

23  with one S and two A's, and just now you spelled it with two

24  S's and one A?

25  A.   Well, I guess I -- that's an oversight of mine, but my

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0478

1  name is spelled with two S's.

2  Q.   All right.  And in fact, throughout this document, would

3  you dispute the representation that throughout this document

4  your first name is spelled with one S and two A's?

5  A.   Yeah.  It's spelled with two S's.

6  Q.   All right.  Did you type the document or did someone else

7  type it?

8  A.   Somebody else did it.

9  Q.   Okay.  And can you just briefly describe how you came to

10  write the affidavit?

11  A.   How did I come to write it?

12  Q.   Well, just -- I mean, I'm assuming that nobody just showed

13  up one day with a prewritten affidavit for you?

14  A.   No, they didn't.  They didn't.

15  Q.   Okay.

16  A.   I was questioned about -- I was asked some questions about

17  Inmate Matthew Reeves.

18  Q.   Okay.  What sorts of questions?

19  A.   Did I have any -- about my interaction with him, did I

20  know him, and as my affidavit state, I have dealt with him for

21  a number of years.

22  Q.   Okay.  And based on those conversations that you had, this

23  affidavit reflects what you told the person?

24  A.   It does.

25  Q.   Okay.  And who was the person you told this to?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0479

1    A.   A State's attorney.  One of the Department of Corrections

2    attorneys.

3    Q.   Okay.  So a Department of Corrections attorney?

4    A.   Yeah.

5    Q.   Could it have been Jody Stewart?

6    A.   Yes, sir.

7    Q.   Okay.  So you have been a correctional officer at Holman

8    since 2000?

9    A.   April 2000.

10   Q.   April 2000.  And you were -- have you always been assigned

11   to Holman Correctional?

12   A.   All of my career.  All of my 21 and a half years.

13   Q.   Okay.  Is that because you like Holman particularly?

14   A.   Not particularly because I like it.  That's where I work

15   and that's where I make my living at.

16   Q.   Got you.  And do you have a long commute to get there?

17   A.   I do.  My hometown is like 75 miles from Holman, but I

18   live on state property.

19   Q.   Okay.  Excellent.  And at one point Holman had more

20   inmates than it does now, right?

21   A.   It did.

22   Q.   And can you tell us when that changed?

23   A.   That changed -- a couple of years ago it changed from like

24   900 to about -- we house about 300 now.

25   Q.   And that consists of death row of about 160?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0480

1    A.    Yeah, 160.

2    Q.    And the honor dorm of the remainder?

3    A.    Yeah.  And Echo Unit, the remainder of the inmates, they

4    work in the -- like the tag plant and the sewing factory.

5    Q.    And I am not from Alabama, so when I first got here and I

6    heard tag, I couldn't understand what that meant.  Those are

7    license plates?

8    A.    They make license plates.  Every license plate in the

9    state of Alabama is made at Holman.

10   Q.    I did not know that.  Would you say that most of your time

11   has been spent on death row during your career?

12   A.    About 20 -- a little over 20 years of my time spent at

13   Holman was on segregation and death row.

14   Q.    Okay.  And so segregation was for those general population

15   inmates who are not on death row but were behavioral problems

16   or otherwise needed to be isolated?

17   A.    Yes, sir.

18   Q.    And were they housed in the same general location as death

19   row?

20   A.    No, sir.  They were in different buildings.

21   Q.    Okay.  Were death row inmates ever in segregation?

22   A.    Sir?

23   Q.    Were death row inmates ever in segregation in the area

24   where general population segregation was?

25   A.    No, sir.  Not until recently.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0481

1    Q.   Okay.

2    A.   Recently it has -- what was the segregation unit now,

3    that's where the death row inmates are housed.

4    Q.   Got you.

5    A.   It used to be segregation.

6    Q.   Before you came to work for Department of Corrections,

7    what did you do?

8    A.   I worked several jobs.  I was like a -- the last job

9    before the Department of Corrections, I worked for Honda

10   Al-Lock, which made locks.  And before that I had my own little

11   trucking business.

12   Q.   Okay.  At like a long-haul trucking?

13   A.   No, sir.  I didn't do long hauls.  I just did like only in

14   Alabama.

15   Q.   Okay.  And where was the Honda Lock America located?

16   A.   Selma, Alabama.

17   Q.   And that's where Mr. Reeves is from, right?

18   A.   Yes, sir.

19   Q.   Did you know Mr. Reeves at all before this?

20   A.   I did not.

21   Q.   Do you know any of his family?

22   A.   I did not.

23   Q.   Okay.  Do you have any experience working in education?

24   A.   No, sir.

25   Q.   Do you have a degree in any sort of academic subject?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0482

1    A.   No, I do not.

2    Q.   Okay.  Do you have any particular expertise in literacy?

3    A.   No, sir.

4    Q.   Okay.  What about psychology?

5    A.   No, sir.

6    Q.   Early childhood development?

7    A.   No, sir.

8    Q.   Okay.  Have you ever acted as maybe a volunteer to help

9    people learn how to read?

10   A.   No, I have not.

11   Q.   Okay.  In the course of your duties at Holman, have you

12   ever distributed legal mail?

13   A.   I have.

14   Q.   Okay.  Can you briefly describe how legal mail is

15   distributed?

16   A.   Legal mail is distributed -- you take the -- you take it

17   to his cell.  He signs for it.  He has to sign for it.  And

18   then you open it to make sure there's no contraband in it, but

19   you have to open it in his presence.

20   Q.   All right.  And you're not supposed to read it?

21   A.   No, sir.

22   Q.   You're just checking for anything that's not appropriate?

23   A.   Yes, sir.

24   Q.   Okay.  And is it unusual for a death row prisoner to

25   receive legal mail?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0483

1   A.   No, it's not.

2   Q.   Do they all pretty much receive legal mail?

3   A.   I wouldn't say all, but from time to time most of them

4   receive some from their attorneys.

5   Q.   Got you.  And do their cases tend to drag on?

6   A.   Their cases?

7   Q.   Yes.

8   A.   I'm not really sure how long their cases drag, but yeah.

9   Q.   But maybe an inmate will get a piece of legal mail one

10  year and then 10 years later he'll still be getting legal mail?

11  A.   It's possible.

12  Q.   And Mr. Reeves was already on death row in Holman when you

13  started in April of 2000?

14  A.   I can't really remember whether he was there when I got

15  there or not, but he's -- I know he's been there for a number

16  of years.

17  Q.   Got you.  And would you have any reason to dispute that he

18  arrived at Holman prior to your time?

19  A.   I'd have no reason to dispute it.

20  Q.   Okay.  You don't have a specific recollection of the first

21  time you met Mr. Reeves?

22  A.   I don't.

23  Q.   Okay.  And in your affidavit you state that you, quote,

24  "have frequently spoke and interacted with Mr. Reeves

25  throughout my time at Holman."

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0484

1   A.   That's correct.

2   Q.   Okay.  Can you tell us a little bit about what y'all talk

3   about?

4   A.   Just generally talking.  He may talk to me about

5   basketball.  Just general conversation.  Nothing specifically,

6   just -- because I communicate with all -- you know, I'm in

7   contact with all of them, so he may come up and just start

8   talking about anything.  Nothing specific.

9   Q.   Are you an Auburn or an Alabama fan?

10  A.   Neither.

11  Q.   Neither, okay.  Neutrality.  Do y'all ever talk about

12  sports rivalries or anything like that?  Is that the kind of

13  thing --

14  A.   I don't talk about -- I'm not a sports person, so I've

15  never talked -- you saying did I talk about that with Matthew

16  Reeves?

17  Q.   Yeah.

18  A.   No.

19  Q.   Okay.  But mostly you recall conversations about maybe

20  basketball and that sort of thing?

21  A.   Yeah.  Like out on the ball yard.  I take them out to the

22  ball yard where they exercise and stuff like that, so he may

23  just come talk of anything in general.  You know, just start

24  talking.

25  Q.   All right.  Anything particularly academic about what

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0485

1   y'all talk about?

2   A.   No, sir.

3   Q.   Okay.  So it's just general conversation?

4   A.   Just general conversation.

5   Q.   Is that different than any other inmate that you interact

6   with?

7   A.   No different than any other inmate.

8   Q.   Okay.  Do you typically talk about books?

9   A.   No, sir.

10  Q.   Okay.  Even with Mr. Reeves?

11  A.   No, sir.

12  Q.   Okay.  Now, also in your affidavit, you note that "from my

13  interactions with him, he appears to be able to read and

14  write."

15  A.   I have no reason to say that he can't read or write.  I

16  can't say that I've saw him doing it, but I've saw him with

17  writing material and stuff before in the past, so I would have

18  no reason to think that he couldn't.

19  Q.   But you haven't ever specifically seen him write

20  something?

21  A.   No, sir.  Not specifically.

22  Q.   And have you ever seen him specifically reading something?

23  A.   Not specifically.

24  Q.   So when your affidavit says that from your interactions

25  with him, quote, "he appears to be able to read and write" --

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0486

1   A.   He -- I always notice him have like some type material in

2   his hand, so I would have no reason to think that -- I never

3   saw him getting nobody else to write nothing for him.

4   Q.   And is it unusual to observe inmates on death row with

5   legal materials or legal mail?

6   A.   It's not unusual, no.

7   Q.   Would you estimate how many of the folks on death row do

8   not have any sort of written material in their cells?

9   A.   Very few.

10  Q.   Okay.

11  A.   Very few.

12  Q.   Would very few be fewer than five?

13  A.   Yeah.  It wouldn't -- not over five.  All of them got some

14  type material.

15  Q.   Now, when they're moved to segregation, they don't get to

16  take their materials with them, correct?

17  A.   When they do what, now?

18  Q.   When they get moved to segregation temporarily.

19  A.   When they get -- if he's not disruptive, they can still

20  take some stuff with them.

21  Q.   All right.  And your affidavit also notes that, quote,

22  "During my years at Holman, I've encountered inmates who I

23  would consider 'slow' or of low intelligence."

24  A.   I have.

25  Q.   Okay.  Were they on death row?

AM1983_0487

1    A.   Yes, sir.  There are some on death row.

2    Q.   Okay.  And are any of them still there?

3    A.   Yeah, it's some still there.

4    Q.   Okay.  Can you give me the names of those folks?

5    A.   No, sir, I can't.

6         MS. HUGHES:  Object.  Relevance to the names.

7         THE COURT:  You want him to identify inmates on death

8    row who in his opinion have low intelligence?

9         MR. HAHN:  Yes.  So that I can ask him to compare them

10   to Mr. Reeves, perhaps.

11        MS. HUGHES:  You don't need the names to do that.

12        THE COURT:  What's your objection other than

13   relevance?

14        MS. HUGHES:  It invades the privacy of those inmates.

15        THE COURT:  He's speaking as a correctional officer

16   and not as a mental health counselor, so I'll allow question.

17        MR. HAHN:  Thank you, Your Honor.

18   Q.   (Mr. Hahn, continuing:)  So can you please provide the

19   names of the death row inmates, either current or past, who you

20   believe to be slow or of low intelligence?

21   A.   All of them or just one?

22   Q.   All of them, please.

23   A.   I can't -- I doubt if I can name all of them.

24   Q.   Would there -- is it more than ten?

25   A.   I can't put a number on it.  I don't know exactly how many

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0488

1  it would be because I never really thought of it.

2  Q.   I guess let me get into this, then.  What caused you to

3  believe these inmates in particular were slow or of low

4  intelligence?

5  A.   Because of their actions and the way they act and always

6  getting other inmates to do stuff for them or something to that

7  fact.

8  Q.   So getting people to do work for you, is that what you're

9  saying?

10  A.   The way they act, you could just tell that they were slow.

11  Q.   Got you.  So maybe they look stereotypically like somebody

12  who you would consider to be intellectually disabled?

13  A.   Yeah, and that -- and then me having to take them to see

14  mental health and stuff like -- that's what I consider.

15  Q.   And are you aware Mr. Reeves is on the mental health

16  caseload?

17  A.   No, I'm -- no, I'm not.

18  Q.   And if you knew that Mr. Reeves was on the mental health

19  caseload, would that play into your determination, your

20  layperson opinion regarding his intelligence?

21  A.   No, not necessarily.  Because mostly all of them talk to

22  mental health at some time, but it's the actions what I --

23  their actions what -- the reason why I would determine whether

24  they're slow, their conversation, the way they act.  That's the

25  way I determine it.  But I'm not a specialist in that.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0489

1    Q.   All right.  And so you don't -- you couldn't say with

2    confidence that Mr. Reeves -- what Mr. Reeves' intelligence

3    level is?

4    A.   I could not.

5    Q.   Okay.  And it's entirely possible that Mr. Reeves is slow

6    or of low intelligence?

7    A.   It could possibly -- possibly.

8         MS. HUGHES:  Objection.  Calls for speculation.

9         THE COURT:  Well, these are areas that you brought

10   forward in the affidavit that's been filed, so I'll allow it.

11   A.   Possibly, yeah.

12   Q.   (Mr. Hahn, continuing:)  You think it's possible?

13   A.   Anything is possible.

14   Q.   So can you just give me the names of three inmates who you

15   believe are slow or of low intelligence on death row?

16   A.   Let me think.  I have to think about that.

17       Michael Sockwell.

18   Q.   Michael -- I'm sorry -- what?

19   A.   Michael Sockwell.  Stephon Lindsay.

20       Three, let me think of someone else.  Let me think.

21   Michael Lewis.

22   Q.   Michael Lewis is a bit of an acquired taste, am I right?

23   A.   Pardon?

24   Q.   Michael Lewis can be a bit of a troublemaker?

25   A.   Yes, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0490

1  Q.   Okay.  So when you determined that -- or in your opinion

2  that those three inmates and others were slow or of low

3  intelligence, it was what you saw of them physically?

4  A.   Yeah, what they -- what I see, them physically, and the

5  way they act.

6  Q.   Okay.  Can you provide just an example of what a slow or

7  low intelligence person acts like?

8  A.   Just -- I ain't know I had to do all this, but what I

9  consider them to be slow, they just don't speak well.  They

10  act -- they act kind of slow.  That's what I consider.

11  Q.   Got you.  And would it surprise you to hear that on

12  intake, Mr. Reeves, according to DOC records, was believed to

13  suffer from mild what they call retardation at the time?

14  A.   Would it do what, now?

15  Q.   Would it surprise you to learn that on intake, Mr. Reeves

16  was designated as being mildly -- as suffering from mild

17  retardation?

18  A.   That would surprise me about Matthew Reeves.

19  Q.   Okay.  All right.  Did more officers work at Holman when

20  you started in 2000 or do more work there now?

21  A.   It was more when I started than now.

22  Q.   Okay .  And do you believe Holman to be understaffed in

23  June of 2018?

24  A.   I do.

25  Q.   Okay.  And that was pretty common knowledge, right?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0491

1   A.   Yes, sir.

2   Q.   Okay.  As part of dealing with that understaffing, runners

3   are employed?

4   A.   They are.

5   Q.   Okay.  And runners are folks -- are inmates who do some

6   distribution work?

7   A.   They are.

8   Q.   So they might deliver meals or --

9           MS. HUGHES:  Objection to the leading.

10          MR. HAHN:  Okay.

11          THE COURT:  Restate your question.

12          MR. HAHN:  I will indeed.

13          I always forget that here I am on direct.  I

14  apologize.  A career on cross.

15  Q.   (Mr. Hahn, continuing:)  Can you describe what runners do

16  at Holman?

17  A.   Runners are used to assist in feeding, passing out ice,

18  passing the meal trays out.  That's what they're used for.

19  Q.   Do they ever distribute nonlegal mail?

20  A.   No.

21  Q.   Do they ever distribute any sort of forms or paperwork?

22  A.   No.

23  Q.   Okay.  Not once?

24  A.   No.  They are not to do that.

25  Q.   Okay.  But they do distribute the canteen order forms,

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0492

1  right?

2  A.   Yeah.   They can take a blank order form to the other

3  inmates.

4  Q.   Okay.   So there's no prohibition on them distributing

5  certain forms?

6  A.   Not a blank store form.

7  Q.   Okay.   And then they can collect that blank store form

8  after it's been filled out?

9  A.   Normally the officers -- normally the officers are to pick

10  it up, but sometimes -- it wouldn't be out of the ordinary for

11  them to pick them up and bring it to you.

12  Q.   Got you.   Were you on duty in late June of 2018?

13  A.   Pardon?

14  Q.   Were you on duty at Holman at any point in the last week

15  of June 2018?

16  A.   June 20?

17  Q.   2018.   Just the month, June of 2018?

18  A.   Yes, I was at work.   I should have been there.

19  Q.   Okay.   And do you work day shift?

20  A.   Yeah, I work days.

21  Q.   Okay.   That starts, what, around 6:00 a.m. or so?

22  A.   Yeah, they start at 6:00 a.m.

23  Q.   Okay.   And you were there at the same shift as Captain

24  Emberton?

25  A.   Yes, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0493

1   Q.   Okay.  And you've walked death row, right?

2   A.   Many times, yes.

3   Q.   Okay.  And this is the death row that existed in June of

4   2018, not the new building?

5   A.   Yes, sir.

6   Q.   Okay.  And can you estimate how long it would take you to

7   walk to every cell in death row and hand a piece of paper to

8   somebody in that cell?

9   A.   Probably about 30 minutes.

10  Q.   30 minutes?

11  A.   Yes, sir.

12  Q.   To walk all the tiers?

13  A.   All tiers.

14  Q.   And give 160 folks?

15  A.   Yeah.

16  Q.   Okay.  Do you have any knowledge of how the election

17  form -- do you know what the nitrogen election form is?

18  A.   The what form?

19  Q.   I'm going to ask you, but I'm guessing that it's no.  Do

20  you know anything about the nitrogen election form for nitrogen

21  hypoxia?

22  A.   I'm not familiar with it.

23  Q.   Okay.  So you didn't participate in distributing it, then?

24  A.   I did not.

25  Q.   Okay.  And you didn't witness it get distributed?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0494

1    A.    Huh-uh.

2    Q.    Okay.  Have you received -- you've received training about

3    the Americans with Disabilities Act, right?

4    A.    Yes, sir.

5    Q.    And you do that annually?

6    A.    Not annually, but I have had some training in it.

7    Q.    Got you.  And have you ever been -- do you recall an

8    inmate by the name of Kurt Taylor?

9    A.    Kurt Taylor.  The name sounds familiar.

10   Q.    Would it refresh your recollection if I told you that he

11   filed a lawsuit against you and other Department of Corrections

12   officials?

13   A.    I'm familiar with Kurt Taylor.  Yeah.  He was -- but I'm

14   not familiar with --

15           MS. HUGHES:  Object to the relevance.

16           THE COURT:  What's the point you're trying to make?

17           MR. HAHN:  Yes, Your Honor.  I apologize.

18           I was going to ask -- and I will represent to the

19   Court that the basis of this is Kurt Taylor versus Richard

20   Allen, Number 1:07-CV-794-CGM.  It's a Southern District of

21   Alabama case in which, among other defendants, Officer Moody

22   was sued and alleged to have violated the ADA rights of this

23   inmate.  Now, the suit was dismissed for filing purposes based

24   on a filing fee issue, but I wanted to just inquire as to his

25   knowledge of the ADA.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0495

1          THE COURT:  Let's keep it short on this issue.

2          MR. HAHN:  It will be very short, Your Honor.

3    Q.  (Mr. Hahn, continuing:)  Does that refresh your

4    recollection at all?

5    A.   It's not uncommon for inmates to file lawsuits against us,

6    and Kurt Taylor's name sounds familiar.  But as far as the

7    case, I'm not familiar with it.

8    Q.   All right.  And that was -- it was filed in 2007 and the

9    amended complaint was filed in 2009, so that's been a long

10   time.

11        Now, do you recall in the course of your training on the

12   ADA learning that difficulty reading is considered a

13   disability?

14   A.   Yes, sir.

15   Q.   Okay.  Now, are you now a member of the execution team?

16          MS. HUGHES:  Objection to the relevance, Your Honor.

17          THE COURT:  What is the relevance?

18          MR. HAHN:  I can explain it, Your Honor.

19          THE COURT:  Okay.

20          MR. HAHN:  It's my belief and understanding from

21   speaking with folks that members of the execution team receive

22   additional pay for serving on the execution team and for every

23   execution that occurs.

24          MS. HUGHES:  That's also very privileged and that's a

25   secure --

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0496

1            THE COURT:  Again, what's the relevance to the ADA
2    case that we're here about?
3            MR. HAHN:  Yes, Your Honor.  If Mr. Reeves were to be
4    executed on January 27th and if Officer Moody were a member of
5    the execution team, there would be a pecuniary benefit in that
6    execution occurring on January 27th.
7            MS. HUGHES:  Judge, we never disclose who are members
8    of the execution team, and Mr. Hahn is very aware of that.
9            MR. HAHN:  I will note, Your Honor, that members of
10   the execution team parade around when they do their rounds, and
11   our clients know who the members of the execution team are.
12   It's not a secret.  We're not to disclose them, obviously,
13   outside, but I've seen and I know who members of the execution
14   team are.  I don't particularly know that Officer Moody is from
15   personal knowledge.
16           THE COURT:  I don't see the relevance of it, so
17   objection sustained.  Let's go to the next point.
18           MR. HAHN:  All right.  One second, Your Honor.
19           Thank you, Your Honor.  And I apologize.  I went over
20   my 20.
21           THE COURT:  Any cross?
22           MS. HUGHES:  Yes, sir.
23           THE COURT:  How long do you think?
24           MS. HUGHES:  I don't think it will be longer than ten
25   minutes.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0497

1          THE COURT:  Okay.

2          MS. HUGHES:  We can certainly wait, Judge.

3          THE COURT:  You're on the clock.  I'd like to go ahead

4  and get this witness finished so he doesn't have to wait around

5  for the rest of us.

