IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALAN EUGENE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:22-cv-506-RAH |
| | ) | [WO] |
| JOHN Q. HAMM, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

In 2018, Alabama passed a law granting death row inmates an opportunity to elect their execution by a new method, nitrogen hypoxia, in lieu of Alabama's default method, lethal injection.  This case presents another occasion for the Court to consider the downstream effects of an Alabama Department of Corrections official's decision to distribute to death row inmates a form by which inmates could elect their execution by nitrogen hypoxia.  Plaintiff Alan Eugene Miller claims that he timely submitted a nitrogen hypoxia election form, but the Defendants claim they have no record of Miller's form in their files.  Miller is scheduled to be executed by lethal injection on September 22, 2022.

Miller is a death row inmate in the custody of the Alabama Department of Corrections (ADOC) at Holman Correctional Facility (Holman).[1]  On August 22, 2022, he filed this lawsuit under 42 U.S.C. § 1983 against Defendants John Q. Hamm, the Commissioner of the ADOC; Terry Raybon, the Warden at Holman; and Steve Marshall, Attorney General of the State of Alabama (collectively, the State or Defendants).  All Defendants are sued in their official capacities.

In his Amended Complaint (Doc. 18), Miller alleges that the State violated his constitutional rights by failing to honor his nitrogen hypoxia election.  Miller alleges that he timely made such an election in 2018, but the State cannot locate any record that he did so.  He seeks declaratory and injunctive relief.

This matter is before the Court on Miller's Motion for Preliminary Injunction (Doc. 28), wherein Miller seeks to enjoin the State from executing him by lethal injection and a declaration that his nitrogen hypoxia election be honored.  The motion has been fully briefed (Docs. 42, 48), and the parties have submitted hundreds of pages of evidence.  On September 12, 2022, the Court conducted an evidentiary hearing, during which it heard Miller's live testimony and oral argument from counsel on the motion.  The State presented no live testimony in response.  This matter is ripe for review.

---

[1]  Holman is the primary correctional facility for housing death row inmates in Alabama and is the only facility in the state that performs executions.

For the following reasons, Miller's Motion for Preliminary Injunction is due to be granted.

## II.   BACKGROUND

"When ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1063 (M.D. Ala. 2021) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).  "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### A. Miller's Capital Litigation History

In 2000, Miller was convicted of the capital murder of Lee Holdbrooks, Scott Yancey, and Terry Lee Jarvis.  By a vote of 10–2, the jury recommended that Miller be sentenced to death.  The trial court adopted the jury's recommendation and imposed a death sentence.  Miller's conviction and sentence were affirmed by the Alabama Court of Criminal Appeals in 2004. *Miller v. State*, 913 So. 2d 1148 (Ala. Crim. App. 2004).  The Alabama Supreme Court denied certiorari, and the Alabama

Court of Criminal Appeals issued Miller's certificate of judgment on May 27, 2005. *Miller v. State*, 99 So. 3d 349, 352 (Ala. Crim. App. 2011). The United States Supreme Court likewise denied certiorari. *Miller v. Alabama*, 546 U.S. 1097 (2006) (mem.).

On May 19, 2006, Miller filed a petition under Alabama Rule of Criminal Procedure 32 for postconviction relief and subsequently filed an amended petition on April 4, 2007. *Miller v. State*, 99 So. 3d 349, 353 (Ala. Crim. App. 2011). On May 5, 2009, the state circuit court denied Miller's petition, which the Alabama Court of Criminal Appeals later affirmed. *Id.* at 353, 426. After initially granting certiorari, the Alabama Supreme Court quashed the grant and denied certiorari on June 22, 2012. *Miller v. Dunn*, No. 2:13-cv-154, 2017 WL 1164811, at *9 (N.D. Ala. Mar. 29, 2017).

In January 2013, Miller filed a petition for habeas relief in the United States District Court for the Northern District of Alabama, which was denied in March 2017. *Id.* The United States Court of Appeals for the Eleventh Circuit affirmed the district court's denial of habeas relief in August 2020. *Miller v. Comm'r, Ala. Dep't of Corr.*, 826 F. App'x 743 (11th Cir. 2020) (per curiam). The United States Supreme Court denied certiorari in October 2021. *Miller v. Dunn*, 142 S. Ct. 123 (2021) (mem.).

**B. Backdrop of the Present Action**

*1. Nitrogen Hypoxia Becomes an Alternative Method of Execution*

On June 1, 2018, Alabama Act 2018-353 went into effect. *See* 2018 Ala. Laws Act 2018-353; ALA. CODE § 15-18-82.1(b). This law granted death row inmates one opportunity to elect nitrogen hypoxia as their method of execution, in lieu of Alabama's default method, lethal injection. ALA. CODE § 15-18-82.1(b). The nitrogen hypoxia election process requires an inmate to make that election in writing and deliver it to his or her warden within thirty days after a certificate of judgment has been issued affirming the inmate's conviction. *Id.* Inmates, like Miller, whose certificates of judgment issued prior to June 1, 2018, had from June 1 until July 2, 2018,[2] to elect nitrogen hypoxia in writing to the warden. *Id.* at § 15-18-82.1(b)(2).

Any writing from the inmate is sufficient under the statute. An inmate's failure to elect nitrogen hypoxia within the thirty-day period operates as a waiver of that method of execution.

---

[2] Alabama law states that the "[t]ime within which any act is provided by law to be done must be computed by excluding the first day and including the last. However, if the last day is Sunday, . . . the last day also must be excluded, and the next succeeding secular or working day shall be counted as the last day within which the act may be done." ALA. CODE § 1-1-4. Excluding June 1, 2018, the day the statutory period began to run, the thirty-day period expired on July 1, 2018. July 1, 2018 was a Sunday, and thus could not be counted as the last day. Thus, under Alabama rules of construction, the statutory period to elect nitrogen hypoxia was from June 1, 2018, through July 2, 2018.

*2. Background Regarding Distribution of the Election Form*

On June 26, 2018, attorneys with the Federal Defenders for the Middle District of Alabama's Capital Habeas Unit traveled to Holman to meet with their clients, notify them of the change in the law, and answer questions regarding nitrogen hypoxia.  During this meeting, the Federal Defenders provided a typewritten form that their clients could sign and submit to the warden to effectuate a nitrogen hypoxia election.

Sometime after this June 26 meeting, but before the statutory deadline of July 2, 2018, Holman's then-warden, Cynthia Stewart, obtained the Federal Defenders' election form, and at the direction of someone above her at the ADOC, she instructed Correctional Captain Jeff Emberton to distribute a copy of the form along with a blank envelope to every inmate on Holman's death row.  Captain Emberton then distributed a blank form to each death row inmate and collected the forms from inmates later the same day.

*3. Miller's Execution Date Is Set*

With Miller's appeals of his conviction and death sentence exhausted, on April 19, 2022, Attorney General Marshall moved the Alabama Supreme Court to set Miller's execution date.  (Doc. 52-22.)  On May 18, 2022, Miller filed an objection to the State's motion, arguing that setting an execution date was premature because Miller had timely elected execution by nitrogen hypoxia, and the State had

6

not yet established a protocol for conducting nitrogen hypoxia executions.  (Doc. 52-23.)  In support of his objection, Miller submitted an affidavit asserting that in June or July of 2018, a correctional officer at Holman passed out forms to individuals on death row concerning an election to be executed by nitrogen hypoxia, that Miller completed and signed the form, and that he returned the form to a correctional officer "at the same time that he was collecting forms from everyone else."  (Doc. 18-1.)

Attorney General Marshall responded to Miller's opposition on May 27, 2022, claiming there was no evidence that Miller had elected execution by nitrogen hypoxia.  (Doc. 18-3.)  To support his position, Attorney General Marshall filed an affidavit from Warden Raybon, asserting that the ADOC's nitrogen hypoxia file had no record of an election form from Miller.  (*Id.* at 8.)

Miller then filed a reply brief asserting that the State's response created a factual dispute regarding the existence of Miller's election form and requesting the case be remanded to an Alabama trial court to resolve the dispute.  (Doc. 52-27.)  On July 18, 2022, the Alabama Supreme Court, over a dissent from the Chief Justice, granted the State's motion and set Miller's execution for September 22, 2022.[3]  (Doc. 52-28.)

---

[3] Chief Justice Parker dissented without explanation.

4. *Miller's § 1983 Lawsuit*

In his Amended Complaint, Miller brings three causes of action against the Defendants in their official capacities.   (Doc. 18.)   First, Miller claims the Defendants violated his procedural due process rights under the Fourteenth Amendment "by failing to ensure an adequate procedure for protecting his election to be executed by nitrogen hypoxia." (*Id.* at 15.)

Second, Miller alleges the Defendants violated his right to equal protection under the Fourteenth Amendment by treating him differently from similarly situated death row inmates at Holman who, like Miller, timely submitted nitrogen hypoxia election forms.  (Doc. 18 at 17.)  One inmate mentioned by Miller was Jarrod Taylor, who had his execution motion withdrawn by Attorney General Marshall in 2019 after Taylor claimed that he had elected nitrogen hypoxia.  (Doc. 18-2.)  Neither the Attorney General's Office nor the ADOC could find Taylor's election form in their files.  (*Id.* at 3.)  Nonetheless, the Attorney General decided to withdraw the motion because Taylor produced documents and communications with his lawyer that, according to the Attorney General, "support[ed] the assertion that he made a timely election of nitrogen hypoxia," and the ADOC was not prepared to proceed with an execution by nitrogen hypoxia.  (*Id.* at 2–3.)

Finally, Miller claims the Defendants' decision to execute him by lethal injection rather than nitrogen hypoxia is arbitrary and capricious in violation of the

Eighth Amendment. (Doc. 18 at 18–19.) Miller does not assert a method of execution challenge as to lethal injection or nitrogen hypoxia.

