## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALBAMA

ALAN EUGENE MILLER,      )
                          )
     Plaintiff,        )
                          )
v.                      )  Case No. 2:22-cv-506-RAH
                          )
JOHN Q. HAMM, *et al.*,    )
                          )
     Defendants.    )

## DEFENDANT'S MOTION TO STAY PENDING APPEAL

Plaintiff Alan Eugene Miller is an Alabama death row inmate who is scheduled to be executed on September 22, 2022. On April 19, 2022, the State of Alabama asked the Alabama Supreme Court to schedule the date for execution of Miller's sentence. On July 18, the Alabama Supreme Court set Miller's execution for September 22.

Miller did not file his 42 U.S.C. § 1983 lawsuit in this Court until August 22, just one month prior to his scheduled execution. DE1, DE18. Miller then inexplicably waited one more week, three weeks before his scheduled execution, to file a motion for preliminary injunction, asking this Court to enjoin Defendants from executing him by any method other than nitrogen hypoxia. DE28. The parties fully briefed this motion and this Court conducted an evidentiary hearing on September 12.

On September 19, this Court granted Miller's motion for preliminary injunction, finding that Miller has successfully demonstrated that he is entitled to a preliminary injunction because he has shown a substantial likelihood of success on the merits and that the equities favor Miller. DE62:61 (hereafter, "Op."). This Court then enjoined Defendants from "executing Alabama Eugene Miller by any method other than nitrogen hypoxia until further order from this Court." *Id*.

Defendants respectfully request a stay of the Court's judgment to allow Defendants to pursue an appeal with the United States Court of Appeals for the Eleventh Circuit and, if necessary, the United States Supreme Court. In support, Defendants submit the following.

## INTRODUCTION

Alan Miller claims that in 2018 he filled out a form in which he elected execution by nitrogen hypoxia. The State, however, has no record of him having done so, and accordingly scheduled him to be executed via lethal injection. Miller argues that by allegedly misplacing his method-of-execution form and ignoring his execution preference, the State has deprived him of his constitutional rights to procedural due process and equal protection under the Fourteenth Amendment.

Neither claim has merit. Miller's allegations sound only in negligence, which is categorically insufficient to rise to the level of a constitutional deprivation. Even more damning is the fact that Miller has had over two months to avail himself of an

adequate state-law remedy—here, the writ of mandamus—yet inexcusably has declined to do so. He cannot attack the State's process as constitutionally deficient when he failed to avail himself of it.

And Miller's "class of one" claim fares even worse. Miller claims he is similarly situated to other prisoners who have opted for nitrogen hypoxia and is being treated differently for no rational reason. This is plainly incorrect. First, the State has no record of Miller's supposed decision, which immediately distinguishes him from other inmates who elected nitrogen hypoxia. Second, aside from self-serving testimony, Miller has offered no evidence to show that he turned in a method-of-execution form. This materially distinguishes Miller even from the one other inmate who claimed the State did not receive his form, Jarrod Taylor, for Taylor brought forward substantial evidence to support his assertion that he had properly submitted his election. And because the State has myriad rational reasons to require reliable evidence before crediting a prisoner's assertion—particularly where that assertion implicates his sentence—Miller's "class of one" claim goes nowhere.

Worse still, Miller could have brought suit as soon as July 18, 2022, when the Alabama Supreme Court set his execution date. Yet he followed the playbook of many death-row inmates, waiting to the last minute to file his claims. Miller's

execution is scheduled for September 22. This Court stay its preliminary injunction order.

## STATEMENT OF THE CASE

### A.   The Introduction Of Nitrogen Hypoxia As A Method Of Execution.

On March 22, 2018, Governor Kay Ivey signed Alabama Laws Act 2018-353, which made nitrogen hypoxia a statutorily approved method of execution in Alabama. Pursuant to Alabama Code §15-18-82.1(b)(2), as modified by the act, an inmate whose conviction was final before June 1, 2018, had thirty days from that date to inform the warden of the correctional facility in which he was housed that he was electing to be executed by nitrogen hypoxia.

