# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 22, 2022

Beth Jackson Hughes
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

Edmund Gerard LaCour Jr.
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

Daniel Neppl
Sidley Austin, LLP
1 S DEARBORN ST
CHICAGO, IL 60603

James Bradley Robertson
Bradley Arant Boult Cummings, LLP
1819 5TH AVE N
BIRMINGHAM, AL 35203

Thomas Alexander Wilson
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

Appeal Number:  22-13136-P
Case Style:  Alan Eugene Miller v. Commissioner, Alabama Department of Corrections, et al
District Court Docket No:  2:22-cv-00506-RAH

<u>Electronic Filing</u>
All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. <u>Although not required</u>, non-incarcerated pro se parties are

permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

The enclosed order has been ENTERED.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: David L. Thomas
Phone #: (404) 335-6171

MOT-2 Notice of Court Action

[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-13136

Non-Argument Calendar

————————————————

ALAN EUGENE MILLER,

Plaintiff-Appellee,

*versus*

COMMISSIONER,   ALABAMA   DEPARTMENT   OF
CORRECTIONS,
WARDEN, HOLMAN CORRECTIONAL FACILITY,
ATTORNEY GENERAL, STATE OF ALABAMA,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cv-00506-RAH

————————————

Before JORDAN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

In June of 2018, Alabama enacted legislation providing for nitrogen hypoxia as an alternative method of execution in lieu of lethal injection, which is the default method.  *See* ALA. CODE § 15-18-82.1(b).  Those capital defendants who had been previously sentenced to death had 30 days, or until July 2, 2018, to elect nitrogen hypoxia as the method of execution.  The election had to be in writing and submitted to the warden of the correctional facility.  Failure to elect nitrogen hypoxia as the method of execution during that 30-day period operated as a waiver of that method of execution. *See* § 15-18-82.1(b)(1)-(2).

Sometime in June of 2018, the warden at Holman Correctional Facility ordered that election forms be provided to all inmates who had been sentenced to death.  Prison officials at Holman then collected the forms from inmates who elected nitrogen hypoxia as the method of execution.  *See generally Price v. Comm'r*, 920 F.3d 1317, 1323-24 (11th Cir. 2019).  But the officials decided not to create or keep a list of those inmates who had turned in an election form choosing nitrogen hypoxia.  *See* D.E. 62 at 13-15.

It has been four years since Alabama provided for nitrogen hypoxia as an alternative method of execution. But it still does not have a protocol for carrying out executions through nitrogen hypoxia. As a result, no one has been put to death pursuant to that method.

## I

Alan Eugene Miller, an inmate at Holman, is under sentence of death for the 1999 murders of Lee Michael Holdbrooks, Christopher S. Yancey, and Terry Lee Jarvis. His convictions and sentences have been affirmed on direct appeal and on state and federal collateral review. *See Miller v. State*, 913 So. 2d 1148 (Ala. Crim. App. 2004); *Miller v. State*, 99 So. 3d 349 (Ala. Crim. App. 2011); *Miller v. Comm'r*, 826 F. App'x 743 (11th Cir. 2020).

Mr. Miller alleged that he provided officials at Holman with a timely written election form choosing nitrogen hypoxia as the method of execution. When his execution was set for September 22, 2022, he filed an action pursuant to 42 U.S.C. § 1983 asserting equal protection and due process claims and seeking to prevent the State from executing him other than by nitrogen hypoxia. The State said that it does not have any record of Mr. Miller submitting an election form and maintained that he did not provide such a form to officials at Holman.

The district court held an evidentiary hearing on Mr. Miller's motion for a preliminary injunction. Mr. Miller testified at the hearing that he had filled out the election form choosing nitrogen

hypoxia as the method of execution and put it in a slot between the bars in his cell to be picked up.

Finding Mr. Miller "substantially credible," the district court found that it was substantially likely that he had filled out a timely election form choosing nitrogen hypoxia as the method of execution because of his "single-minded focus on avoiding contact with needles" and that he left it between the bars of his cell to be picked up. *See* D.E. 62 at 23-25, 34. The district court also rejected the State's arguments as to why Mr. Miller should be disbelieved. For example, with respect to the State's contention that it did not have a copy of any election form submitted by Mr. Miller, the district court found that the absence of a copy did not mean it was not received, as it could have been simply misplaced after receipt or misfiled. *See id.* at 25-26. The district court explained that there was "no evidence of a standardized policy or procedure" for officials at Holman "to collect and transmit completed forms . . . for logging and retention," nor was there "evidence of a chain of custody from the time forms were collected[.]" *Id.* at 27. And there was evidence indicating that two other Holman inmates had problems after turning in their election forms: Jarrod Taylor gave his completed form to a Holman official but the State "was unable to find [his] form in its file," and Calvin Stallworth "gave his completed election form to a guard, but the guard refused to deliver the form" to the warden. *See id.* at 27-28. The district court also noted that the State did not present any evidence from the Holman

officials who picked up election forms in Mr. Miller's tier. *See id.* at 28-29.[1]

Based on its factual findings, the district court concluded that Mr. Miller established a substantial likelihood of success on his equal protection and due process claims. It granted preliminary injunctive relief prohibiting the State from executing him by any method other than nitrogen hypoxia.

