# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ALAN EUGENE MILLER, | |
| *Plaintiff*, | Civil Action: 2:22-cv-00506-RAH |
| v. | **CAPITAL CASE** |
| JOHN Q. HAMM,<br>in his official capacity as<br>Commissioner, Alabama Department<br>of Corrections | |
| TERRY RAYBON,<br>in his official capacity as Warden,<br>Holman Correctional Facility | |
| STEVE MARSHALL,<br>in his official capacity as Attorney<br>General, State of Alabama | |
| *Defendants*. | |

## SECOND AMENDED COMPLAINT

1.     For Alan Miller's entire adult life, medical professionals have struggled to access his veins. Drawing blood has always been an long and painful affair for Mr. Miller, even at the hands of experienced physicians who were seeking to safeguard Mr. Miller's health, in accordance with the physicians' code of ethics to do no harm. So when the State of Alabama created a statutory right for death row inmates to elect death by lethal gas ("nitrogen hypoxia") instead of death by lethal injection, Mr. Miller knew what he wanted to do. He elected nitrogen hypoxia as his method of execution, in accordance with all the requirements of the state law that gave him that right. *See* Ala. Code § 15-18-82.1(b); Mem. Op., Dkt. 62 at 41 ("[T]he Court concludes that, on this record as it currently exists, it is substantially likely that Miller timely elected nitrogen hypoxia.").

2.     Despite the fact that Defendants lost the nitrogen hypoxia election forms of several other death row inmates[1]; this Court made the factual determination that it is "substantially likely" Mr. Miller elected nitrogen hypoxia; Defendants agreed that this Court is the proper factfinder for whether or not Mr. Miller elected nitrogen hypoxia[2]; Defendants claimed that they would never execute a man by lethal injection on "a technicality" when they knew that man's intent was to elect nitrogen hypoxia[3]; *and* Defendants represented to this Court that they would accept its fact-finding as to the question of whether Mr. Miller elected nitrogen hypoxia[4];ss Defendants appealed this Court's factual finding all the way to the U.S. Supreme Court. And on September 22, 2022, Defendants attempted to execute Mr. Miller by lethal injection.

3.     Defendants' execution of Mr. Miller failed for the exact reasons Mr. Miller has consistently explained to this Court: medical professionals have a great deal of difficulty accessing his veins. Despite this failed execution, the physical and mental torture it inflicted upon Mr. Miller, and the fact that Defendants have now botched *three* lethal injection executions in just *four* years, Defendants relentlessly seek to execute Mr. Miller again—presumably by lethal injection, as Defendants have yet to announce their nitrogen hypoxia protocol.

4.     On October 4, 2022, a mere 12 days after botching Mr. Miller's lethal injection execution, Defendants petitioned the Alabama Supreme Court, on an emergency basis, for permission to try to execute Mr. Miller again in the same way,  as soon as possible.

---

[1] *See* Mem. Op., Dkt. 62 at 18.
[2] *See* Sept. 12, 2022 Hr'g Tr. at 160:11-18.
[3] *See* Sept. 12, 2022 Hr'g Tr. at 127:4-16 (Defendants state that they would not "stand on [a] technicality" if they knew an inmate's "intent" was to elect nitrogen hypoxia.).
[4] *Id.* at 149:22-150:1 ("[I]f Your Honor looks at the facts and says, I believe truly a substantial likelihood that this [nitrogen hypoxia election] happened, that he's not just making it up, trying to stop his execution, we are required to follow Your Honor's order.").

5.     By seeking an emergency execution date for Mr. Miller, Defendants renew their determination to *not* understand what it is about their own protocols that causes their lethal injections to fail so often and so badly—and what it is about their lethal injection protocol that clearly failed on Mr. Miller.

6.     On information and belief, Defendants have taken no steps to ensure that a second lethal injection execution of Mr. Miller will not be botched. Defendants have done nothing to ensure that Mr. Miller isn't tortured again by lethal injection.

7.     Defendants have no explanation for why, what they could not accomplish in *three hours* on September 22, they could accomplish in the near future—*without* torturing Mr. Miller. What then, in Defendants' view, is a constitutional amount of time to spend stabbing someone with needles in an attempt to kill them? Four hours? Five? Defendants seek *carte blanche* the opportunity to stab Mr. Miller with needles as many times as they can before the clock strikes midnight.

8.     Defendants' repeated, myopic insistence on executing Mr. Miller in violation of the U.S. Constitution and Alabama state law must be stopped. Through their own actions, Defendants are depriving Mr. Miller of his Fourteenth Amendment rights to procedural due process and equal protection under the law, as well as his rights under the U.S. and Alabama Constitutions not to be subject to "cruel and unusual" and "arbitrary and capricious" punishments.

9.     Mr. Miller hereby seeks injunctive and declaratory relief prohibiting Defendants from executing Mr. Miller by any method other than nitrogen hypoxia, in accordance with Alabama law. Mr. Miller also seeks monetary damages caused by the pain and suffering Defendants Raybon and Hamm inflicted on Mr. Miller during his cruel and unusual botched execution, and by their intent to repeat the same cruel procedure on Mr. Miller in the near future.

Mr. Miller brings this action pursuant to 42 U.S.C. § 1983 to vindicate his rights under the United States Constitution, the Alabama Constitution, and Alabama law.

## PARTIES

10.     Plaintiff Alan Eugene Miller is a United States citizen and a resident of the State of Alabama.  He is an inmate sentenced to death under Defendants' supervision.  At all relevant times, Mr. Miller has been and continues to be incarcerated at the Holman Correctional Facility in Atmore, Alabama ("Holman").

*Terry Raybon*

11.     Defendant Terry Raybon, Warden of the Holman Correctional Facility, is sued in his official capacity.  Defendant Raybon has been acting under color of law and as the agent and official representative of the Holman Correctional Facility and ADOC.

12.     Defendant Raybon is the statutory executioner of all Holman death row inmates. *See* Ala. Code § 15-18-82 ("The warden of the William C. Holman unit . . . shall be the executioner. In the case of execution by lethal injection, the warden . . . may designate an employee of the unit to administer the lethal injection.").

13.     Defendant Raybon plays a direct role in each execution that takes place at Holman. *See* Alabama Execution Procedures, Dkt. 52-1 at 28-44. Defendant Raybon organizes the execution team. He is responsible for ensuring on the night-of an execution that the execution does not violate any court order or order from the Governor's office. *See id*. Defendant Raybon reads the death warrant to the inmate being executed, and administers the lethal injection. *See id*.

14.     Defendant Raybon is responsible for implementing ADOC policies and procedures governing executions, managing the preparations for an execution, and supervising the execution site during the execution. Defendant Raybon also is responsible for protecting the constitutional rights of all persons incarcerated at the Holman Correctional Facility.

*John Q. Hamm*

15.     Defendant John Q. Hamm, Commissioner of the Alabama Department of Corrections ("ADOC"), is sued in his official capacity. At all relevant times, Defendant Hamm has been acting under the color of law and as the agent and official representative of ADOC, pursuant to ADOC's official policies and procedures.

16.     ADOC is the state agency charged with the incarceration, care, custody, and treatment of all state prisoners, including prisoners sentenced to death. Ala. Code § 14-1-1.2.

17.     Defendant Hamm is the alternate statutory executioner of all death row inmates at Holman. *See* Ala. Code § 15-18-82 ("In the event of the death or disability or absence of both the Warden and Deputy, the executioner shall be that person appointed by the Commissioner of the Department of Corrections."). Moreover, Defendant Hamm is statutorily charged with providing the materials necessary to execute death row inmates. *See id*. ("It shall be the duty of the Department of Corrections of this State to provide the necessary facilities, instruments, and accommodations to carry out the execution.").

18.     Defendant Hamm must be present at Holman for each execution, and Defendant Hamm is responsible for maintaining an open telephone line to the Governor and Defendant Marshall. *See* Alabama Execution Procedures, Dkt. 52-1 at 28-44.

19.     Defendant Hamm is responsible for ensuring that all prisoners committed to the custody of ADOC are treated in accordance with the United States and Alabama Constitutions. He is also responsible for the development and implementation of the protocol and procedures governing the execution of death-sentenced inmates in Alabama.

20.     Defendant Hamm has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced inmates in Alabama.

Furthermore, Defendant Hamm has the ability to remedy problems that arise due to ADOC's lack of adequate procedures.

21.     Defendant Hamm has the authority to determine what method of execution will be used on a given inmate.[5]

<em>Steve Marshall</em>

22.     Defendant Steve Marshall, Attorney General of the State of Alabama, is sued in his official capacity. At all relevant times, Defendant Marshall has been acting under color of law and as the agent and official representative of the Attorney General's office.

23.     Defendant Marshall has the power, authority, and obligation to implement, interpret, and enforce Alabama state law, including Ala. Code. § 15-18-82.1, the Alabama Constitution, and the U.S. Constitution.

24.     Defendant Marshall is responsible for initiating the execution process in Alabama in a constitutional manner by identifying individuals for whom he moves to set an execution date. Defendant Marshall has the obligation and responsibility to withdraw motions to set an execution date that are unconstitutional, including when the conditions of the proposed execution are unconstituional. He also has the obligation and responsibility to ensure that ADOC complies with all state and federal law, including federal court orders, during an execution.

25.     During each execution, Defendant Marshall is responsible for maintaining an open telephone line to Commissioner Hamm, who attends each execution. *See* Alabama Execution Procedures, Dkt. 52-1 at 28-44.

26.     Defendant Marshall plays an active role in "clearing" each execution in the State of Alabama to begin. *See* Dkt. 52-1 at 46 ("Attorney General Marshall cleared the execution to

---

[5] *See* Sept. 12, 2022 Hr'g Tr. at 8:9-12; 149:17-21.

commence at 9:05 p.m."); *id.* at 48 ("Attorney General Marshall cleared the execution to commence at 9:04 p.m.").

## JURISDICTION AND VENUE

27.     Mr. Miller's claims arise under the Constitution and the laws of the United States, as well as under the Constitution and laws of the State of Alabama. This Court has federal question jurisdiction over those claims arising under the Constitution and laws of the United States pursuant to 28 U.S.C. § 1331, 1343. This Court has supplemental jurisdiction over the claim arising under the Alabama Constitution. 28 U.S.C. § 1367. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65.  The federal rights asserted by Mr. Miller are enforceable under 42 U.S.C. § 1983.

28.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

29.     No administrative grievance is available at Holman Correctional Facility for Mr. Miller or other death-sentenced inmates to challenge the way in which Defendants have implemented Ala. Code § 15-18-82.1, nor the way in which Defendants botched Mr. Miller's execution by lethal injection on September 22.

## FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

*Mr. Miller's Criminal Sentencing*

30.     In June 2000, Mr. Miller was convicted of capital murder. Mr. Miller's conviction and sentence were affirmed by the Alabama Court of Criminal Appeals.  The Alabama Supreme Court and the United States Supreme Court denied certiorari.

31.     On May 19, 2006, Mr. Miller filed a petition under Alabama Rule of Criminal Procedure 32 for postconviction relief, and subsequently filed an amended petition on April 4, 2007. The circuit court dismissed Mr. Miller's claims under the amended petition except for his claims of ineffective assistance of appellate counsel.

32.     From February 11 to 14, 2008, and on August 7, 2008, an evidentiary hearing was conducted on Mr. Miller's claims of ineffective assistance of appellate counsel. On May 5, 2009, the circuit court denied Mr. Miller's petition with regard to those claims, which the Alabama Court of Criminal Appeals later affirmed. After initially granting certiorari, the Alabama Supreme Court quashed the grant and denied certiorari on June 22, 2012.