6                    CROSS-EXAMINATION

7  BY MS. HUGHES:

8  Q.   Good morning, Officer Moody.

9  A.   Good morning.

10  Q.   I'm Beth Hughes from the Attorney General's Office.

11      When you were talking about your affidavit, could it have

12  been that you talked to attorneys from the Attorney General's

13  Office?

14  A.   That's correct.  It could have been.

15  Q.   And that was a conversation over the phone; is that

16  correct?

17  A.   Yes, ma'am, it was.

18  Q.   And you see Matthew Reeves on a daily basis; is that

19  correct?

20  A.   Yes, ma'am.

21  Q.   And in your affidavit, you said he's a problematic inmate.

22  Can you tell me what a problematic inmate is?

23  A.   Always into something with the other inmates or even, you

24  know -- he just has a little smart attitude.

25  Q.   And was Mr. Reeves frequently put on P tier?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0498

1    A.    He was.

2    Q.    And what is P tier?

3    A.    P tier is kind of -- it's like when one get in trouble on

4    death row, that's where he's placed.

5    Q.    And you've seen Mr. Reeves walking around with a legal

6    pad, correct?

7    A.    I have.

8    Q.    Maybe as recently as a couple of days ago he was walking

9    around with a legal pad; is that correct?

10   A.    That's correct.

11   Q.    Does Mr. Reeves ever get legal mail?

12   A.    I'm not sure at this time right here, because when they

13   pass legal mail out now, I'm not around because they pass -- I

14   work first shift and they pass the mail out on second shift, so

15   I haven't saw any.

16   Q.    What do you recall -- you've seen reading materials in

17   Mr. Reeves' cell; is that correct?

18   A.    I have.  I did an inspection and a search of his cell, and

19   I have saw reading material.

20   Q.    Would it surprise you that on other mental health forms in

21   the Department of Corrections that Matthew Reeves has -- it's

22   noted that Matthew Reeves has normal intelligence?

23   A.    Would it surprise me?

24   Q.    Uh-huh.

25   A.    No, ma'am.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0499

1  Q.   Mr. Reeves has never asked you to read something for him,

2  has he?

3  A.   No, ma'am.  Never.

4  Q.   And Mr. Reeves has never asked you to write something for

5  him, has he?

6  A.   No, ma'am.

7  Q.   Have you seen inmates helping other inmates read on death

8  row?

9  A.   I have.

10  Q.   But you've never -- have you ever witnessed another inmate

11  reading to Mr. Reeves?

12  A.   No, ma'am.

13  Q.   Does Mr. Reeves understand instructions that you give him?

14  A.   Very well.

15  Q.   Do you know if Mr. Reeves has told anybody he couldn't

16  read?

17  A.   I've never heard -- known of him telling anyone that he

18  couldn't read.

19  Q.   Is he able to communicate his needs to people at the

20  prison?

21  A.   Very well.

22  Q.   And does he interact with other inmates?

23  A.   Yes, ma'am, he does.

24  Q.   Have you seen him interacting recently since he's been put

25  on the single walk?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0500

1    A.   I have.

2    Q.   What did you see?

3    A.   I see him -- I've seen him recently just talking to

4    another inmate, telling him what channel to put the TV on.

5    Q.   And what happened with that?

6    A.   What happened with it?  Well, the inmate couldn't find the

7    channel he want, and he got mad and slammed the door.

8    Q.   And when we were talking about slow inmates, do you think

9    that a slow inmate is somebody who can't read or needs help

10   with reading?

11   A.   I would think so.

12   Q.   Because of the way they talk?

13   A.   Yes, ma'am.

14        MS. HUGHES:  That's all I have, Judge.

15        MR. HAHN:  Your Honor, I have one redirect question.

16        THE COURT:  All right.  One question.

17        MR. HAHN:  Thank you, Your Honor.

18                   REDIRECT EXAMINATION

19   BY MR. HAHN:

20   Q.   Michael Lewis, who you testified is one of the slower, low

21   intelligence inmates, he pretty much lives on P side, correct?

22   A.   Yes, sir.

23   Q.   Thank you.

24        THE COURT:  Thank you, Officer Moody.

25        THE WITNESS:  Yes, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0501

1          THE COURT:  Okay.  Let's take a lunch break.

2          MR. ANDERSON:  Your Honor, if we could, I think we may

3     have one more redirect question.

4                      RECROSS-EXAMINATION

5     BY MS. HUGHES:

6     Q.   Are there inmates on P tier that you don't consider are

7     slow?

8     A.   There are.

9          MS. HUGHES:  That's all.

10         THE COURT:  All right.  It's 11:30 now.  Let's take

11    about an hour.  Let's have your next witness at 12:30.  Can you

12    do that?

13         MR. HAHN:  Thank you, Your Honor.  Yes, Your Honor.

14         THE COURT:  Is this something we can finish up today?

15         MR. HAHN:  Crossing my fingers, Your Honor.  I've

16    learned long ago not to make promises to judges that I don't

17    know with certainty that I can keep, but we are going at a

18    pretty good clip here.

19         THE COURT:  Okay.

20         MR. HAHN:  Thank you, Your Honor.

21       (A recess was taken from 11:31 a.m. until 12:31 p.m.)

22         THE COURT:  Who is your next witness going to be?

23         MS. BUTNER:  That's Lori McCulloch.

24         THE COURT:  Do we need to talk about anything before

25    we begin, counsel?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0502

1          MS. KENNY:  Your Honor, just for housekeeping, we

2    would offer the snippet of the phone call as Defendant's

3    Exhibit A so that the record will have that.  And we've talked

4    to your staff about how to accomplish that.

5               THE COURT:  Okay.  Any objections?

6               MR. HAHN:  No, Your Honor.

7               THE COURT:  It's admitted.  Anything else, counsel?

8               MS. KENNY:  No, Your Honor.

9               THE COURT:  You can come up, ma'am.

10                        LORI MCCULLOCH

11          The witness, having been duly sworn to speak the

12    truth, the whole truth and nothing but the truth, testified as

13    follows:

14                      DIRECT EXAMINATION

15    BY MS. BUTNER:

16    Q.   Hello, Ms. McCulloch.

17    A.   Hey.

18    Q.   And just so I make sure I'm saying it right, do you say

19    McCulloch or McCulloch?

20    A.   McCulloch.

21    Q.   Okay.  My name is Lucie Butner.  I'm an attorney for the

22    plaintiff.

23    A.   Okay.

24    Q.   Could you please state your name and spell it for the

25    court reporter.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0503

1  A.   It's Lori, L-o-r-i -- Lee, L-e-e -- McCulloch,

2  M-c-C-u-l-l-o-c-h.

3  Q.   And where are you currently employed?

4  A.   For the Alabama Department of Corrections.

5  Q.   And how long have you been employed with them?

6  A.   Eight years.

7  Q.   What is your title or position with the Department of

8  Corrections?

9  A.   My classification is a planning and economic development

10  specialist, but I'm basically a grants administrator for the

11  most part and do the records disposition authority as one of my

12  tasks.

13  Q.   And just before we kind of get into more detail there, you

14  were designated by defendants as a 30(b)(6) witness, which

15  means you're answering on behalf of the defendants as a whole

16  today --

17  A.   Yes, ma'am.

18  Q.   -- in answers to the questions.  Okay.  Just wanted to be

19  clear on that.  So I'm asking you in that capacity.

20  A.   Sure.

21  Q.   And the specific category is knowledge and memorialization

22  of recordkeeping and procedures.

23  A.   Yes.

24  Q.   So to back up a little bit, you said -- I failed to write

25  down exactly what you said in addition to grant writing.  What

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0504

1  is the term you used for the records work that you do?

2  A.  It's our records disposition authority.

3  Q.  Thank you.

4  A.  I'm the administrator of that.

5  Q.  And what are your duties as part of that?

6  A.  You know, it's basically approving or declining a request

7  to destroy records and to make sure that we preserve them as

8  we're supposed to.

9  Q.  And what did you do to prepare for testimony today?

10  A.  Nothing, really.

11  Q.  Do you know anything about the subject matter of the

12  lawsuit today?

13  A.  Very little.

14  Q.  Did you meet with any attorneys or review any documents in

15  preparation for your testimony today?

16  A.  I spoke to an attorney, just explaining that I was to come

17  here, but I didn't review anything.

18  Q.  I'd like to ask you some questions about the Department's

19  recordkeeping as a whole.  Could you describe for me, if you

20  know, what is the agency records administrator for the

21  Department of Corrections?  Do you know what that title implies

22  and what the duties of that role are?

23  A.  Well, that's my title --

24  Q.  Right.

25  A.  -- for that.  Yes, ma'am.  I mean, I know what I'm

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0505

1   supposed to do.

2   Q.   I'd like to ask you now specifically about recordkeeping

3   at Holman Correctional Facility to the extent it might deviate

4   from any sort of general policies.  Can you --

5           MR. ANDERSON:  Your Honor, I'm going to object.  This

6   is outside of what we had designated as a subject for this

7   witness.  I don't know if she knows anything about the

8   recordkeeping at Holman specifically.  But the sole designation

9   that we got was defendants' knowledge of and memorialization of

10  its recordkeeping policy and procedures, and we have put up the

11  person who knows the institutional policy.  I don't know how

12  much knowledge she has about what is done exactly at Holman,

13  but I know she knows policy.

14          THE COURT:  Well, if you don't know how much she

15  knows, we won't know until she's asked the question and

16  answered it.

17          You can proceed.

18          MS. BUTNER:  Thank you.

19  Q.   (Ms. Butner, continuing:)  Can you tell me about the

20  recordkeeping and retention policy as it relates to officer

21  staffing?  How records regarding officers would be created and

22  retained.

23  A.   What kind of records?

24  Q.   Records related to attendance of employees at work, who

25  might be assigned on a given day to attend, employee

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0506

1    scheduling, and those kinds of records.

2    A.    There are officer logs, duty logs, that are retained.  And

3    to tell you the number of years they're kept, I'd have to refer

4    to the RDA because there are so many different timeframes for

5    different documents.  But I can say there's been nothing

6    destroyed for -- I don't want to tell you incorrectly, but I

7    know since 2017, and it could be prior to that, but I believe

8    2017, everything's been under a litigation hold.

9    Q.    And is that a broad policy?

10   A.    Yes.

11   Q.    That -- a litigation hold?  And how is a litigation hold

12   put in place?

13   A.    I don't know if there's something formal.  I don't know.

14   Q.    So nothing has been destroyed since 2017 due to that

15   litigation hold; is that -- regarding officer duty logs; is

16   that correct?

17   A.    Correct.

18   Q.    Can you describe what a litigation hold is, generally?

19   A.    No.

20   Q.    So there's no description of what is required under policy

21   in order to comply with a litigation hold?

22   A.    I don't have a legal background, so I don't want to

23   misstate anything.  I have documents from our legal division

24   that have pretty clearly defined none of this is allowed to be

25   destroyed because we're under a litigation hold.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0507

1  Q.   So the legal division makes that determination, not the

2  records division?

3  A.   True.  Yes.

4  Q.   If records were discovered to be missing that were

5  expected to be kept -- so let's say records of something basic

6  that would be kept of record such as healthcare records or

7  something that would be kept in the normal course of Department

8  of Corrections' care for an inmate, is there an audit process

9  to determine either the accuracy or completion of general

10 records like that in the Department of Corrections?

11 A.   No.

12 Q.   Is there an audit process that occurs as part of a

13 litigation hold that you're aware of?

14 A.   Not that I'm aware of.

15 Q.   Is there a system as part of department policy on

16 recordkeeping that can verify the accuracy of recordkeeping?

17 A.   Outside of my job, which is really just to make sure that

18 what we do destroy or pass to archives and history meets the

19 criteria that we agree to, I don't know if anybody at the

20 facilities or in operations has anything like that in place.

21 Q.   So that would be outside of the general policy and would

22 be something that would occur in operations; is that fair?

23 A.   Yes.

24 Q.   And do you work directly -- your department or your

25 function work directly with operations at individual

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0508

1  institutions?

2  A.   No.  Well, I communicate with them if they request

3  something from me.

4  Q.   Okay.  Can you give me an example of what type of request

5  you're referring to in regards to what operations might request

6  from you?

7  A.   Well, for instance, if they have a change in personnel and

8  there's somebody new at that facility that's going to be in

9  charge of trying to store their records, and then, you know, at

10  a certain time know that they've got things that have met the

11  retention period and ask to destroy them, you know, I'll work

12  with that person to get them trained on what our policy is.

13      And again, like I said, though, since 2017 it's been box

14  it, label it, but you can't do anything with it.

15      And on occasion there will be somebody who contacts me

16  because they feel like they've got records that are just

17  unimportant for anything related to an inmate or staff or

18  anything like that, and they'll ask if they can destroy them

19  and we'll have those conversations, but...

20  Q.   What criteria are there for those requests to destroy

21  records outside of a timeframe?  So let's say records older

22  than ten years might be destroyed, but are there other

23  criterion that you use to answer whether or not something can

24  be destroyed?

25  A.   Well, there are certain records that are permanent, and

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0509

1  then the ones -- I mean, anything outside of the permanent

2  records does have a retention period.

3  Q.   What records are permanent, if you can give some examples?

4  A.   Well, an inmate's file, anything that has to do with --

5  you know, there's a certain part of it where -- fingerprints,

6  pictures.  Inmates' files are pretty much permanent.  Our

7  administrative regulations are permanent.

8  Q.   What about personnel files?

9  A.   Personnel files at our facilities?

10  Q.   Of let's say for a Department of Corrections employee.

11  A.   Okay.  At the facilities, they have to maintain it -- and

12  again, I don't want to misspeak, but I'd have to look at it to

13  verify --

14  Q.   Sure.

15  A.   -- but they keep it there until an employee has been gone

16  a certain amount of time.

17      But the whole file is still kept with Department of

18  Corrections in HR, so even if it's not at that individual

19  facility, it's in HR.

20  Q.   Does it ever occur that records are -- permanent records,

21  for example, are discovered to be missing or misplaced?

22  A.   Not that I'm aware.

23  Q.   Is there a policy if that were to happen that prescribes

24  what you would do or how you would memorialize something like

25  that?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0510

1    A.   Permanent records, if they're permanent, if they get to a

2    point where they're permanent and they're no longer really

3    accessed, they're supposed to be transferred to archives and

4    history.  If they're things that we still review, we keep them

5    on site.

6              MS. BUTNER:  Just one moment.

7              We have nothing further.

8              THE COURT:  Any cross on this witness?

9              MR. ANDERSON:  Very, very briefly, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. ANDERSON:

12   Q.   Ms. McCulloch, I think I was that attorney you spoke with.

13   A.   Yes, sir.

14   Q.   Rich Anderson with the Attorney General's Office.

15        You were asked about the litigation holds, and you said

16   you didn't want to misspeak or mischaracterize things that

17   legal has told you.  What does it mean to you, practically

18   speaking?

19   A.   That we have lawsuits that they don't want to chance any

20   documents being gone that, you know, might be needed.

21   Q.   And you've been asked a number of questions about

22   different records.  How many different kinds of records does

23   ADOC have, like categories?

24   A.   Our RDA is divided up basically by Accounting; Human

25   Resources; Operation s, which Operations is going to include

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0511

1  inmates, staff, the division I work under, Research and

2  Planning.  Within each of those divisions, especially

3  Operations, there's -- Operations could have hundreds of

4  different types of records.  They're anything from, you know,

5  maintenance, vendors.

6  Q.   Hundreds of different categories?

7  A.   Yes.

8  Q.   And you don't know all of them off the top of your head, I

9  assume?

10  A.   No.

11  Q.   Okay.  And they may have different retention periods?

12  A.   They do.

13  Q.   Okay.  But to your knowledge, currently essentially the

14  rule is don't destroy it; box it up?

15  A.   Yes.  That's correct.

16        MR. ANDERSON:  That's all I have.

17        THE COURT:  Any further questions, Ms. Butner?

18        MS. BUTNER:  No, Your Honor.

19        THE COURT:  You can be excused, ma'am.  Thank you.

20        THE WITNESS:  Thank you.

21        THE COURT:  Your next witness?

22        MR. PALOMBI:  Your Honor, we'll call Richard Lewis.

23                    RICHARD LEWIS

24        The witness, having been duly sworn to speak the

25  truth, the whole truth and nothing but the truth, testified as

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0512

 1   follows:

 2                        DIRECT EXAMINATION

 3   BY MR. PALOMBI:

 4   Q.   Good afternoon, Mr. Lewis.

 5   A.   Good afternoon.

 6   Q.   Good to see you again.  I might ask you -- this is just

 7   because of me -- to make sure you could speak up a little.  I

 8   have no idea why my hearing aids are being a little iffy today,

 9   but they are, so if you could just make sure you speak up

10   because I just want to make sure I hear your answers.

11        Anyway, could you spell your name -- full name -- for the

12   court reporter.

13   A.   Yes.  It's Richard, R-i-c-h-a-r-d, Lewis, L-e-w-i-s.

14   Q.   Thank you.  What is your present job?

15   A.   My present job is the ADA coordinator for Holman

16   Correctional Facility.

17   Q.   Do you have any other responsibilities at Holman?

18   A.   No.

19   Q.   On any committees or anything?

20   A.   Well, I'm on the Critical Crisis Committee.

21   Q.   Okay.  How long have you been in that job?

22   A.   Since 16 October, 2020.

23   Q.   All right.  So you're lucky.  You're not going to be asked

24   about 2018.  When was your position created?

25   A.   I couldn't tell you.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0513

1    Q.   Were you the first ADA coordinator?

2    A.   No.

3    Q.   So it was created sometime before?

4    A.   (Witness indicated.)

5    Q.   Do you know why your position was created?

6    A.   Yes.  It was created because of the court case Braggs

7    versus Dunn, and it's because the ADA accommodates all inmates

8    with impairment.

9    Q.   All right.  Let's go into that, inmates with impairment.

10   Can you tell me roughly how many requests for accommodation

11   you've processed since you've been at Holman?

12   A.   Yes.  Approximately 23.

13   Q.   Have any of those requests for accommodation been for

14   difficulties reading?

15   A.   No.

16   Q.   Have any of those requests for accomodation been for any

17   cognitive -- and by cognitive, I mean cognitive as opposed to

18   physical issues?

19   A.   No.

20   Q.   When you started in October 2020, the prison had a larger

21   population than it does now, correct?

22   A.   Yes.

23   Q.   About how many more people did it have then than it does

24   now?

25   A.   Well, when I came on board it only had what it has right

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0514

1  now.  I think it's 320, somewhere in that number.  And I think

2  before then they had 1,000 or better.

3  Q.  And still even with that extra population, you had no

4  inmates requesting an accommodation for cognitive issues?

5  A.  Again, I stated when I came on board it was only with 300

6  and something, so no, I did not.

7  Q.  So what is the process at Holman if you get -- if an

8  inmate requests any type of accommodation?

9  A.  When they request an accomodation, I receive the

10  accomodation form.  Within ten days -- ten working days -- I

11  have to make sure I get some type of answer.  I take it and see

12  where it need to go.  Most likely it will go to medical,

13  request some medical attention or something like that.  They

14  request a wheelchair or a CPAP machine or requesting a cane or

15  some -- might have an amputee that need an adjustment to his

16  prosthetic or something like that, and I'll make sure they just

17  accommodate it.

18      Once I turn it over to medical, medical will get it back

19  to me.  Within that time, I will go back and brief the inmate,

20  and upon briefing him, he will sign it and then the follow up

21  procedure would be done through medical.

22  Q.  And you have how many days to turn that over?

23  A.  Ten days, but just ten days from the time he give it to

24  the time I receive it until I get it back to him.  But it might

25  take a little longer because medical might take a little

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0515

1  longer, but I will go down there and inform the person his

2  medical is taking longer than that period of time, so I will

3  intentionally keep him informed.

4  Q.   Is an inmate required to go to sick call in order to start

5  this process?

6  A.   No.  We have forms available, which is -- request for

7  accommodation is available in the shift's office.  Also it's

8  available in my office and also it's available in the cube.

9  All they have to do is ask for an accommodation form and he

10  will be given one, which he'll fill out, and he can place it in

11  a box that's readily available in his local area.

12  Q.   And you said you do not approve the requests?

13  A.   No, I do not -- yes, I approve it after the process have

14  been done.  Like if somebody requests, let's say, a prosthetic

15  adjustment, now, I'm not going to approve it, but what I will

16  do is I will send it to medical, let medical make a statement

17  and medical say, well, okay, then we'll get ahold of our expert

18  and get his adjustment done, and they will send it back to me.

19  Now, at that time I would approve it and take it down to the

20  inmate, talk with him about it, let him sign it, and take it

21  back and put it in his permanent record and I will file it.

22  Q.   Is it possible -- I guess next question is do you have the

23  power to -- do you deny requests?