Miller asks the Court to declare that he "timely submitted his election form pursuant to Ala. Code § 15-18-82.1(b) and opted into execution by nitrogen hypoxia," and that the Defendants' decision to execute Miller by lethal injection rather than nitrogen hypoxia violates his Eighth and Fourteenth Amendment rights. (*Id.* at 19.) Additionally, Miller asks the Court to enter an injunction requiring the Defendants to honor his nitrogen hypoxia election and enjoining the Defendants from executing him with the current lethal injection protocol. (*Id.* at 19–20.) Each Defendant has filed a motion to dismiss Miller's Amended Complaint. (Docs. 21, 30, 35.)

On September 1, 2022, Miller filed a Motion for Preliminary Injunction asking this Court to enjoin the Defendants from executing Miller via lethal injection and to declare that his nitrogen hypoxia election be honored. (Doc. 28.) On September 2, 2022, Miller filed a Motion for Expedited Discovery, (Doc. 32), which the Defendants partially opposed, (Doc. 33). The Defendants attached to its partial opposition messages or emails between Miller and a pen-pal, (Docs. 33-1, 33-2, 33-3), including one in which Miller states in relevant part: "Lawyers saying same thing got to wait," (Doc. 33-1). The Court ordered the Defendants to answer Miller's Interrogatories and Requests for Admission and to produce documents the

9

Defendants had agreed in their response to produce, as well as a small subset of email communications regarding Miller's election form that the Defendants could locate with reasonable diligence.   The Court also ordered Miller to produce documents in his possession relating to his claims or request for preliminary injunction and any documents he intended to introduce at the September 12 evidentiary hearing.   On September 7, 2022, counsel for the Defendants deposed Miller at Holman.  (Doc. 52-29.)

### 5. *Evidence Presented at the September 12, 2022 Hearing*

At the evidentiary hearing, Miller presented recordings of two phone calls he made to his brother on April 21, 2022, two days after his execution date was requested.  In the first call, he informed his brother that his execution date had been requested.   The two discussed whether Miller's brother would be present for the execution, as well as drafting a will, ensuring that Miller's remains would be cremated, and the handling of his remains.  During the second call, Miller mentioned a piece of paper about "gas stuff," that Miller called his lawyers and told them they needed to call "the Equal Justice and stuff, and the public defenders" and that "they might be able to halt, put a hold on that," and that he told his lawyers "a long time ago" but his "lawyer did not even know what [he] was talking about."[4]

---

[4] At Miller's deposition, the State's counsel asked Miller if he agreed he had said, "Some other inmates signed a piece of paper about using some kind of gas stuff.  I called those lawyers and told them they need to call the Equal Justice and stuff and the Public Defenders."  (Doc. 52-29 at 66–

Without objection from the Defendants, Miller read into the record parts of several depositions from another case, *Smith v. Dunn*, Case No. 19-cv-927-ECM (M.D. Ala.), including those from Cynthia Stewart, who served as Holman's warden during the election period (Doc. 52-13); Captain Jeff Emberton, who served at Holman during the election period (Doc. 52-14); Warden Raybon, who served at Holman during the election period (Doc. 52-15); and Jennifer Parker, Warden Stewart's secretary during the election period (Doc. 52-17).

During her May 26, 2021 deposition, Cynthia Stewart testified she first learned of the new nitrogen hypoxia law through the news, that she was told to expect forms electing the method from inmates, and that prior to the late June meeting between the Federal Defenders and their clients at Holman, she did not receive any election forms.  (Doc. 52-13 at 74, 78–80.)  Warden Stewart testified that her secretary, Jennifer Parker, kept track of inmates' completed election forms and scanned them to wherever they had to go.  (*Id.* at 88.)  Additionally, Warden

---

67.)  Miller responded: "Federal Defenders.  I meant Federal Defenders." (*Id.* at 67.)  The State's counsel then asked Miller, "But is that what you indicated to your brother?", to which Miller responded, "Oh, yes." (*Id.*)  At the evidentiary hearing, however, Miller's counsel insisted that Miller said he had told his lawyers a long time ago that he had chosen gas, "or something to that effect." (Doc. 58 at 161, 176.)  The Court listened to the audio at the hearing and numerous times after the hearing.  The audio is not clear, and it is difficult to understand parts of it.  The Court cannot ascertain with certainty what was said in the call.  Given the audio quality, reasonable factfinders could reach different conclusions about the contents of the call.

Regarding the lawyer not knowing what he was talking about, Miller explained in his deposition that "there's many lawyers, legal counsel.  And the one I talked to was just one." (Doc. 52-29 at 68.)

Stewart testified that she received instructions from someone higher in the chain of command at the ADOC in Montgomery to distribute election forms to inmates so that they could elect nitrogen hypoxia as their method of execution, but she could not recall who gave her this instruction.  (*Id.* at 83–84.)  She instructed Captain Emberton to distribute the forms, although she could not recall who made the copies of the blank forms for distribution.  (*Id.* at 84–87.)  She also could not recall what day Captain Emberton distributed the forms, and she did not know whether Ms. Parker received the forms distributed by Captain Emberton.  (*Id.* at 88.)  Warden Stewart testified that inmates could give their completed forms to a staff member, give the forms to her when she made rounds through the facility, or they could place their forms in a locked collection box, which was emptied daily and given to the warden's secretary.  (*Id.* at 89–91.)

During his May 24, 2021 deposition, Captain Emberton testified that Warden Stewart directed him to distribute election forms to every Holman death row inmate. According to Captain Emberton, Warden Stewart told him there was a box of election forms and envelopes on the conference room table and that he was to distribute a form and envelope to each inmate.  He said she instructed him not to write anything down, not to write anyone's name down, and not to keep track of who submitted a form.  (Doc. 52-14 at 52–55.)  Captain Emberton could not recall what day he distributed the forms.  He testified that he went to death row, explained to the

inmates that the law had changed and they now had a choice in their execution method, and if they wanted to choose, they were to fill out a form and he would return later in the day to pick it up. (*Id.* at 55–56.) He said he gave this "spiel" to three or four inmates at a time because their cells were close together. (*Id.* at 55–56.) He personally handed a form to each inmate unless the inmate was asleep, in which case he knocked on the cell door to try to wake the inmate up and left the form in the bars of the cell. (*Id.* at 56, 58.) Also, if the inmate was not in his cell at the time, that inmate did not receive a form. Captain Emberton recalled distributing the forms in the morning. He recalled coming back after lunch and collecting the forms, and then he returned the box with the collected forms to the conference room table and told Warden Stewart that he was finished. (*Id.* at 57.) However, Captain Emberton later testified in the same deposition that he did not remember the timeline for collection and that he may not have turned the box of forms in that evening. (*Id.* at 61.) He did not count how many forms were returned to him. (*Id.* at 57.) He testified that tier runners did not distribute the forms. (*Id.* at 58.) He also testified that he did not recall receiving any additional forms after that day. (*Id.* at 60.) He did not tell lieutenants or sergeants that he distributed the forms, and Warden Stewart did not send out a memo to staff about it. (*Id.* at 61–62.) He also explained that Holman death row inmates are locked down in their cells 23 hours a day. (*Id.* at 20.)

Warden Raybon has served as a warden at Holman since 2014.  (Doc. 52-15 at 18–19.)  During his July 19, 2021 deposition, Warden Raybon echoed Warden Stewart's testimony that she had directed Captain Emberton to distribute election forms after receiving instructions to do so from the central office.  (*Id.* at 60–62.) Warden Raybon recalled seeing an election form in Warden Stewart's office, but he could not recall if she showed it to him, if he saw it on her desk, or something else. (*Id.* at 60–61.)

During her July 9, 2021 deposition, Jennifer Parker testified that she received election forms the last week of June 2018; that she scanned and emailed a copy of each form to ADOC's legal counsel, Jody Stewart, in Montgomery; and that she placed the originals of the forms in a file.  (Doc. 52-17 at 6–7.)  Ms. Parker recalled receiving a stack of election forms after the Federal Defenders' late June visit and that she knew some forms came in the mail.  (*Id.* at 7.)  Otherwise, Ms. Parker said she was unaware of where the forms she received came from.  (*Id.*)  Ms. Parker was not aware that blank forms had been distributed to every death row inmate at Holman.  She said that she did not create a list of inmates who submitted an election form.  (*Id.* at 12.)  She could not recall Warden Stewart asking her to do anything with the forms.

Without objection from the Defendants, Miller also presented a transcript of ADOC Assistant Deputy Commissioner Cheryl Price's testimony from the hearing

held by this Court on December 9, 2021, in *Reeves v. Dunn*, Case No. 20-cv-27-RAH (M.D. Ala.). Ms. Price served as a Rule 30(b)(6) witness for the ADOC. (Doc. 52-19 at 92–93.) She testified that she was not aware of any protocol the ADOC established regarding the nitrogen hypoxia election process, nor was she aware of any discussion among staff about how to handle nitrogen hypoxia elections. (*Id.* at 97.) She also testified that she was not aware of any procedure in place regarding how to log forms or pieces of paper from inmates who elected nitrogen hypoxia. (*Id.*) She said there was no directive from the ADOC to the individual wardens. (*Id.* at 98.) She said she had no knowledge of Captain Emberton keeping track of who he gave election forms to, nor was she aware of any inmate being asked to sign a receipt that they received the form. (*Id.* at 102.)

At the evidentiary hearing, Miller took the stand and testified. He testified unequivocally that he does not like needles. He explained that, prior to June 2018, someone at the ADOC who tried to insert a needle into his arm to draw blood had trouble finding a vein. (Doc. 58 at 92–93.) According to Miller, they "poke" the needle around, move it around, "sometimes they'll nick a nerve, or they'll pull it out and go after the hands or the other arm." (*Id.* at 93.) Miller estimated that the entire process to draw his blood took 30 minutes. (*Id.* at 95.) He described the experience as "painful" and "feeling like a pin cushion." (*Id.* at 93–94.) Afterwards, Miller had

a large bruise covering the area inside his elbow that lasted a couple days.  His testimony on this subject was uncontroverted.