The law did not include any provision requiring that any individual be given special notice of its enactment, nor did it specify how an inmate should make an election, other than to require the election be made "personally," "in writing," and "delivered to the warden of the correctional facility" within thirty days of the triggering date. Ala. Code §15-18-82.1(b)(2). The Alabama Department of Corrections ("ADOC") had no statutory duty to create an election program, and it had no authority to change the terms of the statute. ADOC's only duty was to receive timely notices of election from inmates who wished to elect hypoxia.

On June 22, 2018, an attorney with the Federal Defenders for the Middle District of Alabama drafted an election form, which was given to death-row inmates

represented by that organization on June 26. Affidavit of John A. Palombi at 2, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 29, 2019), ECF No. 29-3. Cynthia Stewart, then the Warden of Holman Correctional Facility, where Miller was an inmate, directed Captain Jeff Emberton to give every death-row inmate a copy of the form and an envelope in which he could return it to the warden, should he decide to elect. DE52-10; DE62:6 (hereafter "Op."). Emberton did so, Op.6, explaining to each inmate—in the district court's summation—"that the law had changed and they now had a choice in their execution method, and if they wanted to choose, they were to fill out a form and he would return later in the day to pick it up," Op.12-13 (citing DE52-14:55-56). The form was distributed to every death-row inmate at Holman by June 27. About fifty inmates turned in forms. DX22. Although the form was provided to every death row inmate at Holman, *see* DE56-14:10–13, "a lot of inmates refused to turn them back in," DE52-14:57-1–2, because they wanted to speak with counsel. DE52-14:56-19–23.

**B.    The State Schedules Miller's Execution.**

On April 19, 2022, the State of Alabama asked the Alabama Supreme Court to schedule the date for execution of Miller's sentence. Miller's counsel subsequently contacted the Office of the Alabama Attorney General and asked whether Miller had elected nitrogen hypoxia during the 2018 election period.

After the Attorney General's Office informed Miller's counsel that ADOC possessed no nitrogen hypoxia election form for Miller, Miller filed an affidavit in the Alabama Supreme Court, on May 18, claiming to have made an election in "June or July 2018" by giving his form "to the correctional officer who was collecting the forms." DE18-1:3. Miller further alleged that his form was turned in to this "correctional officer" "at the same time that he was collecting the forms from everyone else." *Id.* Miller asked the Alabama Supreme Court to refrain from setting his execution date.

On July 18, 2022, the Alabama Supreme Court issued an order for Miller's judicial execution to be carried out on September 22, 2022. Inexplicably, Miller did not file his §1983 lawsuit until August 22, just one month before his scheduled execution. On August 4—two weeks after the Alabama Supreme Court's issuance of Miller's execution warrant and two weeks prior to the filing of his complaint—Miller confided in a pen pal that his attorneys had told him he had "to wait." DE33-1:2. In a responsive filing, Miller assured the district court that it lacked "important context" to determine whether this was an admission of unreasonable delay. DE34:1. Such "important context," however, was never produced.

## C.    This Court Stays Miller's Execution; Defendants Appeal.

Yesterday, this Court stayed Miller's execution on the theory that (1) he likely suffered a constitutional deprivation as a "class of one" under the Equal Protection

Clause, and (2) his procedural due process rights were likely harmed because he alleges the State lost his method-of-execution form. Op.62. Because Miller's execution is scheduled for September 22, 2022, Defendants now seek a stay from this Court, and a ruling by **12:00 PM CT on September 21**.

## STANDARD OF REVIEW

When deciding whether to grant a stay, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).

Rule 62(c) of the Federal Rules of Civil Procedure and Rule 8(a) of the Federal Rules of Appellate Procedure provide the following factors when considering a stay application:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies.

While the first factor is often the most important, "the movant may also have his motion granted upon a lesser showing of a 'substantial case on the merits' when 'the balance of the equities [identified in factors 2, 3, and 4] weighs heavily in favor

of granting the stay.'" *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)

(alterations in original) (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981)).

As to the likelihood of the Defendants prevailing on appeal, the standard of review

for a grant or denial of a motion for a preliminary injunction was recently explained

in *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13581, 2021 WL 4916001, at *3

(11th Cir. Oct. 21, 2021), *cert. denied sub nom. Smith v. Dunn*, 142 S. Ct. 12, 211 L.