First, the district court ruled that Mr. Miller made out a "class of one" equal protection claim under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), and its progeny, including *Leib v. Hillsborough County Public Transportation Commission*, 558 F.3d 1301, 1307 (11th Cir. 2009). Mr. Miller was intentionally being treated differently from others similarly situated—i.e., those inmates who had also turned in a timely form electing nitrogen hypoxia as the method of execution—and there was no rational basis for the difference in treatment:

> [H]aving timely elected nitrogen hypoxia, [Mr.] Miller is similarly situated to every other inmate who timely elected nitrogen hypoxia. There is no evidence or argument that the State has executed by lethal injection any inmate who timely elected nitrogen hypoxia . . . [and there was] no rational basis to treat [Mr.] Miller differently. The State's belief that [Mr.]

---

[1] The district court further discussed and rejected six other arguments made by the State as to why Mr. Miller should not be found credible. *See id.* at 30-41.

> Miller has not proven his case to the *State's* satisfaction is irrelevant.  The State is not the exclusive arbiter of whether an inmate has made a proper and timely election.  The State does not argue otherwise, and it is agreed that this Court is the proper factfinder to determine whether it is substantially likely that [Mr.] Miller timely elected.

D.E. 62 at 44-45.

Second, the district court ruled that Mr. Miller was likely to succeed on his procedural due process claim, which required a showing of three elements—the deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally-inadequate process.  *See Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).  He had a statutorily-created liberty interest in choosing to be executed by nitrogen hypoxia.  *See* D.E. 62 at 50.  The deprivation of this interest through execution by lethal injection, moreover, constituted state action, and the deprivation would not be complete until the execution was carried out.  *See id.* at 50-51.  And no adequate post-deprivation remedy (e.g., a writ of mandamus) existed because execution is final and a post-execution order for the State to honor Mr. Miller's election would be meaningless.  *See id.* at 52.

The State now appeals the district court's preliminary injunction and asks us to stay it pending appeal.  We agree with the district court that the State is not entitled to a stay, *see* D.E. 70 at 3-11, and deny its motion.

## II

In reviewing a motion to stay a preliminary injunction, we consider the following matters: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). *See also Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (same). The first two factors "are the most critical." *Nken*, 556 U.S. at 434; *Lee*, 915 F.3d at 1317. "It is not enough that the chance of success on the merits be better than negligible . . . . By the same token, simply showing some possibility of irreparable injury . . . fails to satisfy the second factor." *Nken*, 556 U.S. at 434-35 (internal quotation marks omitted).

The district court, in granting a preliminary injunction, did not definitively rule on the merits of Mr. Miller's claims. We likewise do not conclusively resolve the merits of the State's appeal. Because a preliminary injunction is reviewed under the deferential abuse of discretion standard, *see Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018), the narrow question before us is whether the State has made a "strong showing" that the district court abused its discretion. The "abuse of discretion standard allows for a range of choice for the district court, so long as the choice does not constitute a clear error of judgment." *United States v. Frazier*, 387 F.3d

1244, 1259 (11th Cir. 2004) (en banc) (cleaned up). In other words, the district court's decision "is given an unusual amount of insulation from appellate review for functional reasons." *McLane Co., Inc. v. EEOC*, 137 S. Ct. 1159, 1169 (2017) (internal quotation marks omitted).

## III

"[L]ike other stay applicants," the State here "must satisfy all of the requirements for a stay." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). So "[f]ailure to show any of the four factors is fatal[.]" *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

One of the things the State must show—and one of the two most important—is that it will suffer irreparable harm if a stay is not granted. *See Lee*, 915 F.3d at 1317. Significantly, the State's motion for a stay is devoid of any argument or assertion concerning irreparable harm. *See* Motion to Stay at ii-iii (Table of Contents). Indeed, the term irreparable harm is nowhere to be found in the motion (except in a paragraph setting out the standard for a stay). Because the State has not argued, much less shown, that it will suffer irreparable harm absent a stay, it has abandoned any such contention. *See, e.g., Lapaix v. Atty. Gen.*, 605 F.3d 1138, 1145 (11th Cir. 2010) ("Generally, when an appellant fails to offer argument on an issue, that issue is deemed abandoned."). As it is not our job to make that argument for the State—which has the burden—its motion for a stay must be denied for this reason alone. *See Am. C.L. Union*, 557 F.3d at 1198.