33.     Mr. Miller then filed a petition for habeas corpus in the District Court for the Northern District of Alabama in January 2013. The district court denied Mr. Miller's petition in March 2017. Mr. Miller then moved for a certificate of appealability in the U.S. Court of Appeals for the Eleventh Circuit. While the Eleventh Circuit granted a certificate on a number of claims, the court affirmed the district court's denial of habeas relief in August 2020. The U.S. Supreme Court denied certiorari in October 2021.

*Nitrogen Hypoxia Election at Holman*

34.     In Alabama, lethal injection is the default method of execution. But in March 2018, Alabama added nitrogen hypoxia as an alternative execution method. *See* Ala. Code § 15-18-82.1(b).  The statute became effective on June 1, 2018.

35.     Under the statute, a death-row inmate has "one opportunity to elect that his or her death sentence be executed by . . . nitrogen hypoxia." Ala. Code § 15-18-82.1(b).  If an inmate's certificate of judgment from the Alabama Supreme Court affirming a sentence of death was "issued before June 1, 2018, the election must be made and delivered to the warden within 30 days of that date." *Id.* § 15-18-82.1(b)(2).  The statute does not specify the type or manner of writing required to elect.

36.     Under the statute, death-row inmates have "one opportunity to elect that his or her death sentence be executed by . . . nitrogen hypoxia." Ala. Code § 15-18-82.1(b).  If an inmate's certificate of judgment from the Alabama Supreme Court affirming a sentence of death was "issued

8

before June 1, 2018, the election must be made and delivered to the warden within 30 days of that date." *Id*. § 15-18-82.1(b)(2).

37.    The statute does not specify the type or manner of writing required for an inmate to elect nitrogen hypoxia. Nor does it delineate a process for distributing, collecting or storing records of an election.

38.    Defendants did not establish a process or procedure delineating a method for distributing, collecting or storing records of an election or determining whether an election had been made, either prior to or after June 1, 2018. *See* Op. at 14-15; Dkt. 52-1 at 92-93 (testimony of ADOC Rule 30(b)(6) witness that ADOC had no protocol or procedures to handle the nitrogen hypoxia election process).

39.    In the absence of such guidance—and notwithstanding the fact that ADOC has declined to promulgate any accompanying regulations—the time at Holman during which the election period was underway has been publicly described as extremely disorganized. *See, e.g.,* The Montgomery Advertiser, *In 2018, Alabama Approved Death by Nitrogen for Executions. When Did it Inform its Inmates?*, June 25, 2019, https://www.montgomeryadvertiser.com/story/news/crime/2019/06/25/alabama-says-didnt-have-inform-its-inmate-new-execution-method/1276330001/.

40.    Mr. Miller was incarcerated at Holman during the entire election period in 2018.

41.    Cynthia Stewart was the warden of Holman during the entire election period in 2018. Op. at 6.

42.    At some point between June 26, 2018, and June 30, 2018, Warden Stewart obtained an election form created by the Federal Defenders for the Middle District of Alabama. *See Reeves*

*v. Comm'r, Alabama Dep't of Corr.*, 23 F.4th 1308, 1314 (11th Cir.), *application granted sub nom. Hamm v. Reeves*, 142 S. Ct. 743 (2022). *See also* Op. at 6.

43.     Warden Stewart received instructions from ADOC to distribute the election form to the inmates at  Holman. Op. at 6.

44.     Warden Stewart directed Captain Jeff Emberton to distribute the election form to every person on death row at Holman. *Id.* Furthermore, Warden Stewart told Captain Emberton that he was not to keep track of who took the form and who didn't, and who returned the form and who did not. Op. at 12; Dkt. 52-1 at 52-55.

45.     A few days before the election period came to a close, Captain Emberton distributed more than one hundred copies of the election form with over one hundred envelopes. Op. at 12-13.   Captain Emberton distributed the forms in the morning, and collected them that same afternoon. Op. at 6.

46.     Captain Emberton made an announcement regarding the form on each tier where people are housed on death row. Op. at 12-13.  Captain Emberton testified that inmates who were not present or were sleeping would not have received his explanation, nor would Emberton have placed the forms directly into their hands. *Id.* Captain Emberton told the inmates that he would return later that same day to pick up their forms. Op. at 13. On instructions from Warden Stewart, Captain Emberton did not create a list logging the names of the individual from whom he collected an election form. He returned a box with the forms to the custody of Warden Stewart. Op. at 12-13.

47.     Reflecting the chaotic process, and upon information and belief, ADOC did not record which inmates received the election forms. In fact, one inmate has alleged that several individuals on death row never received an election form, and that the inmates who did were not

notified of the impeding deadline. *See Saunders v. Hamm*, No. 20-CV-456-WKW, 2022 WL 493693, at *2 (M.D. Ala. Feb. 17, 2022).

48.     United States Circuit Judge Jill Pryor has described as "feckless" the way in which ADOC, having taken "on the responsibility to inform prisoners about their right to elect death by nitrogen hypoxia within 30 days, did so." *Smith v. Comm'r, Ala. Dep't of Corr.*, 2021 WL 4916001, at *5 (11th Cir. Oct. 21, 2021) (Pryor, J., concurring).

49.     The collection of the forms was also extremely disorganized. Some election forms were received by Jennifer Parker, the Warden's secretary, via mail. Op. at 14. Some election forms arrived on Parker's desk after a large group meeting the Federal Defenders had with their clients. *Id.* Some forms were collected by Captain Emberton; others by Lieutenant Franklin. Op. at 14, 18. Some forms were never collected at all. Op. at 18.

50.     Despite the gravity of the election decision—a time-sensitive and irreversible election concerning the manner in which inmates were to be executed—Defendants failed to create a reliable system for collecting, recording, and retaining the election forms.

*Mr. Miller Elects Nitrogen Hypoxia*

51.     Against this backdrop, Mr. Miller received an election form in June 2018 as his certificate of judgment was issued prior to June 1, 2018. *See* SAC Ex. A, Affidavit of Alan Eugene Miller (May 10, 2021).[6]

52.     Mr. Miller completed and signed the election form, indicating that he opted into execution by nitrogen hypoxia. *Id.*

---

[6] Exhibit A is attached to this Complaint and incorporated by reference as if fully set forth herein.

53.     Mr. Miller then returned the form to the prison official who was collecting completed forms from other inmates. *Id.* The official collected Mr. Miller's form at the same time that he collected election forms from others.  *Id.*

54.     Mr. Miller asked the official that the form be copied and notarized so as to record his election. *Id.* The official refused both of Mr. Miller's requests. *Id.*

55.     Mr. Miller followed the instructions he was given for submitting his election form to the warden, and relied on the instruction he received that an ADOC guard would pick up this form later that day and return the form to the warden.

56.     Mr. Miller does not know what the official did with the election form after collecting it from Mr. Miller. *Id.*

57.     In a filing made on May 27, 2022, Defendant Marshall claimed that Defendant Raybon has no record of Mr. Miller's election form. *See* SAC Ex. C, State's Resp. to Miller's Objection to State's Mot. to Set an Execution Date, *Miller v. State*, Case No. 1040564 (Ala. May 27, 2022).[7] Even though Mr. Miller provided a sworn-affidavit attesting that he timely elected to be executed by nitrogen hypoxia, Defendants refuse to honor Mr. Miller's election. The State attempted to execute Mr. Miller via lethal injection on September 22, 2022, and now seeks to do so *again*, instead of complying with Mr. Miller's statutory-protected election to be executed by nitrogen hypoxia.

*Defendants Lost or Misplaced Election Forms Submitted by Other Inmates*

58.     Forms were distributed and collected from inmates, but Defendants entirely failed to implement any written process for providing notice, distributing, collecting, or storing election

---

[7] Exhibit C is attached to this Complaint and incorporated by reference as if fully set forth herein.

forms, and as a result, ADOC has lost election forms submitted by Mr. Miller and other people on death row at Holman.

59.     In addition to Mr. Miller's form, ADOC also lost Jarrod Taylor's form.

60.     Like Mr. Miller's form, the situation involving Mr. Taylor's form came to light after Defendant Marshall moved the Alabama Supreme Court to schedule Mr. Taylor's execution. As part of that motion filed on July 29, 2019, Defendant Marshall represented that Mr. Taylor had not made a timely election of death by nitrogen hypoxia. *See* SAC Ex. B, State's Mot. to Withdraw Mot. to Set Execution Date, *Taylor v. State,* Case No. 1991307 (Ala. Aug. 2, 2019).[8]

61.     On July 30, 2019, Mr. Taylor's counsel informed Defendant Marshall that Mr. Taylor had, in fact, timely elected death by nitrogen hypoxia.  *Id.* Mr. Taylor gave his completed election form to ADOC staff member Lieutenant Franklin with instructions to give the form to Warden Stewart, yet Defendants were unable to find Mr. Taylor's election form in their files when Defendant Marshall moved to set Mr. Taylor's execution date. *See* Mem. Op. at 18; Dkt. 51-2 at 22.

62.     On August 2, 2019, Defendant Marshall moved to withdraw the motion to set Mr. Taylor's execution date because counsel for Mr. Taylor provided Defendant Marshall copies of attorney-client communications in or around the time that Mr. Taylor submitted his election form. *See* Sept. 12, 2022 Hr'g Tr. at 127:12-16.

63.     In his withdrawal motion, Defendant Marshall represented that neither the Attorney General's office nor counsel for ADOC had Mr. Taylor's election form in their files. *Id.*

---

[8] Exhibit B is attached to this Complaint and incorporated by reference as if fully set forth herein.

64.   Defendant Marshall further represented that the State nevertheless intended to honor Mr. Taylor's election even though neither the Attorney General nor ADOC had a written election from him. *Id.*

65.   Defendant Marshall represented that the documentation provided by Mr. Taylor's counsel supported the "assertion that he made a timely election of nitrogen hypoxia." *Id.*

66.   Defendants also lost, misplaced, or improperly collected Mr. Calvin Stallworth's nitrogen hypoxia election form. Calvin Stallworth gave his nitrogen hypoxia election form to a Holman guard during the statutory election period, but that guard refused to deliver the form to Warden Stewart. *See* Mem. Op. at 18; Dkt. 52-8 at 2-3.

67.   Mr. Miller fully complied with the statute, timely submitting in writing his intent to be executed via nitrogen hypoxia. This Court found as much. His election should be honored. Defendants refused, and continue to refuse, to do so. Instead, Defendants made a disastrous attempt to execute Mr. Miller on September 22, 2022 via lethal injection. And Defendants seek to execute Mr. Miller *again* via their arbitrary and capricious process, which fails to honor Mr. Miller's statutory right to execution via nitrogen hypoxia.

*Troubling Examples of Alabama Administering Its Lethal Injection Protocol*

68.   As alleged, lethal injection is the default method of execution in Alabama.

69.   But time and again, Defendants have proven incompetent at carrying out such an execution, botching *three* lethal injection executions in the last *four* years.

70.   In February 2018, the team responsible for carrying out Doyle Lee Hamm's execution failed to access any peripheral or central veins. *See* Montgomery Advertiser, *Doyle Lee Hamm Punctured at Least 11 Times in Execution attempt, Report States* (March 5, 2018), https://www.montgomeryadvertiser.com/story/news/2018/03/05/execution-attempt-so-painful-

inmate-hoped-get-over-report-states/397304002/. As a result, the team stopped the execution after hours of trying. *Id.* By then, however, the damage had already been done as the execution team had punctured Mr. Hamm at least 11 times in his limbs and groin, causing him to bleed profusely. *Id.*

71.     After the execution was terminated, Mr. Hamm was unable to stand on his own and collapsed as he was being taken off the gurney.