24  A.   Yes.  I do deny some that I see.  Some requests, like if

25  an inmate is on single walk, he take accomodation form and say

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0516

1    I request to be moved off of single walk, I have nothing to do

2    with single walk.  They go out walking.  I have nothing to do

3    with that.  So what I would do at that time, I would read it, I

4    would bring it to the warden's attention that this was sent to

5    me, and then I would deny it and I will send it back to the

6    inmate.  The inmate might -- at that time he have 30 days from

7    that time if I deny it to send it forward to my next higher

8    headquarters, which would be up here in Montgomery.

9    Q.   But let's say it's for something like a CPAP machine.  If

10   an inmate requests a CPAP machine, do you have the authority to

11   deny that request?

12   A.   No.  Why would I?

13   Q.   But if they ask for one, you just start -- you start the

14   process?

15   A.   I will start the process.  I will turn it over to medical.

16   Medical will handle the CPAP.  I don't have the authority to

17   authorize or to even get a CPAP, so I would follow procedures

18   to get him what he needed to be accommodated with.

19   Q.   And if you -- now, we've talk ed about inmates making

20   requests.  Have you ever had a situation where you have seen a

21   need, that an inmate has a need, and taken action?

22   A.   Yes.

23   Q.   Could you describe that situation?

24   A.   Well, I know I have walked down -- and I visit often, go

25   down and visit the inmates and talk with them.  I mean the ones

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0517

1   that's on the ADA list.  And I have seen an inmate that was

2   walking kind of one-sided, and I pulled him to the side and I

3   asked him what was wrong, you know, why he was walking like

4   that.  He said that he had a hip injury and he's unable to walk

5   properly, and I suggested that he go to sick call and talk with

6   them, tell them that he's having problems with his hips and all

7   this here, and see can they get him a cane.  And then at that

8   time I followed up with medical and told them a certain inmate

9   was going to come down and see them and what it was that I saw

10  what was wrong with him and could they work with -- you know,

11  what they would expect to see down there.

12      Once he got down there, they saw him and he was

13  accommodated with a cane.  At that time he was added to my ADA

14  list to look after because any type of assistance that an

15  inmate receives as far as physical, any type of physical care

16  or a problem that he might have, I have to accommodate.  So at

17  that time he was added to my list.

18  Q.   And you provide reports of these accommodations?

19  A.   Yes.

20  Q.   Do you do that monthly?  Quarterly?  Yearly?

21  A.   We have monthly reports that we send forward and also

22  quarterly.

23  Q.   Do you remember signing an affidavit in relation to this

24  case?

25  A.   Yes.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0518

1          MR. PALOMBI:  Your Honor, this is in the record

2    already as Document 42-8.

3    Q.   (Mr. Palombi, continuing:)  And paragraph 6, that first

4    sentence, Mr. Lewis, you say, "ADOC employs a formal process

5    for requests for accomodation."  Is that the process you just

6    described to the Court?

7    A.   Yes.

8    Q.   Now, the second sentence in that references Document 27.1

9    in the case, and that was an inmate request slip.  Do you

10   remember reviewing that slip?

11   A.   Oh, that slip of paper.  Yes, I do.

12   Q.   Can you describe to the Court -- an inmate request slip is

13   a fairly regular form, right?

14   A.   It's a fairly regular form to just fill out for an inmate

15   to make any type of request on anything he feel he might need

16   or information he might want.

17   Q.   Okay.  So it's not -- it's a request for just about

18   anything?

19   A.   Yes.

20   Q.   Is this the -- I was trying to center it and get that

21   title up there.

22        Is this the form you were referring to when you were

23   discussing the inmate request slip in your affidavit?

24   A.   Yes.

25   Q.   And you remember seeing this form?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0519

1   A.   Yes.

2   Q.   In this form -- what you say in your affidavit is that

3   this document would not be considered a formal written request

4   for accomodation.

5   A.   Yes.

6   Q.   Why wouldn't it be?

7   A.   Well, it's not a formal request because he's not actually

8   -- he's asking for paperwork to be done for him through another

9   channel other than ADA.  A formal request to me is an actual

10  accomodation form.  But if somebody send me this and needed --

11  you know, wanted assistance for reading or something like that,

12  I would usually assist them if I could, but it's not a formal

13  request because it's -- procedures are followed by the request

14  for accommodation form that are in place for that type of

15  procedure.

16       This form here can be addressed almost by anyone.

17  Requests for accommodations are only addressed through me to

18  get accommodated for.

19  Q.   Now, this form is dated 2015, which is obviously five

20  years before you started working.  And in this form Mr. Reeves

21  said, I wanted to have something read to him, but the officer

22  he requested said he didn't have time.

23       If you received a form like this today, what action would

24  you take?

25  A.   Well, technically, this form wouldn't come to me, but if I

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0520

1   was to receive it, I would go --

2   Q.   Let's say you were to receive it.

3   A.   Okay.  If I were to receive it, I'd go down there and talk

4   with him and see what does he need.

5   Q.   So would you assist the inmate in getting whatever

6   document he requested?  Would you assist them in getting that

7   read?

8   A.   No.  I don't have that much latitude, so I would have to

9   go in and talk with the warden to see what his recommendation

10  is.

11  Q.   So if an inmate asked to have a document read, you would

12  not read it to them?

13  A.   If he needed my assistance to read a document that is

14  appropriate and all that there, I would assist him, yes.

15  Q.   And ADA accommodations are not -- they're not necessarily

16  permanent, are they?

17  A.   What do you mean?

18  Q.   For example, let's say -- we've heard reference a couple

19  times to the basketball courts at Holman.  Let's say an inmate

20  is out playing basketball and breaks his leg and needs

21  assistance, whether that be crutches or something after

22  breaking their leg.  An ADA request for something like crutches

23  or a wheelchair, that could be temporary, correct, because

24  their leg could get better?

25  A.   In some cases, yes.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0521

1   Q.   And in some cases, obviously, the person, whatever the

2   condition is, is permanent and is never going to improve?

3   A.   Right.

4   Q.   Are there situations where inmates who have accommodations

5   need accommodations for certain things but not others?

6   A.   Yes.

7   Q.   Can you give an example of one of those?

8   A.   Well, if an inmate needs -- let's say has a cane but then

9   he does not need a wheelchair at that time.

10  Q.   Okay.  And accommodations can also include actual changes

11  in the physical layout of the prison, can they not?

12  A.   What do you mean?

13  Q.   If there's a need for a ramp or something like that.

14  A.   Yes.

15  Q.   I just wanted to double-check this again.  If an inmate --

16  if you were walking those tiers and an inmate says to you,

17  Mr. Lewis, I can't read this, would you -- you would find a way

18  to assist them?

19  A.   Yes, as long as it's appropriate.

20  Q.   That's all, Mr. Lewis.

21  A.   Okay.

22                        CROSS-EXAMINATION

23  BY MS. HUGHES:

24  Q.   Good afternoon, Mr. Lewis.

25  A.   Good afternoon.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0522

1   Q.   Although you were not the ADA coordinator in 2018, there

2   was a running list of inmates with accommodations at Holman in

3   2018; is that correct?

4   A.   Yes.

5   Q.   Is Matthew Reeves' name on that list?

6   A.   No.

7   Q.   Have you reviewed the ADA files that you have at Holman?

8   A.   Yes.

9   Q.   Did you find any evidence that Mr. Matthew Reeves has ever

10  made a request for an ADA accommodation?

11  A.   No.

12  Q.   He's not made a request for an ADA accommodation for

13  reading, for example, has he?

14  A.   No.

15  Q.   I'm going to put this form back up so you can see it

16  again.

17  A.   Okay.

18  Q.   What request was made in this inmate request form?

19  A.   To me, he was just making a statement.  To me, he was just

20  making a statement saying that an officer did not accommodate a

21  request he asked of him.

22  Q.   Was that a request to bring some papers back to him?

23  A.   Right.

24  Q.   Is that a request for an ADA accomodation?

25  A.   No.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0523

1    Q.    Inmates make requests or ask for things all the time,
2    correct?
3    A.    Yes, ma'am.
4    Q.    But they're not all ADA requests; is that correct?
5    A.    No, they're not.
6    Q.    Because an ADA accommodation is meant to correct a
7    disability; is that correct?
8    A.    Yes, ma'am.
9    Q.    For instance, a blind inmate who needs Braille material or
10   a hearing-impaired inmate who needs hearing aids, that would be
11   an ADA accomodation?
12   A.    Yes.
13   Q.    Or I can't walk and I need a cane, that would be a request
14   for an ADA accomodation?
15   A.    Yes.
16   Q.    But not I'm feeling lazy and I want to be carried to the
17   day room.  That wouldn't be a request for accommodation?
18   A.    No, ma'am.
19   Q.    Are you familiar with the inmate handbook?
20   A.    No.
21   Q.    You're not familiar with the inmate handbook that's kept
22   in --
23   A.    Oh, yeah.  The inmate handbook, yes.  I'm very familiar
24   with that handbook.
25   Q.    Where is it kept at Holman?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0524

1  A.   It's kept -- well, I have one in my office, as a matter of

2  fact, and it's kept in the cube and it's kept in the law office

3  down there and on death row itself.

4  Q.   And does it contain a section concerning the ADA?

5  A.   Yes.  It's labeled "Disabilities."

6  Q.   And that's available for all the inmates, correct?

7  A.   All the inmates, in hardcopy and on the computer.

8  Q.   Okay.  If you had a request for a reading accomodation,

9  that would be something that you would accommodate?

10  A.   Yes.

11  Q.   And if you had a request for a cognitive deficiency, that

12  would be also something that you would accommodate?

13  A.   Yes.

14  Q.   And there is an appeal process when you deny an ADA

15  accomodation; is that correct?

16  A.   Yes.

17  Q.   And that goes to the statewide ADA coordinator; is that

18  correct?

19  A.   Yes, ma'am.

20  Q.   Are you required to check on the special needs inmates on

21  a monthly basis?

22  A.   I'm required to check on them on a weekly basis.

23  Q.   On a weekly basis.  And then you have to write a report on

24  a monthly basis; is that correct?

25  A.   On a monthly basis I have to send a report forward.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0525

1    Q.   Okay.  And you can make a request for an accommodation

2    with an inmate request slip; is that correct?

3    A.   Yes.

4    Q.   And you could -- and an inmate can tell an officer or a

5    staff member that they need an accomodation, and that would be

6    brought to your attention; is that correct?

7    A.   Yes.

8    Q.   And is getting papers returned to an inmate an ADA

9    accomodation?

10   A.   Yes.

11   Q.   Getting papers returned to him?

12   A.   No.  It's not ADA responsibilities.  That's something that

13   the correction officers would take care of.

14   Q.   And when a ramp is built for an ADA accomodation, who goes

15   out and makes sure that it's to the required specifications?

16   A.   I do.

17   Q.   Okay.  So you know what the ramp's -- I guess what the

18   incline of the ramp is supposed to be?

19   A.   Yes.

20   Q.   You have to go out there and actually take a tape measure

21   and measure it?

22   A.   Yes.  We got certain measurements and heights it has to be

23   to accommodate a wheelchair.

24   Q.   Let's go back to this inmate request slip that we've asked

25   you about.  Take a look at it.  It doesn't say I can't read,

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0526

1  does it?

2  A.   No, ma'am.

3  Q.   And does it say I don't understand the papers?

4  A.   No, it does not.

5  Q.   Does it say please read the papers to me?

6  A.   No, it does not.

7  Q.   What does it ask on that last line?

8  A.   On --

9  Q.   The last line of his -- what he said, starting with "so."

10  A.   It says, "So you won't bring the papers back to me."

11        MS. HUGHES:  That's all I have, Judge.

12                REDIRECT EXAMINATION

13  BY MR. PALOMBI:

14  Q.   Mr. Lewis, is difficulty reading or inability to read a

15  disability under the ADA?

16  A.   Yes.

17  Q.   And is an inmate required to first make a request for

18  accommodation before you can take any action in any situation?

19  A.   Well, in any situation -- well, that's the only way I

20  know, that he make a request.  So either he tells someone, an

21  officer, that he's having a problem, and I will go down and

22  talk with him and let him know what the procedures he need to

23  follow to get accommodated.