In his testimony, Miller also recalled that in June 2018, a correctional officer yelled down the hallway to announce that he was handing out forms for the inmates to sign and that he would return later that day to collect them.  Miller did not know which correctional officer made the announcement.  He explained that he was lying in his bed with his head against the rear wall of the cell during this time.  He also said that he was unable to see out of his cell and down the hallway, and due to the cell's design, he could only see directly in front of his cell.  Miller was told after-the-fact that Captain Emberton had distributed forms to all the inmates.

Miller testified that he recalled receiving the form and reading it, and he said the words "nitrogen hypoxia" reminded him of "nitrous" or "nitrous oxide," the gas that dentists give patients.  (*Id.* at 99–100.)  He testified that he used to deliver medical supplies to dentist and plastic surgery offices and that is how he knew about nitrous oxide.  (*Id.* at 100.)  As he explained, with the nitrous oxide one gets at the dentist, "they put you to sleep."  (*Id.*)  He explained that he wanted to elect nitrogen hypoxia because, while he did not want to die at all, he was particularly concerned about dying by lethal injection due to his fear of needles and his past negative experiences with them.  (*Id.*)

Miller could not recall how long he thought about nitrogen hypoxia before deciding to sign the form.  He testified that he signed the form and placed it in a slot between the bars where ADOC staff could collect forms, colloquially known as the "bean hole."  (*Id.* at 97, 101.)  He testified, without contradiction, that he typically left documents in the bean hole to be picked up.  (*Id.* at 98.)  He did not know who collected the election form or what happened to the form after it was collected.  He said he had yelled down the hallway saying he wanted the form notarized and a copy for himself, but he did not receive a copy or follow up on his request.

On cross-examination by the State, Miller testified that he lay down after placing the form in the bean hole because he had ankle pain.  Miller was unable to describe the correctional officer who passed out the forms, and he said he was unsure whether the same officer both dropped off and collected the form.  He also discussed the second phone call with his brother in April 2022, explaining that he had "found out somebody signed it before me and signed it after me, and I thought it was just one time.  It was one time signing.  And I'm finding out that other people was able to . . . sign or turn it in whenever they felt like turning it in."  (*Id.* at 110.)

In addition, Miller explained that his attorneys had contacted the ADOC in 2021 when he was placed in "single walk" due to a stabbing incident, but he said he was cleared of all wrongdoing by prison officials.  The State introduced an email exchange between Miller's counsel and the ADOC regarding Miller and his

17

counsel's concerns with the ADOC's internal disciplinary procedures.  The emails concerned the attack by another inmate which resulted in Miller's assignment to single walk and counsel's concerns that Miller was being treated unfairly during the process.

Evidence was also submitted regarding two other Holman death row inmates who raised complaints about their completed election forms.  First, Jarrod Taylor claimed that he gave his completed election form to an ADOC staff member (Lieutenant Franklin) during the statutory election period with instructions to give the form to the warden, (Doc. 51-2 at 22), but the State was unable to find Taylor's form in its files when it moved to set his execution date in 2019.  Second, Calvin Stallworth claimed that he gave his completed election form to an ADOC staff member (an unnamed guard) during the statutory election period, but the individual refused to deliver the form to Warden Stewart.  (Doc. 52-8 at 2–3.)  Mr. Stallworth's form was ultimately delivered to the warden.

### 6.  Status of Alabama's Execution Protocol for Nitrogen Hypoxia

When the Alabama Code was amended to add nitrogen hypoxia as an alternative method of execution, and throughout the June 2018 election period, the ADOC had not yet developed a protocol for performing nitrogen hypoxia executions.  In a December 2021 hearing before this Court in a different case concerning nitrogen hypoxia election forms, counsel for the ADOC represented that

the protocol should be ready within the first three or four months of 2022.  (Doc. 78 at 219 in *Reeves v. Dunn*, Case No. 20-cv-27-RAH (M.D. Ala.).)   During the September 2, 2022 status and scheduling conference in this case, counsel for the State represented that prior to the filing of this lawsuit, the State anticipated making an announcement with respect to the nitrogen hypoxia protocol in October.  (Doc. 39 at 21.)  Subsequently, on September 8, 2022, the State represented in its Response in Opposition to Plaintiff's Motion for a Preliminary Injunction that if this Court were to issue an injunction requiring Miller's execution by nitrogen hypoxia, the execution still could be conducted on September 22, 2022.  (*See* Doc. 42 at 10.)  At the September 12, 2022 evidentiary hearing, counsel for the State stated that, if the Court enjoined Miller's execution by lethal injection, it was "very likely" the ADOC could execute Miller by nitrogen hypoxia on September 22, 2022.  (Doc. 58 at 57–58.)  On September 15, 2022, the State filed an affidavit from Commissioner Hamm, in which the Commissioner represented that the ADOC is *not* prepared to execute Miller by nitrogen hypoxia on September 22, 2022.

Suffice it to say, the readiness of the protocol and of the ADOC to conduct executions by nitrogen hypoxia has been a moving target.  In this case specifically, the Court has received inconsistent information along the way from the State.  In any event, the Court accepts as true Commissioner Hamm's sworn statement that the ADOC cannot execute Miller by nitrogen hypoxia on September 22, 2022.  The

Court notes that while nitrogen hypoxia may not be available on September 22, 2022, the State has not said when it expects the protocol to be ready. From all that appears, the State intends to announce its readiness to conduct executions by nitrogen hypoxia in the upcoming weeks.

## III.   JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## IV.   DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Miller is entitled to a preliminary injunction if he demonstrates (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the Defendants; and (4) that the injunction would not be adverse to the public interest. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). Where, as here, "the [State] is the party opposing the preliminary injunction, its interest and harm merge with the public interest," and thus the third and fourth elements are the same. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435

(2009)).  A preliminary injunction is "'not to be granted unless the movant clearly established the "burden of persuasion"' for each prong of the analysis."  *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (citation omitted).  Miller, as the movant, must satisfy his burden on all four elements "by a clear showing."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

## A. Substantial Likelihood that Miller Timely Elected Nitrogen Hypoxia

All parties agree that, to evaluate Miller's likelihood of success on the merits, a material issue of fact must first be resolved: whether Miller timely elected nitrogen hypoxia—or, at this stage, whether it is substantially likely that Miller timely elected nitrogen hypoxia.  The State agrees that this Court is the proper factfinder to make this determination.[5]

The Defendants have not filed answers to the Amended Complaint, instead filing motions to dismiss.  But it appears to the Court, based on a review of the record, that Warden Raybon's affidavit—attached to Miller's Amended Complaint—creates a factual dispute, at least as to whether Miller timely submitted

---

[5] At the evidentiary hearing, the Court inquired of the State's counsel, "If it's a fact question, where is the appropriate forum for that to be resolved?"  (Doc. 58 at 160.)  Counsel responded, "Here, now that [Miller's] filed his 1983, it would be this court."  (*Id.*)

the form.[6]  Warden Raybon attests that he and his secretary looked in the file where election forms have been stored since June 2018, and they did not find an election form for Miller.  (Doc. 18-3 at 8.)  Additionally, the State produced in discovery documents purporting to comprise all the nitrogen hypoxia election forms the ADOC has received, none of which is a completed form from Miller.  These documents were part of Miller's evidentiary submission at the September 12 hearing.  Like Warden Raybon's affidavit, these documents—along with Miller's affidavit, deposition testimony, and hearing testimony—create a factual dispute, at least as to whether Miller timely submitted the nitrogen hypoxia election form.  The Court notes that the State did not expressly identify either the nitrogen hypoxia file or the completed forms as potentially rebutting Miller's testimony.  Nonetheless, in light of this factual dispute, the Court must weigh the evidence presented and assess Miller's credibility in order to determine whether it is substantially likely that he timely elected nitrogen hypoxia.

---

[6] Miller argues that the State "ha[s] yet to provide any evidence that Mr. Miller did not submit an election form."  (Doc. 48 at 3.)  However, in the proceedings before the Alabama Supreme Court, Miller took the position that Warden Raybon's affidavit and Miller's affidavit "present[ed] a factual conflict that must be resolved," necessitating a remand to an Alabama trial court to conduct an evidentiary hearing and weigh the conflicting testimony.  (Doc. 52-27 at 4–5.)  To the extent Miller now contends that Warden Raybon's affidavit is insufficient to create a factual dispute, such a contention would be inconsistent with Miller's earlier position when litigating before the Alabama Supreme Court.

Having listened to Miller's live testimony and observed his demeanor, and having compared Miller's live testimony with his deposition and affidavit, and with no direct contradicting evidence from the State that is specific to Miller, the Court finds substantially credible Miller's testimony that he timely submitted a nitrogen hypoxia election form.  Miller says he followed the instructions for submitting an election form that were given by the correctional officer[7] who distributed the forms. In accordance with those instructions, Miller filled out the election form and turned it in the same day by placing it in the bars of his cell (the bean hole), where he typically placed documents for retrieval and where it was picked up by a prison official.  At the hearing, the State did not dispute that placing a form in the bean hole was a proper means of delivering an election form to the warden.   Miller's description of the instructions he received is consistent with Captain Emberton's testimony[8] from another case that he distributed forms to all death row inmates one

---

[7] Although Miller could not remember details about who distributed the forms and could not say that it was Captain Emberton, the Court finds it more likely than not that it was Captain Emberton. Another possibility is that there was a second mass form distribution event at Holman.  But the Court is aware of no evidence that would support an inference that a second form distribution occurred at Holman.  Indeed, Warden Stewart's and Captain Emberton's deposition testimony is clear that the ADOC's distribution of forms at Holman was a single event undertaken by Captain Emberton at Warden Stewart's direction.  Nonetheless, the Court acknowledges that Miller cannot identify Captain Emberton as the correctional officer who distributed the election form to him.