Ed. 2d 224 (2021). As the Eleventh Circuit explained:

> Because "[t]he grant or denial of a preliminary injunction is a decision within the sound discretion of the district court," our "review of such a decision is very narrow." *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984) (per curiam). Accordingly, we will not reverse the district court's ruling "unless there is a clear abuse of discretion." *Id.* An abuse of discretion occurs when the district court makes factual findings that are clearly erroneous, follows improper procedures, or applies the incorrect legal standard. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

*Id.* The Eleventh Circuit has also held that an abuse of discretion occurs when

it "ignores or misunderstands the relevant evidence, [or] bases its decision upon

considerations having little factual support." *Glock v. Glock, Inc.*, 797 F.3d 1002,

1006 (11th Cir. 2015); *quoting FTC v. AbbVie Prods. LLC,* 713 F.3d 54, 61 (11th

Cir. 2013).

## SUMMARY OF THE ARGUMENT

This Court should stay its preliminary injunction order.

Miller's constitutional theories are foreclosed by clear precedent. First, Miller's procedural due process claim fails because everyone agrees that Miller has an adequate state-law remedy he has never taken advantage of: the writ of mandamus. Because "the writ of mandamus would be available under state law to [Miller], and because … mandamus would be an adequate remedy to ensure that [Miller] was not deprived of his due process rights, … [Miller] has failed to show that inadequate state remedies were available to him to remedy any alleged procedural deprivations." *Cotton v. Jackson*, 216 F.3d 1328, 1333 (11th Cir. 2000). Separate and apart from that black-letter law, the procedural harm Miller alleges is negligence, which "simply [does] not implicate[]" the Due Process Clause. *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

Second, Miller's equal protection "class of one" claim suffers equally fatal defects. Miller is not similarly situated to other State prisoners who elected nitrogen hypoxia (or even to Taylor who claimed he elected nitrogen hypoxia *and* that Defendants misplaced his form) because the State has no reliable evidence that Miller elected nitrogen hypoxia. In the same vein, the State has an eminently rational interest in verifying its prisoners' allegations, which easily justifies treating Miller differently from those inmates. Miller therefore fails to satisfy either necessary element of his "class of one" claim.

Finally, the equities favor the State. Because Miller could have brought his claim earlier yet decided to wait, the State's "significant interest in enforcing its criminal judgments," *Nelson v. Campbell*, 541 U.S. 637, 650 (2004), outweighs Miller's purported interest in nitrogen hypoxia.

## ARGUMENT

### I.  Miller's Constitutional Theories Fail on the Merits.

#### A.  Miller's Procedural Due Process Argument Fails as a Matter of Law.

##### 1.  Miller Declined to Avail Himself of the State's Process, Dooming His Procedural Due Process Argument.

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.*

"When a state procedure is inadequate, no procedural due process right has been violated unless and until the state fails to remedy that inadequacy." *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994). "Again and again, [the Eleventh Circuit] has repeated the basic rule that a procedural due process claim can exist only

if no adequate state remedies are available." *Flagship Lake Cnty. Dev. No. 5, LLC v. City of Mascotte, Fla.,* 559 F. App'x 811, 815 (11th Cir. 2014) (collecting cases). "This directive is not an exhaustion requirement. Instead, this directive is a recognition that procedural due process violations do not even exist unless no adequate state remedies are available." *Cotton*, 216 F.3d at 1331 n.2 (citations omitted).

Critically, where a plaintiff can petition for "the writ of mandamus … under state law," the availability of the writ is "an adequate remedy to ensure that Plaintiff was not deprived of his due process rights" and in turn a plaintiff "has failed to state a claim for a procedural due process." *Id.* at 1333. "In *Cotton*, [the Eleventh Circuit] stated that, even if the plaintiff has no specific legal remedy, the ability to seek a writ of mandamus in the state supreme court may be a sufficient remedy to a local government's alleged procedural due process violation." *Randel v. Rabun Cnty. Sch. Dist.*, No. 21-12760, 2022 WL 1195655, at *2 (11th Cir. Apr. 22, 2022). There, "*the mere possibility* that the state supreme court could have issued a writ of mandamus in his favor was a sufficient process." *Id.* (emphasis added). "Thus, '[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Flagship Lake Cnty.,* 559 F. App'x at 814–15 (quoting *Cotton*, 216

F.3d at 1331-33); *see also, e.g.*, *Club Madonna, Inc. v. City. of Miami Beach*, 924 F.3d 1370, 1378-79 (11th Cir. 2019).