In an abundance of caution, however, we will address the State's arguments concerning one of the bases for the preliminary injunction—Mr. Miller's equal protection claim—and discuss the State's argument about the balance of equities.[2]

## IV

Before addressing the equal protection claim, we point out one very important thing. And that is that the State does not challenge, as clearly erroneous, *any* of the district court's factual findings. This includes the critical finding that it is substantially likely that Mr. Miller timely submitted a written election form choosing nitrogen hypoxia to officials at Holman. Although the State tries at different points to cast doubt on the strength of Mr. Miller's evidence, it never argues that the district court's factual findings are unsupported by the record.[3]

That is, we think, because on this record the State cannot show that any findings are clearly erroneous. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) ("If the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first

---

[2] Because we conclude that the district court did not abuse its discretion in ruling that Mr. Miller was substantially likely to prevail on his equal protection claim, we need not address the due process claim.

[3] As the district court put it in denying the State's motion for a stay pending appeal, the State "presents legal arguments as if [it] had not [found that Mr. Miller timely submitted his election form for nitrogen hypoxia]." D.E. 70 at 6.

instance."); *Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1325 (11th Cir. 2010) ("Credibility determinations, so far as they involve demeanor, have . . . been characterized as largely 'unreviewable.'") (citations omitted).  As we explain below, some of the arguments made by the State are undermined in whole or in part by its acceptance of the district court's factual findings.

## A

The State argues that Mr. Miller cannot make out his "class of one" equal protection claim because he is not similarly situated to other capital inmates at Holman who submitted timely election forms.  As the State sees things, Mr. Miller is different than those other inmates because (a) prison officials had election forms for them and (b) even Mr. Taylor, the inmate for whom officials did not have a form, had "credible evidence from his attorney that the form had been timely completed."  Motion to Stay at 24.

We are not tasked with making any definitive pronouncements on the merits of Mr. Miller's equal protection claim.  We are reviewing only the district court's evaluation of substantial likelihood of success, and our review is the deferential abuse of discretion standard.  *See Cafe 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir. 1993) ("Whether the district court's determination of this point [substantial likelihood of success on the merits] is right or wrong, the record before us indicates no abuse of discretion."); *Di Giorgio v. Causey*, 488 F.2d 527, 528-29 (5th Cir. 1973) ("[O]n appeal from a preliminary injunction[,] this Court does not concern itself with the merits of the controversy. . . .   No attention is paid to the merits of the controversy beyond that necessary to

determine the presence or absence of an abuse of discretion[.]"). With that standard in mind, we turn to the State's argument.

To prevail on a "class of one" equal protection claim, a plaintiff must ultimately show that he was intentionally treated differently from others "similarly situated" and that there is no rational basis for the difference in treatment. *See Olech*, 528 U.S. at 564. Where the challenged state action is one-dimensional, such that it involves a "single answer to a single question," we analyze the "similarly situated" requirement "succinctly and at a high order of abstraction." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007). For a multi-dimensional action, the similarly situated comparators "must be *prima facie* identical in all relevant aspects." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006). A multi-dimensional action, we have explained, "involve[s] varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time." *Griffin*, 496 F.3d at 1203.

The State argues that the nitrogen hypoxia election determination requires a multi-dimensional analysis because it involved a "multifactor standard" of looking at whether officials had a record of a capital inmate's election or whether there was credible corroborating evidence that the inmate timely completed and submitted an election form. But even if the State correctly characterized the factors that it deemed relevant, the number of factors considered is not dispositive in deciding what degree of similarity is required. *See id.* Nor are the State's purported factors determinative here, considering the district court's unchallenged finding of fact that it

12                    Opinion of the Court                  22-13136

is substantially likely that Mr. Miller timely elected execution by nitrogen hypoxia. Given that uncontroverted finding—which the State agreed the district court was entitled to make—Mr. Miller's credibility is not at issue for purposes of determining whether he is similarly situated to other inmates who submitted a timely election form.

Moreover, the determination prescribed by Ala. Code. § 15-18-82.1(b), was always binary: Did an inmate timely elect for execution by nitrogen hypoxia? If so, that inmate was to be executed by nitrogen hypoxia. The provision on its face does not give the State any discretion in the matter. *See* D.E. 58 at 150 (The Court: "So your position is there's no discretion. The statute has to be followed." [The State]: "We can't disregard the statute because we don't like it. Yes, your honor."). Put differently, the "single question" here was whether Mr. Miller timely elected execution by nitrogen hypoxia. And the "single answer," according to the district court, was yes. *See Griffin*, 496 F.3d at 1203. Mr. Miller's claim therefore demanded a one-dimensional analysis for purposes of determining similarity.

The State further argues that, even at the level of abstraction of a one-dimensional analysis, the relevant comparators were all capital inmates who showed credible evidence (in the State's eyes) of a timely election. But, again, the district court's uncontested finding of fact controls. Mr. Miller was "substantially credible," and the district court believed his testimony that he timely submitted an election form for nitrogen hypoxia. He is therefore similarly

situated to other capital inmates who turned in a timely election form.  The State has not shown that the district court abused its discretion.