72.     Following this horrific event, the State agreed not to subject Mr. Hamm to any further execution attempts. Defendants never moved to set a subsequent execution date for Mr. Hamm. Mr. Hamm later died of natural causes. *See* The New York Times*, Doyle Hamm, Who Survived a Bungled Execution, Dies in Prison at 64* (Nov. 29, 2021), https://www.nytimes.com/2021/11/29/us/doyle-hamm-dead.html.

73.     More recently, Joe Nathan James Jr. was executed on July 28, 2022, following an initially unexplained three-hour delay during which ADOC's execution personnel repeatedly failed to establish an intravenous line for the lethal injection.

74.     Witnesses to Mr. James's execution have stated that before his execution began, Mr. James did not open his eyes and did not move on the gurney. *See* Montgomery Advertiser, *ADOC 'Cannot Confirm' if Joe Nathan James Jr. was Fully Conscious Before his Execution* (Aug. 2, 2022), https://www.montgomeryadvertiser.com/story/news/2022/08/02/joe-nathan-james-jr-execution-adoc-cannot-confirm-if-conscious/10168003002. Witnesses have also said that Mr. James was silent when asked for his final words. *Id.* This strongly suggests that ADOC did not follow its own execution protocol, which provides that when executing a person via lethal injection, Defendants must carry out several steps that require first speaking to a *conscious* person, including reading the death warrant to the person, and asking if the person has any last words. *See*

15

Dkt. 52-1 at 28-44, Execution Procedures § IX(L-M). The State's execution procedures at § IX(P)(2) state that after the inmate has had the opportunity to give his last words and it is clear no court had granted a last-minute stay, *then* Warden Raybon must administer midazolam hydrochloride to cause sedation, and then he must perform a series of physical checks to ensure the inmate is unconscious, before administering the lethal drugs. *See* id. at § IX(P)(2). Together these procedures show that the inmate is meant to be fully conscious before the execution begins.

75.    Defendant Hamm claimed that Mr. James was not sedated prior to the flow of the lethal injection, and other prison officials have said that they "cannot confirm" whether Mr. James was fully conscious before his execution began. *Id.*

76.    Moreover, despite ADOC's public statements that "nothing out of the ordinary" happened in the course Mr. James's execution, an autopsy showed that he "suffered a long death" and that his body showed "pool[s] of deep bruising" and a deep incision on over a vein on his arm called a "cutdown" that indicated "that the IV team was unqualified for the task in a most dramatic way."  *See* The Atlantic, *Dead to Rights: What did the State of Alabama do to Joe Nathan James in the Three Hours Before his Execution?* (Aug. 14, 2022), https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-execution-alabama/671127.[9]

77.    The State's lethal injection protocol has come under intense scrutiny in other cases as well, including because the first drug administered in the three-drug protocol, midazolam, has

---

[9] In a recent filing in other litigation, Defendant Hamm danced around the question of whether a cut-down occurred in the execution of Mr. James. *See Kenneth Smith v. John Hamm*, No. 22-cv-00497-RAH, Dkt. No. 14 at 5 n.2 (Oct. 3, 2022) (stating that allegations of the cut-down stemmed from an autopsy that occurred a week after Mr. James's execution, and pointing out that "postmortem swelling" may have taken place during that week; but *not* explaining how a surgical incision over Mr. James's vein would have appeared due to "postmortem swelling"); *id.* at 6, 8 (arguing that a cut-down during an execution attempt is not cruel and unusual under the Eighth Amendment); *id.* at 9 (stating that Defendant Hamm does not have "any present intent" to employ a cut-down procedure "in the future").

been found to not reliably keep recipients unconscious. *See* Montgomery Advertiser, *A History of Execution Methods in Alabama, and the Controversies Around Them* (Oct. 14, 2021), https://www.montgomeryadvertiser.com/story/news/2021/10/14/history-execution-methods-alabama/8425445002/.

78.     To date, neither ADOC nor any of the Defendants have explained the discrepancy between their statement that "nothing out of the ordinary" happened in Mr. James's execution by lethal injection and the facts revealed at Mr. James's autopsy.

79.     Neither ADOC nor any of the Defendants explained what steps they are taking to ensure that what transpired in Mr. Hamm's attempted execution, Mr. James's execution, and Mr. Miller's attempted execution, from happening again.

80.     All of this has led local news organizations to ask: "Why is Alabama so bad at executions? 'They do a terrible job, and they just hide it'" *See* AL.com, *Why is Alabama So Bad at Executions? 'They Do a Terrible Job, and They Just Hide It'*, (Oct. 4, 2022) https://www.al.com/news/2022/10/why-is-alabama-so-bad-at-executions-they-do-a-terrible-job-and-they-just-hide-it.html.

*Defendants Lose Mr. Miller's Nitrogen Hypoxia Election, and Move to Set His Execution by Lethal Injection*

81.     On April 19, 2022, the State of Alabama, by and through the Office of the Attorney General, moved the Alabama Supreme Court to set Mr. Miller's execution date. Mr. Miller filed a brief in opposition, attesting in a sworn affidavit that he had completed and returned the election form, choosing to be executed by nitrogen hypoxia in accord with the statutory requirements for doing so. Defendant Marshall responded to Mr. Miller's opposition on May 27, 2022. Through an affidavit signed by Defendant Raybon, the State claimed that it has not found a record of Mr. Miller's form, though it had no affirmative or contemporaneous evidence that Mr. Miller had or

had not submitted it to the warden. Mr. Miller then filed a reply brief, emphasizing that the State's response had created a quintessential factual dispute regarding the existence of Mr. Miller's form that must be resolved by an Alabama trial court before he can be executed by lethal injection.

82.     On July 18, 2022, the Alabama Supreme Court granted the State's motion over Chief Justice Parker's dissent without making any findings with respect to the factual dispute, and set Mr. Miller's execution for September 22, 2022.

*Mr. Miller Commences the Instant Litigation*

83.     Mr. Miller initiated the instant lawsuit on August 22, 2022, bringing claims against Commissioner Hamm, Warden Raybon, and Attorney General Marshall for violations of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

84.     On September 1, 2022, Mr. Miller moved for a preliminary injunction to enjoin Defendants from executing Mr. Miller by any method other than nitrogen hypoxia. Defendants opposed the motion, and filed motions to dismiss the complaint.

85.     On September 12, 2022, the Court held a day-long evidentiary hearing on the single factual question that underpinned Mr. Miller's complaint at the time: Was is substantially likely that Mr. Miller did timely elect nitrogen hypoxia as his method of execution under Ala. Code § 15-18-82.1(b)? The Court, in its role as a fact finder evaluating the strength of the evidence and the credibility of Mr. Miller's live in-court testimony, found that it is substantially likely that Mr. Miller elected nitrogen hypoxia. *See* Sept. 19, 2022 Mem. Op., Dkt. 62. The Court entered the preliminary injunction, prohibiting Defendants from executing Mr. Miller by any method other than nitrogen hypoxia.

86.     On September 20, 2022, Defendants appealed this Court's decision to the U.S. Court of Appeals for the Eleventh Circuit. *See Commissioner v. Miller*, No. 22-13136-P (11th

Cir.). On this same day at 7:00 p.m.,[10] Defendants filed a "Motion to Stay Pending Appeal" in this Court, demanding that this Court rule on their motion by noon on September 21. *See* Dkt. 67 at 7.

87.     Then, at 8:00 p.m. on September 20, Defendants filed an "Emergency Motion to Stay Preliminary Injunction" in the Eleventh Circuit, and demanded that the Eleventh Circuit grant their motion by September 21 at 4:00 p.m. In their Emergency Motion to Stay Injunction, Defendants argued that this Court's preliminary injunction was "flawed," "confused," "difficult to understand," "missed all of" the applicable constitutional law on procedural due process claims, was based on "unremarkable [and] irrelevant" premises, "ignored" facts, made "odd observation[s]," and "straightforwardly contravened [sic] [Eleventh Circuit] and the Supreme Court's binding precedent." Mot. at i, 6, 9-10, 20, 22. Defendants acknowledged that a District Court's factual findings are reviewed for "clear error," yet never even attempted to argue that this Court's factual finding about Mr. Miller's nitrogen hypoxia election was "clear error." *See id.* at 5.

88.     Neither this Court nor the Eleventh Circuit were persuaded by Defendants' arguments, and both declined to abide by Defendants' demanded ruling deadlines. This Court denied Defendants' Motion to Stay Pending Appeal at 3:30 p.m. on September 21; the Eleventh Circuit denied Defendants' Emergency Motion to Stay Preliminary Injunction at 2:30 p.m. on September 22. Defendants did not even attempt to appeal the Eleventh Circuit's ruling.

89.     Instead, on September 22, 2022 at 4:30 p.m., Defendants filed an "Emergency Application to Vacate Preliminary Injunction" in the U.S. Supreme Court. *See Hamm v. Miller*, No. 22A258. Defendants demanded that the Supreme Court grant their relief by 7:00 p.m. CT.

---

[10] All times referenced in the Second Amended Complaint are U.S. Central Time.

90.     The Supreme Court did not enter a briefing schedule on Defendants' "Emergency Application to Vacate Preliminary Injunction," nor did it indicate its preferred timeline for ruling. Nevertheless, at 7:40 p.m., Mr. Miller filed his Opposition to Defendants' Emergency Application to Vacate Preliminary Injunction.

91.     Just an hour and a half later, around 9:15 p.m. on September 22, the U.S. Supreme Court issued a two sentence ruling on a 5-4 basis: "The application to vacate injunction presented to Justice Thomas and by him referred to the Court is granted. The September 19, 2022 order of the United States District Court for the Middle District of Alabama is vacated."

92.     The Supreme Court never issued any follow-up opinion or explanation of its decision. The Supreme Court has not stated on what basis, on an emergency application and only an hour and a half after receiving Mr. Miller's opposition brief, it vacated this Court's preliminary injunction.

*Defendants Try, and Fail, to Execute Mr. Miller by Lethal Injection*

93.     It is difficult to overstate the mental—and eventually physical—anguish that Mr. Miller experienced on the night of September 22 into the early morning hours of September 23. The events of September 22 and 23 substantiate new claims under the Eighth Amendment to the U.S. Constitution and Article I § 15 of the Alabama Constitution, and further demonstrate the injury Defendants caused Mr. Miller by refusing to honor his timely nitrogen hypoxia election.

94.     Mr. Miller sets forth here the timeline of his failed execution to the extent currently possible,[11] given that much of the information and evidence about what took place that night is still in Defendants' sole custody and control.

---

[11] All three Defendants concealed themselves from Mr. Miller during his execution, so it is currently impossible for Mr. Miller to identify and describe Defendants' specific acts and omissions that caused Mr. Miller's execution—over which the Defendants had total control—to go so horribly wrong.

95.     Mr. Miller spent most of the day on September 22 visiting with family members and receiving in-person and phone updates from his lawyers. Mr. Miller was removed from his family visitation room around 4:30 p.m. Mr. Miller was then taken to the medical unit to have a "body chart" exam done, during which a Holman nurse visually inspected Mr. Miller's veins, and documented all existing bruises and cuts on Mr. Miller's body. ADOC served Mr. Miller his "last meal" in the execution holding cell around 5:30 p.m.

96.     Around 9:00 p.m., while on the phone with one of his lawyers, Mr. Miller's lawyer received news that the Supreme Court had vacated this Court's preliminary injunction. Mr. Miller's lawyer relayed this information to Mr. Miller, and they said their goodbyes to each other. At hearing this news, Mr. Miller experienced profound shock and disappointment. He laid down on the cot in the execution cell and tried to make sense of what had, and what would, happen.