24  Q.   On direct examination, you testified that there was a

25  situation where you made an observation --

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0527

```
 1   A.   Right.

 2   Q.   -- and so you initiated the process.  The inmate did not

 3   initiate the process, correct?

 4   A.   Yes.

 5   Q.   Thank you.

 6        MR. PALOMBI:  No further questions.

 7        MS. HUGHES:  Just one more question.

 8                    RECROSS-EXAMINATION

 9   BY MS. HUGHES:

10   Q.   If you saw an inmate with reading materials, you wouldn't

11   think that he needed an accomodation, would you?

12   A.   No.

13        MR.  PALOMBI:  No further questions.

14        THE COURT:  Mr. Lewis, I've got one question for you.

15   As it concerns that inmate request form that Mr. Reeves

16   completed that we just showed you, if that exact same language

17   was put by Mr. Reeves on a form that said ADA request form,

18   would you have treated that as an accommodation request?

19        THE WITNESS:  Yes.

20        THE COURT:  Okay.

21        MR. HAHN:  Your Honor, just for clarity on the

22   record -- I'm a former appellate attorney and trial attorney --

23   that was Document 27-1 that we've all been talking about, the

24   inmate request slip.  Thank you.

25        THE COURT:  All right.  You can be excused, sir.
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0528

1    Thank you.

2          THE WITNESS:  Okay.

3          MS. HUGHES:  Judge, one more question?

4          THE COURT:  Ms. Hughes, is this a question in response

5    to the question that I just asked?

6          MS. HUGHES:  Yes, sir.

7          THE COURT:  Okay.

8                    RECROSS-EXAMINATION

9    BY MS. HUGHES:

10   Q.   Mr. Lewis, what disability would you accommodate on that

11   form if it had been made on an inmate request form -- or on an

12   ADA accommodation form?

13   A.   Well, all I would have did is deny that and inform the

14   warden of it and took it back and briefed the inmate on the

15   form.

16   Q.   Thank you, sir.

17          THE COURT:  You can be excused now, sir.

18          THE WITNESS:  Okay.

19          THE COURT:  Thank you.

20          Who's your next witness?

21          MR. HAHN:  Your Honor, we will call Cynthia Stewart

22   next.

23                    CYNTHIA STEWART

24          The witness, having been duly sworn to speak the

25   truth, the whole truth and nothing but the truth, testified as

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0529

 1  follows:

 2                         DIRECT EXAMINATION

 3  BY MR. HAHN:

 4  Q.   Good afternoon, Ms. Stewart.

 5  A.   Good afternoon.

 6  Q.   Good to see you again.  Spencer Hahn, in case you don't

 7  remember.  I think we've talked a few times.

 8       Can you please state and spell your name for the record.

 9  A.   My name is Cynthia Stewart.  C-y-n-t-h-i-a, S-t-e-w-a-r-t.

10  Q.   And what is your current title?

11  A.   Regional director.

12  Q.   And that's for the Alabama Department of Corrections?

13  A.   Yes.

14  Q.   And is that over a particular set of prisons?

15  A.   Yes.  The southern region.

16  Q.   Okay.  And is Holman one of those prisons?

17  A.   Yes.

18  Q.   Okay.  And prior to that -- immediately prior to that,

19  what was your position?

20  A.   I was the Warden III assigned to Holman Correctional

21  Facility.

22  Q.   Okay.  And that Warden III is the highest ranking warden?

23  A.   Yes.

24  Q.   Okay.  So you were in charge of Holman Correctional

25  Facility?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0530

1  A.   Yes.

2  Q.   And there are other levels of warden who may have assisted

3  you in that position?

4  A.   Yes.

5  Q.   And when did you -- when were you warden at Holman, Warden

6  III?

7  A.   From August 16th, 2016, until roughly March 2020.

8  Q.   Okay.  So you were present and in charge of Holman

9  Correctional Facility in June of 2018?

10  A.   Yes.

11  Q.   And I know you've been asked about this a lot, and I'm

12  going to try not to go too long on this, but do you recall the

13  distribution of an election form?

14  A.   Yes.

15  Q.   Okay.  And I'm going to go ahead and put on the Elmo a

16  form.  Does this appear to be the form that we've talked about

17  in the past?

18  A.   I'm not for sure.

19  Q.   Okay.

20  A.   I know it was an election form.

21  Q.   Okay.  And how did that form come to be distributed at

22  Holman?

23  A.   I was instructed to have the form distributed.

24  Q.   Okay.  So this was not you acting on your own?

25  A.   No.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0531

1   Q.   And when you say instructed, that means somebody above you
2   in the chain of command?
3   A.   Yes.
4   Q.   Okay.  And I believe in the past you've testified that you
5   couldn't recall specifically who that was?
6   A.   Correct.
7   Q.   Does that lack of memory continue today?
8   A.   Yes.
9   Q.   Okay.  But you are certain that it was someone above you
10  in the chain?
11  A.   Yes.
12  Q.   Okay.  How did you happen to get the forms that were
13  distributed?
14  A.   I can't recall.  My secretary may have had them.  I didn't
15  have the form myself.
16  Q.   Okay.  And maybe I can just ask you, like, is there a
17  process by which forms or materials are distributed to inmates?
18  I may be able to narrow that down.  I realize that was a
19  wide-open question.
20      Let's say, for example, central office says we need to
21  distribute a certain form to everyone in the facility.  Whose
22  job is it to get you that form?
23  A.   If we have to disseminate any information to an inmate
24  from the central office, they will send the forms to us.
25  Q.   Okay.  Sufficient copies for you to distribute?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0532

1    A.    Not necessarily.  They can send one.

2    Q.    And then y'all have a photocopier there at Holman?

3    A.    I'm sorry?

4    Q.    There's a photocopier at Holman?

5    A.    Yes, it is.

6    Q.    All right.  Do you know Inmate Matthew Reeves?

7    A.    Not for real, no.

8    Q.    Got you.  Can I ask you in June of 2018, did at any time

9    you read an election form to any inmate at Holman?

10   A.    No.

11   Q.    Okay.  And you didn't call an inmate to your office to

12   read them a form?

13   A.    No.

14   Q.    Okay.  And that's something that would stick out in your

15   mind?

16   A.    Well, I know I didn't, so I'm not going to say it's going

17   to stick in my mind.  I did not.

18   Q.    You have no doubts about that.  All right.

19         Now, you have been called -- I know you had personal

20   knowledge of some of this, but you've also been called as a

21   Rule 30(b)(6) witness, so for the next few questions I'll be

22   asking you -- and there are only a few -- you're answering on

23   behalf of the Department of Corrections.  Do you understand?

24   A.    Yes.

25   Q.    Okay.  And was that role of yours as a 30(b)(6) witness

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0533

1  explained to you a little bit by counsel?

2  A.   Yes.

3  Q.   Okay.  So can you describe to me what the responsibilities

4  are for maintaining duty post logs?

5  A.   On a daily basis, the shift, after they complete their

6  tour of duty, will submit the duty post logs to the captain,

7  and then the captain will review the duty post logs, the one

8  assigned to that particular shift, and they will then turn them

9  over to either the warden secretary or the captain secretary

10  for the warden -- assistant warden to review.  And after that,

11  they will be given to one of the secretaries to file.

12  Q.   And those files are maintained for -- as far as you know,

13  for as long as -- how long are those files --

14  A.   We have a retention SO regulation, and I had a retention

15  officer at Holman, so I'm not familiar with the timeframe.  But

16  we did have a person assigned to retention.

17  Q.   And do you recall who in June of 2018 was that retention

18  officer?

19  A.   I believe it was Mary Messer.

20  Q.   Mary -- I'm sorry?

21  A.   Mary M-e-s-s-e-r.

22  Q.   Thank you.  And is she a corrections officer or something

23  else?

24  A.   She's not a correctional officer.  She's an assistant

25  ASA/support personnel.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0534

1   Q.   Got you.  And within those duty post logs are inmate
2   movements throughout the day?
3   A.   Yes.
4   Q.   So if an inmate gets moved from, say, his or her cell on
5   death row to the yard for a visit, that will be documented in
6   the duty post log?
7   A.   Yes.
8   Q.   Okay.  And if an inmate is, say, moved from his or her
9   cell to attend, say, a meeting of Project Hope, that would be
10  reflected in the logs?
11  A.   Not necessarily with one particular inmate.  It may be
12  that it will be noted as religious service began for whichever
13  services may be, but not for a specific inmate unless he had an
14  attorney visit or something to that nature.  But not for just a
15  program call.  It would just be for the particular program.
16  Q.   Okay.  And do you maintain or did Holman in June of 2018
17  maintain a list of all members of, say, Project Hope?
18  A.   I am not for sure.  I'm not for sure.
19  Q.   Okay.  And if I represent to you that on -- I'm trying to
20  find it here -- that some duty post logs reflect specific
21  inmate names as being taken to Project Hope meetings in June of
22  2018, would you have any reason to doubt that that is the case?
23  A.   I don't have any reason to doubt.  It all depends on who
24  was doing the log.  But the correct way is to announce that
25  that project is being done or that religious service is being

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0535

1  conducted.

2  Q.   Got you.  And do these types of meetings ever occur during

3  the course of count?

4  A.   What type of meetings?

5  Q.   And I apologize.  I'm sort of assuming knowledge here that

6  may not be out there.

7       Every day there are regular counts done of the number of

8  inmates who are present in the facility?

9  A.   Correct.

10  Q.   Okay.  And part of the reason that y'all keep track of

11  inmate movement through the duty logs is to know who's in and

12  who's out of the prison?

13  A.   Correct.

14  Q.   Including inmates?

15  A.   Correct.

16  Q.   So you can have an accurate count?

17  A.   Correct.

18  Q.   Okay.  Is it unusual for duty post logs to go missing for

19  a particular shift?

20  A.   Well, unusual?  I can't say it's -- I don't want to use

21  the term unusual, but it does happen.

22  Q.   Okay.  And what happens when it -- in your role as a

23  supervisor either currently or when you were warden of the

24  facility, when it came to your attention that duty post logs

25  were missing, what, if any, action was taken?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0536

1  A.   We'll try to locate the duty post log.  Of course, you

2  know, we do a lot of -- the duty post log will go from one

3  station to another, but I, if it was brought to my attention,

4  will try to locate that duty post log.

5  Q.   Got you.  And so the person responsible ultimately for

6  maintaining complete and accurate records of all records

7  required to be maintained at Holman in June of 2018, would that

8  have been the records retention officer, Mary Messer, or would

9  that have been someone else?

10  A.   Ms. Messer.

11  Q.   Okay.  And so ultimately you mentioned a procedure by

12  which these duty post logs and other documents would go through

13  the captain and then to either the captain's secretary or

14  warden's secretary, and then after that the next stop would

15  have been with Ms. Messer?

16  A.   No.

17  Q.   Okay.  What would the next step have been?

18  A.   It would have been for the assistant warden, Warden II, to

19  review.

20  Q.   Got you.

21  A.   And then it would have gone to Ms. Messer for retention.

22  Q.   Okay.  So all duty post logs are reviewed by -- or at the

23  time, at least, are reviewed by one of the wardens at the

24  facility?

25  A.   The deputy, yes.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0537

1   Q.   Okay.

2        MR. HAHN:  If I could have just one second.

3   Q.   Okay.  So do you have any independent knowledge or

4   institutional knowledge -- either way at this point -- as to

5   why the duty post log for -- well, let me withdraw that

6   question.

7        Do you recall the visit that the Federal Defenders had on

8   June 26th of 2018 concerning the election form?

9   A.   Yes.

10  Q.   And that was a -- this was actually like a fairly unusual

11  occurrence?

12  A.   Yes.

13  Q.   And was that because a large number of inmates were all in

14  the yard at once?

15  A.   Well, yes.

16  Q.   Okay.  And that was a time where attorneys from the

17  Federal Defenders office came in and reviewed paperwork with

18  their clients?

19  A.   They came in and met with their clients, yes.

20  Q.   Okay.  And after that meeting, did you receive a stack of

21  election forms?

22  A.   I do not recall.  Not me personally.

23  Q.   Okay.  Got you.  And who was your secretary at the time?

24  A.   Jennifer Parker.

25  Q.   Okay.  And do you have any idea why the duty post log for

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0538

1    that particular shift when the Federal Defenders came -- I

2    believe it's called an A day shift -- why that duty post log is

3    missing from the records?

4    A.   No.

5    Q.   All right.  I am going to briefly, just for illustration

6    purposes, put on the Elmo something that in discovery is

7    Defendant's Discovery Disclosure Bates stamp 012980.  It

8    appears to be -- okay.

9         Do you see the document on the Elmo?

10   A.   I do.

11   Q.   Does that appear to be a duty post log?

12   A.   Yes.

13   Q.   Okay.  And can you read to me the entry for 8:15 a.m. on

14   6/20 of 2018?

15   A.   Yes.  Death row inmates are released for Project Hope at

16   this time, and it has G1 Jeffrey Lee, G18 Jesse Phillips, F7

17   Nicholas Smith, F18 Bart Johnson, and F20 Sherman Collins.

18   Q.   Thank you.  Matthew Reeves' name is not on that list,

19   correct?

20   A.   No.

21        MR. HAHN:  I have nothing further, Your Honor.  Thank

22   you.

23        THE COURT:  Any cross?

24        MR. ANDERSON:  Yes, Your Honor.

25                      CROSS-EXAMINATION

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0539

1 | BY MR. ANDERSON:

2 | Q.   Good morning, Ms. Stewart.  I'm Rich Anderson for the

3 | State of Alabama -- well, for defendants.

4 | A.   Good afternoon.

5 | Q.   I'm sorry.  I'm used to being for the State.

6 |      When you were the warden at Holman, as warden it would be

7 | your practice to walk the tiers occasionally, correct?

8 | A.   Correct.

9 | Q.   And inmates could and did make requests for things

10 | directly to you, true?

11 | A.   Correct.

12 | Q.   But Matthew Reeves never made any requests of you, did he?

13 | A.   I don't recall.

14 | Q.   Okay.  Did Matthew Reeves ever ask you to read something

15 | for him?

16 | A.   No.

17 | Q.   Okay.  Did anybody ever tell you Matthew Reeves is having

18 | trouble reading; he needs some help?

19 | A.   No.

20 | Q.   Okay.  Project Hope, that's an inmate-led organization,

21 | isn't it?

22 | A.   I'm really not familiar with Project Hope.  I was thinking

23 | it was more of a religious faith-based --

24 | Q.   If I tell you that the name of the organization, the full

25 | name, is Project Hope to Abolish the Death Penalty, does that

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0540

1   ring any bells?

2   A.   (Witness indicated.)

3   Q.   Okay.  Would you expect a duty post log to show the

4   movements of every inmate on every day?

5   A.   No.

6   Q.   Okay.  I just want to show you another duty post log, if

7   you don't mind, and tell me if indeed this looks like a Holman

8   duty post log.  Can you see it on the screen in front of you?

9   A.   I do, yes.

10  Q.   Okay.  Does that appear to be a document you're

11  familiar -- the type of document you're familiar with?

12  A.   Yes.

13  Q.   Okay.  I just want to show you an example down at the

14  bottom of the page.  At 7:40 and 7:50 a.m., does that indicate

15  that some inmates were walked?

16  A.   Yes.

17  Q.   Okay.  And what does it tell you about those inmates?

18  A.   That it was seven inmates on single walk.  For 7:40, death

19  row inmates -- rover placed seven death row inmates for single

20  walk.  That's on the walk yard and it was seven.  At 7:50 they

21  began to group walk.

22  Q.   It doesn't give you all their names, does it?

23  A.   No.

24  Q.   Was it the universal practice in handling these duty post

25  logs to list every inmates' movement when it was a group of

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0541

1  inmates doing something?

2  A.   No, unless it was something specific.

3  Q.   Okay.

4  A.   But no.

5  Q.   And certainly you don't know who every member of Project

6  Hope is?

7  A.   No.

8  Q.   All right.  And you don't know who members of Project Hope

9  might talk to, do you?

10  A.   No.

11  Q.   Are you aware of Matthew Reeves ever making a request for

12  ADA accomodation during your time at Holman?

13  A.   No.

14        MR. ANDERSON:  Just a moment.

15  Q.   And you were shown a little while ago an excerpt from a

16  duty post log that showed several inmates going to a Project

17  Hope meeting, correct --

18  A.   Yes.

19  Q.   -- that opposing counsel showed you?

20  A.   Yes.

21  Q.   Do you have any reason to believe that that list is the

22  exclusive list of the membership of Project Hope?

23  A.   Can you rephrase that?  I'm sorry.

24  Q.   Do you have any reason to think that those five people are

25  it as far as it comes to Project Hope, that those are the only

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0542

1   members?

2   A.   I have no idea.

3   Q.   Do you know if Project Hope has a formal membership?

4   A.   I have no idea.

5           MR. ANDERSON:  That's all I have, Your Honor.

6           THE COURT:  Any redirect?

7           MR. HAHN:  No, Your Honor.  Thank you.  And this

8   witness can be excused, please.

9           THE COURT:  Okay.  You can be excused, ma'am.  Thank

10  you.

11          MR. PALOMBI:  Our next witness, Your Honor, will be

12  Deidre Prevo.

13                      DEIDRE PREVO

14      The witness, having been duly sworn to speak the

15  truth, the whole truth and nothing but the truth, testified as

16  follows:

17                  DIRECT EXAMINATION

18  BY MR. PALOMBI:

19  Q.   Good afternoon, Ms. Prevo.

20  A.   Good afternoon.

21  Q.   Nice to see you in person actually this time.  I'm just

22  going to ask you to make sure you lean into the microphone.

23  It's more to help me make sure I hear your answers.

24      Could you state and spell your name for the court

25  reporter.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0543

1  BY MS. HUGHES:

2  Q.   An inmate can use an inmate request slip to make a request

3  for an accomodation; is that correct?

4  A.   Yes.

5       MS. HUGHES:  That's it.

6       THE COURT:  Let's take a break.

7       You can be excused, ma'am.  Thank you.

8       Let's take about a 10-minute break.

9     (A recess was taken from 2:09 p.m. until 2:22 p.m.)

10      THE COURT:  You can be seated.

11      Anything we need to talk about before we move into our

12  next witness?  DOC lawyers?

13      MR. ANDERSON:  Nothing from us, Your Honor.

14      MR. HAHN:  No, Your Honor.

15      THE COURT:  All right.  Who's your next witness?

16      MS. DULAC:  The plaintiff calls Cheryl Price.

17                        CHERYL PRICE

18      The witness, having been duly sworn to speak the

19  truth, the whole truth and nothing but the truth, testified as

20  follows:

21                    DIRECT EXAMINATION

22  BY MS. DULAC:

23  Q.   Good afternoon, Ms. Price.

24  A.   Good afternoon.

25  Q.   Can you please state your name and spell it for the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0544

1    record?

2    A.   Cheryl Price.  C-h-e-r-y-l.  Last name P-r-i-c-e.

3    Q.   And for the record, can you state your title at the

4    Alabama Department of Corrections?

5    A.   I serve as an assistant deputy commissioner.

6    Q.   And how long have you held that position?

7    A.   Since roughly December of 2020.

8    Q.   And before that, what was your position with the

9    Department?

10   A.   I had the title of regional director.

11   Q.   And did your region include Holman Correctional?

12   A.   At one point it did, yes.

13   Q.   And when was that?

14   A.   It depends on which time of the year.

15   Q.   Okay.  Did that include in 2018?

16   A.   Yes, it did.

17   Q.   And are you aware today that you're appearing as a Rule

18   30(b)(6) witness as to specific topics?

19   A.   Yes.

20   Q.   And those topics include the factual basis for the

21   defendants' answer, the factual basis for the defendants'

22   affirmative defenses, the defendants' response to certain

23   discovery requests, differences in the 2002 electrocution

24   versus lethal injection election process, differences between

25   the 2018 lethal injection versus nitrogen hypoxia election

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0545

1   process, and then the identification of notes, memoranda, and

2   other written evidence regarding the distribution of the

3   nitrogen hypoxia election form?

4   A.   I was not provided with a list in that form, but I am

5   aware of the fact that I am appearing as a 30(b)(6) for the

6   Alabama Department of Corrections today.

7   Q.   And what did you do to prepare for today's testimony?

8   A.   I met with my attorneys and I also reviewed a number of

9   documents.

10  Q.   And what were those documents?

11  A.   Those items included, but not necessarily limited to,

12  Inmate Reeves' medical file, documents from his institutional

13  file, the testimonies of some defendants, in some cases their

14  actual affidavits as well.

15  Q.   I'm going to show you a document.  I don't think it's been

16  marked yet by the plaintiff, but the title of it is The

17  Election to be Executed by Nitrogen Hypoxia.  It is the

18  document that I think we've been referring to quite a bit over

19  the course of the day.

20       Do you recognize that document?

21  A.   Only based on the title that's here.

22  Q.   I'm sorry?  I couldn't hear you.

23  A.   Only based on the title that is listed here, The Election

24  to be Executed by Nitrogen Hypoxia.

25  Q.   Have you ever seen this document before?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0546

1   A.   I may have seen a document similar to this one.  Yes.

2   Q.   And do you remember where you have seen that?

3   A.   Only in the documents that I reviewed in preparation.

4   Q.   And the document that you saw, was it similar to this or

5   had it been -- was there a signature on it?

6   A.   There was a signature on the one that I saw.

7   Q.   Do you remember whose signature that was?

8   A.   It was two of the other inmates from Holman Prison that

9   had signed off on a document.

10         MS. DULAC:  Your Honor, at this time the plaintiff

11  would move to mark this as Exhibit 3.

12         THE COURT:  Any objection?

13         MR. ANDERSON:  No objection, Your Honor.

14         THE COURT:  It's admitted.

15  Q.   (Ms. DuLac, continuing:)  Ms. Price, so one of our first

16  topics is about the process that the Department of Corrections

17  implemented regarding the nitrogen hypoxia election.  And so

18  the law went into effect -- or the change of the law went into

19  effect June 1st, but prior to that, what procedures, if any,

20  did the Department put into place regarding the election

21  process?

22  A.   You mentioned June 1st --

23  Q.   Of 2018.  I'm sorry.

24  A.   Okay.  And if you could repeat your question as to --

25  Q.   Sure.  The law in Alabama changed and it allowed for

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0547

1   inmates to make an election of their method of execution by

2   nitrogen hypoxia, and they were allowed as of June 1st to make

3   that election in writing to the warden of the facility where

4   they were located.

5          And my question is prior to June 1st when the

6   Department -- when that change was going to go into effect,

7   what process did the Department put in place in regards to that

8   change in the law?

9   A.   I'm not aware of a process that we put into place.

10  Q.   Was there a protocol that was put into place?

11  A.   No.

12  Q.   I'm going to show you a document which is a privilege log

13  that was produced to us.  I'm not sure the best way to do this.

14  There we go.  It was produced in discovery by the defendants.

15  It's page 15 of their privilege log.

16       I would direct your attention to Item 41340, just halfway

17  down the page.  There's an e-mail from May 24th of 2018, so

18  that would be prior to the June 1st date, and the subject of

19  the e-mail is the protocol for the hypoxia election period.  It

20  shows you as a recipient of this e-mail.

21          So now having maybe refreshed your recollection, do

22  you remember what the Department's protocol was going to be for

23  the hypoxia election period?

24          MR. ANDERSON:  Your Honor, I'm going to object to this

25  question.  This is a question about a privilege log.  This is

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0548

1   an attempt to pierce the privilege that's been asserted.  It's

2   an improper question.  Ms. Price, one, is not an attorney and

3   wasn't involved in producing the privilege log, so the State

4   objects to what is a blatant attempt to pierce privilege.

5           MS. DULAC:  Well, Your Honor, I'm not --

6           THE COURT:  Are you claiming it was an improper

7   privilege assertion as it concerns this e-mail, Ms. DuLac?

8           MS. DULAC:  No, no.  I'm not asking about the subject

9   of the e-mail.  What I'm asking about is what was the protocol

10  generally.  I mean, what --

11          THE COURT:  You asked that question.  She said she was

12  not aware of a protocol or a process.

13          MS. DULAC:  Right.  And now I'm asking her if this

14  privilege log refreshes her memory that, in fact, there was a

15  protocol.

16          THE COURT:  Outside of what may have been discussed or

17  communicated between the recipients of that e-mail?

18          MS. DULAC:  Right.  Yes, Your Honor.

19          THE COURT:  Can you answer that question in the

20  context of nothing that was actually said or discussed or

21  written on that e-mail about whether there was a protocol

22  concerning nitrogen hypoxia?

23          THE WITNESS:  I do not recall, sir.

24  Q.  (Ms. DuLac, continuing:)  And so to your knowledge, you

25  don't remember a procedure or a protocol that the Department of

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0549

1   Corrections had in place prior to June 1st of 2018?

2          MR. ANDERSON:  Asked and answered, Your Honor.

3          MS. DULAC:  I'm just trying to clean it up because

4   it's a little --

5          THE COURT:  Go ahead and ask your question.

6   Q.  (Ms. DuLac, continuing:)  I'm just asking you, so you

7   don't remember if there was a policy or a procedure or a

8   protocol, anything in place prior to June 1st?

9   A.  As I previously stated, I'm not aware of a protocol.

10  Q.  And are you aware of any protocol after June 1st?

11  A.  I am not aware of a protocol.

12  Q.  Were there any discussions amongst staff at the Department

13  of Corrections regarding how to handle elections for people who

14  wanted to elect nitrogen hypoxia?

15  A.  To my knowledge, I am not aware of that type discussion,

16  no.

17  Q.  Was there a procedure in place as to how to log in forms

18  that -- or pieces of paper or however someone wanted to make an

19  election, was there a procedure in place as to how that would

20  happen?

21  A.  No.  The agency did not establish a procedure for that.

22  Q.  Was there any discussion amongst the wardens who were the

23  ones that were to receive the elections regarding how they were

24  to handle it at a facility level?

25  A.  I'm not aware of the discussion that took place at the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0550

1   facility level.

2   Q.   So there was not a directive from DOC to the individual

3   wardens?

4   A.   No, there was not.

5   Q.   And so according to the record, sometime after June 26th

6   this election form that was Plaintiff's Exhibit 3 was

7   distributed at Holman Correctional Facility.  Is that your

8   understanding?

9   A.   Are you saying after June 26th of 2018?

10  Q.   Yes, ma'am.

11  A.   At some point, according to the testimony I reviewed from

12  then Warden Stewart, yes, they did pass that out there at

13  Holman.

14  Q.   Was that form distributed anywhere else in the Department

15  of Corrections?

16  A.   There was a different form also there at Holman that at

17  least two other inmates had.  There was a version of the form

18  for at least one inmate at Tutwiler, and there was the same

19  form or a very similar form there at Donaldson was

20  disseminated.

21  Q.   If the Department distributed the form to inmates at

22  Holman, why wouldn't they distribute it to everyone?

23       MR. ANDERSON:  Object to the form of the question.

24  There's been no testimony that the Department distributed the

25  form at Holman.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0551

1      THE COURT:  I'll let her answer the question if she

2  understands it.  Objection's overruled.

3  A.   Could you repeat your question, please?

4  Q.   Sure.  If the Department, through its warden, Ms. Stewart,

5  distributed the form at Holman Correctional to persons on death

6  row, then why wasn't it distributed to all persons on death row

7  in Alabama?

8  A.   In everything that I have looked at, there was nothing

9  that came out from the Department going out to all of the

10  facilities where there were death row inmates.  In reviewing

11  the testimony from then Warden Stewart, she did have forms and

12  she did have someone to pass them out there.  Warden Gordy, who

13  was the warden at Donaldson, passed out the form there.  I'm

14  not certain how Tutwiler came about their form.

15  Q.   Right.  But my question is why weren't those forms passed

16  out to everyone at Tutwiler, for example?

17  A.   I can't answer that question because I'm not aware of any

18  order or direction from the central office to pass out that

19  form.

20  Q.   Has anyone asked?  For example, has anyone asked the

21  warden at Tutwiler, why did you not pass out those forms?

22  A.   Because I'm not aware of anyone asking the warden at

23  Tutwiler.  There may have been discussion with her as well.

24  But there was no reason for us to pass out that form.

25      Everything that I reviewed is that the attorneys at Holman

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0552

1  did come in and meet with their clients and they gave them

2  forms.  Attorneys did go to Donaldson and they met with their

3  clients.  So I'm not exactly certain how that form was

4  disseminated around the state.

5  Q.   And when you say attorneys, which attorneys do you mean?

6  I'm sorry.  Just for the record.

7  A.   If memory serves, it would have been the Federal Defenders

8  attorneys that went into Holman.  I'm not sure at the other

9  facilities.

10  Q.   And why did Warden Gordy distribute that form at

11  Donaldson?

12  A.   I am not certain why he disseminated that form.  I did

13  not -- I don't recall seeing his -- or exactly what was said in

14  his affidavit.

15  Q.   And was he directed by someone at the Department of

16  Corrections to do that?

17  A.   Not to my knowledge, no.

18  Q.   So he did that of his own volition?

19  A.   That I cannot testify to.  Only based on his testimony.

20  I'm not certain how he came about the form or who told him to

21  pass them out.

22  Q.   Is this of concern to the Department that there wasn't

23  uniformity in the distribution of this form?

24  A.   I'm not certain I understand your question.

25  Q.   Well, this is now the subject of two lawsuits, and so my

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0553

1   question is, is the Department concerned that an election form

2   that was distributed was not uniformly distributed throughout

3   its facilities?

4   A.   No.  There is no concern there in that respect because I

5   accept the testimony from then Warden Stewart who said that she

6   was told to pass this form out.  She simply does not recall who

7   told her to pass it out.  The agency had no reason to

8   disseminate this form.  The attorneys who met with their

9   clients ensured that their clients had those forms.

10  Q.   But the attorneys I think that you're referring to don't

11  represent everyone at Holman; is that correct?

12  A.   I'm not certain who they represent at Holman.

13  Q.   And following the disclosure that these forms were

14  distributed by Warden Stewart or through her agent, Captain

15  Emberton, was there an investigation that was conducted by the

16  Department?

17  A.   There was not an investigation, per se.  Questions and

18  discussions were asked and discussions were held -- questions

19  were asked and discussions were held about that.

20  Q.   And do you know who was questioned?

21  A.   Not specifically.  The defendants in this case, because

22  that's when all of that came to light, but most importantly,

23  the then Warden Stewart.

24  Q.   And was there a system in place to confirm whether someone

25  received this form or not?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0554

1   A.   At which location?

2   Q.   At Holman, for example.

3   A.   According to the documents, it was Captain Emberton that

4   then Warden Stewart passed the forms off to for him to

5   disseminate.

6   Q.   And when he handed the forms out, did he keep track of who

7   he gave them to?

8   A.   Not to my knowledge.  There was no real documentation for

9   that other than him keeping up or passing out the forms to each

10  of the inmates who were on death row at that time.

11  Q.   And so the inmate never signed any receipt that he had

12  received the form?

13  A.   I am not aware of a receipt being signed.

14  Q.   And are there other forms that inmates receive from the

15  Department where they have to sign a receipt that they had

16  received it?

17  A.   Which forms?

18  Q.   For example, a disciplinary report.  Let's say you receive

19  a disciplinary.

20  A.   When the inmate receives a disciplinary, he does sign or

21  he could refuse to sign.

22  Q.   But either way, there is a place for him to either refuse

23  to sign or sign that he received that and he has that

24  information?

25  A.   There is a place on the disciplinary form that requires

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0555

1    his signature, and if he does not sign, then they will state

2    refused to sign.

3    Q.   But when the form was -- the election form was distributed

4    at Holman, there is no record of who received it or if they

5    received it; is that correct?

6    A.   That is correct.

7    Q.   Were people in the administration, people like yourself at

8    the Department, informed that the law had changed?

9    A.   I was made aware that the law had changed.

10   Q.   And do you remember when that was?

11   A.   No, I do not recall the exact date.

12   Q.   Do you remember if it was before the law changed or after

13   the law changed?

14   A.   I don't understand your question.

15   Q.   I mean, were you informed that, hey, the law is changing

16   and so soon you may hear about, you know, election forms or

17   people that are wanting to elect nitrogen hypoxia as their

18   method of execution, or did you hear about it a year later?

19   A.   I do not recall specifically what I was told about that

20   other than, yes, we did have discussion that the law was

21   changing, but there was no discussion at that point about

22   having the inmates to make an election.  No.

23   Q.   Were you employed at the Department when the law changed

24   from electrocution to lethal injection?

25   A.   Yes, I was.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0556

1  Q.  And do you remember what the process was during that

2  period?

3  A.  No, I do not.

4  Q.  As the 30(b)(6) witness, did you speak with anybody about

5  how the Department handled that process?

6  A.  As the 30(b)(6) witness today?

7  Q.  Yes.

8  A.  I did not discuss with anyone about the then electrocution

9  process.

10  Q.  Were you aware that you were going to be asked about that

11  at the hearing today?

12  A.  About what, specifically?

13  Q.  About the differences between the 2002 electrocution

14  versus lethal injection election process.

15       MR. ANDERSON:  I'm going to object to the question.

16  For one thing, that sentence makes no sense.  The differences

17  between the 2002 electrocution versus lethal injection process.

18  What differences?

19       THE COURT:  I'll let her answer the question.

20  Objection overruled.

21  A.  Can you ask your question again, please?

22  Q.  Sure.  I was just wondering if you had been advised that

23  you were going to be asked questions about that today and that

24  you were the 30(b)(6) witness on that topic.

25  A.  But when you say "that" --

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0557

1   Q.   Regarding the election process when the law changed and

2   the method of execution went from electrocution to lethal

3   injection in 2002.

4         THE COURT:  Why don't you rephrase your question.  I'm

5   having a hard time understanding it myself.

6         When you say advise, are you talking about from

7   Mr. Anderson or one of the lawyers in preparation for today?

8         MS. DULAC:  Right.  I mean, Mr. Anderson or counsel

9   for the defendants advised that she would be the 30(b)(6)

10  witness on this topic, and so she doesn't know the answer and

11  so I'm just asking her did anyone tell her that she should know

12  the answer to these questions.  That's all.

13        THE COURT:  That kind of gets into what I would

14  consider attorney-client communications.

15        MR. ANDERSON:  And as far as that goes, again, Your

16  Honor, I point out that this topic is nonsensical.  The topic

17  makes no sense.

18        THE COURT:  Well, can you ask the question in a format

19  that does not require her to disclose any type of communication

20  that one of the lawyers for DOC may have had with her?

21        MS. DULAC:  I'm just trying to ascertain whether she

22  was prepared for her testimony today, and she does not appear

23  to be prepared for her testimony on this particular topic.

24  That's all.

25        THE COURT:  You've made your point on that.  Let's

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0558

1   move on to the next one.

2           Let me ask y'all both something.  This has been

3   sticking in my head.  And I don't know that this is the

4   witness.  When we talk about election forms that were handed

5   out at Holman by DOC personnel, were they handed out to

6   everybody on death row, including inmates that had already met

7   with the Federal Defenders and executed forms in connection

8   with those meetings, or are we talking about inmates who did

9   not meet with the Federal Defenders?

10          MR. ANDERSON:  From the defendants' perspective in

11  relation to Captain Emberton who testified about this in the

12  Smith litigation -- and I think has submitted an affidavit in

13  this case -- they were handed out to everyone on death row

14  regardless of whether they had been involved in the mass

15  meeting that the Federal Defenders held.

16          THE COURT:  Okay.  So I think somebody showed a call

17  or a duty log, and it showed Mr. Palombi or Mr. Hahn, one of

18  you, coming in through the gate on the 24th -- well, whatever

19  date you did.  And assuming you sat down with clients and

20  perhaps had some of them sign forms, those same individuals

21  could have received another form from DOC within a matter of

22  days?

23          MR. ANDERSON:  That Captain Emberton may have passed

24  out a second form to them.  Yes, sir.

25          THE COURT:  Okay.  I've got it.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0559

1   Q.   (Ms. DuLac, continuing:)   Ms. Price, I think perhaps I can

2   drill down this question a little bit better regarding the

3   electrocution versus lethal injection versus nitrogen hypoxia.

4   And I think the distinction is that when the law changed in

5   2002, it was that electrocution was the method of execution and

6   it was changing to lethal injection.   Is that your

7   understanding?

8   A.   That is my understanding, yes.

9   Q.   All right.   And so if you did not elect to keep

10  electrocution as your method, the default became lethal

11  injection.   Is that your understanding?

12  A.   When you say -- you're speaking in reference to the

13  inmates on death row at that time?

14  Q.   Yes, ma'am.

15  A.   It is my understanding that --

16        MR. ANDERSON:   Your Honor, I'm also going to object to

17  the relevance of the 2002 election process, if there was one.

18        THE COURT:   Objection's overruled.   You can answer the

19  question.

20  A.   That was the change to lethal injection.   There was no

21  need to pass out a form.   That was all up to the inmate because

22  when the statute changed, that was made clear.

23  Q.   (Ms. DuLac, continuing:)   That's right.   And so if you

24  wanted the new method, lethal injection, then you didn't need

25  to do anything, correct?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0560

1  A.   That is correct.

2  Q.   Which is the opposite of how the nitrogen hypoxia election

3  was; is that correct?

4  A.   In some portions of it, yes.

5  Q.   Right.  Because if you wanted nitrogen hypoxia, this time

6  you had to actually fill out a form and make an affirmative

7  election, correct?

8  A.   That is correct.

9  Q.   And Mr. Reeves has been on death row since 1998; is that

10  correct?

11  A.   I believe that is correct.  I don't recall the exact date,

12  but he has been there for quite some time.

13  Q.   And that would be prior to the change in 2002 with

14  electrocution versus lethal injection, correct?

15  A.   I'm sorry.  I don't understand your question.

16  Q.   He would have been on death row prior to 2002?

17  A.   Yes, he was.

18       MS. DULAC:  That's all I have for the moment.

19       THE COURT:  Any cross?

20       MR. ANDERSON:  Yes, Your Honor.

21            CROSS-EXAMINATION

22  BY MR. ANDERSON:

23  Q.   Good afternoon, Ms. Price.  Thank you for coming in.

24  A.   Good afternoon.

25  Q.   I'm going to have a few questions for you.  I'm Rich

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0561

 1   Anderson.  I'm with the Attorney General's Office representing

 2   the defendants here.

 3       The first thing I want to -- I want to clear something up.

 4   You were asked a moment ago whether you had to fill out a form

 5   to elect nitrogen hypoxia.  In fact, you didn't have to fill

 6   out any particular form, did you?

 7   A.   No.

 8   Q.   You could write on a piece of paper "I elect nitrogen

 9   hypoxia" and deliver it to the warden?

10   A.   That is correct.

11   Q.   In fact, to the extent there's any process to the election

12   of either nitrogen hypoxia or of electrocution versus lethal

13   injection, it's set up by the statute in both cases, isn't it?

14   A.   Yes, it is.

15   Q.   And the legislature in enacting both of those statutes, in

16   neither one of those statutes did it create any requirements

17   for the Department of Corrections, correct?

18   A.   That is correct.

19   Q.   And it certainly didn't set out any particular form that

20   had to be filled out, correct?

21   A.   That is correct.

22   Q.   Earlier you testified about questions that had been asked

23   and discussions that had been had about the process of passing

24   out forms at Holman, about the fact that forms were handed out

25   at Holman.  Those questions were asked in the context of the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0562

1   Smith litigation primarily; is that correct?

2   A.   That is correct.

3   Q.   And maybe to a lesser degree in the Christopher Price

4   litigation a couple of years ago?

5   A.   Correct.

6   Q.   But there was never any like inspector general, formal

7   investigation of how the forms ended up being passed out?

8   A.   No.  As I previously stated, there was no formal

9   investigation, just discussions and questions.

10  Q.   And mostly probably lawyers trying to figure out what

11  happened, right?

12  A.   Mostly, yes.

13  Q.   Do you know where Warden Stewart got the forms that

14  Captain Emberton passed out?

15  A.   No, I do not.

16  Q.   Would you have been in Ms. Stewart's chain of command at

17  the time?

18  A.   Indirectly, yes.

19  Q.   Do you recall giving any instructions to her to pass out

20  any sort of form?

21  A.   I did not give her any instructions.

22  Q.   Are you aware of any agency-wide instruction to either

23  Warden Stewart or any other warden to hand out forms to

24  facilitate the election process?

25  A.   No, I am not aware.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0563