[8] At the hearing, counsel for the State was quick to correct the Court when the Court suggested that Captain Emberton was the officer who would have handed out and collected Miller's form. (*See* Doc. 58 at 162.)  As such, in challenging a suggestion that Captain Emberton was the person who handed out and collected the forms, including Miller's form, the State has created a gap in the chain of custody as it concerns the collection of the forms at the time Miller says he submitted his form.

morning and told them he would return to collect the forms later that day, and that he did pick the forms up later that day.

A consistent theme animates Miller's narrative regarding why he elected nitrogen hypoxia in lieu of lethal injection: his dislike of, and desire to avoid, contact with needles.  Miller consistently testified in his deposition and at the hearing that he elected nitrogen hypoxia to avoid being "stabbed" with needles.  (Doc. 52-29 at 38, 56, 57; Doc. 58 at 100.)  At the hearing, Miller elaborated that he had prior bad experiences at Holman where someone struggled to insert a needle into his arm, causing him to be poked and prodded in an experience he described as "painful" and "feeling like a pin cushion" and that left him with a large bruise that lasted several days.  (Doc. 58 at 92–94.)  This testimony was uncontroverted.  In his deposition, Miller explained that he had heard other inmates had allergic reactions to the lethal injection and that by electing nitrogen hypoxia, he would avoid "allergic reactions to the chemicals that they said was in the lethal injection."  (Doc. 52-29 at 38.)  The Court finds compelling and credible Miller's consistent explanation that he elected nitrogen hypoxia primarily to avoid needles.

Miller also explained that, based on some limited knowledge of "nitrous" or "nitrous oxide" that is used at the dentist and plastic surgery offices, he thought nitrogen hypoxia would be less painful because "you just went to sleep," (*Id.* at 38–39), "they put you to sleep," (Doc. 58 at 100), or "you just go under," (Doc. 52-29

24

at 56).  He explained the basis of his belief was hearing about others' experiences with gas at the dentist and his prior employment experience delivering equipment to dentist and plastic surgery offices.  Thus, Miller "thought" that nitrogen hypoxia would be "a more humane thing."  (*Id.*)  The Court finds this testimony compelling and credible.

Here, the State does not articulate what circumstances legally meet the definition of "delivery to the warden" and what circumstances do not.  Nor does the State argue that putting an election form in the bean hole is insufficient to accomplish delivery to the warden.  Nor does the State present any testimonial evidence from Captain Emberton or any other correctional officer who affirmatively stated that Miller did not submit a form when that officer collected the forms from death row after having handed them out.[9]  The State simply argues that Miller did not do what he now claims he did because the State does not have a copy of Miller's completed form in its nitrogen hypoxia file.  Thus, the Court now turns to the State's arguments for why Miller's testimony should be disbelieved.

Although not expressly identifying it, the State produced two pieces of evidence suggesting that Miller did not elect nitrogen hypoxia.  First, an affidavit

---

[9] The State does not contend that Captain Emberton, Warden Raybon, or any other witness whose testimony the State wished to present was unable to appear at the evidentiary hearing, nor does the State contend that any such witness was unable, due to the expedited nature of the proceedings, to provide a declaration for the State to offer into evidence.

from Warden Raybon, who was not called as a witness at the evidentiary hearing, states that he and his secretary looked in one place for Miller's form and could not find it.  Second, the State produced emails where Jennifer Parker sent ADOC Legal in Montgomery copies of completed election forms that she had received, and a form signed by Miller was not among them.  Neither piece of evidence directly rebuts Miller's testimony that he signed the form and put it in the bean hole; rather, each piece only potentially indirectly rebuts Miller's testimony that he delivered the form to the warden by signing the form and putting it in the bean hole.

Where, as here, Miller followed the instructions he says he was given for submitting his election form (and these instructions are consistent with those Captain Emberton gave), and the State does not argue that his submission would be legally insufficient, the State's evidence that his form is not among its records "does not mean it was not received . . . .  It could have simply been misplaced after receipt or even misfiled."  *Cf. Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1241 (11th Cir. 2002) (analyzing receipt in the context of mailing a document that was properly addressed, stamped, and mailed, which creates a rebuttal presumption of receipt); *id.* at 1240 (explaining that the presumption of receipt is "not a conclusive presumption of law, but a mere inference of fact, founded on the probability that the officers of

the government will do their duty and the usual course of business" (citation omitted)).[10]

Here, the Court has before it no evidence of a standardized policy or procedure for ADOC officials to collect and transmit completed forms to Jennifer Parker for logging and retention, nor is there evidence of a chain of custody from the time forms were collected by Captain Emberton or other ADOC officials.  The evidence only reflects that Ms. Parker received completed election forms, scanned and sent copies to Jody Stewart at ADOC Legal, and put the original forms in a file.  But other than a stack of forms she received after the Federal Defenders' visit and forms that arrived by mail, Ms. Parker did not know where completed election forms came from. Ms. Parker also testified that she was unaware that blank forms had been distributed to all death row inmates at Holman.

Thus, there is no evidence of how, or even if, forms collected by Captain Emberton or other ADOC officials made their way to Ms. Parker for filing and storing.  Captain Emberton said he did not tell the lieutenants and sergeants that he distributed the forms and that Warden Stewart did not send out a memo to staff.  And evidence suggests that two Holman death row inmates had problems after turning in their election forms to ADOC staff: (1) Jarrod Taylor gave his completed election

---

[10] The Court does not suggest that a *presumption* of receipt applies here.  Nonetheless, the Court finds *Barnett*'s discussion instructive in evaluating the weight of the State's evidence.

form to Lieutenant Franklin and explained it needed to be given to the warden, but the State was unable to find Taylor's form in its file; and (2) Calvin Stallworth gave his completed election form to a guard, but the guard refused to deliver the form to Warden Stewart.  This evidence suggests that what Miller claims the ADOC did— or failed to do—after he turned in his form was not unique to him.  Other than looking in a file and reviewing emails where copies of completed election forms were transmitted, the State has not explained any efforts it undertook to collect all of the forms from death row inmates, how all of these forms were aggregated, or how the forms made their way into its nitrogen hypoxia file or to ADOC Legal in Montgomery.  Nor has the State showed any efforts it undertook to look for a form signed by Miller or to investigate what might have happened to the form.

While prior deposition testimony from Captain Emberton was presented about his collection of election forms, during the hearing, counsel for the State was quick to argue against any inference that Captain Emberton was the individual who collected completed forms from Miller's tier at the time Miller claims that they were collected.[11]   As such, the State has all but argued away any relevance, from the State's perspective, that Captain Emberton has to Miller's election.

---

[11] The following exchange occurred at the evidentiary hearing:

> THE COURT: If you were going to play the game of technicalities, and presumably it's Captain Emberton, and he says, I'm going to come back by and take these forms back up, was putting the executed form in the bean hole sufficient?

Because Miller followed the instructions he says he was given for submitting his election form, because there is no evidence of a chain of custody establishing how inmates' completed election forms made their way to Jennifer Parker and into the nitrogen hypoxia file, and because there is evidence suggesting that the State was unable to find Taylor's form despite his giving the form to an ADOC official to give to the warden, that Warden Raybon could not find Miller's form in one location is weak evidence that Miller did not timely submit a form. *Cf. Barnett*, 283 F.3d at 1242 (explaining that an office employee's mere assertion that the office never received a completed form in the mail is insufficient to rebut the presumption of receipt without, for example, the employee setting forth their personal knowledge of office procedures for processing received mail).[12]   Similarly, that Miller's form was not among the forms Ms. Parker emailed to ADOC Legal is weak evidence that Miller did not timely submit a form.  Even in the absence of testimony from Captain Emberton or another ADOC official that Miller did not leave a form in the bean hole or otherwise submit a form, if there was evidence that Captain Emberton and other ADOC officials who received election forms routinely followed a particular

---

MR. HOUTS: I want to stop the Court right there.  *Absolutely inappropriate to say the presumption is it's Captain Emberton.*

(Doc. 58 at 162 (emphasis added).)

[12] Again, the Court does not suggest that a presumption of receipt applies here.  Rather, the Court finds *Barnett*'s discussion instructive in evaluating the weight of the State's evidence.

protocol, such as taking the forms directly to Ms. Parker or following some other process to get the forms into Ms. Parker's custody, the State's evidence likely would be stronger.  However, the Court sees no such evidence in the present record.

Instead of rebutting head-on Miller's testimony about submitting the form by placing it in the bean hole, the State attacks the weight and credibility of Miller's testimony in six ways: (1) Miller has refused to corroborate his testimony with attorney–client privileged communications at the time of his election in June 2018; (2) Miller remembers very few details about the day he says he made the election; (3) Miller purportedly testified that it is not "fair" that he be executed by nitrogen hypoxia now because other inmates elected "before" him; (4) Miller's second phone call with his brother on April 21, 2022, was the first time Miller mentioned nitrogen hypoxia in a conversation; (5) according to the State, Miller lied in his affidavit about giving his election form to the person who was collecting forms from the other inmates; and (6) Miller has said he does not want to die, has recently expressed concerns about being executed by nitrogen hypoxia, and has stated that he does not want to be executed by that method until an independent evaluation has been performed.  The Court will address each of the State's positions in turn.