These decisions are fatal to Miller's procedural due process claim. As the State explained below, there is no doubt that "the facts pleaded in [Miller's] amended complaint [DE18] establish that he could have sought a petition for writ of mandamus directed to Defendant Hamm in state court." DE35:4. In response, because Miller could not deny that state law provides him the opportunity to petition for mandamus, he attempted to cast the State's argument as "gamesmanship" and assert that "this argument is entirely inappropriate" because "a plaintiff does not need to 'prove' a lack of post-deprivation hearing at the pleading stage." DE45:14-15.

This is confused, as mandamus would be a *pre*deprivation remedy if Miller would only seek it. Eleventh Circuit precedent leaves no doubt that a state-law writ of mandamus constitutes "an adequate remedy to ensure that Plaintiff was not deprived of his due process rights," meaning that where, as here, the writ is available, a plaintiff "has failed to state a claim for a procedural due process," *Cotton*, 216 F.3d at 1333. Because Alabama state law provided Miller the opportunity to seek a writ of mandamus, Miller's procedural due process claim is a non-starter. *Cotton*, 216 F.3d at 1333.

The Court's decision seemed to overlook this dispositive issue, cursorily addressing in a two-sentence footnote the critical question whether the availability of the writ of mandamus constitutes adequate process:

> To the extent that predeprivation process was not feasible or would be unduly burdensome, or if the predeprivation process afforded here was constitutionally adequate, the Court agrees with the State that Miller has an adequate postdeprivation remedy because he could seek a writ of mandamus in a state circuit court. But, for the reasons explained earlier, the Court emphasizes that no adequate postdeprivation remedy exists to cure the deprivation of Miller's liberty interest once the deprivation is complete: when an execution by lethal injection is carried out.

Op.53 n.21.

Though the Court "agrees with the State" that mandamus constitutes an adequate remedy, it simultaneously dismisses the adequacy of this remedy because "no adequate postdeprivation remedy exists to cure the deprivation of Miller's liberty interest once the deprivation is complete." *Id.* The Court, however, inexplicably deemed mandamus relief a "*post*deprivation remedy" even though Miller could seek to use it *pre*deprivation. Miller's neglect of this predeprivation remedy does not transform it into a postdeprivation remedy; instead, that neglect forecloses Miller's due process claim. He cannot attack the State's process by declining to avail himself of it. *Cotton*, 216 F.3d at 1333.

13

### 2.    Miller's complaint alleges negligence, which cannot amount to a constitutional deprivation.

Miller's procedural due process claim also fails because he has alleged only a species of negligence, not a constitutional deprivation. The Supreme Court has been unequivocal: "[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels*, 474 U.S. at 328. Moreover, predeprivation safeguards are inapplicable in situations where the State is "unable to anticipate and prevent a random deprivation of a liberty interest." *Zinermon*, 494 U.S. at 132. "It would do no good for the State to have a rule telling its employees not to lose mail by mistake, and it 'borders on the absurd to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct.'" *Id.* at 137.

Miller never explained what about the State's process violated the Constitution. Instead, he alleged that Defendants violated his procedural due process rights because they "failed to create and maintain an accurate accounting of who timely submitted election forms and failed to implement a reviewable process for determining whether an election had been made." DE18:14.

But aside from alleging that the prison's operations are "messy" (DE18:14), Miller cannot identify what aspects of the process itself were inadequate. As the district court explained, Defendants provided prisoners with forms to indicate their preferred method of execution and then stored these completed forms for safe

14

keeping. Op.22; *see also* Op.14. The record shows that there were roughly 160 death-row inmates at the time the Legislature passed Ala. Code §15-18-82.1, *see* DE52-13:51; DE52-15:27, and method-of-execution election forms were provided to "every death row inmate," DE52-10:1-2. To date, only two prisoners have alleged that ADOC misplaced their forms. *See* Op.8, 40. Allegations that two forms went missing do not amount to a violation of the Constitution.

This Court rejected the claim that "negligent loss of an election form does not give rise to an actionable due process claim" on the theory that "the deprivation Miller complains of is about more than the negligent loss of a form"; "[i]t is about the deprivation of his right to choose a nitrogen hypoxia execution and the State's plans to carry out his execution by lethal injection in contravention of his choice." Op.53 n.19.