One more point is worth mentioning.  The officials at Holman chose not to keep a list or log of those inmates who submitted election forms, and the State cannot now blame Mr. Miller for that institutional decision.  What the State is asking for is blind acceptance of its position that Mr. Miller did not submit a timely election form because he had no corroborating evidence that satisfied the State.

## B

The State also contends that it acted rationally because it could demand certain corroborating evidence from an inmate that he submitted a timely election form.  And despite having lost one inmate's election form, the State maintains that only it could determine what was sufficiently corroborating and what was not.

At its core, the State's argument attempts to circumvent the district court's finding that it is substantially likely that Mr. Miller timely submitted his form electing nitrogen hypoxia, without challenging the finding as clearly erroneous.  The State apparently takes an *ex ante* view of the world, looking only at whether it acted reasonably according to its understanding of the circumstances prior to the preliminary injunction hearing.  But this is not the proper approach in a legal regime where facts are proved in court.

At the preliminary injunction hearing, Mr. Miller was required to prove by a preponderance of the evidence that he turned

14                    Opinion of the Court                    22-13136

in the form in June of 2018.  He did that to the district court's satis-
faction.  *See* D.E. 62 at 23 (finding it substantially likely that Mr.
Miller "timely submitted a nitrogen hypoxia election form").
When a district court, sitting as the trier of fact, determines that X
did Y at some point in the past, it is not "creating" a new reality.  It
is instead, determining what *actually happened* at that prior point
in time.  If the finding of X doing Y goes unchallenged—as it does
here—then that is what the past consisted of for appellate purposes.

The State relies on two Eleventh Circuit cases in support of
its argument that its *ex ante* determinations can serve as a reason-
able basis for different treatment.  *See Campbell*, 434 F.3d at 1316-
17; *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1315-19
(11th Cir. 2003).  Neither supports the State's position.

In *Campbell*, the panel held that Rainbow City had a rational
basis to deny tentative approval of the plaintiff's proposed building
project because it "did not comply with the requirements for ten-
tative approval[,]" and to approve another project that complied
with all of the requirements.  *See* 434 F.3d at 1316-17.  In contrast,
here Mr. Miller acted identically to the similarly situated class of
inmates—all of them timely submitted the form electing to be ex-
ecuted by nitrogen hypoxia.

*Knight* does not apply here, as it is not a "class of one" equal
protection case.  The plaintiff in *Knight* brought an employment
discrimination claim under Title VII, not an equal protection claim.
*See* 330 F.3d at 1314.  The panel did not reach the question of
whether the employer had a rational basis for the alleged disparate

treatment; instead, it determined that the white employee was not similarly situated to the plaintiff.  *See id.* at 1317-18.[4]

Given the district court's unchallenged finding that it is substantially likely that Mr. Miller timely submitted the election form for nitrogen hypoxia, he was similarly situated to the other inmates who did the same thing.  The district court did not abuse its discretion in concluding that Mr. Miller established a substantial likelihood of success on his equal protection claim.

## V

The State argues that the district court abused its discretion when it found that the balance of the equities weighed in Mr. Miller's favor.  The State attacks Mr. Miller's delay in bringing a claim by characterizing it as a "gambit" and as "gamesmanship" that should not be "rewarded."  Motion to Stay at 21-22.  In particular, the State focuses on a couple of messages between Mr. Miller and a pen-pal as evidencing an admission by Mr. Miller of his "unreasonable delay."  Because the State's argument ignores the district court's findings of fact, we conclude there was no abuse of discretion.

"[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or

---

[4] A "class of one" claim is not cognizable in the employment context at all. *See Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008) ("[T]he class-of-one theory of equal protection does not apply in the public employment context.").

withholding of the requested relief." *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (internal quotation marks and citation omitted).  In balancing the harms, the district court here expressly acknowledged the competing interests at issue.  On one hand, Mr. Miller was not seeking an "open-ended stay of execution," but a "tailored injunction effectively requiring the State to execute him by nitrogen hypoxia"—an option given to death row inmates by Alabama law.  D.E. 62 at 55.  On the other hand, the district court recognized that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Id.* at 56 (quoting *Hill*, 547 U.S. at 584).  In balancing these interests, the district court concluded that any potential harm to the State or the public in granting Mr. Miller's requested relief—i.e., requiring the State to execute him by nitrogen hypoxia—is greatly outweighed by the harm that will likely befall Mr. Miller in the absence of such relief. *See* D.E. 62 at 56-57.  Significantly, the district court explained that the State did not argue "that the harm to the public interest counsels against injunctive relief here." *Id.* at 56.  Given the district court's explanation, and considering the State's (a) failure to challenge the finding that it is substantially likely that Mr. Miller turned in his election form and (b) inability to execute Mr. Miller by nitrogen hypoxia on September 22, 2022, the