97.     By 9:20 p.m., "an ADOC spokesperson told reporters that [Defendant Marshall] had given prison officials the OK to proceed." Referring to Mr. Miller's execution, Defendant Marshall told the ADOC spokesperson, "It's a go." *See* Montgomery Advertiser, *Legal Challenges, Difficulty Establishing an IV Complicated Hours Before Miller's Death Warrant Expired* (Sept. 23, 2022) https://www.montgomeryadvertiser.com/story/news/2022/09/23/alabama-execution-alan-eugene-miller-updates/69511737007/.

98.     Defendants were already on notice of the problems medical professionals have accessing Mr. Miller's veins, as he resides in ADOC custody, and receives all medical care from ADOC medical providers. Defendants also know that Mr. Miller is 351 pounds, and that accessing veins on a person that size challenging even to qualified anesthesiologists.  And on September 12,

Defendants heard additional detailed evidence of Mr. Miller's fear of needles, and the fact that doctors have long struggled to access Mr. Miller's veins. *See, e.g.,* Op. at 15-16.

99.     Defendants chose to proceed with Mr. Miller's execution by lethal injection despite their knowledge of the great difficulty that even qualified medical professionals have accessing Mr. Miller's veins, and despite their knowledge of the fact that Mr. Miller would suffer greatly from their attempts to set an IV in his veins. Defendants did not take steps to ensure that they could establish veinous access to Mr. Miller. They recklessly and knowingly charged ahead at 9 pm, using only their generic protocol and their unqualified IV team, in a rush to execute Mr. Miller before midnight.

100.     Around 9:55 p.m., Mr. Miller noticed that the sound of the football game the guards were watching outside his cell had been cut off. Mr. Miller looked to the door of the cell, and saw over a dozen ADOC correctional officers standing together outside his cell. The group included, among others, Sergeant Chris Earl, Captain McKenzie, and Officer Quarles. Earl looked at Mr. Miller and said, "It's time." Earl told Mr. Miller how to position himself on his cot in order to be bound in handcuffs and leg irons.

101.     Mr. Miller followed the instructions and did not resist.

102.     The group of guards then walked Mr. Miller to the execution chamber. Mr. Miller noticed that the guards holding his arms were being far more gentle than normal; Mr. Miller believes this was in order to avoid bruising.

103.     Mr. Miller arrived, for the first time in his over 20 years incarcerated at Holman, in the execution chamber. Present in the execution chamber were more than a dozen guards who escorted Mr. Miller from his cell, ADOC employee Katrina Brown, ADOC employee Captain Woods, an unidentified white female in business attire, and an unidentified white male in a suit.

Mr. Miller believes the unidentified white male in a suit may have been Defendant Hamm. None of the people in the execution chamber identified themselves to Mr. Miller, therefore, he can only name herein the people he already knew before the failed execution began.

104.    One of the guards asked Mr. Miller to lay down on the execution gurney, which he did without resistance. Around 10:15 p.m. the guards began to strap Mr. Miller down to the gurney. The below picture, obtained from a news article in *The Montgomery Advertiser*,[12] depicts the basic layout of the Holman lethal injection execution gurney, although the gurney may have been modified slightly since the taking of this photograph:



---

[12] *See* Montgomery Advertiser, *A History of Execution Methods in Alabama, and The Controversies Around Them* (Oct. 14, 2021) https://www.montgomeryadvertiser.com/story/news/2021/10/14/history-execution-methods-alabama/8425445002/.

105.     As is evident from the above image, the straps on the execution gurney are arranged at a fixed height.  Mr. Miller's height is, to the best of his knowledge, 5 feet 10 inches. He is apparently shorter than the height that the gurney was designed for. The guards had to slide Mr. Miller's body down the gurney in order to secure his feet into the feet straps. Therefore, Mr. Miller's arms were raised into a stress position—in which Mr. Miller's arms were higher than perpendicular to his torso—in order to be strapped into the arm rests on the gurney. This position immediately caused Mr. Miller pain in his chest, neck, and arms. Despite the pain, Mr. Miller did not resist being strapped down to the execution gurney.

106.     There was a clock in the execution chamber. Mr. Miller's body was tightly constricted on the gurney. Depending on where members of the execution team were standing, Mr. Miller could not always see the clock.

107.     There were bright fluorescent lights immediately above the execution gurney, arranged into the same "t" or "cross" shape as the gurney itself. There was no cover on the fluorescent lights as there typically is on fluorescent lighting, so the light burned very brightly into Mr. Miller's eyes, and caused him pain. Mr. Miller had difficultly looking away from the fluorescent lights due to his tight physical restraints.

108.      Captain McKenzie inspected the straps on Mr. Miller's body, and seemed to approve that they were appropriately placed.

109.     Mr. Miller then heard the doors to the execution chamber open, and saw two men wearing medical scrubs walk in. Neither man identified himself or explained whether he had any sort of medical credentials.[13] One of the men was pushing a rolling cart that appeared to contain

---

[13] During the botched execution, Mr. Miller asked the men in scrubs if they were doctors. They refused to answer.

medical supplies. Because ADOC refuses to identify these men, Mr. Miller must refer to them herein by the color of the scrubs they were wearing.

110.     Mr. Miller had seen the first man, "Green Scrubs," once before—on September 20, 2022—when ADOC employee Katrina Brown brought Green Scrubs (wearing different clothing at the time) to see Mr. Miller while he was sitting in the execution holding cell. Brown told Mr. Miller to extend his arms through the "bean hole" in his cell so that Green Scrubs could "look at" Mr. Miller's veins. Mr. Miller declined to extend his arms through the bean hole, explaining that this Court's preliminary injunction against a lethal injection execution was in place, and it was inappropriate to begin the lethal injection protocol while the Court's order was in effect. Brown quickly took Green Scrubs away from Mr. Miller's holding cell.

111.     Mr. Miller had never before seen the second man, "Aqua Scrubs." Both Green and Aqua Scrubs are white men. Green Scrubs looked older, perhaps in his sixties, and tall, while Aqua Scrubs appeared to be in his late thirties or early- to mid-forties.

112.     Green Scrubs appeared to be responsible for tying torniquets on Mr. Miller, and slapping Mr. Miller's skin, to find a vein.  Aqua Scrubs did the vast majority of the needle punctures.

113.     Green Scrubs tied a torniquet on Mr. Miller's right bicep, and began slapping Mr. Miller's inner right arm inside his elbow (the "elbow pit"). The slapping went on for long periods of time as Green Scrubs tried and tried to find a vein. The tourniquets were tied extremely tightly and caused Mr. Miller pain. Aqua Scrubs punctured Mr. Miller's right elbow pit in multiple different points trying to find a vein. Mr. Miller could feel the needle being injected into his skin, and then turned in various directions, as Aqua Scrubs tried to place the needle inside a vein. This process was painful and traumatic for Mr. Miller. After one of the needle punctures on his arm,

Mr. Miller told the men in scrubs that what they had just done was "excruciating" for him. No one responded.

114.    One of the men wearing scrubs then pulled out a small pocket flashlight in an attempt to better see Mr. Miller's veins. The pocket flashlight did not help the men in scrubs better see Mr. Miller's veins.

115.    As a result, ADOC employee Captain Woods[14], who was present in the execution chamber, offered the men in scrubs the use of the bright flashlight application on his smartphone. The men in scrubs accepted Captain Woods's offer, and examined Mr. Miller's arm while Captain Woods placed his phone flashlight on Mr. Miller. After some time, the men abandoned the use of Captain Woods's smartphone flashlight.

116.    All the while, Aqua Scrubs continued to probe Mr. Miller's right elbow pit with needles.[15] Mr. Miller could feel his veins being pushed around inside his body by needles, which causes him great pain and fear.

117.    Defendants chose to allow Mr. Miller's execution to continue despite their knowledge of the great difficulty the men in scrubs were having with accessing Mr. Miller's veins, and despite their knowledge of the fact that Mr. Miller was suffering greatly from their attempts to set an IV.

118.    Eventually, after repeated attempts, the men in scrubs abandoned their efforts to find a vein in Mr. Miller's right elbow pit, and moved to Mr. Miller's right hand. Green Scrubs tied a torniquet around Mr. Miller's right hand, and repeatedly and firmly slapped the top of Mr.

---

[14] On information and belief, Captain Woods may be a Deputy Warden at the G.K. Fountain Correctional Facility in Atmore, Alabama.
[15] The men in scrubs did not discard every needle that they used to puncture Mr. Miller's skin. Therefore, there should be fewer needles in evidence than there were actual puncture sites on Mr. Miller's body.

Miller's right hand. Aqua Scrubs punctured Mr. Miller's skin with needles in several places on his right hand.

119.    At some point while the men in scrubs were using needles on Mr. Miller's right hand, Mr. Miller was able to see that the clock on the wall read 11:00 p.m.

120.    Unable to find a vein in Mr. Miller's right hand, the men in scrubs abandoned that effort as well, and moved to Mr. Miller's left hand. After a visual inspection, the men determined it would be impossible to find a vein in Mr. Miller's left hand, and abandoned that injection site too.

121.    Throughout this process, Mr. Miller attempted to speak to, and ask questions of, the men in scrubs. They refused to respond to almost all of his comments and questions. While Defendants attempted to execute Mr. Miller, Mr. Miller thought fearfully about what happened to Doyle Hamm and Joe James. He feared that Defendants would attempt to establish a central line via his groin, as they did with Doyle Hamm. He feared that Defendants would perform a cut-down into his vein, as they did with Joe James.

122.    The men in scrubs moved to Mr. Miller's left arm. Green Scrubs tied the torniquet, and Aqua Scrubs began puncturing Mr. Miller's left elbow pit with needles. Mr. Miller felt the needles going deeper in his body than ever before, which caused intense physical pain. Mr. Miller told the men in scrubs he could feel that they were not accessing his veins, but rather stabbing *around* his veins. The men did not respond.

123.    After many punctures on Mr. Miller's left elbow pit, the men in scrubs walked away from the execution gurney and spoke to each other in whispers. Mr. Miller could not hear what they said to each other.

124.     The men in scrubs then told the guards that they wanted to try to puncture Mr. Miller's right foot. One of the guards removed the strap from Mr. Miller's right foot. When Aqua Scrubs saw the condition of Mr. Miller's right foot, he sighed loudly. Mr. Miller has had a long-running ankle injury, which impacts his ability to walk, and on information and belief, impacts blood circulation and vein access in his feet.  Mr. Miller could feel the men in scrubs tie a torniquet on his right foot, and begin massaging and slapping the foot to increase blood flow. One of the men in scrubs inserted a needle in Mr. Miller's right foot, which caused sudden and severe pain to Mr. Miller. Mr. Miller felt like he had been electrocuted in this foot, and his entire body shook in the restraints. Mr. Miller believes the men in scrubs hit a nerve in his right foot. The pain of this needle puncture immediately reminded Mr. Miller of the intense physical pain he felt as a child when his father severely beat Mr. Miller's testicles. The men in scrubs withdrew the needle from this painful site, and continued to puncture many other locations on Mr. Miller's right foot.

125.     While the men in scrubs were trying and failing to access Mr. Miller's veins, Mr. Miller told the men in scrubs that the difficulty they were having accessing his veins is precisely what he warned Defendants about in this litigation. Mr. Miller said that Defendants "tried to call [him] a liar" regarding the difficulty medical professionals have accessing his veins, but that in the past, his blood draws in ADOC custody have been so painful that they "brought tears to [his] eyes."

126.     Eventually the men in scrubs abandoned Mr. Miller's right foot, and turned to look at Mr. Miller's left foot and leg. One of the men in scrubs shook his head in frustration after inspecting Mr. Miller's left foot and leg. Apparently persuaded that neither of those locations would be suitable injection sites, the men in scrubs returned to Mr. Miller's right arm. This time, Aqua Scrubs inserted needles into Mr. Miller's right inner forearm.