```
1    Q.   Do you know Matthew Reeves?

2    A.   I do.

3    Q.   Okay.  We talked the other day during your deposition

4    about a memorable encounter that you had with Mr. Reeves, and I

5    think it was earlier this year.  Do you recall that?

6    A.   Yes, I do.

7    Q.   I assume that was at Holman Prison?

8    A.   Yes, it was.

9    Q.   And while you were at Holman Prison, Mr. Reeves asked you

10   a question.  Could you tell us about that?

11   A.   I was actually on the unit walking and talking with the

12   inmates, and he was seated at a table with other inmates

13   playing a game -- either checkers or dominos or something like

14   that -- and he questioned me with a bit of an irate tone about

15   the inmate phones.  He was complaining because when you picked

16   up the phone on one tier, an inmate on the other side could

17   actually hear that phone conversation.  And because of his

18   tone, I had to speak sternly to him and have him to change his

19   tone, which he did, and then I answered his question and told

20   him that we were aware of it and we were making some

21   adjustments with the phone.

22   Q.   So he didn't have any problem communicating to you the

23   problem he had, true?

24   A.   No, he did not.

25   Q.   You understood him fine?
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0564

1    A.   Yes, I did.

2    Q.   And you communicated to him what Holman and ADOC was doing

3    to address the problem, and he understood you --

4    A.   Yes, he did.

5    Q.   -- as far as you could tell?

6    A.   Yes.

7    Q.   Now, you're aware that both of the statutory election

8    provisions, both the one that took effect in 2002 for

9    electrocution versus lethal injection and the one that took

10   effect in 2018 for lethal injection and nitrogen hypoxia, both

11   of those required the inmate to take action, correct?

12   A.   That is correct.

13   Q.   And you're not aware of any formal ADOC-wide process or

14   program or anything that was devised to be communicated to all

15   death row inmates to facilitate their fulfilling their

16   statutory obligation, are you?

17   A.   No, I'm not.

18   Q.   Are you familiar with the inmate handbook?

19   A.   Yes, I am.

20   Q.   And are inmate handbooks made available to all prisoners

21   in ADOC custody?

22   A.   They are not passed out to them to each have one in their

23   hand, but the inmate handbook is posted in the library,

24   hardbound copies, and/or it is actually on the computer so that

25   they can access the handbook from the library computers.

AM1983_0565

1   Q.   And to your knowledge, the inmate handbook contains a

2   section regarding ADA accommodations and how inmates can get

3   help?

4   A.   Yes, it does.

5           MR. ANDERSON:  Just a moment.

6           Nothing further, Your Honor.

7           THE COURT:  Any redirect?

8                   REDIRECT EXAMINATION

9   BY MS. DULAC:

10  Q.   Ms. Price, Mr. Anderson just asked you about whether or

11  not the inmates could just write it on a sheet of paper, did

12  they need an actual form, and your testimony was they could

13  just write it on a sheet of paper.  And my question was were

14  they notified of that?

15  A.   Which inmates?

16  Q.   Any inmates.  Did the Department notify death row inmates

17  that they could write their nitrogen hypoxia election on a

18  sheet of paper?

19  A.   No, not to my knowledge.  The Department did not do

20  anything to tell the death row inmates about that election.

21  Q.   Except for they gave them a form?

22  A.   No.  The warden at Holman had a form that she

23  disseminated.  The warden at Donaldson had a form that he

24  disseminated.  And as I mentioned, I am not certain where the

25  inmate at Tutwiler got her form.  And also the other two

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0566

1  inmates at Holman that had different forms, I'm not sure where

2  they got those forms from either.

3  Q.   So is it your position that the Department did not give

4  the forms to inmates at Holman?  I just want to make sure that

5  we're clear on this point.

6  A.   According to the testimony from then Warden Stewart, she

7  doesn't know who told her to pass out those forms.  She is

8  saying that it came from someone in her chain.  I'm not certain

9  where the forms came from.

10 Q.   But she was directed to do it by someone within the

11 Alabama Department of Corrections; is that correct?

12 A.   According to her testimony, yes.  But I don't know who

13 that person was.

14 Q.   And when you met with Matthew Reeves earlier this year,

15 did he read anything to you?

16 A.   The encounter I had with Inmate Reeves was, as I

17 mentioned, in the day room area, and he was seated at the table

18 playing a game with the other inmates.