*First*, the State attacks the weight of Miller's testimony on the grounds that Miller will not corroborate his testimony by waiving the attorney–client privilege and disclosing communications with his counsel from June 2018.  The State points

out that in 2021, Miller allowed his attorneys to communicate with the ADOC about concerns he had shared with them about his "single walk" status, which, according to the State, suggests that Miller has been willing to waive the privilege in the past if he believed it would help him.  Here, attorney–client privileged communications would be probative if Miller and his attorneys discussed his decision to elect or not elect nitrogen hypoxia.  However, "[a]ny such inference would intrude upon the protected realm of the attorney-client privilege." *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 775 (4th Cir. 1990) (per curiam).  While corroborating evidence can boost the weight afforded to a witness's testimony, the Court declines to draw any negative inference about the weight owed to Miller's testimony based on his decision not to waive the attorney–client privilege.  "The privilege was created to protect the right to effective counsel," and "[t]o protect that interest, a client asserting the privilege should not face a negative inference about the substance of the information sought." *Id.*  That Miller may have waived the privilege on a different occasion concerning a different matter does not change the analysis, nor does it bear on Miller's credibility.

*Second*, the State argues Miller is not credible because he remembers so few details about the day he says he made his nitrogen hypoxia election.  The State points out that Miller could not identify which correctional officer distributed the forms, nor could he recall the officer's height, race, hairstyle, or uniform color.  He also

could not remember the exact date he signed the form or how long he thought about it before he signed it.  But as Miller explained, the election happened over four years ago, which is why he cannot remember many details.  Moreover, Miller's level of recollection is consistent with that of other ADOC officials involved in distributing election forms at Holman who testified in 2021—closer in time to the election period than now.  For starters, neither Warden Stewart nor Captain Emberton could recall the date the forms were distributed.  Additionally, Warden Stewart testified that someone above her in the chain of command told her to distribute election forms, but she could not recall who that was.  And she also could not recall who made the copies of the blank forms to be distributed.  Warden Raybon testified that he saw the election form in Warden Stewart's office, but he did not remember how or where he saw it—whether she showed it to him, whether it was on her desk, or something else.  Captain Emberton testified that he collected the forms from inmates the same day he distributed them and then returned the box of forms to the conference room table.  However, later in the same deposition, he backtracked and said he did not remember the timeline for collection and that he may not have turned the box of forms in that evening.  When the Court asked the State's counsel what Captain Emberton would say if he were asked if he picked up a completed form from Miller, counsel responded:

> I believe his most recent answer would have been . . . I don't know if I did or didn't. . . .  [I]t's like Mr. Miller said.  It's four years ago. . . .  I

> feel the same way as Mr. Miller.  I agree with him.  Asking me to go back four years and find out what happened is very unfair to the defendants.

(Doc. 58 at 128.)  In sum, key individuals in addition to Miller who were involved in the form distribution process in 2018 generally do not recall many details—even critical ones, like who told Warden Stewart to pass out the forms—due to the passage of time.

Also, Miller's testimony reflects that his primary source of information that day was auditory rather than visual due to the design of his cell.  His unrebutted testimony demonstrates that he could not see much beyond his cell except directly in front of the bars and that he heard a correctional officer announce that he was about to distribute forms.   Again, this testimony is consistent with Captain Emberton's testimony that he did not speak to each inmate individually, although the State's attorney was quick to correct the Court that it cannot be inferred that Captain Emberton was the one who collected the forms on Miller's tier.  Thus, Miller's inability to produce a physical description of the officer who passed out the forms is also attributable to Miller's limited ability to see outside of his cell.  Also, although Miller cannot remember how long he thought about the form before signing it, his testimony demonstrates that he had a small window of time to do so, as the officer announced that he would be back later in the day to collect the forms.  Thus,

it is not surprising that Miller cannot recall more details given the short time in which the process occurred.

The Court has also considered whether the gravity of the decision embodied in signing the election form would leave a strong impression on an inmate who signed it, such that an inmate would or should have a better recollection than Miller of the circumstances surrounding his election.  Maybe, maybe not.  In this particular case, Miller's testimony reflects a fairly straightforward decision-making process about electing nitrogen hypoxia that was primarily animated by a desire to avoid being stabbed with needles, as opposed to a complex or thoughtful decision or desire to affirmatively elect nitrogen hypoxia as his method of execution.  Thus, the Court finds Miller's inability to recall details to be consistent with his single-minded focus on avoiding contact with needles, and no different from the nature of the deposition testimony provided by ADOC officials.  In sum, under the circumstances presented here, Miller's inability to recall more details about his election does not undermine the weight or credibility of his testimony.

*Third*, the State contends that Miller "subconsciously" admitted that he did not timely elect nitrogen hypoxia because he testified in his deposition that it would not be "fair" to execute him by hypoxia at the present moment because other inmates, such as Bobby Waldrop, Jarrod Taylor, and Eugene Clemons, elected "before" him. (Doc. 42 at 6.)  According to the State, Miller admitted that he does not have personal

knowledge of when other inmates elected and that he does not remember exactly when he elected. (*Id.*)  Thus, according to the State, he could only be talking about those who elected "before" him because he knows he did not elect in 2018. (*Id.*)

The Court's examination of Miller's deposition transcript reveals that the State has misrepresented Miller's testimony.  Miller did not say it would be unfair to execute him now because other inmates elected before him.[13]   Instead, Miller testified: "There's people who were prior to me whose appeals have run out, you know, they signed it like I did.  Why are they not here going through the same thing I am doing with the Court Reporter recording this."  (Doc. 52-29 at 82–83.) Elsewhere, Miller stated that "other people signed it like [he] did" and their executions have been "put on hold." (*Id.* at 76.)  Miller did specifically mention Jarrod Taylor, but Miller said: "Did you question Jarrod Taylor?  They never found his [form], but did he go through this deposition like I'm going through?" (*Id.*) Thus, Miller's actual deposition testimony is that he believes it is unfair for the State to treat him differently than other inmates who elected nitrogen hypoxia by making only him sit for a deposition and putting others' executions on hold but not his. Moreover, Miller testified that he learned after the election period that some inmates elected before him and some elected after him, when he had previously thought it

---

[13] It would be one thing if the State had argued that the Court should draw those inferences from Miller's testimony, but the State represented these statements as Miller's actual testimony. (*See* Doc. 42 at 6.)

was a "one time signing." (Doc. 58 at 110.) This is supported by the record, which reflects that inmates submitted election forms on different days within the statutory period. Thus, to the extent Miller's comment about inmates "who were prior to me" refers to inmates who elected before him,[14] the Court cannot construe this comment as an admission that Miller elected after the statutory period expired. The Court perceives nothing in Miller's deposition testimony that would support the inference that Miller subconsciously admitted that he elected nitrogen hypoxia after June 2018, and thus the Court finds the State's argument unconvincing.

*Fourth*, the State argues that Miller's second April 21, 2022 phone call with his brother undermines Miller's testimony. The State points out that this second phone call is the first time "gas stuff"—nitrogen hypoxia—had come up in conversation. According to the State, if Miller had truly elected nitrogen hypoxia,

---

[14] It could also refer to inmates who elected nitrogen hypoxia and who exhausted their appeals before Miller did, such as Bobby Waldrop, Jarrod Taylor, and Eugene Clemons. For Bobby Waldrop, the Eleventh Circuit affirmed the district court's denial of federal habeas relief on September 26, 2017. *Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900 (11th Cir. 2017) (per curiam). The U.S. Supreme Court denied certiorari on October 1, 2018. *Waldrop v. Dunn*, 139 S. Ct. 118 (2018) (mem.). For Jarrod Taylor, the district court denied federal habeas relief and denied a certificate of appealability (COA) on January 25, 2018, *Taylor v. Dunn*, No. 14-cv-0439, 2018 WL 575670 (S.D. Ala. Jan. 25, 2018), and denied Taylor's motion to alter or amend on March 12, 2018, *Taylor v. Dunn*, No. 14-cv-0439, 2018 WL 1308947 (S.D. Ala. Mar. 12, 2018). The Eleventh Circuit denied Taylor's motion for a COA on October 5, 2018. *Taylor v. Ala. Dep't of Corr.*, No. 18-11523-P, 2018 WL 8058904 (11th Cir. Oct. 5, 2018). The U.S. Supreme Court denied certiorari on May 13, 2019. *Taylor v. Dunn*, 139 S. Ct. 2016 (2019) (mem.). Finally, for Eugene Clemons, the Eleventh Circuit affirmed the district court's denial of federal habeas relief on July 30, 2020. *Clemons v. Comm'r, Ala. Dep't of Corr.*, 967 F.3d 1231 (11th Cir. 2020). The U.S. Supreme Court denied certiorari on June 7, 2021. *Clemons v. Dunn*, 141 S. Ct. 2722 (2021) (mem.). These inmates' appeals all were exhausted before Miller's appeals, which were exhausted in October 2021. *See Miller v. Dunn*, 142 S. Ct. 123 (2021) (mem.).

he would have brought it up immediately in the first call with his brother. The State also contends that Miller's purported reference to "some other inmates" electing nitrogen hypoxia and having their executions put on hold is evidence that *Miller* did not elect and that he is claiming he elected to try to delay his execution. The Court does not agree. First, on this record, that Miller's first call with his brother in April 2022 did not mention a method of execution and instead was an emotional discussion of logistics surrounding Miller's death does not, in the Court's view, undermine Miller's testimony that he elected nitrogen hypoxia in June 2018. Second, even assuming the State's interpretation of the call is correct (and the Court maintains that the audio is unclear), this is not definitive evidence that Miller did not timely elect. Indeed, a reference to "some other inmates" would be consistent with Miller's narrative that the State has not set execution dates for other inmates who elected nitrogen hypoxia and the State is treating him differently because it has set *his* execution date.

*Fifth*, according to the State, Miller also lied in his affidavit about giving his election form to the official who was collecting forms from the other inmates because Miller later testified that he did not actually see the official and did not see anyone else turn in the form. Not so. Miller testified that he knew the official was collecting forms because the official had announced he would return later to collect the forms. And as noted above, Miller's testimony demonstrates that much of the

information he gathered is auditory rather than visual.  Given that Miller is confined to his cell 23 hours a day, it is reasonable for him to believe that prison officials do what they say they will do.  Thus, if an official told Miller, "here's this form, fill it out, I'm going to come back later today day and pick it up," Miller can reasonably rely on that statement and infer that the official did in fact return to pick it up, because Miller cannot leave the four walls of his cell.  Thus, the Court cannot agree with the State that Miller lied in his affidavit on this basis.