But while the substantive "deprivation Miller complains about" is ultimately "his right to choose nitrogen hypoxia" (*id.* n.21), this is a procedural due process claim, which means that in addition to the alleged "constitutionally-protected … property interest"—*i.e.*, the alleged "right to choose nitrogen hypoxia"—Miller must *also* show "constitutionally-inadequate process." *Benison*, 5 F.4th at 1232. By collapsing the asserted "property interest" and the "process," this Court erroneously elided analysis of the *procedural* right Miller alleges. Because the only

"constitutionally-inadequate process" Miller even *alleges* amounts to nothing more than negligence, Miller's procedural due process claim fails as a matter of law.

**B.    Miller fails to satisfy the necessary requirements of his "class of one" Equal Protection claim.**

A "class of one" claim requires a plaintiff to show (1) "that [he] has been intentionally treated differently from others similarly situated," and (2) "that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Both prongs are necessary to the success of a "class of one" plaintiff's claim, but Miller meets neither.

**1.    Miller has failed to identify any inmate with whom he is similarly situated.**

A "class of one" claim cannot survive unless individuals are similar in all "factors relevant to an objectively reasonable governmental decisionmaker." *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decision makers from treating differently persons *who are in all relevant respects alike*." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added).

No "class of one" claim can survive when the government applies the same test to all individuals. Plaintiffs must show that the government applied a wholly different test to the plaintiff versus other individuals. *See Olech*, 528 U.S. at 565 (conditioning water provision on a 33-foot easement for plaintiff but only 15-foot

easements from other property owners); *Sioux City Bridge Co. v. Dakota County, Neb.,* 260 U.S. 441, 445-47 (assessing plaintiff's property at 100 percent of its value and other properties at 55 percent).

The level of identity required between comparators depends on the relevant variables for comparison. If the government applies a "one-factor" analysis, then individuals must be similar as defined by that one factor. In *Olech*, for example "the only relevant factor was the size of the easement required in return for connection to the municipal water supply." *Griffin*, 496 F.3d at 1203. But when the government applies a multifactor test involving discretionary determinations, individuals must be "*prima facie* identical in all relevant respects." *Campbell*, 434 F.3d at 1314. "This is a more difficult standard to meet." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1265 (11th Cir. 2010); *see also, e.g.*, *Leib v. Hillsborough County Pub. Transp. Commn.*, 558 F.3d 1301, 1307 (11th Cir. 2009) (no Equal Protection violation in multidimensional decision to impose restrictions on a bar that violated multiple regulations but not other bars that didn't appear to violate those same regulations); *Campbell*, 434 F.3d 1306 (11th Cir. 2006).

Here, Defendants applied the same, multifactor standard to all death row inmates seeking nitrogen hypoxia: the inmate must have either (1) an election form in ADOC's records or (2) credible evidence that the inmate timely completed and submitted the form to the warden. Aside from Miller, all death row inmates seeking

nitrogen hypoxia thus far have met these requirements. Miller did not. *See* DE18-3 (warden's affidavit that ADOC's nitrogen hypoxia file had no record of an election form from Miller). Even Taylor, the other inmate who claimed to have made an election form but whose form ADOC did not possess, showed credible evidence from his attorney that the form had been timely completed.

Defendants' decision involved the sort of "subjective, individualized determinations" that make any "class of one" claim difficult. *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 604 (2008). Faced with Miller's claim that an election form existed despite its nonexistence in ADOC's records, Defendants had to determine the credibility of Miller's claims. These determinations implicated several factors, such as Miller's inability to describe the prison official who collected his form, *see* DE58:98-110, and his complete lack of evidence apart from a self-serving affidavit, *see* Op.30-31; DE18:1. Because ADOC did not possess Miller's form and because Miller offered no evidence that he had completed a form aside from a self-serving affidavit, Miller was not similarly situated to other inmates.

But even if Defendants' test is characterized as simple or one-dimensional, they still applied the same simple test to all inmates: show credible evidence of a timely form. Miller is the only one to fail this test. Thus, Miller's "class of one" claim must fail.