22-13136                  Opinion of the Court                  17

district court did not abuse its discretion in balancing the equities. There was no clear error of judgment.[5]

As noted, the State focuses its argument exclusively on a series of messages by Mr. Miller, but that single-minded focus fails. Contrary to the State's suggestion, these messages were not "ignored" by the district court. The district court specifically discussed the messages between Mr. Miller and his pen-pal (where Mr. Miller wrote that his lawyers said they "got to wait"). *See* D.E. 62 at 57-58. The district court explained that these messages "do not reference nitrogen hypoxia or lethal injection" and simply "do not support the conclusion or inference that [Mr.] Miller or his lawyers were waiting *to file this lawsuit*." *Id.* at 58 (emphasis in original). The district court thus concluded that the messages did not "support the State's position that [Mr.] Miller intentionally delayed bringing this lawsuit." *Id.*

The State's argument essentially ignores the district court's factual finding on this point. Based on that unchallenged finding, the district court did not err in concluding that Mr. Miller did not "intentionally delay[ ] bringing this lawsuit." *Id.   See Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017) ("A finding that is plausible in light of the full record—even if another is equally or more so—must govern.") (citation and internal quotation marks omitted);

---

[5] We note, as well, that "the State intends to announce its readiness to conduct executions by nitrogen hypoxia in the upcoming weeks." D.E. 62 at 20. Any delay in Mr. Miller's execution will therefore be short.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)
("Where there are two permissible views of the evidence, the fact-
finder's choice between them cannot be clearly erroneous.").

The State also asserts that the "context" of the messages was
not "produced during the evidentiary hearing" by Mr. Miller. *See*
Motion to Stay at 31. But as the district court noted, the State had
the opportunity to question Mr. Miller about the messages both at
his deposition and at the evidentiary hearing but failed to do so.
*See* D.E. 62 at 57-58. Given the State's own failure to examine Mr.
Miller about the messages, we cannot accept the State's argument
that "Mr. Miller's delay in bringing a claim has helped him *succeed*
in delaying his execution." Motion to Stay at 31.

As the district court explained, the delay here is attributable
to the State. *See* D.E. 62 at 55. This determination was also not a
clear error of judgment. Mr. Miller only wants to die via his chosen
method. More than four years after giving inmates the option of
choosing nitrogen hypoxia as a method of execution, the State has
yet to come up with or implement a protocol for carrying out exe-
cutions pursuant to that method. "That [Mr.] Miller's execution by
nitrogen hypoxia cannot be carried out on September 22, 2022, is
attributable to the State, not [Mr.] Miller." D.E. 70 at 9.

Finally, the district court did not abuse its discretion in con-
cluding that that Mr. Miller did not bring his claims "in a dilatory
manner." *Ray v. Comm'r, Alabama Dep't of Corr.*, 915 F.3d 689,
702 (11th Cir. 2019). When the Attorney General asked the Ala-
bama Supreme Court to set an execution date for him, Mr. Miller

22-13136                Opinion of the Court                19

objected.  He asserted that he had timely submitted an election form for nitrogen hypoxia and asked for a trial court to make factual findings on the issue.  The Alabama Supreme Court rejected his request on July 18, 2022, and it was only then that Mr. Miller filed his suit in federal court just a few weeks later.[6]

As the district court explained, the State did not argue that Mr. Miller's lawyers took an unreasonable amount of time to research and evaluate his constitutional claims, perform due diligence, and secure local counsel after Mr. Miller's execution date was set.  *See* D.E. 62 at 59-60.  Indeed, the district court observed that although Mr. Miller filed his lawsuit four weeks before his execution, (1) it was able to hold an evidentiary hearing where Mr. Miller testified and was subject to cross examination, and (2) the State was able to depose Mr. Miller before the hearing.  *See id.* at 60.  The district court also noted that the State did not argue that it was prejudiced in any way by the timing of the briefing on the preliminary injunction motion or the evidentiary hearing.  *See id.* Even now, the State does not make any argument that it has suffered any irreparable harm.

---

[6] It respects state sovereignty more, not less, to file in state court first.  Finding delay in Mr. Miller's use of the state court system would only encourage litigants to skip state court and move directly to federal court.  Indeed, for his due process claim Mr. Miller had to seek available and adequate state remedies.  *See generally McKinney v. Pate*, 20 F.3d 1550, 1562-63 (11th Cir. 1994) (en banc).

20                    Opinion of the Court                    22-13136

In sum, the district court did not abuse its discretion in finding that the balance of the equities weighed in Mr. Miller's favor.

## VI

In 2018, Alabama gave capital inmates the option of choosing nitrogen hypoxia as a method of execution.  More than four years have passed, and the State still does not have in place a protocol for carrying out executions through nitrogen hypoxia.