127.    Next, and for the first time during the execution, Aqua and Green Scrubs split up, and each began working on puncturing different parts of Mr. Miller's body. Aqua Scrubs began puncturing Mr. Miller's left arm, while Green Scrubs began puncturing Mr. Miller's right arm.

128.    At this point, a new man in scrubs entered the execution chamber, wearing navy scrubs. Navy Scrubs is a white man, heavyset, wearing glasses, who appeared to be in his sixties. Navy Scrubs also did not identify himself or explain whether he had any medical credentials.

129.    Navy Scrubs walked around Mr. Miller's body and examined all the puncture sites that Green and Aqua Scrubs had made. Navy Scrubs then moved up to Mr. Miller's head and started feeling and slapping the skin on his neck. Mr. Miller physically recoiled out of intense fear of the men trying to insert a needle in his neck. Mr. Miller asked urgently whether the men were going to try to insert a needle into his neck; all refused to answer him.

130.    Very soon after Mr. Miller recoiled from Navy Scrubs, there was a loud knock on the window pane that borders the execution chamber and the State's observation room. Mr. Miller could see state employees observing his execution from this observation room.

131.    All three men in scrubs left the execution chamber after hearing this knock on the window.

132.    The guards who were still in the execution chamber with Mr. Miller placed a large strap across his chest. Officer Quarles began operating a foot pump at the base of the execution gurney, which gradually raised the gurney from a horizontal to vertical position. Mr. Miller was strapped into the gurney by his arms, feet, and chest, and was left hanging vertically from the gurney. No one explained to Mr. Miller why he was being raised into a vertical position or why the men in scrubs had left the room. Mr. Miller said to Officer Quarles and Captain McKenzie that

the position he was hanging in was "giving [him] hell," his elbows, arms and back were in pain, and that his foot was "killing [him]." Mr. Miller noticed that the clock on the wall said 11:40 p.m.

133.    At this point, Mr. Miller still believed he was going to die. Mr. Miller looked to his shoulder and saw Officer Quarles, and asked Officer Quarles to pass on his final words to some of his friends on death row. Quarles refused to respond.

134.    Mr. Miller approximates that he was left hanging vertically from the execution gurney for 20 minutes. He experienced a lot of pain while left hanging: in his many puncture wounds, particularly in his right foot, which was throbbing with pain; and in his arms, chest, and neck, from having been extended into a painful stress position for 90 minutes. Mr. Miller felt nauseous, disoriented, confused, and fearful about whether he was about to be killed, and was deeply disturbed by his view of state employees silently staring at him from the observation room while he was hanging vertically from the gurney. Blood was leaking from some of Mr. Miller's wounds.

135.    Suddenly, without warning, and immediately before midnight, ADOC employee Katrina Brown appeared by Mr. Miller's head, and said, "Your execution has been postponed." Mr. Miller was deeply confused by this comment. He asked Brown for an explanation of what was going on, what had happened to cause a "postponement." Brown refused to answer Mr. Miller's desperate questions, and simply walked out of the execution chamber.

136.    One of the guards in the execution chamber then slammed the execution gurney back into a horizontal position, while Mr. Miller was still strapped to it.

137.    Once the execution gurney was horizontal, Green and Aqua Scrubs removed EKG wires that they had strapped to Mr. Miller's chest, and lines that had been taped to his arm.

138.    Sergeant Earl then approached Mr. Miller and explained that Brown was wrong, that the execution had not been "postponed," but was in fact truly over, as the time had passed midnight and Mr. Miller's death warrant had expired.

139.    The guards in the execution chamber asked Mr. Miller to get off the table. Mr. Miller's arms were so stiff and painful from having been extended above his head for 90-plus minutes that he was not able to bend them on his own. Mr. Miller had to ask one of the guards to bend his arms for him.  Mr. Miller was not able to get off the table immediately, and had to try to restore circulation to his limbs himself.

140.    The large group of guards reentered the execution chamber and handcuffed Mr. Miller. They took Mr. Miller to the medical unit, where a Holman nurse wiped the blood off of Mr. Miller's body. The nurse also wrote up a quick "body chart" exam of Mr. Miller's vitals. Mr. Miller told the nurse that his right foot in particular was in great pain from the punctures. The nurse appeared to make a note of it, but did not offer any medical assistance for Mr. Miller's physical and psychological pain.

141.    Mr. Miller was returned to the execution holding cell after he was removed from the medical unit. He was in a deep state of shock and post-traumatic stress. Mr. Miller curled into a fetal position on the cot in the execution holding cell for most of the early morning hours of September 23.

142.    During the day on September 23, ADOC guards encouraged Mr. Miller to shower. He did so. While Mr. Miller was showering, ADOC employee Officer Carson observed the wounds on Mr. Miller's body and said, "I'm happy for you. But I'm not happy you had to go through that."

143.    Mr. Miller was returned to his prior cell on Holman's death row during the day on September 23.

144.     Mr. Miller now spends much of his time curled in the fetal position on his bed, reliving the execution attempt. He is deeply disturbed by the botched execution, and in a great deal of physical and emotional pain.

145.     Mr. Miller's arms are still in pain from the botched execution.

146.     Pursuant to this Court's September 23 Order, one of Mr. Miller's attorneys was able to visit Mr. Miller on September 23 to begin collecting evidence of the failed execution and Mr. Miller's injuries.

147.     On September 24, one of Mr. Miller's attorneys and a non-ADOC physician returned to Holman, in order for the physician to assess Mr. Miller's injuries from the failed execution.

148.     The physician who examined Mr. Miller is Mark J. Heath, M.D.  Dr. Heath is practicing anesthesiologist at New York-Presbyterian Hospital and Columbia University Irving Medical Center. Dr. Heath is also a professor of anesthesiology at Columbia University Irving Medical Center.[16]

149.     In the aftermath of the failed execution, Mr. Miller has had intense psychological symptoms. He sometimes goes into a "twilight mode" where he loses track of time and dissociates from reality. He experiences intrusive thoughts of the execution, even when he is trying not to think about the execution. He has been dwelling on thoughts of being stabbed with needles. He twitches or taps his hands together to try to calm down.

150.     Since the botched execution, Mr. Miller has not felt comfortable extending his arms away from his body. Doing so gives him flashbacks to the execution, when his arms were painfully

---

[16] Dr. Heath's report on Mr. Miller's injuries is forthcoming. Due to Defendants' decision to create an emergency timeline in this case, Mr. Miller is not currently able to attach Dr. Heath's report as an exhibit to this pleading.

strapped down and punctured repeatedly with needles. Before the botched execution, Mr. Miller used to sit next to his fellow inmates to watch a movie together from a shared set of headphones. When sharing headphones, Mr. Miller would sometimes extend an arm around a friend's shoulders. He can no longer extend an arm around a friend due to the intensity of the flashbacks. Mr. Miller often keeps his arms and hands curled up tight on his chest.

151.    The pain Mr. Miller experienced during his execution (which lingered for days after the execution) reminded him of the physical abuse he suffered as a child at the hands of his father. While on the execution gurney, Mr. Miller immediately associated the pain he was feeling to the pain inflicted on him by his father's beatings. That association continues to this day.

152.    Mr. Miller's sleep has been greatly disturbed since the failed execution. He often does not sleep more than a few hours at night. He suffers from many intrusive thoughts of the execution at night.

153.    Defendants subjected Mr. Miller to precisely the unnecessary and wanton infliction of pain that the Eighth Amendment was intended to prohibit.

154.    To this day, no Defendant has offered Mr. Miller any medical or psychological treatment for the pain he suffered, and continues to suffer, from Defendants' failed execution.

155.    Mr. Miller is the only living execution survivor in the United States. He now lives with psychological trauma that the human brain was not designed to process.

156.    On information and belief, if Defendants have their way, Mr. Miller would be the first person in U.S. history whom a State has attempted to execute by lethal injection twice, which demonstrates the cruel and unusual nature of the State's proposed punishment. And Mr. Miller would be only the second person in the past century whom a State attempted to execute a *second* time by the *same* method. The only other man was Willie Francis, who Louisiana executed by

electric chair twice. In 1946, the Louisiana botched Mr. Francis's execution by electric chair. In 1947, Louisiana *again* subjected Mr. Francis to the electric chair, killing him.

*Defendants Rush to Moot This Litigation and Execute Mr. Miller by Lethal Injection Again*

157.   After Mr. Miller's execution failed, Defendant Hamm gave only a paltry explanation of what happened: "Due to the time constraints resulting from the lateness of the court proceedings, the execution was called off once it was determined the condemned's veins could not be accessed in accordance with our protocol before the expiration of the deadline." *See* USA Today, '*Veins Could Not be Accessed': Alabama Halts Man's Execution for Time, Medical Concerns* (Sept. 23, 2022) https://www.usatoday.com/story/news/nation/2022/09/23/alabama-alan-miller-execution-halted-medical-concerns/8088788001/.

158.   To hear Defendants tell it, nothing unforeseeable—no accident, no mishap—led to the botched execution of Mr. Miller. Indeed, ADOC has proudly declared that nothing went wrong in Mr. Miller's execution.[17] Thus, the failed execution was Defendants' deliberate decision to proceed by methods they knew or should have known would be unsuccessful. It was the consequence of a deliberate and intentional act to try to execute Mr. Miller no matter what it took or how much unnecessary pain it caused.

159.   On September 23, Governor Ivey announced that Defendants would seek to execute Mr. Miller again as soon as possible. *See* WVTM13, *Alabama Calls Off Execution of Allen Miller Just Before Midnight Deadline* (Sept. 23, 2022) https://www.wvtm13.com/article/alabama-execution-alan-miller-nitrogen-hypoxia/41345821 ("According to Ivey's office, the governor said she expects the execution to be rescheduled at the 'earliest opportunity.'"). Defendant Marshall also confirmed immediately that Defendants would seek to execute Mr. Miller again. *See* AL.com,

---

[17] *See* The Atlantic, *Dead Man Living* (Oct. 2, 2022), online at
https://www.theatlantic.com/ideas/archive/2022/10/alabama-inmate-execution-alan-miller/671620/.

*Judge Tells State to 'Locate and Preserve Evidence' in Failed Execution of Alan Eugene Miller* (Sept. 23, 2022) https://www.al.com/news/birmingham/2022/09/attorneys-for-alabama-inmate-alan-miller-ask-court-to-preserve-evidence-of-injuries-after-failed-execution-attempt.html ("Marshall's statement said[:] 'To be clear: Alan Miller will receive his just punishment, which is death by execution. He has simply succeeded in delaying—not escaping—his appointment with justice.'").

160.    On October 4, 2022, Defendant Marshall filed a motion in the Alabama Supreme Court requesting that court set an *expedited* execution date for Mr. Miller. *See* SAC Ex. D, State of Alabama's Expedited Motion to Set an Execution Date, *Miller v. Alabama*, No. 1040564 (Oct. 4, 2022).[18] Defendants seek to expedite Mr. Miller's next execution date, *in contravention of Alabama Rules of Appellate Procedure*, and *despite* the pending litigation in this Court, for the sole reason that *Defendants* botched Mr. Miller's execution on September 22. *See id*. at 3 ("This Court should suspend the Alabama Rules of Appellate Procedure and reset Miller's execution date… this court may consider the extraordinary circumstances present in this case and reset Miller's execution of sentence prior to acting on the State's [already-filed] motion [to execute James] Barber."). Defendant Marshall is petitioning the Alabama Supreme Court to place Mr. Miller's execution date *ahead* in line of another death row inmate whose execution date Defendant Marshall moved for in early August. *Id.*

161.    Thus, Defendants continue their strategy to avoid any judicial review of their unconstitutional actions toward Mr. Miller. Defendants are well aware that if they kill Mr. Miller, this litigation—and all judicial scrutiny of their constitutional violations against Mr. Miller—becomes moot.