19 Q.   So he did not read anything to you?

20 A.   No, he did not.

21        MS. DULAC:  Thank you.  No further questions.

22        THE COURT:  Let me make sure I'm clear on this,

23 Ms. Price.  Other than the election form that was handed out on

24 death row and what may have been told to those inmates at the

25 same time, DOC undertook no other efforts to inform death row

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0567

```
1   inmates of the change in the law and how they could go about

2   electing into nitrogen hypoxia?

3           THE WITNESS:  Correct.

4           THE COURT:  And then as it concerns -- we've talked

5   about Holman and Tutwiler.  Donaldson has death row inmates?

6           THE WITNESS:  Yes.  They did at that time.

7           THE COURT:  Are there any other facilities that did?

8           THE WITNESS:  No.

9           THE COURT:  Okay.  You can proceed.

10          MR. ANDERSON:  Just a couple questions, Your Honor.

11                      RECROSS-EXAMINATION

12  BY MR. ANDERSON:

13  Q.   Ms. Price, inmates have rights to file appeals, legal

14  appeals, right?

15  A.   That is correct.

16  Q.   They file habeas petitions, they file Rule 32s, they file

17  direct appeals, and all of these are things that they have a

18  legal right to do, correct?

19  A.   Correct.

20  Q.   ADOC doesn't advise them on what to file, do they?

21  A.   No, we do not.

22  Q.   Would it be their lawyers who advise them what to file?

23  A.   I would hope so.

24  Q.   Does ADOC allow its inmates to have access to their

25  attorneys?
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0568

1   A.   Oh, yes, sir.

2   Q.   They have telephonic access, true?

3   A.   Yes, they do.

4   Q.   They have visitation access if they want it, true?

5   A.   Yes.

6   Q.   One other question about the encounter, the time you met

7   Mr. Reeves and you were talking to him about the telephones and

8   he was expressing his concern and you corrected him.

9        Was he able to multitask, continue playing his game

10  and participate with the other people, or did he just seem to

11  not be able to handle that?

12  A.   Oh, no.  He was able to continue with the game.

13  Q.   Okay.

14       MR. ANDERSON:  That's all I have, Your Honor.

15       THE COURT:  We can excuse this witness, Ms. DuLac?

16       MS. DULAC:  Yes, Your Honor.

17       THE COURT:  Thank you, Ms. Price.

18       THE WITNESS:  Thank you.

19       THE COURT:  Who's your next witness?

20       MS. DULAC:  Your Honor, our last witness is Captain

21  Jeff Emberton.

22       THE COURT:  Let me ask this of both lawyers, and I

23  think I know the answer.  Is anybody going to be able to

24  testify or can anybody, in fact, testify as to why the

25  instruction or order was given from Montgomery to hand out

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0569

1    these forms?

2          MR. ANDERSON:  I wish we knew the details of that,

3    Your Honor.  We do not.  We are not aware of anyone who has

4    that knowledge.

5          THE COURT:  We don't know who made the instruction; we

6    just know that it was made?

7          MR. ANDERSON:  We know that Ms. Price recalls

8    receiving that instruction -- not Ms. Price.  I'm sorry.  I

9    misspoke.  Ms. Stewart.

10                        JEFF EMBERTON

11         The witness, having been duly sworn to speak the

12   truth, the whole truth and nothing but the truth, testified as

13   follows:

14                     DIRECT EXAMINATION

15   BY MS. DULAC:

16   Q.   Captain Emberton, how are you?

17   A.   Pretty good, ma'am.  How are you?

18   Q.   I'm good.  Thank you.  Can you please state your name and

19   spell it for the court reporter.

20   A.   Jeff Emberton, E-m-b-e-r-t-o-n.

21   Q.   And can you state your occupation?

22   A.   Correctional captain.

23   Q.   And how long have you held that position?

24   A.   Since 2016.

25   Q.   And in preparation for your testimony today, did you

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0570

1  review any documents?

2  A.    No, ma'am.

3  Q.    And did you meet with anyone?

4  A.    No.  I spoke with the attorneys.  That's it.

5  Q.    And we've spoken before so I won't go into all the

6  questions we've gone through before, but just for the judge's

7  reference, how long have you worked for the Department of

8  Corrections?

9  A.    22 and a half years.

10  Q.    And at what point did you work at Holman Correctional

11  Facility?

12  A.    From 2016 to 2019.

13  Q.    And at what point or how long did you work on death row,

14  specifically?

15  A.    The whole three years I was there.

16  Q.    And did you always have the same job classification?

17  A.    Yes, ma'am.  While at Holman?

18  Q.    Yes, while you were at Holman.

19  A.    Yes, ma'am.

20  Q.    Have you had training on the Americans with Disabilities

21  Act?

22  A.    Yes, ma'am.

23  Q.    And how often do you or have you had that training?

24  A.    We get refresher training every year.

25  Q.    And is that training for you as an employee or for you to

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0571

1  recognize or how to assist persons that are in custody with the

2  Department of Corrections?

3  A.   I mean, it's just part of our annual training we go to

4  every year.

5  Q.   Have you ever assisted someone to complete an ADA

6  accommodations request?

7  A.   Not that I recall.

8  Q.   In June of 2018, you were contacted by your warden,

9  Cynthia Stewart?

10       MR. ANDERSON:  Your Honor, I don't want to slow things

11  down unnecessarily, but I do want to object to the leading

12  nature of some of these questions.

13       THE COURT:  Well, the objection's overruled on this

14  one.  We just need to move some of these things along.  I don't

15  think this is really a disputed issue.

16  Q.   (Ms. DuLac, continuing:)  Captain, why don't you -- and

17  I'm sure you know where we're going because this has been the

18  subject of many conversations between you and I.  What I'd like

19  for you to do is just tell the Court in June of 2018, you were

20  contacted by Warden Stewart regarding an election form, and she

21  instructed you to distribute the election form.  Can you tell

22  the Court what she advised you to do and what you did, please?

23  A.   She advised me to make sure that every inmate on death row

24  received an election form and an envelope.  I proceeded to

25  death row and made sure that every inmate on death row received

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0572

1    an envelope and an election form.

2    Q.   And what did -- how did you make sure that every inmate

3    received it?

4    A.   I personally handed them the form and the envelope.

5    Q.   And did every person take the form and the envelope out of

6    your hand?

7    A.   Some of them did.  Some of them were asleep and I just

8    tapped them on their foot and laid the form in the bars of

9    their cell door.

10   Q.   So you may or may not have, in fact, made eye contact with

11   every person?

12   A.   I may or may not.

13   Q.   And did you have a list that you kept of all the persons

14   that were on death row that day that you gave a form to?

15   A.   No.

16   Q.   Do you have any records of any kind of who you gave a form

17   to?

18   A.   No.

19   Q.   And did you make any statements to the inmates as you gave

20   them the form?

21   A.   Other than -- I can't remember exactly what it was my

22   timeframe was, but I gave them a timeframe of when I needed the

23   forms back.

24   Q.   And when was that?

25   A.   I can't recall.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0573

1   Q.   Was it -- could you give me an approximate time?  Was it

2   that day?  Was it next month?

3   A.   If I had to -- I think it was at the end of the week.  I'm

4   not totally correct or sure if it was the end of the week or

5   not.

6   Q.   And what day did you perform this task?

7   A.   On the date they were given to me.

8   Q.   The day after they were given to you?

9   A.   No.  The day of.

10  Q.   Oh, the day of.  Okay.

11  A.   Yes.

12  Q.   And when were they given to you?

13  A.   That morning.

14  Q.   And what day of the month were they given to you?

15  A.   June.

16  Q.   June.  And do you remember June what?

17  A.   I don't remember the date.

18  Q.   So you know that it was June of 2018, but you don't

19  remember what day.  Do you remember what day of the week?

20  Monday?  Tuesday?

21  A.   I do not recall.

22  Q.   Did you work the weekends?

23  A.   I did not.

24  Q.   So it would have been Monday through Friday?

25  A.   Yes, ma'am.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0574

1   Q.   Did you work at night or during the day?

2   A.   During the day.

3   Q.   I'm sorry?

4   A.   During the day.

5   Q.   So it would have been during the daytime hours Monday

6   through Friday sometime in June of 2018?

7   A.   If I'm correct, yes.

8   Q.   And did anyone ask you any questions?

9   A.   Not really.

10  Q.   And do you have any memory of any specific inmates that

11  you handed the form to?

12  A.   No, not really.  I mean, I don't have -- they all got one.

13  I don't have anybody that just stands out in my mind that --

14  Q.   And to your knowledge, were any of the inmates out of the

15  facility that day?

16  A.   I can't recall.

17  Q.   If they were out of the facility, would they have received

18  a form?

19  A.   Probably not.  But they don't go anywhere very often

20  anyway that they're not back by the end of the day.

21  Q.   Let's say they were at a free-world hospital, for example.

22  Surgery.  Would they have gotten a form when they came back?

23  A.   I wouldn't have given them one.

24  Q.   If they were at court, for example, where they would have

25  been at a county jail for several days, would they have gotten

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0575

1   a form when they came back?

2   A.   If they were out that week, probably not.

3   Q.   Okay.  Did you provide these forms to the warden at

4   Donaldson?

5   A.   I did not.

6   Q.   Did you provide these forms to the warden at Tutwiler?

7   A.   No, ma'am.

8   Q.   Do you know at the time if there was a death row inmate at

9   St. Clair?

10  A.   No, ma'am.

11  Q.   Did you ever speak with Warden -- I believe his name is

12  Gordy at the Donaldson Correctional Facility?

13  A.   No, ma'am.

14  Q.   Did you speak with the warden at Tutwiler?

15  A.   No, ma'am.

16  Q.   Did Warden Stewart ask you what you said to the inmates

17  when you handed out the form?

18  A.   No, ma'am.

19  Q.   Do you have any training in identifying persons with

20  cognitive deficiencies?

21  A.   No, ma'am.

22  Q.   You've recently filed an affidavit in this case.

23  A.   Yes, ma'am.

24  Q.   What were the circumstances of you being asked to file

25  this affidavit or draft an affidavit?

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0576

1  A.   I was just asked by one of the attorneys to -- if I knew

2  who Matthew Reeves was and if I had any contact while I was on

3  death row, and I said yes, sir.  And they said that he needed

4  an affidavit based on the same case as before.

5  Q.   And did you draft this affidavit yourself?

6  A.   I think I actually wrote it out and sent it to him and it

7  was -- they modified it a little bit.  I think the format was

8  off.

9  Q.   And you discuss that Mr. Reeves was a problematic inmate.

10 What did you mean by that?

11 A.   Inmate Reeves stayed in a lot of trouble.  He did not get

12 along well with other inmates.  He stayed on what we call

13 single walk for a long time.  I tried to give Inmate Reeves

14 several opportunities to, I guess, be a little bit more

15 productive.  He was a tier runner for a short period of time,

16 and he just -- he was not a good fit.

17 Q.   Do you remember if he was on P block in June of 2018?

18 A.   He was.

19 Q.   And what's the distinction on P block as far as -- I'm

20 sorry.  That was a terrible question.

21      If you're on P block, are you allowed interaction with

22 others or are you in segregation or how does that work?

23 A.   Death row doesn't really technically have a segregation

24 because they're all locked down 23 hours a day, but the ones

25 that cannot function in a tier with other inmates, that's where

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0577

1   we put them because they are isolated.

2   Q.   So at the time Mr. Reeves would have been isolated from

3   other inmates?

4   A.   Other than the other ones on that tier that -- you know,

5   we had about 20-something inmates on that tier at the time that

6   just could not live with any of the other inmates.

7   Q.   And so I guess maybe my question is how does P block

8   differ from the other tiers as far as inmates having

9   interaction with others?

10  A.   P block is off by itself.

11  Q.   Okay.

12  A.   When you -- and it's kind of hard to picture.  If you walk

13  it, when you go on to a tier, you have two sides with a two

14  story on each side, an upstairs and a downstairs.  And P block

15  on that side, you've only got that one side.  There's no one

16  else around them.  That upstairs and the downstairs is all

17  there is.

18  Q.   Do you remember when you passed out those forms if you did

19  P block first or if you did it last or --

20  A.   I don't recall.

21          MS. DULAC:  I think that's all I have for today.

22  Thank you.

23          THE COURT:  Any cross?

24                  CROSS-EXAMINATION

25  BY MR. ANDERSON:

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0578

1  Q.   Good afternoon, Captain Emberton.  I'm Rich Anderson.  I

2  represent the defendants here.  I've got a few questions for

3  you.

4      There's been some discussion in this case of duty logs or

5  day logs from Holman.  Would they routinely show all movements

6  of inmates?

7  A.   Not all the time.

8  Q.   Okay.  Might they show, you know, a certain number of

9  inmates moved from one place to another but not who they were?

10 A.   They can.

11 Q.   And they might not even reflect an inmate's movement just,

12 say, to the day room or something like that?

13 A.   They may not.

14 Q.   Now, you know -- when you were at Holman, you knew death

15 row pretty well?

16 A.   Yes, sir.

17 Q.   You didn't need a list of inmates to find your way to

18 every cell, did you?

19 A.   No, sir.

20 Q.   I assume -- did you just go from cell to cell until you

21 covered the whole thing?

22 A.   Yeah.  Just depending on whichever mood I was in where I

23 started, if I started at the back or the front.  It just

24 depends on how I wanted to do it that day.

25 Q.   Now, you said that the inmates didn't really ask you any

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0579

1  questions about the form, but do you recall testifying in the

2  Smith litigation that, in fact, some of the inmates had asked

3  you some questions about -- and you offered an explanation of

4  the form?

5  A.   Some of them asked me, you know, when I walked up there

6  what I had, or they made the comment -- when I told them, you

7  know, they would all chime in, well, we ain't signing anything

8  until we send it to our attorney.  I mean, that was just

9  general...

10  Q.   Do you recall testifying that -- you said that the

11  warden -- I'm sorry.

12      You told the inmates that the law had changed and now the

13  inmates had a choice and that they needed to fill out the form?

14  A.   Yes.  They needed to sign it and give it back to me.

15  Q.   So you offered that explanation to at least some of the

16  inmates?

17  A.   I made the announcement on each tier.

18  Q.   On each tier, okay.  I want to talk to you briefly about

19  your affidavit, Captain Emberton.  Do you recall that I

20  actually e-mailed you a draft affidavit?

21  A.   Actually, I do.  Yes, sir.

22  Q.   And asked you to look over it and make sure it agreed with

23  what our conversation was and what your memory was; is that

24  correct?

25  A.   Yes, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0580

1    Q.   And you signed it and sent it back to me, correct?

2    A.   Yes, sir.

3    Q.   How many affidavits have you signed or drafted in your

4    career?

5    A.   A whole lot.

6    Q.   Okay.  And you don't remember the circumstances of every

7    one?

8    A.   No, sir.

9    Q.   Okay.  But when you sign an affidavit, you want to make

10   sure that it's correct.  That's the important thing to you,

11   true?

12   A.   Yes.

13   Q.   Now, you testified earlier that Mr. Reeves was not a good

14   fit as a tier runner.  Isn't it true that it's because

15   Mr. Reeves was, among other things, scamming other inmates?

16   A.   That's true.

17   Q.   Okay.  Was Mr. Reeves charging them for the services he

18   was supposed to provide for free?

19   A.   He was.

20   Q.   Tell me a little bit about that.

21   A.   Like I said before, the rest of the inmates are locked

22   down for 23 hours a day, so they don't have a whole lot of

23   access to anything.  The microwave, the phone, the ice cooler,

24   or anything like that, they don't have access.  That's what the

25   tier runners are for is to be able to run them errands for the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0581

1  other inmates.  Matthew Reeves would charge inmates to go do

2  that stuff for them.

3  Q.   So if an inmate wanted a plate of food taken to the

4  microwave --

5  A.   He'd charge them.

6  Q.   And he's not supposed to do that?

7  A.   No, sir.

8  Q.   You were asked some questions about P block generally, and

9  I think in your affidavit you indicated that the correction

10 officers tend to have more interaction with people in P block

11 than in other tiers, correct?

12 A.   Yes, sir.

13 Q.   Can you tell us kind of why that is?

14 A.   Because not being an actual restrictive housing unit, it

15 is our problematic inmates, the ones that we cannot -- that

16 need to be isolated to where we can deal with them one on one.

17 That's why they have a whole lot more, because you have those

18 type of inmates over there throwing feces, throwing other

19 stuff.  I mean, they're constantly -- there's constantly

20 something, an incident going on on that block.

21 Q.   Now, Mr. Reeves specifically, you know him, correct?

22 A.   Yes, sir.

23 Q.   You have memories of him.  Did he ever ask you to read

24 anything for him?

25 A.   No, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0582

1   Q.   Did he ever tell you, Captain Emberton, I can't read?

2   A.   Not that I recall.

3   Q.   But some inmates do have problems reading, true?

4   A.   Some do.

5   Q.   And in your experience, oftentimes -- particularly on

6   death row -- inmates will prefer to turn to each other for

7   assistance?

8   A.   That's correct.

9   Q.   And, of course, particularly on death row again, they've

10  all got their lawyers, right?

11  A.   Yes, sir.

12  Q.   And inmates have access to a telephone, correct?

13  A.   Yes, sir.

14  Q.   And they can make legal calls or personal calls, et

15  cetera, as needed?

16  A.   Yes, sir.

17  Q.   Do you recall what you told the inmates to do with the

18  form?

19  A.   Not right off the top of my head.

20  Q.   If you had previously testified that you told them to fill

21  out the form and put it in the envelope, seal it, and you'd be

22  back to collect it --

23  A.   That sounds about correct.

24  Q.   Did anybody ask you to read the form to them?

25  A.   No, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0583

1   Q.   Do the inmates ever ask you for legal advice?

2   A.   They try.

3   Q.   If an inmate asks you for legal advice, what do you tell

4   them?

5   A.   That's not in my scope of my job.

6   Q.   Do you have any reason to believe that Matthew Reeves

7   can't read?

8   A.   No, sir.

9   Q.   Or can't write?

10  A.   No, sir.

11  Q.   Are you aware of whether Mr. Reeves has, in fact,

12  written -- made written communications to ADOC staff and Holman

13  staff throughout his time at Holman?

14  A.   Not that I'm aware.  I mean, I've never received anything.

15  Q.   Okay.  At Holman, on Holman death row, the inmate policy

16  manual, it's kept in the library, correct?

17  A.   Yes, sir.

18  Q.   If an inmate wanted a copy of it, can he get a copy of it?

19  A.   He can.

20  Q.   I just want to make sure I haven't missed something, so if

21  you'll bear with me just a second, we can get you done.

22       Did any hall runners or tier runners assist you in passing

23  out the forms?

24  A.   No, sir.

25  Q.   Okay.  Is that because Warden Stewart had ordered you to

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0584

1   do it personally?

2   A.   Yes, sir.

3   Q.   And you take those kind of orders seriously?

4   A.   Yes, sir.

5   Q.   So if the warden tells you -- the big boss warden, Warden

6   III -- tells you to hand one of these out to everybody, you're

7   going to make sure you do that yourself?

8   A.   Yes, sir.

9   Q.   And in your experience, do inmates sometimes refuse to

10  sign forms?

11  A.   All the time.

12  Q.   And inmates sometimes just don't want to cooperate with or

13  have anything to do with the correctional officers?

14  A.   That's true.

15  Q.   Do they sometimes ignore you?

16  A.   A lot of times.

17  Q.   During your time at Holman death row, did you ever see any

18  other inmate helping Mr. Reeves with reading?

19  A.   No.

20  Q.   Did you ever see any correctional officer helping him with

21  reading?

22  A.   No, sir.

23  Q.   Did you ever see any of the mental health staff helping

24  him with reading?

25  A.   No, sir.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0585

1    MR. ANDERSON:  That's all I have, Your Honor.

2    THE COURT:  Any redirect?

3    MS. DULAC:  Briefly, I promise.  I know every lawyer

4  says that, but I mean it.

5                     REDIRECT EXAMINATION

6  BY MS. DULAC:

7  Q.   Captain Emberton, I think when we spoke a couple months

8  back, we talked about the law library, and I know you had

9  previously done a lot of work in there, and you mentioned to me

10  that sometimes the computer does not always work there.

11  A.   It depends.  Sometimes it -- it goes in and out, correct.

12  Q.   Right.  So there might be times where a person doesn't

13  always have access to information that's on the computer in the

14  law library.  Is that true?

15  A.   At times.

16  Q.   And you referenced that you sometimes have read to persons

17  on death row.  They've asked you to read things to them?

18  A.   No, I have not.

19  Q.   No, you have not?

20  A.   Huh-uh.

21  Q.   Okay.  And then the last thing, you had mentioned that

22  sometimes the guys, they kind of turn to each other if they

23  need assistance?

24  A.   Yes, ma'am.

25  Q.   If Mr. Reeves is on P side, you mentioned that sometimes

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0586

1   those folks are not necessarily in the -- in a good way, right?

2   A.   Yes, ma'am.

3   Q.   They throw feces and other mental health issues, perhaps,

4   so they may not turn to one another.  Is that a fair statement?

5   A.   No.  Because when it comes down to legal stuff, when it

6   comes down to death row stuff, legal stuff, they're going to

7   find a way to communicate.  They're going to lay down some

8   common grounds and communicate about what each one's attorney

9   says and stuff like that.  They're going to communicate.  Their

10  reference comes to other prison stuff where they can't get

11  along.

12  Q.   I see.  Okay.  Thank you.

13       MR. ANDERSON:  Nothing further from defendants, Your

14  Honor.

15       THE COURT:  You can be excused, Captain.

16       THE WITNESS:  Thank you, sir.

17       THE COURT:  Thank you.

18       Any further witnesses, counsel?

19       MR. HAHN:  No, Your Honor.  Thank you.

20       THE COURT:  Let me ask you about your exhibits that

21  you attached to your preliminary injunction.  Are you offering

22  those?

23       MR. HAHN:  We are, Your Honor.

24       THE COURT:  Are there any objections to those?

25       MS. HUGHES:  No, Your Honor.  And we'd also like to

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0587

1   introduce ours.

2          THE COURT:  That was the same question I was going to

3   ask of you.  Any objections from your end, Mr. Hahn?

4          MR. HAHN:  What's good for the goose is good for the

5   gander, Your Honor.

6          THE COURT:  All right.  They're all admitted, both

7   sides.

8          Okay, Mr. Anderson.  Do you have any witnesses?

9          MR. ANDERSON:  The only witness I think that we would

10  call is John Palombi, the issue we brought up earlier, Your

11  Honor.

12         THE COURT:  And identify for me exactly what it is you

13  want to question Mr. Palombi about.

14         MR. ANDERSON:  One of the issues that has come up --

15  and this touches a little bit on the expert evidence that was

16  provided this morning by Ms. Fahey regarding reading materials,

17  specifically her lack of knowledge of other things that

18  Mr. Reeves has read and how it might inform this Court's view

19  of her credibility.  As I say, I would be happy to make a

20  proffer of what I expect to be able to show, but it would not,

21  I don't believe, invade attorney-client privilege on that

22  issue.

23         THE COURT:  The form that you want to ask Mr. Palombi

24  about is which form exactly?

25         MR. ANDERSON:  Well, there's two separate issues, Your

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0588

1  Honor.  There is the questions we had about the form and how
2  they came to be at Holman Prison, whether the Federal Defenders
3  brought 50 copies or 200 copies, essentially.
4       And then the secondary issue was with whether
5  Mr. Palombi specifically had provided nonlegal reading
6  materials to his client.  And I would be happy to make, as I
7  say, a brief proffer about --
8       THE COURT:  Why don't you make a proffer.  One of the
9  things about putting lawyers on the stand is sometimes you
10  better watch what you ask for, because you may just get it.
11      MR. ANDERSON:  I understand, Your Honor.
12      The two things that we have come across is there is
13  Project Hope to Abolish the Death Penalty, which you've heard
14  referred to a few times.  We expect to be able to show some
15  evidence of a business record from Project Hope in the form of
16  meeting minutes that were posted to Facebook with an
17  interaction from Mr. Palombi.  Those meeting minutes indicate
18  Project Hope thanking the Federal Defenders and Mr. Palombi
19  specifically for bringing not only enough copies of the form
20  for their clients, but for everyone.
21      The second issue relates to inmate phone calls that
22  were provided the other day -- yesterday or day before,
23  yesterday I think -- and a statement by Mr. Reeves himself that
24  Mr. Palombi had sent him -- and I apologize for the
25  colloquialism, Your Honor, but a big-ass brief about the Creek

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0589

1  Indians and their history around here and plantations and

2  lawsuits and kind of curious about what that might be.  It

3  sounded like somewhat academic or historical reading material

4  that would be strange to provide to someone who is alleged to

5  be functionally illiterate.

6        THE COURT:  Well, I'll hear from Mr. Palombi or Mr. --

7        MR. PALOMBI:  Your Honor, we would still object to me

8  being called as a witness in this matter.  Things that I send

9  to Mr. Reeves is certainly within the attorney-client

10  privilege.  What Mr. Anderson said before, if his theory is

11  correct, any attorney representing somebody in an ADA suit

12  would have to testify in those cases about what they talked to

13  their client about.  That's in effect what Mr. Anderson wants

14  out of this situation.

15        And with respect to the form, Your Honor, again, this

16  was client-related business.  The Department of Corrections has

17  had three years to figure out how this form was passed out and

18  they haven't figured it out, and asking me at this point,

19  again, would invade what we did in visiting with our clients

20  specifically that day.

21        THE COURT:  What if Mr. Anderson wants to ask you

22  questions about when you did sit down with your clients and

23  presented them the form and ask you questions about the

24  conversations you had with your clients about what that form

25  meant and how many times you may have read it compared to the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0590

1    testimony that I've heard that -- whereas you may have on the

2    one hand sat down with your clients, explained the form, read

3    it to them maybe once, twice, three times, DOC didn't do that;

4    they just handed the form out with no context of what it means.

5    That's the kind of things where you better watch what you ask

6    for, because you may just get it.

7            The Project Hope, did you go make a presentation to

8    the Project Hope group and did that group include individuals

9    who were not your client or clients?

10           MR. PALOMBI:  No, Your Honor.

11           THE COURT:  No?

12           MR. PALOMBI:  No.

13           THE COURT:  They were all your clients?

14           MR. PALOMBI:  Project Hope meets, if I'm not mistaken,

15   every Wednesday morning in the prison.  It is members that are

16   in the prison.  I can say to the Court I have never made a

17   presentation to members of Project Hope as that group.

18           THE COURT:  And I draw a distinction between you

19   sending your client, Mr. Reeves, materials versus you showing

20   up at a Project Hope meeting and made a presentation to some

21   individuals who may have been clients, other individuals who

22   may not have been.

23           MR. PALOMBI:  Correct.  And --

24           THE COURT:  And if there were individuals who were not

25   clients, then I don't think that would necessarily be protected

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0591

1  by privilege.

2  MR. PALOMBI:  I can tell the Court that I have made no

3  presentation to a group that I -- that did not involve -- that

4  was not my clients.

5  THE COURT:  Okay.  All right.  Mr. Anderson, anything

6  else on your proffer?

7  MR. ANDERSON:  No, Your Honor.

8  THE COURT:  I don't see where I'm going to allow you

9  to call Mr. Palombi, to be honest with you.

10  All right.  Anybody else?

11  MS. HUGHES:  No, sir, Your Honor.

12  THE COURT:  I had a couple of questions, and I just

13  want to make sure I'm straight on the story.  We know that DOC

14  handed out these forms to everybody on death row.  There is a

15  dispute as to who exactly handed those forms out, whether it

16  was Captain Emberton, as he says, or a hall runner, as

17  Mr. Reeves says in his affidavit.  Is that an accurate

18  assessment there?

19  MR. ANDERSON:  I believe that is accurate, Your Honor.

20  THE COURT:  And so one of the issues I've got to

21  decide is whether DOC's decision to hand those forms out in the

22  manner and in the context in which they did constitutes a

23  service or a program.  Fair enough?

24  MR. ANDERSON:  I think that's fair enough, Your Honor.

25  THE COURT:  Mr. Anderson, tell me why that does not

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0592

1  constitute a service or a program.

2         MR. ANDERSON:  Your Honor, it is not a -- it wasn't a

3  formalized process.  It was -- and probably the most key part

4  of it, it is not something that was necessary in order to

5  elect.

6         As Judge Marks had said in the Smith litigation, other

7  inmates elected, made what is very much a legal decision about

8  their case through their attorneys.  Mr. Reeves had access to

9  his counsel.  There was no statutory requirement that a program

10  be developed.  There was no ADOC-wide or no evidence of an

11  ADOC-wide decision to implement a program.  ADOC did not draft

12  a form.  The form was drafted by other attorneys.

13         You know, at the end of the day, all that really was

14  required was for Mr. Reeves to write on a piece of paper or on

15  the back of an inmate request form or on a piece of a legal pad

16  or whatever, I elect nitrogen hypoxia.  So, you know, to the

17  extent -- the handing out of this election form, as we've

18  called it, was not a key or integral part of making the

19  election.  It didn't deny him the ability to participate in the

20  election.  You know, any alleged violation attached to it would

21  not have prevented him from getting --

22         THE COURT:  But isn't the problem that DOC was not

23  obligated to do anything under the statute?

24         MR. ANDERSON:  Correct, Your Honor.

25         THE COURT:  But they decided to do it, and they

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0593

 1   decided to do it for everybody on death row.  And in doing

 2   that, they were providing a service to everybody on death row

 3   for purposes of making that election.

 4        MR. ANDERSON:  Your Honor, again, the defendants in

 5   this case -- who are the face of ADOC, the commissioner and the

 6   warden -- did not institute a program.  We do know and we don't

 7   contest that the then warden at Holman ordered the form to be

 8   passed out, but we are -- we remain unsatisfied that that

 9   informal process is sufficiently formalized to be a --

10        THE COURT:  Your position is what they did does not

11   rise to a sufficient level to constitute a program.

12        MR. ANDERSON:  Correct, Your Honor.

13        THE COURT:  My observation is that, you know, is this

14   probably a circumstance of no good deed goes unpunished or as

15   an unintended consequence.

16        Anything else you want to say on it on your end,

17   Mr. Hahn, Ms. DuLac, Mr. Palombi?

18        MR. HAHN:  No, Your Honor.  We just thank the Court

19   for your time.

20        We would ask -- we're going to order the transcript.

21   And my apologies in advance to the court reporter that I tend

22   to talk a little fast, and I usually apologize at the very

23   beginning.  But we would ask for the opportunity to do some

24   post-hearing briefing.

25        THE COURT:  I'm going to give you until next Friday to

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0594

1    give me a supplemental brief with respect to what happened

2    today and the impact.  I don't need you to rehash what you've

3    already filed.  It's today's events, okay?

4          MR. HAHN:  And just one other question, Your Honor.

5    You had ordered the defendants to provide progress reports and

6    sort of rolling discovery.  To the extent that we were to

7    obtain information that we wanted to offer --

8          THE COURT:  You can supplement.

9          MR. HAHN:  Thank you, Your Honor.

10         THE COURT:  Can we all agree that this is -- there is

11    no evidence in this case that Mr. Reeves actually made an

12    accommodation request?

13         MR. ANDERSON:  Correct, Your Honor.

14         THE COURT:  So we're just proceeding down the road

15    that did he have a disability and was it obvious?

16         MR. HAHN:  Yes, with respect to this form, Your Honor.

17         THE COURT:  With respect to this form.

18         MR. ANDERSON:  That's correct.

19         THE COURT:  I'm just trying to -- I want us to get on

20    the same page of what is in dispute and what's not.

21         MR. ANDERSON:  And in all candor, the State believes

22    that the clearest and strongest failure in Mr. Reeves' case is

23    his failure to establish that there was an obvious -- there was

24    a need and it was an obvious need.

25         THE COURT:  We've got an affidavit from him.  For

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0595

1   me -- I'll be honest with you -- my struggle is we're talking

2   about an individual who has claimed to have an obvious

3   disability, but I've never seen this individual.  I haven't

4   heard him.  He's not -- he hasn't testified here today.

5   Nobody's taken his deposition, so I don't have the ability to

6   gauge for myself this individual, so I have to take it upon

7   what the experts say in their respective reports and so forth.

8   I just want to be upfront with you all on that.  That was a

9   strategic election presumably made by both sides on it.

10          Am I correct in at least taking from his affidavit or

11  declaration that if he knew back in June 2018 what he knows now

12  about the election form, he would have signed it and returned

13  it back in June of 2018?

14          MR. HAHN:  That is correct, Your Honor.

15          THE COURT:  So assuming that's his position now, then

16  somebody has sat down and read it to him?

17          MR. HAHN:  I have, Your Honor.

18          THE COURT:  So is his accomodation request really a

19  moot issue at this point?

20          MR. HAHN:  Well, an accommodation, Your Honor, within

21  the timeframe so that it could be an effective election.  So I

22  think it's not moot in terms of --

23          THE COURT:  A prospective -- he's certainly not

24  seeking at this point an order from me requiring that somebody

25  sit down with him and read the form two or three times, read it

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0596

1  slowly, read it forwards, backwards, and then ask him questions

2  about how he understands it?

3      MR. HAHN:  Correct, Your Honor.  If this Court were to

4  rule in his favor, we would provide the Court -- I'm sorry --

5  we would provide the warden of Holman Correctional Facility

6  with an executed form within whatever timeframe was given.

7      THE COURT:  Okay.  Is that fair enough, Mr. Anderson?

8      MR. ANDERSON:  I think, Judge, we've actually argued

9  that precise point in one of our pleadings, that the

10  accommodation is really moot at this point since he's made that

11  declaration.

12      THE COURT:  So we're looking at was the ADA violated

13  in that four-day, five-day period of time when that form was

14  handed to him, and if it was, what are the ramifications from

15  that.

16      I went back and read the election statute.  I read it

17  a couple of times.  Does the statute preclude DOC from

18  accepting an out-of-time election?

19      MR. ANDERSON:  Your Honor, the statute prescribes no

20  role for ADOC or the commissioner or the warden in the election