*Sixth*, the State argues that Miller is not credible because he says he does not want to die and recently expressed concerns about being executed by nitrogen hypoxia, pointing out that there is no protocol and expressing his belief that it would not be fair to execute him by nitrogen hypoxia until an independent expert evaluates and approves the protocol.  The State also contends that, when asked at his deposition if he would agree to allow a correctional officer to fit him with a mask as a planning precaution for a nitrogen hypoxia execution, Miller refused.  According to the State, Miller's statements demonstrate that his true goal is to delay his execution.  But an inmate's decision to elect nitrogen hypoxia over lethal injection does not preclude the possibility that the inmate would have concerns about a nitrogen hypoxia execution.  This is especially so in this case, given Miller's testimony that he elected nitrogen hypoxia because he wanted to avoid needles and "thought" nitrogen hypoxia meant he would just go to sleep.  It simply does not

follow from Miller's election of nitrogen hypoxia in June 2018 that he would have no reservations about whatever protocol the State eventually adopted.  In the Court's view, Miller's recent statements expressing concern about being executed by nitrogen hypoxia have little bearing on the veracity of Miller's testimony that he made a timely election in June 2018.

And as for the mask-fitting, the State once again has misrepresented Miller's testimony.  Counsel for the State asked Miller if fitting a mask to his face was "something that you would be cooperative with, or is that something that would upset you?"  (Doc. 52-29 at 86.)  Miller responded, "It could be something that would upset me," explaining that it was "[b]ecause why ain't nobody else going through the same thing?  Why are people prior to me, who signed like I did, are people who they didn't find theirs?  As in Jarrod Taylor, . . . Why they are not doing this and you asking the same question of them?  I want to be treated fairly."  (*Id.* at 87.)  In the Court's view, this exchange does not reflect Miller's refusal to cooperate with the ADOC in the execution process broadly or the nitrogen hypoxia protocol development more specifically.  Instead, Miller said he would be upset because no one else who elected nitrogen hypoxia is being subjected to mask-fitting.  Moreover, the Court agrees with Miller's counsel that it is a natural human reaction to be upset about the prospect of being fitted with the means of one's own execution.  Thus, in the Court's view, Miller's statements in response to the query about mask-fitting

have no bearing on the veracity of his testimony that he made a timely election in June 2018.

In sum, both in live testimony before the Court and in deposition testimony, Miller has presented consistent, credible, and uncontroverted direct evidence that he submitted an election form in the manner he says was announced to him by the ADOC. His testimony about how forms were distributed and then collected on the same day is consistent with Captain Emberton's testimony in an earlier case. Miller has also presented evidence that the ADOC lacked any standardized protocol or rules regarding the collection and transmittal of inmates' completed election forms, which is circumstantial evidence supporting Miller's theory that the ADOC lost or misplaced his form after he turned it in. Miller has also presented evidence that the ADOC has likely lost or misplaced an inmate's completed election form on another occasion, which further circumstantially credits his narrative. On the other hand, the State does not directly rebut Miller's sworn, and consistent, testimony. Nor has the State established a chain of custody for the election forms, which could have called into doubt the veracity of Miller's testimony. Rather, the State's arguments are based on weak circumstantial evidence (that Miller's form is not in the State's files and Miller's phone call with his brother), improper inferences (about Miller's invocation of the attorney–client privilege), misrepresentations about Miller's

testimony, and—at bottom—the State's subjective belief that Miller did not timely elect because he has a motive to try to delay his execution.

The Court has seriously considered the possibility that Miller did not in fact timely elect nitrogen hypoxia but now claims to have done so only to delay his looming execution.  The Court cannot definitively rule out this possibility.  But at this stage, an inmate in Miller's position is not required "to prove his case once and for all."  *Hamm v. Comm'r, Ala. Dep't of Corr.*, No. 18-10473, 2018 WL 2171185, at *4 (11th Cir. Feb. 13, 2018).  The Court has considered and weighed all of the evidence, including Miller's own testimony, which was not directly rebutted by the State with any testimony from an ADOC official, including Captain Emberton, stating that Miller did not leave a form in the bean hole when the official collected election forms, nor indirectly rebutted by the State with evidence of a chain of custody for submitted forms or a standardized procedure followed by ADOC officials in collecting and transmitting completed election forms to Ms. Parker.  The Court has also assessed Miller's credibility at this stage in light of the evidence presented, and in light of the evidence *not* presented by the State, and it has carefully considered the State's arguments about Miller's credibility separately and together. Having carefully considered the foregoing, the Court concludes that, on this record as it currently exists, it is substantially likely that Miller timely elected nitrogen hypoxia.  Further discovery and evidence may result in a different outcome on the

election issue, but that is a different inquiry for a different day under a different standard.

**B. Substantial Likelihood of Success on Miller's Legal Claims**

Resolving the factual dispute over whether Miller timely elected does not end the substantial-likelihood-of-success inquiry. The Court must now evaluate the merits of his legal claims. To obtain a preliminary injunction, a plaintiff "must demonstrate a substantial likelihood of prevailing on at least one of the causes of action he has asserted." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005).[15]

*1. Equal Protection*

A plaintiff may successfully allege a violation of his equal protection rights as a "class of one" by showing "that [he] has been intentionally treated differently

---

[15] Each Defendant filed a motion to dismiss for failure to state a claim, raising several arguments. None of their arguments persuade the Court that Miller is not substantially likely to succeed on the merits of his equal protection and procedural due process claims. For example, Defendant Marshall's invocation of prosecutorial immunity is misplaced because the immunity applies only to claims for money damages, *see Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000), and Miller does not seek money damages from Defendant Marshall (or any Defendant). Additionally, Defendant Raybon's argument that he cannot be held liable under a *respondeat superior* theory is misplaced because that argument is relevant only to an individual capacity claim for money damages. *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Again, Miller does not seek money damages from Defendant Raybon; rather, Miller is suing Defendant Raybon in his official capacity because Raybon stands in the shoes of Warden Stewart for purposes of official capacity liability and because Raybon is Miller's statutory executioner. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." (citation omitted)). Additionally, the Court addresses, and ultimately rejects, Raybon's and Hamm's statute of limitations argument below.

from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "[W]here the challenged governmental decision is simple or one-dimensional—for example, where the decision involves the application of a single criterion to a single issue— making out a 'class of one claim' is generally easier than in cases where governmental action is 'multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (citation omitted).   When the governmental decision is simple or one-dimensional, the "similarly situated requirement" may be analyzed "succinctly and at a high order of abstraction."  *Grider v. City of Auburn*, 618 F.3d 1240, 1265 (11th Cir. 2010) (citation omitted).  The plaintiff must nevertheless show that he is similar to the party of comparison in all legally relevant respects.  *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204–07 (11th Cir. 2007).

Since no fundamental right is at stake here, nor do the parties assert such, the rational basis test applies to Miller's equal protection claim.  "The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it."  *Leib*, 558 F.3d at 1306.

43

The parties focus heavily on whether Miller is similarly situated to Jarrod Taylor.  But Miller also makes the broader argument that he is similarly situated to all inmates who timely elected nitrogen hypoxia, (Doc. 18 at 17, ¶ 94; Doc. 58 at 181), and that there is no rational basis to treat him differently than any inmate who timely elected, (*see* Doc. 58 at 22–23).  The Court finds that this is the proper inquiry.

The State's arguments focus on why it withdrew its motion to set Taylor's execution but declined to withdraw the motion to set Miller's execution.  But the question is whether it would violate Miller's equal protection rights if the State executed him by lethal injection even though he timely elected nitrogen hypoxia, while not pursuing execution by lethal injection for other inmates who timely elected nitrogen hypoxia.  It is substantially likely, if not certain, that it would.

All § 15-18-82.1(b) requires for a nitrogen hypoxia election is an inmate's writing delivered to his or her warden within the proscribed time period.  An inmate who complies with the statutory requirements is similarly situated in all legally relevant respects to every other inmate who complies with the statutory requirements.  *See Griffin Indus.*, 496 F.3d at 1204–07; *see also Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1325 (11th Cir. 2019) (per curiam) (suggesting that inmates who timely elected nitrogen hypoxia are similarly situated to one another).  Thus, having timely elected nitrogen hypoxia, Miller is similarly situated to every other inmate who timely elected nitrogen hypoxia.  There is no evidence or

argument that the State has executed by lethal injection any inmate who timely elected nitrogen hypoxia.  The Court can conceive of no rational basis to treat Miller differently.  The State's belief that Miller has not proven his case to the *State*'s satisfaction is irrelevant.  The State is not the exclusive arbiter of whether an inmate has made a proper and timely election.  The State does not argue otherwise, and it agreed that this Court is the proper factfinder to determine whether it is substantially likely that Miller timely elected.  Thus, what matters here is the Court's determination that Miller timely elected in compliance with the statute (or, more accurately, that it is substantially likely he did).  Because there is no rational basis for the State to execute Miller by lethal injection where he has provided sufficient evidence at this stage that he timely elected nitrogen hypoxia, Miller is substantially likely to succeed on his equal protection claim.

### 2.  *Procedural Due Process*

Although it is sufficient that Miller has demonstrated a substantial likelihood of success on his equal protection claim, the Court also concludes that he has demonstrated a substantial likelihood of success on his procedural due process claim.