In reaching the opposite conclusion, this Court committed at least two reversible errors. *First*, the Court mischaracterized Defendants' decision as "simple or one-dimensional" when Defendants were making subjective, individualized determinations about credibility. Op.43. As explained above, Miller cannot make the demanding showing of being "identical in all relevant respects" to other inmates in all the subjective factors that went into Defendants' evaluation of credibility. *Campbell*, 434 F.3d at 1314. But *second*, even if Defendants' decision was simple and one-dimensional, the Court still erred in concluding that Miller was identically situated with other inmates. In fact, Miller was the only inmate to fail to present (1) any election form in ADOC's records *and* (2) any evidence, apart from a self-serving affidavit, that he completed a timely election form. DE18-3 (no form from Miller in record); DE58:98-110 (inability to describe official); Op.30-31 (undisputed allegation of refusal to corroborate testimony); DE18:1 (Miller's affidavit). Whether an inmate presents evidence to support a claim as substantial as Miller's is obviously "relevant to an objectively reasonable governmental decisionmaker," *Griffin Industries, Inc.*, 496 F.3d at 1204, making this distinction dispositive.

> ## 2. Defendants have a rational interest in requiring strong evidence to support prisoners' claims.

But even if Miller was similarly situated to other death row inmates, Defendants have a rational basis to treat him differently. Rational basis review "is a paradigm of judicial restraint." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314

(1993). "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). So long as a "rational policymaker could believe" the decision would further a legitimate state objective, the decision must be upheld. *Cook v. Bennett*, 792 F.3d 1294, 1301 (11th Cir. 2015).

These principles apply in full force to a plaintiff's equal protection "class of one" claim. In such circumstances, the court must examine the "full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision." *Griffin*, 496 F.3d at 1203. If any rational basis could support a legitimate state objective, then the claim fails.

Though there are many rational bases on which to differentiate individuals, two bear emphasis here. *First*, the State may reasonably differentiate individuals based on its confidence in their credibility. In *Campbell*, the city was skeptical of plaintiff's building proposal because plaintiffs failed to consistently bring a sketch of the proposed building to Planning Commission meetings. 434 F.3d at 1316-17. The commission was also nervous that the provided sketch, made with a pencil, "would have allowed any of the proposed building locations to be changed easily." *Id.* In contrast, the other property developer provided site plans, an architect, and an

engineer at every meeting by the Planning Commission, bolstering the developer's credibility. *Id.* "[T]he nature of the presentations Echols made would inspire more confidence than the Campbells' rather nonchalant approach," and this difference provided a rational basis for approving one project and not the other. *Id.*

*Second*, the government may rationally differentiate individuals based on the State's own record evidence. In *Knight v. Baptist Hosp. of Miami, Inc.*, the Eleventh Circuit looked to the different employment records of the plaintiff nurse and another nurse in an Equal Protection claim. 330 F.3d 1313, 1315–19 (11th Cir. 2003). Despite the plaintiff's claims that both she and the other nurse had the same job performance problems, the government had a rational basis to treat them differently because their records showed differences in job performance and tardiness. *Id.* The Court emphasized that the decision to place the plaintiff on leave was "based on a review of her entire record" and "documented instances" of her performance problems. *Id.* at 1317. Regardless of the plaintiff's self-serving claims, "the record [did] not indicate" that the plaintiff had the same degree of problems as the other nurse. *Id.* at 1318.

Here, Defendants relied on multiple rational criteria to treat Miller differently from other death row inmates. First, unlike other death row inmates, ADOC does not have Miller's form. DE18-3. Like the government employer in *Knight*, which relied on its records to justify differential treatment of employees, here Defendants

reasonably relied on their records to differentiate between death row inmates. Defendants had a process for collecting forms, DE52-13:74-80, and it is rational to doubt the existence of a form that does not show up in ADOC's records. And as in *Campbell*, where plaintiffs failure to "provide a record" supporting their allegations was evidence of a rational basis for differential treatment, 434 F.3d at 1315, here ADOC's lack of a form is evidence suggesting that Miller—unlike his fellow inmates—did not complete the form at all. That evidentiary distinction distinguishes Miller from other inmates, and the State's interest in verifying its prisoners' claims is self-evidently rational. *See, e.g.*, *Superintendent, Massachusetts Correctional Instn., Walpole v. Hill*, 472 U.S. 445, 454-55 (1985) (recognizing "the legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation").