Prison officials at Holman chose not to keep a log or list of those inmates who submitted an election form choosing nitrogen hypoxia.  They lost or misplaced the election form submitted by another inmate at Holman, Mr. Taylor, and a prison guard did not turn in the form of a third inmate, Mr. Stallworth.  The district court found, following an evidentiary hearing, that it is substantially likely that Mr. Miller submitted a timely election form even though the State says that it does not have any physical record of a form.  The State does not challenge that factual finding, and has completely failed to argue (much less show) that it will suffer irreparable harm.  For the reasons set forth in this order, the State's emergency motion for a stay of the district court's preliminary injunction is denied.

**MOTION FOR STAY DENIED.**

22-13136                  LUCK, J., Dissenting                    1

LUCK, Circuit Judge, dissenting:

Alan Miller was convicted and sentenced to death for murdering Lee Holdbrooks, Christopher Yancy, and Terry Jarvis in 1999. Three days before Miller's sentence was finally going to be carried out, the district court enjoined the state from executing him by lethal injection. Today, the day fixed for the execution, the court has denied the state's motion to stay the district court's injunction. I respectfully dissent.

"A court considering whether to issue a stay considers four factors: (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quotation omitted). Applying the stay factors to this case, I would stay the district court's injunction.

*Likelihood of success on the merits*

The district court concluded that Miller was likely to succeed on two of his 42 U.S.C. section 1983 claims: (1) a "class of one" equal protection claim alleging that the state treated him differently from similarly situated death row inmates at Holman Correctional Facility who timely submitted nitrogen hypoxia election forms; and (2) a procedural due process claim alleging that the state failed to ensure an adequate procedure for protecting his election

2                          Luck, J., Dissenting                      22-13136

to be executed by nitrogen hypoxia.  I agree with the state that Miller is not likely to succeed on either claim.

<u>"Class of one" equal protection claim</u>

The equal protection clause provides that "[n]o [s]tate shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  A class of one claim "does not allege discrimination against a protected class." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009).  Instead, a class of one claim asserts that an individual was "irrationally singled out"—without regard for his or her membership in any group—for discrimination.  *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008).

To succeed on a class of one claim, a petitioner must show (1) "that [he] has been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Miller has failed to meet *both* prongs:  Miller has not shown that he was similarly situated to other death row inmates who elected nitrogen hypoxia as their execution method.  And, to the extent he was similarly situated to the other death row inmates, the state had a rational basis to treat him differently.

First, Miller was not similarly situated to the other inmates.  To be similarly situated, the comparators "must be *prima facie* identical in all relevant respects." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006).  This requirement is important

22-13136                    Luck, J., Dissenting                    3

because, "at their heart, equal protection claims, even class of one claims, are basically claims of discrimination." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007). "To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, we are obliged to apply the 'similarly situated' requirement with rigor." *Id.*

Miller has not shown that he is "identical in all relevant respects" to the other death row inmates who elected nitrogen hypoxia as their execution method. *See Campbell*, 434 F.3d at 1314. The state based its execution-method decision on one of two "relevant respects": (1) an election form filed within thirty days of an inmate's conviction becoming final electing nitrogen hypoxia as his execution method; or (2) contemporaneous documents (from the inmate's election period) showing that the inmate timely elected nitrogen hypoxia.[1] It's through these documents that the state ensures that the inmate's election was timely. And Miller is the only inmate that had neither of these things. Unlike the fifty or so others that elected nitrogen hypoxia as their execution method, the state had no record of Miller's election form or contemporaneous documents—setting him apart from the others.

---

[1] There's no requirement that the contemporaneous documents have to be attorney-client communications, as Miller argues. They could be anything else that shows the inmate timely elected nitrogen hypoxia as the execution method.

4                    Luck, J., Dissenting                    22-13136

Miller has not pointed to any other death row inmate who the state decided to execute by nitrogen hypoxia without an election form in the state's official records or some contemporaneous documents showing an election.  And Miller has not pointed to any other death row inmate who the state decided to execute by lethal injection with an election form in the state's official records or some contemporaneous documents showing that the inmate elected to be executed by nitrogen hypoxia.  This is fatal to his class of one equal protection claim because "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *Griffin*, 496 F.3d at 1207 (quotation omitted).

Second, even if Miller was similarly situated to the other death row inmates, Miller failed to show that the state had "no rational basis for the difference in treatment."  *Griffin*, 496 F.3d at 1207.  Here, the state had a rational basis to treat Miller differently because, unlike every other death row inmate who elected nitrogen hypoxia, the state didn't have an election form or contemporaneous documents showing a timely election by Miller in its official records.  Miller was the only inmate to have neither.  Without an election form or contemporaneous documents, the state had a rational basis to doubt Miller's election (even if Miller elected nitrogen hypoxia as his method of execution, as the district court found).

Miller, like every death row inmate, was given a form in June 2018 to elect nitrogen hypoxia as his method of execution.  Prison officials distributed the forms to every death row inmate, including Miller, and collected them that day or the next.  The state

22-13136            Luck, J., Dissenting                 5

has in its records the election forms of about fifty death row in-
mates that were collected by prison officials. But none from Miller.
The state also has contemporaneous documents from other death
row inmates showing that they made a timely election. But none
from Miller.