---

[18] Exhibit D is attached to this Complaint and incorporated by reference as if fully set forth herein.

162.    This is an extremely rare example of civil litigation in which the defendants can kill the main witness to the events giving rise to the legal claims at issue.  Defendants clearly intend to take full advantage of that possibility. Defendants now seek to execute Mr. Miller by lethal injection as soon as possible in order to evade discovery and this Court's ruling on the merits of Mr. Miller's claims.

163.    By filing their motion to set a new execution date for Mr. Miller on an emergency basis, Defendants create precisely the kind of emergency conditions that, by Defendants' own logic, prevented them from completing Mr. Miller's execution the first time.

164.    Defendants' insistence on continuing to execute Mr. Miller via lethal injection can only be considered intent to inflict unnecessary pain and suffering on him.

## CAUSES OF ACTION

## COUNT ONE: VIOLATION OF MR. MILLER'S RIGHT TO PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

## AGAINST ALL DEFENDANTS

165.    Mr. Miller repeats and realleges paragraphs 1 through 164 as though fully set forth herein.

166.    The Fourteenth Amendment prohibits the deprivation of life, liberty or property without due process of law.

167.    Alabama Code § 15-18-82.1(b)(2) contains a state-created liberty interest for death-sentenced inmates in Alabama to choose one of two state-sanctioned execution methods.

168.    Mr. Miller completed and signed his election form during the election period in June of 2018, indicating that he opted into execution by nitrogen hypoxia rather than lethal injection.

169.     Mr. Miller timely returned the form to the prison official at Holman who was collecting completed forms from other inmates. Defendants lost, misplaced, or improperly collected Mr. Miller's form, and have refused to recognize Mr. Miller's meritorious election.

170.     Defendants are responsible for ensuring that executions in Alabama comport with constitutional requirements.  Defendants' respective roles are described in paragraphs 11 to 26.

171.     Defendants violated Mr. Miller's due process rights by failing to ensure an adequate procedure for protecting his election to be executed by nitrogen hypoxia.

172.     Defendants failed to create and maintain an accurate accounting of who timely submitted election forms and failed to implement a reviewable process for determining whether an election had been made.

173.     Defendants had no (and currently have no) process for evaluating whether Mr. Miller made an election in accordance with the statute.

174.     To disregard Mr. Miller's election reflects Defendants' total failure to put in place any written rules or guidance whatsoever governing the election process. No written rules or guidance existed for distributing election forms. No written rules or guidance existed for collecting such forms. And no written rules or guidance existed for storing such forms. Defendants have lost multiple election forms, and Defendants have no coherent process for honoring some misplaced forms, while disregarding others.

175.     Defendants also failed to create a coherent process for determining which elections would be honored when Defendants lost the election form.

176.     Mr. Miller has also been harmed by the lack of process surrounding his request to have a court resolve any factual disputes arising from his election.  Like Mr. Jarrod Taylor, Mr. Miller would not have an execution date at this time if Defendants had created and followed

reasonable procedures for collecting and storing inmates' nitrogen hypoxia elections. Like Mr. Calvin Stallworth, Defendants would have never sought Mr. Miller's execution by lethal injection in the first place if Defendants had created and followed reasonable procedures for collecting and storing inmates' nitrogen hypoxia elections.

177.    In opposition to having his execution via lethal injection be set, Mr. Miller filed a sworn-affidavit before the Alabama Supreme Court attesting that he completed and timely returned his election form. In response, Defendant Raybon filed his own affidavit stating that, contrary to Mr. Miller's own sworn statement, he has not found a record of Mr. Miller's form. In doing so, Defendants created a quintessential factual dispute that can only be resolved by a trial court after an evidentiary hearing. The Alabama Supreme Court ignored that dispute, declined to remand the issue to a lower court, and granted the State's motion to set an execution date.

178.    The complete lack of process involving Mr. Miller's election form is a flagrant violation of Mr. Miller's due process rights. Defendants had no (and currently have no) process in place to evaluate whether Mr. Miller made an election in accordance with the statute.

179.    This Court has found that Mr. Miller is substantially likely to succeed on his procedural due process claim. Op. at 42-45.

**COUNT TWO: VIOLATION OF MR. MILLER'S RIGHT TO EQUAL PROTECTION UNDER THE LAW**

**AGAINST ALL DEFENDANTS**

180.    Mr. Miller repeats and realleges paragraphs 1 through 164 as though fully set forth herein.

181.    Defendants are responsibsle for ensuring that executions in Alabama comport with constitutional requirements.  Defendants' respective roles are described in paragraphs 11 to 26.

182.    Pursuant to the Fourteenth Amendment, Mr. Miller is entitled to equal protection under the law.

183.    Mr. Miller is subject to disparate treatment as compared to similarly-situated death-row inmates at Holman who, like Mr. Miller, submitted election forms invoking their right to be executed by nitrogen hypoxia.

184.    Mr. Taylor and Mr. Miller are both death-row inmates at Holman who submitted election forms. Defendants lost, misplaced, or improperly collected election forms submitted by both men. Rather than treat Mr. Taylor and Mr. Miller equally, Defendants recognized Mr. Taylor's election (and not Mr. Miller's election) because Defendant Marshall received copies of privileged attorney-client communications from around the time of Mr. Taylor's election.

185.    Mr. Stallworth and Mr. Miller are both death row inmates at Holman who submitted election forms. Defendants lost, misplaced, or improperly collected election forms submitted by both men. Rather than treat Mr. Stallworth and Mr. Miller equally, Defendants recognized Mr. Stallworth's election (and not Mr. Miller's election) because Defendants received copies of privileged attorney-client communications from around the time of Mr. Stallworth's election.

186.    Nowhere in Ala. Code § 15-18-82.1(b) are Defendants permitted to replace a missing election form with attorney-client communications.

187.    When presented with Mr. Miller's sworn affidavit attesting that he timely elected to be executed by nitrogen hypoxia, Defendants refused to honor his election.

188.    When presented with Mr. Miller's deposition testimony, live in-court testimony that Mr. Miller timely elected to be executed by nitrogen hypoxia, and multiple pieces of corroborating evidence that Mr. Miller timely elected by nitrogen hypoxia, Defendants refused to honor his election.

189.     When *this Court* held that it is substantially likely that Mr. Miller timely elected nitrogen hypoxia, Defendants refused to honor his election.

190.     Defendants' decision to recognize the nitrogen hypoxia elections of Mr. Taylor, Mr. Stallworth, and indeed all other men on death row who timely elected nitrogen hypoxia, but not Mr. Miller, has no rational basis. This Court has found that it is substantially likely Mr. Miller complied with Ala. Code § 15-18-82.1(b) by submitting his elections in writing within the 30-day window. Yet, in defiance of that factual finding, Defendants are arbitrarily treating Mr. Miller differently because he has not shown them attorney-client communications at the time of his election.

191.     Defendants' disparate treatment of Mr. Miller is not rationally related to a legitimate government interest.

192.     As a result of their violations of Mr. Miller's Fourteenth Amendment rights, Defendants attempted to execute Mr. Miller by lethal injection on September 22, 2022. And they seek to do so again in the near future. *See* SAC Ex. D.

193.     Mr. Miller has the right to be treated the same as all other Holman death row inmates who elected nitrogen hypoxia.

194.     This Court has found that Mr. Miller is substantially likely to succeed on his equal protection claim. Op. at 45-53.

**COUNT THREE: VIOLATION OF MR. MILLER'S RIGHT TO EQUAL PROTECTION UNDER THE LAW**

**AGAINST ALL DEFENDANTS**

195.     Mr. Miller repeats and realleges paragraphs 1 through 164 as though fully set forth herein.

196.    Defendants are treating Mr. Miller differently than they did Mr. Doyle Hamm, whose execution by lethal injection Defendants also botched due to their failure to establish veinous access. After Defendants botched Mr. Hamm's lethal injection, they entered a confidential settlement and jointly dismissed Hamm's pending civil right litigation. On information and belief, Defendants agreed to not attempt to execute Hamm again via lethal injection. In contrast, for Mr. Miller, a mere 12 days after his botched execution, Defendants are moving on an emergency basis in the Alabama Supreme Court to execute Mr. Miller again as soon as possible.

197.    Defendants' disparate treatment of Mr. Miller is not rationally related to a legitimate government interest.

198.    Mr. Miller has the right to be treated the same as all other Holman death row inmates who survived botched lethal injection executions by Defendants.

**COUNT FOUR: VIOLATION OF MR. MILLER'S RIGHTS UNDER THE EIGHTH AMENDMENT TO BE FREE FROM ARBITRARY AND CAPRICIOUS PUNISHMENT**

**AGAINST ALL DEFENDANTS**

199.    Mr. Miller repeats and realleges paragraphs 1 through 164 as though fully set forth herein.

200.    The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII.

201.    The execution of an inmate may be "cruel and unusual" when it is carried out arbitrarily or capriciously. *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976).

202.    Each Defendant therefore has a "constitutional responsibility" to "apply its [capital punishment statutes] in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia,* 446 U.S. 420, 428 (1980).

41

203.    As part of that responsibility, "procedures" are to be in place that prevent the arbitrary execution of an inmate. *Foster v. Strickland*, 707 F.2d 1339, 1347 n.16 (11th Cir. 1983). The State must also "make rationally reviewable the process for imposing a sentence of death." *Godfrey*, 446 U.S. at 428.

204.    Defendants are responsible for ensuring that executions in Alabama comport with constitutional requirements. Defendants' respective roles in the execution process are described in paragraphs 11 to 26.

205.    Defendants' decision to execute Mr. Miller by lethal injection rather than nitrogen hypoxia was unconstitutionally arbitrary. The only basis for executing Mr. Miller by lethal injection instead of nitrogen hypoxia is that the Defendants failed to retain his election form. If the Defendants had not lost Mr. Miller's form, Mr. Miller would otherwise be executed by nitrogen hypoxia.

206.    Defendants lost Mr. Miller's election form because they failed to create, no less implement, adequate procedures for distributing, collecting, and storing such forms. Now, some inmates who elected to be executed by nitrogen hypoxia will have their elections honored by Defendants, while other inmates—who also elected to be executed by nitrogen hypoxia—will not. Even worse, among the group of inmates whose forms have been lost, misplaced, or improperly collected (*e.g.*, Mr. Miller, Mr. Stallworth, and Mr. Taylor), Defendants are picking and choosing who will be executed by nitrogen hypoxia.

207.    Defendants' failure to put any reliable procedures in place regarding the election process also prevents courts from rationally reviewing Defendants' efforts to carry out executions.

208.    All of these actions run afoul of the Eighth Amendment's mandate that Alabama apply its capital punishment statutes in a manner that is not arbitrary and capricious.

**COUNT FIVE: VIOLATION OF MR. MILLER'S RIGHTS UNDER THE EIGHTH AMENDMENT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT**

**AGAINST ALL DEFENDANTS**

209.    Mr. Miller repeats and realleges paragraphs 1 through 164 as though fully set forth herein.

210.    The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII.

211.    The U.S. Supreme Court has previously described punishments to be unconstitutionally cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or when they "involve the unnecessary and wanton infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Eighth Amendment forbids "forms of punishment that intensified the sentence of death with a (cruel) " 'superadd[ition]' " of " 'terror, pain, or disgrace.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).