21  process.  Their participation in it -- they have no

22  participation in it.  Their description in it is purely

23  passive.  The statute places entirely on the prisoner the

24  responsibility of delivering to the warden an election in

25  writing.  That's about all there is.  There is no requirement

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0597

1    that the warden accept it or that the warden effectuate it or

2    that the warden record it or that he even accept it.

3         THE COURT:  Well, DOC has to honor it if the election

4    is made within 30 days, right?

5         MR. ANDERSON:  Correct.

6         THE COURT:  My takeaway is that's the only requirement

7    really made of the statute, is that if a death row inmate gives

8    an election form, for example, to the warden and does so within

9    30 days, DOC has to follow that election.  Fair enough?

10        MR. ANDERSON:  That would be an effective election if

11   it is delivered to -- I mean, not to be flippant.

12        THE COURT:  DOC does not have any discretion.  They've

13   got to accept it and honor it, right?

14        MR. ANDERSON:  Within that period.

15        THE COURT:  The flip side is, well, is there anything

16   in this statute or any other statute that would prevent or

17   preclude DOC from honoring an inmate's post-period election to

18   be executed by nitrogen hypoxia?

19        MR. ANDERSON:  The defendants would have no authority

20   to do so because the only way to create the valid election is

21   to do it within the statutory election period.  They don't have

22   a role in -- because they don't have a role in confirming

23   something or validating it, injunctive relief wouldn't be

24   effective against these defendants because they -- you know,

25   the injunction would almost have to be against the statute

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0598

1    itself because all of the action is from the inmate's

2    perspective to create the effective election.

3            THE COURT:  Are you saying that DOC has no discretion

4    whatsoever outside of that window to honor an inmate's choice?

5            MR. ANDERSON:  No statutory discretion, Your Honor.

6            THE COURT:  Mr. Hahn?

7            MR. HAHN:  If I could just briefly clarify, Your

8    Honor.  I believe that they have admitted that there is

9    authority for that, and I would direct the Court's attention to

10   Document 21, the amended complaint, paragraph 8, and then

11   Document 52, the answer to that complaint, paragraph 8.  And I

12   will just briefly read paragraph 8 as slowly as I can.

13           Paragraph 8, "Only Commissioner Dunn has the authority

14   to alter, amend, or make exceptions to the protocol and

15   procedures governing the execution of death sentence prisoners

16   in the state of Alabama."  The defendants' response to that was

17   "admitted."  That same language was relied upon in the Smith

18   case by the Eleventh Circuit to say that this was a redressable

19   injury, that same type of admission.

20           And so we would point to that in addition to the lack

21   of statutory prohibition.

22           MR. ANDERSON:  I'd be happy to speak to that, Your

23   Honor.

24           THE COURT:  And that was an issue, and I actually

25   wanted some particular briefing on the redressability issue.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0599

1   So, Mr. Anderson, address the redressability, because I'm stuck

2   on it, obviously.  Eleventh Circuit addressed it, albeit very

3   briefly, in the Smith case.

4        MR. ANDERSON:  As we pointed out in our brief about

5   the redressability -- I guess the first thing I want to say is

6   I want to address what Mr. Hahn just said about the complaint

7   and the answer.

8        The only person with any discretion in the realm of

9   executions is the commissioner, who has some statutory

10  discretion over certain limited areas that are defined by

11  statute.  None of that means that the warden is statutorily

12  empowered to willy-nilly change anything about the election

13  process.  Among his powers that he has discretion over are not

14  the power to accept a late election.

15       With redressability, kind of the key problem here is

16  just that there:  The defendants in this case -- the warden of

17  Holman Correctional Facility and the commissioner at the

18  Department of Corrections -- don't have the power to redo the

19  statutory election period.

20       And the plaintiff has cited to a Second Circuit

21  decision regarding a state entity -- not an individual sued in

22  his official capacity, but a state entity -- wherein -- this

23  was the Mary Jo case -- wherein the claimed injury was caused

24  by a statute over which the entity had authority.  Regardless,

25  you know, there is a distinguishing circumstance with what the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0600

1    statute is and the role in that case.

2           And the other problem is that it is a Second District

3    case and that it is dealing with a state entity as opposed to

4    individuals sued in their individual capacity.  And we think --

5    as we said in our brief, we think probably better informative

6    for this Court's decision and certainly more controlling is

7    Eleventh Circuit precedent dealing with redressability in suits

8    against individually named -- or rather, individuals acting in

9    their official capacity.

10          And we've cited, Your Honor, to a couple of cases

11   there that we rely on.  One of which was the Support Working

12   Animals case, which was a reported Eleventh Circuit decision

13   addressing whether the attorney general of Florida was an

14   appropriate redressable defendant in a case involving a

15   not-yet-enforced gambling statute or gambling amendment.  The

16   theory was the attorney general was the chief law enforcement

17   officer of the state and more or less could be injunctively

18   ordered not to enforce a statute.

19          But the Eleventh Circuit point ed out that the

20   plaintiffs' injuries arose not from the attorney general's

21   actions -- and this is actually traceability rather than

22   redressability, but as Your Honor knows, the two are often

23   quite intertwined in circumstances.  The plaintiffs' injuries

24   arose not from the attorney general's actions on the CRC but

25   rather from the independent action of third parties not before

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0601

1    the Court, namely the Florida voters who independently approved

2    the amendment at the ballot box.

3            And we have a somewhat similar situation here, where

4    it's really the legislature which enacted this law and the

5    governor who passed it and didn't give any power to the warden

6    to ignore it.  So the warden lacks that statutory ability to

7    redress the injury just in the same way that the attorney

8    general in --

9            THE COURT:  Were these arguments made with the

10   Eleventh Circuit in Smith?

11           MR. ANDERSON:  I don't know that we cited -- as Your

12   Honor's aware, the briefing schedule in Smith was, again, quite

13   compressed.  I don't know if we cited Support Working Animals

14   or this controlling precedent in our brief to the Eleventh

15   Circuit.  I did not write that brief, so I can't say, Your

16   Honor.

17           I would also point to a similar case from another

18   reported decision from the Eleventh Circuit, which is 974 F.3d

19   1236, Jacobson v. Florida Secretary of State, where the

20   secretary of state was the named defendant acting in his

21   official capacity, and the Court found that there was no

22   redressability against him.

23           And, I mean, that's the problem we have here is that

24   their injury, such as it is, arises from Mr. Reeves' failure to

25   take advantage of the opportunity provided to him by the

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0602

1   statute.  And indeed, we don't even know that he failed to take

2   advantage of it for that reason because we know that he had the

3   assistance of counsel.  We know that he communicated with

4   counsel.  We don't know what they said, but Mr. Reeves has

5   certainly not taken the opportunity in his declaration to say

6   my counsel never told me.

7        But at its heart, what we really have is it's a legal

8   decision about an individual inmate's case, the choice of

9   execution.  It is a perfect example of the kind of thing you

10  would talk to your lawyer about, and you wouldn't rely on an

11  outside party to tell you what to do.

12       THE COURT:  Well, that's speculation.  It may be

13  educated speculation.  It's still speculation.

14       As I read the Eleventh Circuit's opinion, the one from

15  October 15, it was only two sentences long, but they found

16  redressability here.

17       MR. ANDERSON:  And, Your Honor --

18       THE COURT:  Are you suggesting that I cannot -- that I

19  can ignore it?

20       MR. ANDERSON:  Well, Your Honor, one, it is not a

21  reported case so it is not a controlling case.  And I would

22  also note that the analysis that the Eleventh Circuit engaged

23  in, which was essentially we believe that an order from the

24  district court would make it more likely that he would get

25  relief, that kind of analysis was rejected in Support Working

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0603

1    Animals, a reported case, where the Court, you know, demanded

2    more than just some possibility that the order would get the

3    right result.

4            And this is part of the problem here is, as alluded to

5    in the Smith case, Alabama defendants, if ordered to do

6    something by a federal court after an appeal and the order is

7    final, we're going to find a way to do it.  But that doesn't

8    mean that such an order should issue or that under the doctrine

9    of redressability it would be proper.  And I think that may

10   have, kind of our statements in Smith, certainly colored the

11   Eleventh Circuit's decision.  They relied on the fact that we

12   allegedly conceded that in the Smith case when I think it's a

13   little finer point than that.

14           But, Your Honor, we have laid out our issue on

15   redressability in our briefing, and I think that speaks to our

16   position.  I suppose that's all I have.

17           THE COURT:  Mr. Hahn, Mr. Palombi, anything you want

18   to say on this particular issue?

19           MR. HAHN:  Your Honor, just one thing.

20           You had mentioned statutes, and as I was sitting here

21   looking at the amended complaint, it occurred to me that I had

22   cited a statute about administrative exhaustion.  And that does

23   give the Department an exemption from the Alabama

24   Administrative Procedure Act.  It's Alabama Code 15-18-82.1(g).

25   It does indicate that the legislature wanted to give as much

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0604

1   authority as possible to the Department of Corrections to do

2   what they needed.

3          But with that, nothing else, Your Honor.

4          THE COURT:  What is the status -- Mr. Anderson can

5   probably answer it better -- as to the nitrogen hypoxia

6   protocol?  It's been a work in progress.  You all have been

7   telling me this for -- ever since I've been on the bench for

8   two years.  I've been following it closely in the Burton case,

9   but the Burton case is now gone, so I have no idea what's going

10  on.

11         MS. HUGHES:  We are still working.  I think we are

12  very close to having a protocol.  I think that we could in the

13  first three or four months of next year have everything

14  completely ready to go.  We're still -- I mean, we are the

15  first state -- we will be the first state to have a nitrogen

16  hypoxia protocol, so we are being very cautious and making sure

17  that especially the correctional officers and the staff at

18  Holman are protected and that -- I mean, we are working very

19  hard to see that everyone will not be injured or harmed by

20  this.

21         THE COURT:  Your client's election for nitrogen

22  hypoxia, is it a qualified election or an unqualified one?  And

23  I am strictly thinking -- asking hypothetically -- that if by

24  chance they were to allow Mr. Reeves to be executed by nitrogen

25  hypoxia, is there yet going to be another battle about whether

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0605

1  it's a constitutional -- whether it's cruel and unusual

2  punishment?

3      MR. HAHN:  Yes, Your Honor.  So I'm going to say this

4  as briefly as possible and with as little obfuscation as

5  possible.  I would note that we believe the form was a benefit

6  and the form contained a reservation of rights.  However, I

7  feel confident in saying that given the injunction phase in

8  terms of pretrial, the type of equitable relief that we would

9  be seeking, I think it would be within this Court's power and

10  authority to make it a conditional.  That assuming he accepts

11  the protocol that they develop, he would have to waive his

12  right to a challenge right now, at least insofar as they were

13  able to do it before the trial in this case finished.

14      So I know that wasn't as clear or brief as I promised,

15  but...

16      THE COURT:  Another question, and I didn't hear any

17  evidence about it, is the -- they call it the Braggs consent

18  decree or the Dunn consent decree.  Does it have any

19  application in this case?

20      MR. HAHN:  We would argue, Your Honor, that given the

21  fact that in the documents that were filed there, which I

22  believe we attached, there was a notation that the Federal

23  Defenders and I think Equal Justice or Southern Poverty Law

24  Center had raised some concerns about testing of death row

25  inmates, given Atkins issues.  But what ended up happening was

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0606

1   the parties agreed to carve them out, but in doing so noted

2   that they were going to treat death row inmates exactly as they

3   had always been treated, which included testing them.  And they

4   represented in that document that they had tested all death row

5   inmates.

6        So we would argue that it does inform things and it

7   does sort of provide a little bit of a basis for why a 75 IQ

8   number is significant with regard to cognitive difficulties,

9   because there's no difference between a death row inmate with a

10  71 or a 68 and a general population inmate with a 71 or a 68

11  IQ.

12       THE COURT:  So is DOC obligated to test Mr. Reeves

13  under the consent decree?

14       MR. HAHN:  I do not believe that they are obligated to

15  under the consent decree, Your Honor.

16       MR. ANDERSON:  And, Your Honor, we would dispute the

17  allegation, I suppose, or the interpretation Mr. Hahn offers.

18  The document he refers to that postdates the consent decree,

19  which is a report from the parties on why they're dismissing

20  the death row aspect of the mental health issues, ADOC, the

21  document notes that -- I believe it says ADOC has provided

22  mental health testing or intellectual disability testing and

23  that it can be refused.  I think that was always their

24  position.  But there is no evidence whatsoever that ADOC has

25  ever administered an intellectual disability or IQ or, you

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0607

1    know, WAIS-IV or Beta or any test of that sort to Mr. Reeves,

2    much less that there is broad, widespread testing of death row

3    inmates.

4           Frankly, I'm not sure why that pleading, which was

5    drafted by both sides, has that phrase in there, but it doesn't

6    comport with reality.

7           THE COURT:  The consent decree references a Beta III

8    testing.  He has not undergone a Beta III testing; is that

9    right?

10          MR. ANDERSON:  Correct, Your Honor.

11          MR. HAHN:  Correct, Your Honor.

12          It also mentions -- I think the Beta III is a shorter

13   test, a screening test.  And they say that if somebody gets a

14   score below 75 and there's some doubt, they're supposed to do

15   the WAIS or something like that.  They talk about more

16   extensive testing depending on how close you are to the 75.

17          I would note just briefly, Your Honor, that

18   defendants' -- Jefferson Dunn was the respondent in the habeas,

19   and they proffered evidence of an IQ test performed by the

20   expert for the State of Alabama in defending that suit, and

21   that expert I believe came up with a 68 IQ score for Mr.

22   Reeves, and that predated the form.  So to the extent that

23   there was testing, whether we're going to quibble about whether

24   it was the State of Alabama or Commissioner Dunn, he accepted

25   that and offered that to the Court in proceedings in which he

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0608

1    was a named party.

2           THE COURT:  The tests that have been performed on him,

3    are any of those functionally equivalent to the Beta III test?

4           MR. ANDERSON:  No, Your Honor.

5           MR. HAHN:  They're more involved, Your Honor.

6           THE COURT:  Okay.  And here's why I'd asked about it.

7    You all are -- I know you're not ADA lawyers.  You've made that

8    painfully clear.  I'm learning that.  There is also the line of

9    cases and doctrine under ADA case law about "regarded as

10   disabilities."  And when I read this consent decree, one of my

11   initial knee jerks was, well, has DOC agreed in the consent

12   decree that they will regard as intellectually disabled anybody

13   that tests at a level of 75 or below on the Beta III?  And if

14   that is true, then DOC has to make accommodations whether that

15   person is truly disabled or not.

16          MR. ANDERSON:  And we would say, Your Honor, that it

17   is not actually what the consent decree says.  The consent

18   decree -- and I also note happily and proudly that I did not

19   write the consent decree, but I will endeavor to interpret it.

20          The section on intellectual disability begins on page

21   29 and runs for several pages setting out different categories

22   of inmates, including current inmates, inmates who arrive at

23   DOC eight months after the effective settlement, and inmates

24   who arrive between the date of the settlement and eight months.

25   And they have essentially three different ways to deal with

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0609

1   them.

2        They also -- there is discussion that the 75 score and

3   various scores in several sections of this -- and this is also

4   -- I'm sorry.  And I wish that this was not a problem for us

5   and also for the Court, but the headings in the consent decree

6   don't seem to match up with the index, so I'm not sure what

7   happened there.

8        But on page 39 in Section 2 is followed by 2 little I,

9   small Roman numeral, 1 through 5 over the next couple of pages.

10  And it sets out a number of different conditions, including

11  analysis by mental health experts and consideration of adaptive

12  functioning and adaptive deficits and also the requirement that

13  the onset be before 18.  Just to point out that the Braggs

14  consent decree is not a simple matter of the ADOC deeming

15  someone to be intellectually disabled at a certain level.  It's

16  a more complicated inquiry than that, Your Honor.

17       THE COURT:  How else am I to interpret -- this is on

18  page 30:  "Current inmates who have no record of a test score

19  from a Beta III test administered by or at the request of ADOC

20  will be tested using the Beta III within three months following

21  the inmate's next annual or semiannual classification review,

22  whichever is earlier.  The results of that testing will be

23  placed on the OHS module after receipt of those results, and

24  those who score 75 or less will be determined to have an

25  intellectual disability and no further testing will be

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0610

1  required."

2          That's the source of my concern about -- or statement

3  about being regarded as disabled, is that by virtue of this

4  consent decree, DOC, in effect, has contractually agreed to a

5  certain level or category of person that will be regarded as or

6  determined to have an intellectual disability.

7          MR. ANDERSON:  And, Your Honor, I would say that what

8  that says is that further testing will not be required, which

9  would be, you know, a WAIS or one of the other tests that's

10  mentioned.

11          But I do note that on that same page beginning on

12  Subsection 5, there's the provision regarding appropriately

13  licensed mental health professionals using guidelines to

14  determine the criteria in identifying individuals with

15  intellectual disabilities.  And it's here where we discuss

16  about adaptive deficits and you don't have significant adaptive

17  deficits whether your onset was before -- was or was not before

18  the age of 18.  And we believe that this modifies or is an

19  additional condition to the Subsection 2.  We read all of these

20  together, Your Honor, and not as a simple once you have a Beta

21  test of 75, that's it.

22          But moreover, Your Honor, the Braggs consent decree is

23  limited and is not a general application for the very reason

24  that at the insistence of the Federal Defenders, the counsel on

25  the other side here, that death row inmates be carved out.  At

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0611

1   the end of the day, it's an agreement with inmates represented

2   by counsel that we'll do this for you, for these parties to the

3   agreement, which is the class action for non-death row inmates.

4          So to read that as somehow establishing a duty towards

5   a death row inmate doesn't follow, Your Honor, because these

6   inmates were specifically carved out by Judge Thompson's order,

7   Document -- I think it was 727 or 729.  It was the immediately

8   previous or immediately prior document in which he notes how

9   the carve-out process happened and that it happened.  Because

10  of that, we don't believe it can be fairly read that ADOC has

11  entered into any kind of obligation that extends to death row

12  inmates.  The terms of that settlement, frankly, are not

13  relevant to the question of whether a death row inmate has a

14  disability.

15         THE COURT:  Mr. Hahn, do you know why death row

16  inmates were carved out?

17         MR. HAHN:  Your Honor, I believe that there was some

18  concern that Atkins would come into play.  We did not represent

19  Mr. Reeves at the time.  He was not represented by Federal

20  Defenders or the SPLC, so he would not have been part of that.

21         I will note that it is kind of -- when that's the

22  subject of the litigation and you've got the other side giving

23  tests willy-nilly, it becomes kind of concerning.

24         I would like to note from my brief introduction to

25  contracts in law school that I know contracts are construed

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0612

1    against the drafter.  We were not the drafter of this contract,

2    Your Honor.  When the Court does consider, as it pointed out,

3    that this is kind of a contract, I would just -- that's the

4    hornbook law that I remember.

5        I will note the regarded as, I would note that in the

6    records upon his arrival at Holman, according to Appendix 36,

7    DOC designated him as having, quote, "mild retardation."  So

8    somebody there as early as 1999 regarded him as mildly

9    retarded.  And at the time, that was the phrase.  I'm not

10   trying to be offensive here.  It's now intellectually disabled.

11       THE COURT:  So the actual evidence -- and let's talk

12   about it, because I haven't heard anything really new today --

13   about him having an intellectual disability, we've got -- it's

14   all the expert reports.  Dr. Renfro and Goff and -- no, King.

15   It wasn't Renfro, but King.  What is it about these particular

16   experts that establish your argument that he's intellectually

17   disabled, at least to the extent that he needed this kind of

18   accomodation?

19       MR. HAHN:  Yes, Your Honor.

20       Well, so the argument -- and I guess that he's

21   intellectually disabled, I believe the evidence shows that this

22   form was ninth, tenth, eleventh-grade level.

23       THE COURT:  I get that it's an eleventh-grade level

24   form and that he may be functioning at a literacy or

25   readability level of somewhere in the fourth -- maybe the first

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0613

1    grade, third, fourth, fifth grade.  I get all that.

2          MR. HAHN:  Okay.  And so are you asking about the

3    obviousness based on --

4          THE COURT:  The obviousness, yes.

5          MR. HAHN:  Yes, sir, Your Honor.

6          And so what I would note is a couple of things.

7    First, going back to the contract.  I promised not to talk

8    about Doc 728.  The reason it is relevant is it goes to show

9    what they knew or should have known and what was present in the

10   minds of the DOC and Commissioner Dunn in 2016 when they

11   drafted this, and that was that they know or they consented or

12   conceded that inmates -- and there's no reason to believe that

13   a death row inmate is different from a general population

14   inmate with regard to intelligence and whether they're

15   disabled, and certainly no reason to read the ADA that way.

16   But that they acknowledge that a 75 score on an IQ test

17   rendered them subject to the ADA protections.

18         And I would note on page 31 of that, they talk about

19   if an inmate scores at less than the seventh grade level on the

20   WRAT, appropriate assessments will be performed to determine

21   developmental disability status.  So they've put cutoffs in

22   there and counsel for DOC put cutoffs in there that I think

23   informed the decisionmaking process when you look at the form

24   that was distributed and the evidence that was presented.

25         And then you go back to his arrival at Holman, you've

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0614

1   got official records which they maintain.  They regard him as

2   designated as having mild retardation; again, the term of art

3   at the time, is now intellectually disabled.

4          Then four and a half years later in 2003, he's

5   described as having, quote, "learning disabilities," end quote.

6   That's Appendix 37.

7          And nearly four years after that, he was described by

8   Holman staff as, quote, "slow," end quote and, quote, "possibly

9   cannot read," end quote.  App 38.

10         So there is evidence spanning years that show that

11  they knew or should have known that Mr. -- and did regard

12  Mr. Reeves as someone with a disability, a cognitive

13  disability.  And so from his intake to 2016 when they decided

14  that 75 would be their cutoff in that lawsuit, that all informs

15  what they knew or should have known.

16         And so we would submit to this Court that for purposes

17  of whether we can show a significant likelihood of success on

18  the merits sufficient to get a preliminary injunction here,

19  that this is sufficient to establish that.

20         THE COURT:  Do either of you know why 75 was selected

21  as the cutoff in the Braggs litigation?

22         MR. ANDERSON:  Your Honor, one thing I do know is that

23  it was not drafted by the ADOC lawyers.  It's the product of

24  negotiation between two parties.  And as Your Honor knows,

25  nobody ever gets everything they want in a negotiation.  Why it

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0615

1  was picked, I don't know why that number was chosen over any

2  other.

3        But what I do know is, again, that this is not a -- to

4  use this contract analogy, which I don't think is correct

5  because it's not a contract, it is a settlement agreement that

6  was given effect by a federal judge that specifically carved

7  out from its effect and from its applicability in toto death

8  row inmates.  Not merely death row inmates represented by the

9  Federal Defenders at the time, but the entirety of death row.

10 So again, I don't want there to be any blurred lines over the

11 applicability of the Braggs consent decree.

12       I also want to note that there is some cherry-picking

13 going on when --

14       THE COURT:  I think both of y'all are cherry-picking.

15       MR. ANDERSON:  -- with the records.  And I would note

16 that the first record that we find that mentions anything about

17 Mr. Reeves' intellectual functioning is normal intellectual

18 functioning from 7/24 of '98.  We have one speculative

19 document, the 7/28/98, that says he may have limited

20 intellectual disabilities.

21       But, Your Honor, all of this talking back and forth

22 about records and cherry-picking of records of whether he has

23 limited reading ability.  One thing, Your Honor has heard him

24 read.  You have heard an expert opine that he only reads at a

25 second grade level and then hear him reading a more advanced

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0616

1  document.  We don't know the upper limit, actually, objectively

2  of what he can do.  We don't know whether he can read well

3  enough to know that a document is a legal document and is

4  something his counsel could talk about.  We don't have evidence

5  on that.

6          THE COURT:  Let me ask you this.

7          MR. ANDERSON:  Yes, Your Honor.

8          THE COURT:  From DOC's point of view, from a full IQ

9  standpoint, what would be the cutoff score, the line, from an

10  intellectual disability to not being -- and I mean, I know --

11  I've read all the Atkins cases, been involved in some of them.

12  I'm aware of kind of the 70 and there's standard deviations and

13  things like that.  But the purpose of the intellectual

14  disability, the level that we're talking about here under the

15  ADA, what kind of numbers are we talking about?

16          MR. ANDERSON:  The first thing that we -- in talking

17  about this and the IQ scores are that IQ scores don't establish

18  intellectual functioning, intellectual disability, or lack of

19  it.  It involves more factors than that.  And as Your Honor's

20  aware from having seen the Atkins cases, particularly as

21  related to Mr. Reeves, both the state courts and the district

22  court and the Eleventh Circuit have all agreed that he is not,

23  in fact, intellectually disabled based on all of the evidence.

24          THE COURT:  Well, for purposes of an Atkins claim, but

25  this is a little bit different.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0617

1        MR. ANDERSON:  Agreed, Your Honor.  But if we are

2    looking at the question of whether a disability is obvious to

3    the defendants, you know, what we have is a body of evidence

4    that shows that it's anything but obvious.  We have evidence

5    that Mr. Reeves reads.  We have evidence that he doesn't ask

6    for assistance reading.  We have evidence that he's in

7    communication with his attorneys.  We have evidence that he

8    fills out forms and communicates his needs clearly.  We have

9    evidence that he interacts with people in an understandable

10   way.  We have heard from several correctional officers -- or a

11   couple of correctional officers and several correctional

12   officials who have had interactions with Mr. Reeves, none of

13   whom observed anything to cue them in that this is someone who

14   alleges he cannot read or that he needs any accommodation at

15   all.

16        So that, Your Honor -- we started off with what's the

17   obviousness and what's the evidence of obviousness, and we

18   think that's the evidence, that there is no obviousness here.

19        MR. HAHN:  You had asked about the 75, Your Honor.

20   Real quick, I just want to say I have no idea where it came

21   from, but it appears that they were probably trying to build a

22   margin of error in.  But I just wanted to -- I didn't think I

23   heard that get answered there.

24        THE COURT:  As it concerns the obviousness, Mr. Hahn,

25   I guess from your point of view, it's really these reports that

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0618

1   were and are in the custody of DOC?

2          MR. HAHN:  Yes, Your Honor.  And the arguments that

3   Commissioner Dunn and his counsel made against Mr. Reeves in

4   which they said, well, yes, he doesn't meet the old standard on

5   Atkins, he doesn't get the benefit of the new standard, and

6   under AEDPA deference, you need to confirm his convictions.

7          There's a bunch of lenses you have to look through

8   when you get to that, but the reality is they had an IQ score

9   of sub 70 from their own expert; the same expert who said he

10   had a fifth grade reading level.  I don't know how much clearer

11   the obviousness can be.  They had four months before the

12   distribution of this form.  Commissioner Dunn was served with

13   the amended habeas petition which set forth the evidence of the

14   testing and why his counsel believed him to satisfy the Atkins

15   standard, or the newer version that they were arguing should

16   apply.

17          So I'm not sure that there's ever been a time where

18   somebody's put on notice with an official legal document saying

19   here's our evidence that he is slower or intellectually

20   disabled, which we don't have to show he's intellectually

21   disabled.  I don't want to go down that road.  But we have to

22   show he has a disability.

23          But they had four months beforehand.  They and their

24   general counsel, ADOC, were served with this document, and then

25   they have their own records which they have been relying on in

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0619

1  Rule 32 and going forward to challenge the level of impairment

2  that he had.

3       So we would argue that it was obvious.  They had court

4  pleadings.  They were making representations to the courts.

5  They went to the United States Supreme Court on it, Your Honor.

6       THE COURT:  Let me ask this to you as an officer of

7  the court.  You did go down and meet with some of your clients

8  about the election form?

9       MR. HAHN:  Yes, Your Honor, and --

10      THE COURT:  Or was it you, Mr. Palombi?  I have no

11  idea.

12      MR. HAHN:  So I can explain.  We actually organized

13  this.  Ms. Simpson and at the time Mr. Govan were on the other

14  side, and Judge Watkins called us all in.  We'd filed a lethal

15  injection lawsuit, and in it we had alleged nitrogen hypoxia.

16  And in the time between us filing that and going through

17  discovery, the legislature passed the law.

18      Judge Watkins, being a fairly common sense guy, called

19  the parties into an informal conference in his room and said

20  how is this case not moot, because y'all have elected in

21  your -- I consider that it looks like an election to me.

22  They've passed a statute.  We said, well, Judge, we probably

23  want to get some paperwork done on this before we move to

24  dismiss.  It's going to be difficult to get to see all of our

25  clients in a short timeframe.  This was early June, and we had

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0620

1   nine plaintiffs at that point.

2         And I said to the judge, Judge, I'm concerned that if

3   we only go and talk to nine clients, we're doing a disservice

4   to our remaining three dozen clients.  So he ordered or

5   encouraged the ADOC to facilitate our visit.  And so we went

6   and visited on June 26th, took the form, and went over it with

7   all of our clients who were present at Holman with the

8   exception of two.  And then we -- Mr. Palombi went up to

9   Donaldson and met with our clients there, and then one of our

10  attorneys who's no longer there went to Tutwiler to meet with

11  our one female death row inmate.

12        So this was sort of a procedure -- Mr. Stewart, Jody

13  Stewart, assistant general counsel for DOC, actually arranged

14  the whole thing.  It was unusual.  It was Mr. Palombi, me, an

15  investigator from our office no longer there named Terry

16  Deep -- who actually went to Berkeley Law but prefers to

17  investigate -- and a social worker investigator that we have,

18  Sarah Romano.  We all went and met with our clients and

19  answered their questions.

20        MR. ANDERSON:  Your Honor, may I address something?

21        THE COURT:  You may.

22        MR. ANDERSON:  The allegation that the commissioner

23  has imputed knowledge of everything that happens in a habeas

24  litigation, much less in a Rule 32 litigation, is absurd.  Your

25  Honor probably knows that the proper defendant in a habeas

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0621

1   litigation is the person who officially has custody of the

2   inmate, but the practical thing is that the attorney general

3   has and always has represented the State of Alabama in all

4   habeas actions.

5            To the extent the -- you know, even if a copy was

6   actually served on the commissioner -- and I'm not even sure if

7   it was, but if it was, it would only inform him of allegations

8   and nothing more.  The litigation is handled by our office.  As

9   Your Honor knows, counsel often has access to information that

10  clients don't have, obtained through various sources.  And

11  again, the whole point of the litigation below or much of the

12  point of the litigation below was establishing that he is not

13  intellectually disabled.  So I find it hard to see how that

14  could put anyone on notice, much less a pro forma habeas

15  defendant, of an obvious need for an accomodation.

16           THE COURT:  Are you saying he's not a proper party?

17           MR. ANDERSON:  In this action, Your Honor?

18           THE COURT:  Uh-huh.

19           MR. ANDERSON:  No, Your Honor.  I'm referring to the

20  habeas action.

21           THE COURT:  Okay.

22           MR. HAHN:  If I could just briefly speak on that, Your

23  Honor?  I promise, briefly.

24           I can't find it in front of me, but in the request for

25  admissions that we made, they responded and admitted that ADOC

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0622