The Court will first address Raybon's and Hamm's arguments that Miller's procedural due process claim is barred by the statute of limitations,[16] as a

---

[16] Attorney General Marshall did not advance a statute of limitations argument in his motion to dismiss.

determination that the claim is time-barred would affect Miller's ability to demonstrate entitlement to a preliminary injunction, *cf. Henyard v. Sec'y, DOC*, 543 F.3d 644, 647 (11th Cir. 2008) (per curiam) (concluding the district court did not err in determining that the plaintiff's claims were barred by the statute of limitations and that thus the plaintiff had not shown a substantial likelihood of success on the merits).  As explained below, the Court concludes that this argument is unavailing because Miller brought this claim well within the applicable two-year statute of limitations.

Raybon and Hamm bear the burden to establish the applicability of a statute of limitations affirmative defense.  *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990).  A plaintiff is not required to negate a statute of limitations defense in his complaint.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  "[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred."  *Id.* (citation omitted).

The statute of limitations for a § 1983 claim is governed by the personal injury law of the state in which the cause of action arose.  *Wallace v. Kato,* 549 U.S. 384, 387 (2007).  Here, the parties agree that, under Alabama law, the limitations period is two years.  ALA. CODE § 6-2-38(1).  The parties also agree that the statute begins to run, or a claim accrues, when Miller "knew or should have known of his injury

and its cause." *Carter v. City of Montgomery*, 473 F. Supp. 3d 1273, 1307 (M.D. Ala. 2020) (quoting *Burt v. Martin*, 193 F. App'x 829, 830 (11th Cir. 2006)); *see also Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996) (holding that a claim accrues when "the facts which would support a cause of action [were] apparent or should [have been] apparent to a person with a reasonably prudent regard for his rights"). The parties disagree, however, as to exactly when Miller "knew or should have known" that his claim had accrued.

On one hand, Miller asserts that he knew or should have known of his injury on May 27, 2022—when the State told Miller for the first time that they did not have his election form and would not honor his nitrogen hypoxia election.  On the other hand, Raybon and Hamm contend that Miller should have known that he was injured years ago, outside of the statute of limitations, in three ways: (1) Miller should have known that the State lost his election form because he was not given a notarized copy of his election form like he requested in 2018; (2) Miller should have known that the State lost his election form because, as Miller claims, the 2018 form collection process was "extremely disorganized"; and (3) Miller should have known the State lost his election form after the proceedings in Alabama Supreme Court on the State's motion to set an execution date for Jarrod Taylor.

Raybon's and Hamm's arguments miss the mark.  Their accrual theories operate under the same basic logic: Miller should have known that the State had lost

his election form because of the "inadequacies in the [election form] processes and procedures." (Doc. 30 at 10.) But this argument ignores the elements of Miller's due process claim. While a procedural due process claim requires a showing of a "constitutionally-inadequate process," it first requires a "deprivation of a constitutionally-protected liberty interest," that is, an injury. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). And here, Miller had no reason to know that the State had refused to honor his right to elect nitrogen hypoxia until the moment the State informed him that it had no record of his election form.[17]

While the disorganized process could give rise to the third element of a procedural due process claim (procedural inadequacy), it would not have given rise to a viable action, as required for the statute to run, because this information does not make "apparent" to a "reasonably prudent" person that Miller himself had been

---

[17] Raybon and Hamm repeatedly assert that proceedings involving the State's attempt to set an execution date for another death row inmate, Jarrod Taylor, put Miller on notice that the Defendants lost or misplaced Miller's election form. But those proceedings provided Miller no such notice. First, Raybon and Hamm cite no authority for the proposition that Miller has a duty to investigate his own injuries by surveying Alabama Supreme Court proceedings pertaining to the setting of another death row inmate's execution. Second, even if Miller had reviewed the public filings in Taylor's proceedings—and nothing in the Amended Complaint suggests that he did—nothing in those public filings affirmatively indicates that the ADOC lost Taylor's election form. Third, even if those public filings did establish that the ADOC lost Taylor's election form and caused Miller to have concerns about the safety of his election, the outcome of Taylor's case likely would alleviate concerns for a reasonable person in Miller's position. After all, the State recognized Taylor's nitrogen hypoxia election and withdrew its motion to set his execution. An inmate in Miller's shoes analyzing Taylor's proceedings reasonably would have presumed the same treatment would be afforded to him if the State were also unable to locate his election form. Accordingly, Raybon's and Hamm's argument that Taylor's proceedings put Miller on notice that he was injured is misguided.

deprived of his protected interest in electing nitrogen hypoxia, *i.e.*, that Miller himself had been injured. *See Rozar*, 85 F.3d at 562. After all, Miller says he turned in the election form in the manner announced to him, and therefore Miller would have been "justifiably ignorant" as to whether the State subsequently would be unable to locate his election form, especially since the State did not notify the inmates, their attorneys, or anyone else of the outcome or status of their hypoxia elections. *Cf. id.* at 560–62 (holding that plaintiffs "should have known" of a constitutional injury—thereby triggering the statute of limitations—because they were not "justifiably ignorant" to the injury, where one of the plaintiffs observed the injury, the injury was published in a local newspaper, the injury was posted at a courthouse, and a public meeting was held concerning the injury). It defies credulity for the State to say Miller should have known that he was injured in 2018 on the basis that Miller should have known that the State was likely to lose or be unable to locate Miller's election form, refuse to honor his election, move for his execution, and deprive Miller of his protected liberty interest.[18]

---

[18] The essence of Raybon's and Hamm's accrual theory boils down to their belief that Miller had an affirmative duty to ask his attorneys to confirm with the ADOC that Miller's election form had not been lost. In other words, Raybon and Hamm request a rule that has a presumption that the State erroneously lost an election form, even though the form was submitted the way the State's agent asked for it to be submitted and the State does not argue that the way Miller submitted the form is legally defective. The Court will not entertain such a rule that requires inmates to speculate as to whether they have been injured despite following their custodian's instructions.

Raybon and Hamm have failed to meet their burden of demonstrating that the statute of limitations bars Miller's claim.  At this stage, the Court finds that Miller's procedural due process claim accrued on May 27, 2022, when a reasonable inmate in Miller's shoes would have known that he was injured and that he had a viable cause of action.  And because Miller filed suit four months after his claim accrued, Miller's claim is within the applicable two-year statute of limitations and is not time-barred. The State provides no persuasive argument otherwise.

Moving to the claim itself, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of" the Fourteenth Amendment's Due Process Clause. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  A successful procedural due process claim requires "proof of three elements: (1) the deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden*, 345 F.3d at 1232.

Miller contends that his protected liberty interest is his statutorily-permitted choice to be executed by nitrogen hypoxia.  The Court concludes that this is a protected liberty interest, although the State's counsel at the evidentiary hearing would not concede this issue.  The Court also notes that, while Miller's cause of action accrued in May 2022 when he first learned the State would not honor his nitrogen hypoxia election, the deprivation of this interest is state action and is not

complete unless and until the State executes Miller by lethal injection in contravention of his nitrogen hypoxia election.

Where the State can feasibly provide a predeprivation hearing before depriving a person of liberty, it generally must do so regardless of the adequacy of a postdeprivation remedy. *See Zinerman v. Burch*, 494 U.S. 113, 132 (1990); *Barr v. Johnson*, 777 F. App'x 298, 301 (11th Cir. 2019) ("Generally speaking, procedural due process requires that the state give the individual notice and an opportunity to be heard *before* a deprivation." (emphasis added)). "Conversely, in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process." *Zinerman*, 494 U.S. at 132 (citation omitted). Thus, predeprivation process is the general rule. Turning to adequacy, courts consider three factors in determining whether the process provided is adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *accord Worthy v. City of Phenix City*, 930 F.3d 1206, 1223 (11th Cir. 2019).

Executing Miller by lethal injection when he has timely elected nitrogen hypoxia is substantially likely to violate his procedural due process rights. Assuming without deciding that predeprivation process would be unduly burdensome or not feasible, no adequate postdeprivation remedy exists. An execution is final; there are no do-overs or give-backs. Thus, an order directing the State to posthumously honor Miller's election would be utterly inadequate. Compensation to Miller's estate also would not be an adequate remedy, as the harm is not monetary in nature.

To the extent it is relevant what could have been done up to this point to prevent the deprivation of Miller's liberty interest, the Court finds it substantially likely that Miller was entitled to predeprivation process and that the predeprivation process afforded here, which is virtually none, is constitutionally inadequate. The private interest at stake is great—a person's choice in the way he will die at the State's hands. Given the procedures used, the risk of erroneous deprivations is high. There was no established process for collecting election forms. There is no chain of custody establishing how forms submitted in any fashion made their way to Ms. Parker for logging and retention. Other than looking in two places (the nitrogen hypoxia file and the emails), the State has presented no evidence of any investigation into what might have happened to Miller's form. It has not even presented any evidence that it queried Captain Emberton or any other pertinent correctional

officers about Miller and his claimed submission of an election form.   Additional safeguards would be of obvious value in ensuring that all properly submitted nitrogen hypoxia election forms are retained, that all properly submitted elections are honored, and that no inmate who properly elected nitrogen hypoxia is executed by lethal injection.   The State does not argue that additional safeguards would be unduly burdensome or costly, nor does the State argue that it is not feasible to provide predeprivation process.[19]   Rather, the State argues that the statute imposes no duty on the State to do anything.[20]   But the Alabama statute does not dictate the constitutional due process floor.   Therefore, the Court finds that Miller is substantially likely to succeed on the merits of his procedural due process claim.[21]

Because Miller must show a substantial likelihood of success on only one of his claims for purposes of his preliminary injunction motion, the Court pretermits any discussion of his Eighth Amendment claim.

---

[19] The State does argue that the negligent loss of an election form does not give rise to an actionable due process claim because predeprivation process is not feasible in those circumstances.  But the deprivation Miller complains of is about more than the negligent loss of a form.  It is about the deprivation of his right to choose a nitrogen hypoxia execution and the State's plans to carry out his execution by lethal injection in contravention of his choice.

[20] The Court disagrees that the statute imposes *no* duty.  The statute at least imposes a duty upon the State to accept an inmate's written election form that is delivered to his or her warden.