The same principled distinction in credibility also differentiates Miller from Taylor. Whereas Taylor alleged he had completed a method-of-execution form and presented substantial evidence to support his claim, DE28:7, Miller offers no evidence aside from a self-serving affidavit, DE18:1. It is not unreasonable for the State to find a last-minute, self-serving affidavit less persuasive than the robust evidence presented by Taylor. *Compare* Op.30-31 (undisputed allegation of Miller's refusal to corroborate testimony with attorney-client communications), *and* DE18:1

22

(Miller's affidavit), *with* DE28:7 (undisputed statements that Taylor's counsel (1) filed a motion informing Defendants that Taylor had made a timely election and (2) provided Defendants with attorney-client communications from around the time of the election period). *See also, e.g.*, *Williams v. City of Dothan, Ala.*, 745 F.2d 1406, 1415 n.9 (11th Cir. 1984) ("[S]ubjective and possible self-serving evidence must be viewed with a skeptical eye unless it is supported by more objective facts in the record."). The State's finding is all the more reasonable where Miller proved unable to answer questions about the warden who collected his form and to come forward with any evidence of his timely completed form. DE58:98-110.

This Court erred when it could "conceive of no rational basis to treat Miller differently." Op.45. The court's reasoning rested on the premise that "[t]he State is not the exclusive arbiter of whether an inmate has made a proper and timely election." *Id.* But the State need not be "the exclusive arbiter" of truth to come to reasonable, evidence-based conclusions, and rational basis does not require that those conclusions are infallible. Just the opposite. As noted above, "courts are compelled under rational-basis review to accept a legislature's generalizations *even when there is an imperfect fit between means and ends*"; indeed, "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal citations, quotation marks omitted). The Constitution does not prevent Defendants

23

from applying rational criteria to determine which inmates have likely completed a timely form and which have not.

## II.    The Equities Favor The State.

This Court should also stay its order based on the balance of the equities. Miller is scheduled to be executed in two days. His gamesmanship should not be rewarded.

"In deciding whether to grant a stay of execution, courts must consider whether such a challenge could have been brought earlier or otherwise reflects a prisoner's attempt at manipulation." *Nance v. Ward*, 142 S. Ct. 2214, 2225 (2022) (quotations omitted). Federal courts must also consider the State's strong interest in proceeding with its criminal judgment. *See Long v. Sec'y, Dep't of Corrs.*, 924 F.3d 1171, 1176 (11th Cir. 2019).

On August 4—two weeks after the Alabama Supreme Court's issuance of Miller's execution warrant and two weeks prior to the filing of his complaint— Miller confided in a pen pal that his attorneys had told him he had "to wait." DE33-1:2. In a responsive filing, Miller assured the district court that it lacked "important context" to determine whether this was an admission of unreasonable delay. DE34:1. But this "important context" never came.

The Court gave this critical fact short shrift and gave counsel credit for waiting until Miller's execution date was set to begin planning for the event that they might

not prevail before the Alabama Supreme Court. Finally, the Court concluded its order with the observation that "Miller filing suit earlier would not change the reality that the State is not ready to execute anyone by nitrogen hypoxia." Op.61. But that means that Miller's delay in bringing a claim has helped him *succeed* in delaying his execution. That Miller's gambit would lead to delay in carrying out his lawful sentence was reason to deny his preliminary injunction motion.

## CONCLUSION

This Court should stay its preliminary injunction.

Respectfully submitted,

Steve Marshall
*Attorney General*

**/s/ Beth Jackson Hughes**
Beth Jackson Hughes
James Roy Houts
Audrey Jordan
*Alabama Assistant Attorneys General*
*Counsel for Defendants*

September 20, 2022

## **CERTIFICATE OF SERVICE**

I certify that on September 20, 2022, I served a copy of the foregoing upon all counsel of record via the Court's CM/ECF system.

Respectfully submitted,

Steve Marshall
*Alabama Attorney General*

**/s/ Beth Jackson Hughes**
Beth Jackson Hughes
James Roy Houts
Audrey Jordan
*Alabama Assistant Attorneys General*
Counsel for Defendants


OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 242-7392
Fax: (334) 353-8400
Beth.Hughes@AlabamaAG.gov

26