It may be, as the district court found, that Miller did, in fact,
timely elect nitrogen hypoxia as his method of execution. But
without an election form or contemporaneous documents show-
ing an election—like the state had for every other death row in-
mate that elected nitrogen hypoxia—the state had a rational reason
to treat Miller differently. Because the state had election forms and
contemporaneous documents from every other inmate, it was ra-
tional for the state to have more "confidence" in the other inmates'
elections than in Miller's, who had nothing other than his word
years later. *See Campbell*, 434 F.3d at 1317 (explaining that, even
if the developers were similarly situated, there was a rational basis
for different treatment partly because "the presentations [one de-
veloper] made would inspire more confidence than the [other de-
veloper's] rather nonchalant approach"). And because the state
had a rational basis to treat Miller differently than the other death
row inmates who elected nitrogen hypoxia, the state was likely to
succeed on his class of one equal protection claim.

In response, Miller contends that the state "waived" its argu-
ment that it had a "rational basis to execute Miller by lethal injec-
tion" even if he "timely submitted his election for execution by ni-
trogen hypoxia." According to Miller, the state "admitted below

6                      L<small>UCK</small>, J., Dissenting                      22-13136

that if Miller timely submitted his form, they cannot execute him
by lethal injection." Not so. Before the district court, the state
made the same argument it has made here: that even if Miller did
file the form, Miller "was not similarly situated" to other inmates
and the state had a "rational basis" for treating him differently. The
state argued that, even "[a]ccepting as true [Miller's] factual aver-
ments" that he filed the election form, the state "treated Miller dif-
ferently . . . because Miller did not provide the same quantum of
evidentiary proof that an election was made in 2018." As the state
explained in its response to Miller's preliminary injunction motion,
Miller's claims "fail on their merits, . . . even assuming Miller did
make a proper election." There was no waiver here.

Procedural due process claim

        A section "1983 claim alleging a denial of procedural due
process requires proof of three elements: (1) a deprivation of a con-
stitutionally-protected liberty or property interest; (2) state action;
and (3) constitutionally-inadequate process." *Grayden v. Rhodes*,
345 F.3d 1225, 1232 (11th Cir. 2003). "[O]nly when the state refuses
to provide a process sufficient to remedy the procedural depriva-
tion does a constitutional violation actionable under section 1983
arise." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (en
banc). "This rule (that a section 1983 claim is not stated unless in-
adequate state procedures exist to remedy an alleged procedural
deprivation) recognizes that the state must have the opportunity to
remedy the procedural failings of its subdivisions and agencies in
the appropriate fora—agencies, review boards, and state courts

22-13136                 Luck, J., Dissenting                 7

before being subjected to a claim alleging a procedural due process violation." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000) (quotation omitted).

Here, the district court concluded that Miller had a "protected liberty interest in his statutorily-permitted choice to be executed by nitrogen hypoxia" and that "the deprivation of this interest is state action and is not complete unless and until the [s]tate executes Miller by lethal injection in contravention of his nitrogen hypoxia election." I'll assume the district court is right on both counts. Even so, Miller had a pre-deprivation process for challenging the state's attempted deprivation of his liberty interest and the process was constitutionally adequate.

Under Alabama law, Miller could have sought a petition for writ of mandamus in state court directing the state to accept his election of nitrogen hypoxia. *See* Ally Windsor Howell, *Tilley's Alabama Equity* § 29:1 (5th ed.) ("The writ of mandamus is proper when the plaintiff is owed a clear legal duty that the defendant refuses to perform."). "If adequate state remedies were available but [Miller] failed to take advantage of them, [he] cannot rely on that failure to claim that the state deprived him of procedural due process." *See Cotton*, 216 F.3d at 1331. That's what happened here. The "the writ of mandamus" was "available" to Miller "under state law," and it was "an adequate remedy to ensure that [he] was not

8                         Luck, J., Dissenting                         22-13136

deprived of his due process rights." *See id.* at 1333.[2] Because Miller didn't take advantage of his available and adequate remedy to challenge his method of execution election, the state was also likely to succeed on Miller's procedural due process claim.

### Weighing of the equitable interests

"The remainder of the factors we apply when considering a stay amount to a weighing of the equitable interests of [Miller], the [state], and the public." *Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 701 (11th Cir. 2019).[3]   On the state and the public's side

---

[2] In his response to the state's stay motion, Miller says that he sought a different pre-deprivation remedy. "Miller already sought a remedy in the Alabama Supreme Court in opposing the [s]tate's motion to set an execution date and requesting a remand for an evidentiary hearing on the issue of his election." If Miller had an adequate, available remedy in state court, and sought it, he could not have been deprived of procedural due process. *See James v. Att'y Gen.*, 2022 WL 2952492, at *8 (11th Cir. July 26, 2022) ("Because James had notice that the Alabama Supreme Court was considering setting his execution date and an opportunity to be heard on why it shouldn't set the date, his procedural due process rights were not violated."). So long as the "state remedy was capable of providing [Miller] with all the relief warranted," it is constitutionally adequate. *See McKinney*, 20 F.3d at 1564; *see also Cotton*, 216 F.3d at 1331 ("[T]he state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due."). Because Miller already had the opportunity in front of the Alabama Supreme Court to contest his method of execution election, this is another reason the state is likely to succeed on his procedural due process claim.

[3] Miller argues that the state "conceded . . . at the district court that [it does] not . . . contest that these factors weigh in Miller's favor." Although the state "focused on substantial likelihood of success on the merits," it never conceded that the equitable interests favored Miller.   And in its response to the

of the scale, "the Supreme Court has recognized [that] the state, the victim, and the victim's family . . . 'have an important interest in the timely enforcement of [Miller's] sentence.'" *See Brooks v. Warden*, 810 F.3d 812, 825 (11th Cir. 2016) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). "[E]quity must be sensitive to the [s]tate's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 584.

"In considering the factors of harm to other parties and the public interest, we [also] must be mindful of a prisoner's unjustified delay in seeking a stay of execution." *Woods v. Warden, Holman Corr. Facility*, 952 F.3d 1251, 1256 (11th Cir. 2020). "The Supreme Court has made clear that '[l]ast-minute stays should be the extreme exception, not the norm, and the last-minute nature of an application that could have been brought earlier, or an applicant's attempt at manipulation, may be grounds for denial of a stay.'" *Id.* (alteration in original) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019)). Indeed, there's "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584 (quotation omitted).

---

preliminary injunction motion, the state argued that there was a strong equitable presumption against granting a stay because of Miller's delay in filing his claims.

Two of our cases illustrate the strong presumption.   In *Woods*, the inmate "uncovered evidence that cast[] doubt on his convictions and sentence." 952 F.3d at 1254.  The uncovered evidence "was largely discovered by mid-February." *Id.* at 1256.  But the inmate did not file his stay motion until March 3.  *Id.* at 1254. We found the approximately three-week delay (mid-February to March 3) "abusive" and concluded that the inmate could not "obtain a stay." *Id.* at 1256.  "Even considering the purportedly new evidence that" the inmate "describe[d] in the affidavit attached to his motion," we explained, he "has still inexcusably delayed because that evidence was largely discovered by mid-February." *Id.*

And in *In re Hutcherson*, the state gave notice in June, and then again in September, that it intended to seek an execution date. 468 F.3d 747, 749–50 (11th Cir. 2006).  Still, the inmate did not move to stay his execution until October 20.  *Id.* at 748.  We declined to grant a stay because, "[i]n spite of [the] notice," the petitioner waited about a month (September to October 20) "to file his motion to stay pending this court's ruling on his application to file a successive habeas petition." *Id.* at 750.  The inmate's "need for a stay of execution," we said, was "directly attributable to his own failure to bring his claims to court in a timely fashion." *Id.*  Applying the "strong equitable presumption," we denied the stay.  *Id.* (quotation omitted).

There was a similar delay in this case.  Miller had notice that the state sought to execute him by lethal injection in May 2022. And the Alabama Supreme Court fixed the execution date on July

18, 2022. But Miller didn't file his complaint until August 22, 2022: three months after he knew the state didn't have any records of his nitrogen hypoxia election and more than a month after the Alabama Supreme Court fixed the date of his execution. And Miller waited another ten days to file his stay motion. As in *Woods* and *Hutcherson*, the delay in filing his claims and seeking a stay was directly attributable to Miller's own failure to bring his claims to court in a timely fashion. And, as in both cases, Miller could have brought his claims sooner to allow consideration of the merits, but he didn't.

So, because of the delay directly attributable to Miller, there's a strong presumption against staying the execution. And, on top of the strong presumption, the state and the public have a strong and important interest in executing the judgment. Against the strong presumption and strong and important interest, the district court weighed Miller's interest in not being executed in violation of his rights and the "incidental effect" a stay would have on delaying the execution. But, as discussed above, the state has shown a substantial likelihood that Miller will not succeed on his equal protection and procedural due process claims. And, as we said long ago, "[e]ach delay, for its span, is a commutation of a death sentence to one of imprisonment." *Thompson v. Wainwright,* 714 F.2d 1495, 1506 (11th Cir. 1983).

In the end, the weight of the equitable interests come out in favor of the state and the public's right to timely enforcement of Miller's sentence. Because the state has shown a substantial

12                    Luck, J., Dissenting                    22-13136

likelihood that it would succeed on Miller's equal protection and
procedural due process claims, and the equitable interests weigh in
favor of staying the district court's preliminary injunction, I would
grant the state's motion.