212.    The U.S. Supreme Court has also stated that "a series of abortive attempts" at execution raise an Eighth Amendment claim. *Baze v. Rees*, 553 U.S. 35, 50 (2008); *see also Glass v. Louisiana*, 471 U.S. 1080, 1085-86 (1985).

213.    Both Defendants' botching of Mr. Miller's execution on September 22, and Defendants' current attempt to execute Mr. Miller by lethal injection *again*, constitute cruel and unusual punishment under the Eighth Amendment.

214.    Prior to the execution attempt on September 22, 2022, Defendants were aware of Mr. Miller's belief that executing him by nitrogen hypoxia would be more humane than executing him by lethal injection. Defendants were aware that Mr. Miller's belief was based on his personal experience of medical professionals unsuccessfully attempting to access his veins with needles.

43

Defendants were also aware that Mr. Miller attested that he had elected to be executed by nitrogen hypoxia.

215.    In light of that knowledge, Defendants had an opportunity to take reasonable steps in advance of the September 22, 2022 execution to prepare for difficulty accessing Mr. Miller's veins. For example, Defendants could have consulted the execution team to ensure they had any equipment that might be necessary, including an ultrasound machine to assist them in accessing Mr. Miller's veins. The state of Alabama has previously made ultrasound technology available to the execution team, including in the Doyle Hamm execution attempt.

216.    The execution team presumably made its best efforts to access Mr. Miller's veins during the failed execution on September 22, 2022, using the equipment available to them and based on their skill level.

217.    In spite of more than 90 minutes of attempting to establish veinous access, the execution team was unable to achieve the IV access necessary to execute Mr. Miller by lethal injection on September 22, 2022.

218.    What Defendants did to Mr. Miller does not fall within this society's standards for a constitutional execution. The botched execution was terrifying and painful to Mr. Miller. The repeated attempts to establish veinous access were undertaken in spite of Defendants' knowledge of the difficulty accessing Mr. Miller's veins and a more humane alternative of nitrogen hypoxia that Mr. Miller elected.

219.    Now Defendants seek to inflict the same torture on Mr. Miller on an *expedited basis* to avoid judicial review of their actions.

220.    Defendants are intentionally pursuing a method of execution that has already failed on Mr. Miller. Defendants have already tried, for 90-plus minutes, puncturing Mr. Miller's skin

with needles in order to kill Mr. Miller via lethal injection. They failed. Yet they now seek to do the exact same thing to Mr. Miller, without having undertaken any review of what went wrong in his case, or how to avoid such gratuitous pain and suffering in his second execution. Moreover, Mr. Miller's terror at his second execution is amplified in light of Defendants' prior botched execution of Mr. Miller.

221.    Defendants' cruelty is all the more shocking in light of the readily available alternative to lethal injection: nitrogen hypoxia. Nitrogen hypoxia is a readily implemented method of execution in the State of Alabama. Indeed, at Mr. Miller's deposition just a few weeks ago, counsel for Defendants pulled out a gas mask, and asked Mr. Miller if he would be opposed to the State fitting the gas mask over his face to ensure the lethal gas would flow properly. *See* Dkt. 51-1 at 85:18-23 ("If a correctional officer came to try to just, as a planning precaution, fit a mask to your face to make sure there were no issues, is that something that you would be cooperative with, or is that something that would upset you?"); Sept. 12, 2022 Hr'g Tr. at 7:12-15 ("[W]e asked Mr. Miller during his deposition as a planning precaution whether he would agree to have correctional officials fit a [gas] mask to his face to make sure it was the appropriate size.").

222.    Defendants have made many other representations to this Court that they are very near ready to execute people via nitrogen hypoxia. On September 8, 2022, Defendants represented to this Court that if the Court were to issue an injunction requiring Mr. Miller's execution by nitrogen hypoxia, the execution would be carried out by nitrogen hypoxia on September 22. *See* Dkt. 42 at 10. At the September 12, 2022 evidentiary hearing in this Court, Defendants revealed that any delay in executing Mr. Miller in accordance with his nitrogen hypoxia would be quite short. *See* Sept. 12, 2022 Hr'g Tr. at 8:8 ("[T]he nitrogen hypoxia protocol is there."); *id.* at 6:24-7:4 (DEFENDANTS: "I will say if the Court enters a narrowly drawn, tailored injunction saying

go forth only with nitrogen hypoxia, that it is very, very likely that Miller would be executed by nitrogen hypoxia." COURT: "On September 22?" DEFENDANTS: "Correct.").

223. This Court has observed that the State "intends to announce its readiness to conduct executions by nitrogen hypoxia in the upcoming weeks." Dkt. 62 at 20.

224. Nitrogen hypoxia will significantly reduce the substantial risk of severe pain at Mr. Miller's next execution. Mr. Miller is in the rare position of having *proof* that an execution by lethal injection causes him severe pain—because Defendants have already attempted one on him. In contrast, nitrogen hypoxia does not involve needles in any way, and entirely avoids the veinous access issue.

225. To subject Mr. Miller to a second execution by lethal injection would subject him to a torturous experience of physical and psychological unnecessary pain. Therefore, further attempts to execute Mr. Miller by lethal injection would violate the Eighth Amendment.

### COUNT SIX: VIOLATION OF MR. MILLER'S RIGHTS UNDER THE ALABAMA STATE CONSTITUTION TO BE FREE FROM CRUEL OR UNUSUAL PUNISHMENT

### AGAINST ALL DEFENDANTS

226. Mr. Miller repeats and realleges paragraphs 1 through 164 and 209-225 as though fully set forth herein.

227. Article 1 § 15 of the Alabama Constitution states: "That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted." Ala. Const. Art. I § 15.

228. Notably, the U.S. Constitution prohibits "cruel *and* unusual" punishments, whereas the Alabama Constitution prohibits "cruel *or* unusual" punishments. The Alabama Constitution's use of the disjunctive conjunction establishes that the Alabama Constitution provides greater protection against cruel or unusual punishments than does the U.S. Constitution.

229.     On information and belief, the State of Alabama has never attempted to execute the same person twice by the *same* execution method.

230.     Defendants' botched execution of Mr. Miller on September 22, 2022, and their current attempts to execute Mr. Miller *again* via lethal injection, violate Mr. Miller's right under the Alabama Constitution to be free from the infliction of cruel or unusual punishment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

(i)     Permit expedited discovery in this case, including depositions, in light of Defendants' attempt to obtain an expedited execution date for Mr. Miller, and to prevent spoliation of evidence by Defendants;

(ii)    Enter an injunction against Defendants requiring them to honor Mr. Miller's nitrogen hypoxia election under Ala. Code § 15-18-82.1(b), and prohibiting Defendants from executing Mr. Miller by any method other than nitrogen hypoxia;

(iii)   Enter a motion to stay proceedings in the Alabama Supreme Court until the Court can resolve the merits of this litigation, in the interest of judicial efficiency and comity, and under the principles of federalism;

(iv)    Enter a declaratory judgment that:

      a.     Mr. Miller timely submitted his election form pursuant to Ala. Code § 15-18-82.1(b) and elected execution by nitrogen hypoxia;

      b.     Defendants' decision to seek execution of Mr. Miller via lethal injection rather than nitrogen hypoxia violates Mr. Miller's Eighth and Fourteenth Amendment rights;

(v)     Award Mr. Miller both nominal and punitive damages against Defendant Raybon and Defendant Hamm for their intentional infliction of pain, and their deliberate indifference to his suffering as a result of his botched lethal injection execution and the upcoming lethal injection execution they seek; and

(vi)    Such other and further legal and equitable relief as this Court deems, just, and proper.

Dated: October 6, 2022                    Respectfully submitted,

/s/ J. Bradley Robertson
J. Bradley Robertson
Bradley Arant Boult Cummings LLP
One Federal Plaza
1819 5th Ave. N.,
Birmingham, AL 35203
Tel: (205) 521-8188
Fax: (205) 488-6188
Email: brobertson@bradley.com

Daniel J. Neppl
Kelly Huggins
Mara E. Klebaner
Stephen Spector
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email: dneppl@sidley.com
Email: mklebaner@sidley.com
Email: sspector@sidley.com

Marisol Ramirez
SIDLEY AUSTIN LLP
555 West Fifth Street
Suite 4000
Los Angeles, CA 90013
Tel: (213) 896-6000
Fax: (213) 896-6600
Email: marisol.ramirez@sidley.com

*Attorneys for Plaintiff Alan Eugene Miller*

# Second
# Amended Complaint

# EXHIBIT A

No. 1040564 (Death Penalty)

## IN THE SUPREME COURT OF ALABAMA

---

| | |
|---|---|
| EX PARTE: ALAN EUGENE MILLER | ) |
| | ) |
| ALAN EUGENE MILLER | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALABAMA, | ) |
| | ) |
| Respondent | ) |

---

### AFFIDAVIT OF ALAN EUGENE MILLER

I, Alan Eugene Miller, under penalty of perjury affirm that the following is true and correct to the best of my ability:

1. I am currently incarcerated at Holman Correctional Facility in Atmore, Alabama. My inmate number is Z-672.

2. Because I have been sentenced to death, I am incarcerated on Holman's death row.

3. In June or July of 2018, a correctional officer at Holman passed out forms to individuals on death row concerning an election to be executed by nitrogen hypoxia.

4.  The correctional officer said we could sign or not sign the forms. He said they would be back to pick up the forms later. I understood that to mean that a correctional officer would pick it up later.

5.  I completed the form and signed it.

6.  I gave my signed form to the correctional officer who was collecting the forms.

7.  I gave the correctional officer my form at the same time that he was collecting forms from everyone else.  The correctional officer collected my form on the same day that it was distributed to me.

8.  I do not know what the correctional officer did with my form after I gave it to him.

9.  I asked the correctional officer for a copy of my completed form, but the correctional officer refused to make a copy for me.

10. I also asked the correctional officer if I could have the form notarized, but he said no. I know that some other guys had their forms notarized, so I don't know why he would not permit me to get my form notarized.

Wherefore I swear under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Alan Eugene Miller

Date 5-10-21

State of Alabama
County of Escambia

SUBSCRIBED and SWORN TO before me this 10th day of May, 2022.

(Seal)

NOTARY PUBLIC

My Commission Expires: _____
My Commission Expires March 26, 2024

# Second
# Amended Complaint

# EXHIBIT B

E-Filed
08/02/2019 01:37:00 PM
Honorable Julia Jordan Weller
Clerk of the Court

## IN THE SUPREME COURT OF ALABAMA

EX PARTE: JARROD TAYLOR   )
            )
JARROD TAYLOR,       )
            )
    Petitioner,   )
            )
v.           )  No. 1991307
            )
STATE OF ALABAMA,    )
            )
    Respondent.   )

### STATE OF ALABAMA'S MOTION TO WITHDRAW
### MOTION TO SET AN EXECUTION DATE

COMES NOW the State of Alabama and asks this Honorable Court to permit the State to withdraw its motion of July 29, 2019, requesting that Jarrod Taylor's execution be set. As grounds, the State provides as follows:

(1) On July 29, the State moved this Court to set Taylor's execution date. That motion represented that Taylor had not made a timely election of nitrogen hypoxia.

(2) Taylor's counsel called the undersigned on July 30, claiming that Taylor had, in fact, made a timely election. Counsel offered to send supporting documentation.

(3) On July 31, counsel sent the undersigned several documents, including a copy of Taylor's signed election form (dated June 28, 2018) and contemporaneous e-mails among counsel creating a record of conversations with

1

Taylor concerning the election. Taylor indicated to counsel on June 29, 2018, that he had signed two copies of the election form, returned one to counsel, and given the other to a particular ADOC employee to be given to Warden Stewart.

(4) The Attorney General's Office was never given this form, and counsel for the Alabama Department of Corrections did not have this form in their files. Nevertheless, the documentation provided by Taylor's counsel supports the assertion that he made a timely election of nitrogen hypoxia. The State intends to honor that election.

(5) As the ADOC is not yet prepared to proceed with an execution by nitrogen hypoxia, the State requests that it be allowed to withdraw its previous motion.

Respectfully submitted,

Steve Marshall
*Attorney General*

**s/ Lauren A. Simpson**
Lauren A. Simpson
*Assistant Attorney General*
Counsel of Record *

Beth Jackson Hughes
*Assistant Attorney General*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2019, a copy of the foregoing was served on counsel for Jarrod Taylor by e-mail:

| | |
|---|---|
| Theodore V. Wells, Jr. | twells@paulweiss.com |
| Andrew J. Ehrlich | aehrlich@paulweiss.com |
| Steven C. Herzog | sherzog@paulweiss.com |
| Justin D. Lerer | jlerer@paulweiss.com |
| Meredith A. Arfa | marfa@paulweiss.com |
| Joshua P. Myrick | josh@stankoskimyrick.com |

*s/ Lauren A. Simpson*
Lauren A. Simpson
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Tel: (334) 353-1209
Fax: (334) 353-8400
lsimpson@ago.state.al.us

3

# Second Amended Complaint

# Exhibit C

# IN THE SUPREME COURT OF ALABAMA

EX PARTE: ALAN EUGENE MILLER)

ALAN EUGENE MILLER,

       Petitioner,

v.

STATE OF ALABAMA,

       Respondent.

No. 1040564

## STATE'S RESPONSE TO MILLER'S OBJECTION TO STATE'S MOTION TO SET AN EXECUTION DATE

Comes now the State of Alabama, by and through the Office of the Attorney General, and responds to Miller's objection to the State's motion to set an execution date as follows:

1.     On April 19, 2022, the State moved to set an execution date for Miller, noting that his conviction and sentence are final because he has completed his direct appeal, state postconviction review, and federal habeas review.

2.     On May 18, 2022, Miller filed an objection to the State's motion, arguing that Miller timely elected to be executed by nitrogen hypoxia. In support of his objection, Miller submitted an affidavit asserting that a correctional officer at Holman passed out election forms

in June or July of 2018, that Miller completed and signed the form, and that the form was returned to a correctional officer "at the same time that he was collecting forms from everyone else."[1] (Miller's Aff. ¶ 7.)

3.    But as noted by the attached affidavit from Terry Raybon, who is the Correctional Warden III at Homan Correctional Facility, there is no election form on file reflecting that Miller timely elected nitrogen hypoxia. (*See* Ex. A.) Further, there is no evidence offered, aside from Miller's self-serving and uncorroborated affidavit, to show that he did, in fact, timely elect nitrogen hypoxia.

4.    Miller appears to suggest his case is like that of Jarrod Taylor, attaching a copy of the State's motion to withdraw its motion to set an execution date in that case. But the facts in *Taylor* are significantly different from Miller's case. Most notably, there was supporting documentation—the completed and signed election form itself, plus contemporaneous emails from June 2018 that created a record of conversations counsel had with Taylor regarding election—outlining that

---

1. Miller does not indicate whether the correctional officer who passed out the election forms was the same officer who collected the completed and signed forms, nor does he make any attempt to identify the individual(s) who distributed and/or collected the forms.

Taylor had, in fact, timely elected nitrogen hypoxia. (*See* Ex. B.) No such evidence has been offered here.

Therefore, given that there is no evidence before this Court demonstrating that Miller elected nitrogen hypoxia, that there are currently no pending challenges to the validity of his duly adjudicated capital murder conviction and death sentence, and that Miller has exhausted his direct appeal, his state postconviction remedies, and his federal habeas remedies, the State respectfully requests that, pursuant to Rule 8(d)(1) of the Alabama Rules of Appellate Procedure, this Honorable Court "enter an order fixing a date of execution" for Miller.

Respectfully submitted,

Steve Marshall
*Attorney General*


**/s/ Audrey Jordan**
*Assistant Attorney General*
Counsel of Record *

3

## <u>CERTIFICATE OF COMPLIANCE</u>

1. I certify that this response complies with the word limitation set forth in Ala. R. App. P. 27(d). According to the word-count function of Microsoft Word, the response contains 444 words, not including the parts exempted by Ala. R. App. P. 32(c).

2. I further certify that this response complies with the font requirements set forth in Ala. R. App. P. 32(a)(7). The motion was prepared in 14-point Century Schoolbook font.

**/s/ Audrey Jordan**
*Assistant Attorney General*
Counsel of Record *

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 27th day of May 2022, I electronically filed the foregoing and served a copy of the foregoing on the attorneys for Miller by electronic mail, addressed as follows:

Daniel J. Neppl
Sidley Austin, LLP
One Court Dearborn Street
Chicago, Illinois 60603
dneppl@sidley.com

Jeffrey T. Green
Sidley Austin, LLP
1501 K. Street, NW
Washington, DC 2005
jgreen@sidley.com

Patrick Mulligan
Bressler, Amery & Ross, P.C.
2001 Park Place North, Suite 1500
Birmingham, Alabama 35203
pmulligan@bressler.com

**/s/ Audrey Jordan**
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 353-4338
Email: Audrey.Jordan@AlabamaAG.gov

5

# EXHIBIT

# A

**AFFIDAVIT**

Before me, the undersigned authority, a Notary Public, in and for Escambia County and the State of Alabama at large, personally appeared Terry Raybon, who being known to me and being by me first duly sworn, deposes and says on oath as follows:

1.      My name is Terry Raybon. I am currently employed with the Alabama Department of Corrections as a Correctional Warden III at Holman Correctional Facility, Holman 3700, 866 Ross Road, Atmore, AL 36503.

2.      Sometime earlier this year I reviewed the file where all of the Nitrogen Hypoxia elections forms have  been maintained since June 2018 at Holman Correctional Facility to see if Inmate Alan Miller W/Z672 had submitted an election form. I found no record of Inmate Miller submitting a form. I had my administrative assistant to follow-up behind me, and she did not find any record as well. Today, May 19, 2022, after receiving an email from the Attorney General's Office, I instructed my administrative assistant to re-review our records for a submission form, after which I followed up behind her. Neither of us found a submission form from Inmate Miller.

_____
WARDEN TERRY RAYBON

SWORN TO AND SUBSCRIBED before me this the 19th day of May 2022.

_____
NOTARY PUBLIC
My Commission Expires: My Commission Expires March 26, 2024

# EXHIBIT
# B
# (Filed under seal)

# Second
# Amended Complaint

# Exhibit D

## IN THE SUPREME COURT OF ALABAMA

EX PARTE: ALAN EUGENE MILLER)

                                )

ALAN EUGENE MILLER,         )

                                )

        Petitioner,        )

                                )    No. 1040564

v.                                )

                                )

STATE OF ALABAMA,           )

                                )

        Respondent.    )

## STATE OF ALABAMA'S EXPEDITED
## <u>MOTION TO SET AN EXECUTION DATE</u>

Pursuant to Rule 2(b) of the Alabama Rules of Appellate Procedure, the State of Alabama respectfully moves this Honorable Court to suspend Rule 8(d)(1) of the Alabama Rules of Appellate Procedure and set an execution date for carrying out Alan Eugene Miller's lawfully imposed sentence of death prior to setting the previously requested execution date for James Barber. The State moved for Barber's execution on August 5, 2022. However, this request was filed *after* the State requested that this Court order the execution of Miller's sentence of death.

On April 19, 2022, the State moved this Honorable Court to set an execution date for Miller. The Court granted the motion on July 18 and ordered that Miller's execution take place on September 22. One month

prior to his execution date, on August 22, Miller filed a federal lawsuit in the United States District Court for the Middle District of Alabama. Not until approximately 7:00 p.m. on September 19 did that court enter an injunction prohibiting the State from executing Miller by any means other than nitrogen hypoxia. Although the State successfully challenged the issuance of the injunction on appeal, the injunction was not vacated until approximately 9:07 p.m. on September 22.

Due to the lateness of the hour, the Alabama Department of Corrections ("ADOC") was limited in the number of attempts to gain intravenous access ("IV") it could make. ADOC made the decision to halt its efforts to obtain IV access at approximately 11:30 p.m., resulting in the expiration of the Court's execution warrant.

Miller has been on death row since 2000 for the capital murder of Lee Holdbrooks, Scott Yancey, and Terry Lee Jarvis. *Miler v. State*, 913 So. 2d 1148, 1151 (Ala. Crim. App. 2004). Miller gunned down his coworkers, Holdbrooks and Yancey, before driving to his former place of employment and gunning down his former coworker, Jarvis. As set out in the State's original motion to set an execution date, Miller's conviction

and sentence are final because he has completed his direct appeal, state postconviction review, and federal habeas review.

This Court should suspend the Alabama Rules of Appellate Procedure and reset Miller's execution date so that the Court's previous determination that the appropriate time had come for Miller's sentence to be executed can be carried out. Although the State sought an execution date for Barber following its original request for execution of Miller's sentence, this Court may consider the extraordinary circumstances present in this case and reset Miller's execution of sentence prior to acting on the State's motion in Barber. *See, e.g.*, *Gamble v. State*, 413 So. 2d 404, 406 (Ala. Crim. App. 1982) (noting that Rule 2 of the Alabama Rules of Appellate Procedure "allows th[e] Court to suspend the rules in the interests of justice" and that such ability is left to the Court's sound discretion); *Tyson v. State*, 361 So. 2d 1182, 1189 (Ala. Crim. App. 1978) (suspending the rules in the interest of expediting the court's decision). The State's request here is substantially the same as the request made (and granted) following the untimely vacatur of the federal stay of execution in the Christopher Lee Price case in 2019.

3

## CONCLUSION

For the above-stated reasons, the State respectfully requests that this Court suspend the Alabama Rules of Appellate Procedure and once more order the lawful execution of Miller's sentence, notwithstanding the pending motion to set an execution date for James Barber.

Respectfully submitted,

Steve Marshall
*Attorney General*

**/s Audrey Jordan**
**Audrey Jordan**
*Assistant Attorney General*
Counsel of Record *

**/s James R. Houts**
**James R. Houts**
*Assistant Attorney General*

4

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the word limitation set forth in Ala. R. App. P. 27. This motion contains 590 words, including all headings, footnotes, and quotations, and excluding the parts of the motion exempted under Ala. R. App. P. 32(c).

I further certify that this motion complies with the font requirements set forth in Ala. R. App. P. 32(a)(7). This motion was prepared in 14-point Century Schoolbook font.

**/s Audrey Jordan**
**Audrey Jordan**
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 4th day of October 2022, I electronically filed the foregoing and served a copy of the foregoing on the attorneys for Miller by electronic mail, addressed as follows:

Daniel J. Neppl
Sidley Austin, LLP
One Court Dearborn Street
Chicago, Illinois 60603
dneppl@sidley.com

Kelly Huggins
Sidley Austin, LLP
One Court Dearborn Street
Chicago, Illinois 60603
khuggins@sidley.com

Mara Klebaner
Sidley Austin, LLP
One Court Dearborn Street
Chicago, Illinois 60603
mklebaner@sidley.com

Patrick Mulligan
Bressler, Amery & Ross, P.C.
2001 Park Place North, Ste 1500
Birmingham, Alabama 35203
pmulligan@bressler.com

Jeffrey T. Green
Sidley Austin, LLP
1501 K. Street, NW
Washington, DC 2005
jgreen@sidley.com

**/s Audrey Jordan**
**Audrey Jordan**
*Assistant Attorney General*
Counsel of Record *
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 353-4338
Email: Audrey.Jordan@AlabamaAG.gov

6