```
 1   general counsel was served a copy of the -- and I'll represent
 2   that to the Court.  I can provide it under cover.
 3              MR. ANDERSON:  If we said that -- and I don't have any
 4   reason to doubt that it happened.
 5              MR. HAHN:  Thank you.
 6              THE COURT:  All right.  Some of these medical forms
 7   that --
 8              Maybe, Mr. Anderson, you're the one that filed them.
 9   No.  It was just in the general inmate file.
10              -- that purport to have handwriting of his, I do
11   question whether that really is, in fact, his handwriting.
12   There's a lot of forms where he's asking about Ultram.  It's in
13   very good handwriting, if not better than mine.
14              What is DOC's position as to whether those were
15   actually written by him or by somebody else?
16              MS. KENNY:  So, Your Honor, there are some forms that
17   are called inmate -- or sick call forms and medical record
18   request forms.  Those are in Mr. Reeves' handwriting.  Then
19   there's a corollary form that is -- I can't remember -- nurse
20   encounter or something like that that correlates to that sick
21   request or that request that is written in some medical
22   personnel's handwriting.
23              MR. ANDERSON:  Two sides of the same encounter, Your
24   Honor, I think is what --
25              MS. KENNY:  Right.  So you put in a sick request slip
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0623

1   to be seen, and then, you know, maybe the next day you get

2   seen, and the nurse does the intake.  That's what it's called,

3   I think a nurse intake form.  The nurse does the intake, and

4   that's where you'll see quotes from like the nurse is quoting

5   what he's telling the nurse.  But they sort of correlate to

6   each other.  It's two forms for each encounter.

7            MR. ANDERSON:  And I would note additionally, Your

8   Honor, to the extent there's any question about whether

9   Mr. Reeves has written documents that he's submitted, we

10  haven't heard anything from Mr. Reeves on that, so I don't

11  think there's any evidence that it's not his handwriting.

12           THE COURT:  Well, both of you could have brought him

13  in or whatever.  Talking about cherry-picking documents, you

14  know, those are presumably being cherry-picked, and you're

15  asking me to draw some inferences from them as to his level of

16  intelligence, and I'm just going to have to determine whether

17  that's his handwriting and he wrote those or somebody else on

18  the cell block did.

19           MR. ANDERSON:  Just one thing about cherry-picking,

20  Your Honor.  As I understand it, we submitted every single one

21  of the written forms.

22           THE COURT:  That's where I think I pulled it from, was

23  the file that --

24           MR. ANDERSON:  I think so.  I think Your Honor has a

25  complete picture of those.

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0624

```
 1           THE COURT:  Here's what I also want you to do in your
 2    supplemental submissions is pinpoint for me the references, the
 3    entries that you say support the disability or not so if
 4    there's a nurse's note that says mildly retarded or functioning
 5    at a low intelligence level -- I know you did it to some
 6    extent, but to the extent there's more things you have
 7    discovered in preparations for today, just give me the record
 8    cites, okay?  Just give me the CliffsNotes, the highlights of
 9    it so I can go right to it in one --
10           MR. ANDERSON:  So just to understand, if we have
11    previously submitted it, you would like us to cite back to the
12    previous submission rather than putting it back in again?
13           THE COURT:  I want it as simple in front of me as
14    possible, so I would prefer that you not cite back to your old
15    brief.
16           MR. ANDERSON:  Okay.
17           THE COURT:  Let's just pull it all together, old
18    brief, new evidence, into one source for me.
19           MR. HAHN:  And just to clarify, Your Honor, if there's
20    one document out of something that is reflective of that, we
21    would attach that to the brief?
22           THE COURT:  Well, you don't have to attach it if it's
23    already in the record.  If you would just have the record cite
24    to it, Doc 42-1 at 15.  That way I know exactly where to look.
25           MR. HAHN:  Thank you, Your Honor.  And can I ask --
```

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0625

1        THE COURT:  Also, when you do that cite, interpret
2   whatever it is you want me to take from it, because odds are
3   it's handwriting.  You may be able to interpret it and you
4   might, but I may not be able to.  So just give me the context
5   of what it's saying.
6        MR. HAHN:  And I believe Your Honor set a Friday
7   deadline, close of business; is that correct?
8        THE COURT:  Next week, yes.
9        MR. HAHN:  Next Friday.  And we'll order an expedited
10   copy of the transcript from today.
11        THE COURT:  He's heard you.  He's going to get right
12   on it, right, Blanton?
13        MR. HAHN:  We will pay anything.  We will pay
14   literally anything for it to get it on time.
15        THE COURT:  And then on that discovery issue, you all
16   need to be looking at those records and turning them over every
17   day.
18        MS. HUGHES:  Yes, sir.
19        THE COURT:  I am not happy about the fact that you
20   brought that record review to a screeching halt.
21        MS. HUGHES:  We will start on it today.
22        MR. ANDERSON:  Your Honor, we apologize for that.  It
23   is strictly a question of limited resources in a small division
24   of our office.
25        THE COURT:  Well, again, you know, when decisions are

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0626

1   made by the State with ongoing litigation, you better be able

2   to ramp up, because you know what's coming.  So limited

3   resources doesn't quite cut it with me.

4         MR. HAHN:  We appreciate your time today, Your Honor,

5   and the court staff's time in leaving the Christmas thing a

6   little bit early here.

7         THE COURT:  It's unfortunate that the holidays are

8   here, but it is what it is on that.  Let's get moving.  I'll

9   try to get you an order out as quickly as I possibly can.

10        MR. HAHN:  Thank you, Your Honor.

11        MR. PALOMBI:  Thank you.

12        THE COURT:  All right.  We're adjourned.  I thank you

13   all.  I appreciate it.

14        MR. ANDERSON:  Thank you, Your Honor.

15     (Proceedings concluded at 4:42 p.m.)

16

17

18

19

20

21

22

23

24

25

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0627

1              COURT REPORTER'S CERTIFICATE

2       I certify that the foregoing is a correct transcript from

3  the record of the proceedings in the above-entitled matter.

4       This 15th day of December, 2021.

5

6

7                           /s/ Blanton Callen

8                           Official Court Reporter

9                           Registered Professional Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BLANTON CALLEN, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)412-3507

AM1983_0628