[21] To the extent that predeprivation process was not feasible or would be unduly burdensome, or if the predeprivation process afforded here was constitutionally adequate, the Court agrees with the State that Miller has an adequate postdeprivation remedy because he could seek a writ of mandamus in a state circuit court.  But, for the reasons explained earlier, the Court emphasizes that no adequate postdeprivation remedy exists to cure the deprivation of Miller's liberty interest once the deprivation is complete: when an execution by lethal injection is carried out.

## C. Irreparable Injury

Miller will likely suffer irreparable injury if an injunction does not issue because he will be deprived of the ability to die by the method he chose and instead will be forced to die by a method he sought to avoid and which he asserts will be painful.  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  *City of Jacksonville*, 896 F.2d at 1285.  Money would not remedy Miller's injury because his injury is not monetary.  Rather, it is the loss of his "final dignity"—to choose how he will die.  *See Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13581, 2021 WL 4916001, at *5 (11th Cir. Oct. 21, 2021) (Pryor, J., concurring); *cf. Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) (concluding that inmate likely faced irreparable injury in the absence of an injunction allowing his spiritual advisor to audibly pray and lay hands on him during his execution; explaining that "[c]ompensation paid to [the inmate's] estate would not remedy this harm, which is spiritual rather than pecuniary").  And according to his unrebutted testimony, Miller dislikes needles and has had bad experiences with them because it has been difficult to find a vein.  The State does not contest that executing Miller by lethal injection as opposed to nitrogen hypoxia would cause him irreparable injury.  Accordingly, the Court finds that the likelihood of irreparable injury weighs in favor of injunctive relief.

### D. Balance of Harms

The balance of harms also weighs in Miller's favor.  Miller does not seek an "open-ended stay of execution"; rather, he requests a tailored injunction effectively requiring the State to execute him by nitrogen hypoxia.  *Cf. Ramirez*, 142 S. Ct. at 1282 (reaching a similar conclusion in a case involving an inmate's request to engage in religious exercise with a spiritual advisor during the execution).  Also, the State and the public have an interest in conducting executions in a manner that does not violate an inmate's constitutional rights.  *See Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 702 (11th Cir. 2019).  The State and the public also have an interest in the State following its own law generally and in the State honoring an inmate's valid election of nitrogen hypoxia more specifically—an election afforded to inmates by the Alabama Legislature.

The State represented through Commissioner Hamm's recent affidavit that the ADOC is not prepared to execute Miller by nitrogen hypoxia on September 22, 2022, although the State's response to Miller's Motion for Preliminary Injunction and counsel's statements during the evidentiary hearing suggested the State *could* conduct the execution by nitrogen hypoxia.  Thus, the Court recognizes the practical reality that granting the relief Miller seeks will likely have the incidental effect of delaying Miller's execution.  But that delay is attributable to the State, not Miller, and it appears to be a short delay.  After all, the State allowed inmates to elect

nitrogen hypoxia in June 2018 and has since slowly moved to create a method and protocol of performing executions by nitrogen hypoxia, and the State just recently appears to be ready to announce its plan to begin conducting executions by nitrogen hypoxia.  Thus, as soon as the State announces is readiness, the State can move forward with Miller's execution by his chosen method.

The Court concludes that any delay resulting from granting the relief sought here will minimally harm the State and the public, and that any such harm is greatly outweighed by the harm to Miller if an injunction does not issue.  To be sure, "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence."  *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  But the State has not argued that the harm to the public interest counsels against injunctive relief here.  The State "will get its man in the end," *see Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting), and any delay in carrying out Miller's execution is attributable to the State's continued inability to perform executions by nitrogen hypoxia.  That the State is not yet prepared to execute anyone by nitrogen hypoxia does not mean it will harm the State or the public to honor Miller's timely election of nitrogen hypoxia.  By contrast, if an injunction does not issue, Miller will be irrevocably deprived of his choice in how he will die—a choice the Alabama Legislature bestowed upon him.  Additionally, Miller will be in no different position than the other death row inmates who elected

nitrogen hypoxia, including inmates whose appeals were exhausted prior to Miller's appeals (*e.g.*, Waldrop, Taylor, and Clemons).

In sum, the Court concludes that any potential harm to the State or the public in granting Miller his requested relief is greatly outweighed by the harm that will likely befall Miller in the absence of such relief.

### E. Delay

The Court must also address the State's argument that Miller is not entitled to a preliminary injunction because he intentionally delayed in bringing this lawsuit. "A court considering a stay [of execution] must . . . apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill*, 547 U.S. at 584 (citation omitted).  In support of its argument, the State cites emails or instant messages between Miller and a pen-pal where, according to the State, Miller told the pen-pal that his lawyers said he has to "wait" to file his legal challenge.

A closer examination of the messages does not support the State's contention. In the first message, Miller states in relevant part: "Lawyers saying same thing got to wait."  (Doc. 33-1.)  In response, Miller's pen-pal writes: "Your attorney say we have to wait…?"  (Doc. 33-2.)  Miller responds: "No I have not heard from my layers [sic] after a I [sic] called last."  (Doc. 33-3.)  Importantly, the State did not ask Miller

about these messages either in his deposition or at the evidentiary hearing, despite the State's procurement of them prior to both events.

All the messages indicate is that Miller's lawyers said they "got to wait." They do not reference nitrogen hypoxia or lethal injection.  These messages simply do not support the conclusion or inference that Miller or his lawyers were waiting *to file this lawsuit*.  Even if they did, that would not compel the conclusion or inference that the "wait" was undertaken in order to intentionally delay or prejudice the State or the Court.  Thus, the messages do not support the State's position that Miller intentionally delayed bringing this lawsuit.

The State also points to Miller's testimony that he thinks he should not be executed until after the inmates who elected "before" him and after an independent expert approves Alabama's nitrogen hypoxia system.  According to the State, this evidence shows that Miller's true goal is to delay his execution, and that the timing of his lawsuit sought to help achieve that goal.  First, as explained above, Miller did not testify that he thinks he should not be executed until after the inmates who elected "before" him.  Moreover, the Court finds Miller's statements to be weak evidence that he intentionally delayed filing this lawsuit.   And his statements are not dispositive because the prayer for relief in his Amended Complaint, along with his Motion for Preliminary Injunction, expressly request that his hypoxia election be honored and that the State be enjoined from executing him by lethal injection.

Considering all of the circumstances, the Court concludes that Miller did not inexcusably delay filing this lawsuit such that it militates against granting his requested relief.  As an initial matter, Miller does not seek a stay of execution; rather, he seeks a tailored injunction effectively requiring the State to execute him by nitrogen hypoxia.  Turning to the circumstances preceding the filing of this lawsuit, Miller first learned the State could not locate a record of his election form and did not intend to honor his election on May 27, 2022.  Thereafter, Miller asked the Alabama Supreme Court to remand the matter to an Alabama trial court for a hearing to resolve the factual dispute.  On July 18, 2022, the Alabama Supreme Court entered an order setting Miller's execution for September 22, 2022.  Miller filed this lawsuit thirty-four days later and four weeks before his scheduled execution.  Miller argues that it would have offended traditional principles of federalism and comity if he had run to federal court while the matter was being litigated before the Alabama Supreme Court.  The State does not argue otherwise.

The Court agrees with Miller and concludes that "it was not unreasonable for [him] to attempt to exhaust his state remedies by completing litigation on the State's motion to set his execution date before filing his section 1983 lawsuit here."  *See Hamm*, 2018 WL 2171185, at *2.[22]   Additionally, Miller argues that after his execution date was set, his lawyers needed time to research and evaluate his

---

[22] While the Court recognizes that *Hamm* is nonbinding, the Court finds its analysis persuasive.

constitutional claims, perform due diligence, and secure local counsel. The State does not argue that his lawyers took an unreasonable amount of time to perform those tasks. Under these circumstances, the Court finds that Miller did not unreasonably delay bringing this lawsuit.

Again, Miller filed this lawsuit four weeks before his scheduled execution. In the interim, the Court was able to hold an evidentiary hearing during which Miller testified and was subject to cross-examination. Additionally, the State was able to depose Miller before the hearing. The State does not argue that it was prejudiced by the timing of the briefing on the preliminary injunction motion or the evidentiary hearing. The State does not argue, for example, that the timing rendered the State unable to secure evidence it wished to introduce or the attendance of witnesses to testify at the hearing.

Additionally, and most importantly, Miller has met his burden of showing a substantial likelihood that he timely elected and that he can succeed on his claims, that he likely faces irreparable injury, and that the balance of harms weighs in his favor. Consequently, any delay in bringing this lawsuit does not militate against the entry of injunctive relief. *Cf. Smith v. Comm'r, Ala. Dep't of Corr.*, 844 F. App'x 286, 294 (11th Cir. 2021) (in case where an inmate sought to have his spiritual advisor in the room during his execution, explaining that a delay is not dispositive and concluding that "any delay [was] not so weighty" because the inmate was likely

to succeed on his legal claim and, without an injunction, the ADOC would likely execute the inmate without his spiritual advisor present as he passes, and that there is "no do-over in this scenario"). And Miller filing suit earlier would not change the reality that the State is not ready to execute anyone by nitrogen hypoxia.

Miller has shown, based on the evidence presented, a substantial likelihood of success on the merits of his Fourteenth Amendment claims, a likelihood of irreparable injury without an injunction, and that the balance of harms weighs in his favor. Therefore, Miller has established his entitlement to a preliminary injunction that prevents the State from executing him by any method other than nitrogen hypoxia.

## V. CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

1. The Motion for Preliminary Injunction (Doc. 28) is GRANTED; and

2. The Defendants and their agents are hereby ENJOINED from executing Alan Eugene Miller by any method other than nitrogen hypoxia until further order from this Court.

DONE, on this the 19th day of September, 2022.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE