# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

ALAN EUGENE MILLER,        )
                                        )

          Plaintiff,     )
                                        )

v.                          )  **Case No. <u>2:22-cv-00506-RAH</u>**
                                        )

JOHN Q. HAMM, Commissioner,   )
Alabama Department of Corrections,  )
*et al.*,                          )
                                        )

          Defendants.   )

## Defendants' Motion to Dismiss the Second Amended Complaint <u>Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure</u>

COME NOW Defendants and move this Honorable Court to dismiss Plaintiff Alan Eugene Miller's second amended complaint (Doc. 85) for failure to state claims upon which relief can be granted. For the reasons that follow, Defendants are entitled to dismissal of the second amended complaint:

## COUNT ONE: VIOLATION OF PROCEDURAL DUE PROCESS

### A.    Count One is due to be dismissed as a matter of law due to the undisputed availability of an adequate state remedy.[1]

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not itself

---

1. This ground is asserted by all three named defendants. Subsequent grounds for dismissal are asserted by all three named defendants unless otherwise indicated by means of a footnote.

unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id*. Where a plaintiff cannot establish that a state has failed to provide an adequate post-deprivation remedy, dismissal is appropriate. *See Tinney v. Shores*, 77 F.3d 378, 382 (11th Cir. 1996) ("[T]he Tinneys have failed to state a valid procedural due process claim because they have not alleged that Alabama law provided them with an inadequate post-deprivation remedy.").

"When a state procedure is inadequate, no procedural due process right has been violated unless and until the state fails to remedy that inadequacy." *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994). "Again and again, th[e] Court has repeated the basic rule that a procedural due process claim can exist only if no adequate state remedies are available." *Flagship Lake Cnty. Dev. No. 5, LLC v. City of Mascotte, Fla.*, 559 F. App'x 811, 815 (11th Cir. 2014) (collecting cases). "This directive is not an exhaustion requirement. Instead, this directive is a recognition that procedural due process violations do not even exist unless no adequate state remedies are available." *Cotton v. Jackson*, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000) (citations omitted). Ultimately, a "state's action is not complete unless and until it

refuses to provide a post-deprivation remedy." *Tinney*, 77 F.3d at 382 (citing *Hudson v. Palmer*, 468 U.S. 517, 531 (1984)).

Thus, where a plaintiff can petition for "the writ of mandamus … under state law," the availability of the writ is "an adequate remedy to ensure that Plaintiff was not deprived of his due process rights" and in turn a plaintiff "*has failed to state a claim for a procedural due process violation*." *Id*. at 1333 (emphasis added). "In *Cotton*, [the Eleventh Circuit] stated that, even if the plaintiff has no specific legal remedy, the ability to seek a writ of mandamus in the state supreme court may be a sufficient remedy to a local government's alleged procedural due process violation." *Randel v. Rabun Cnty. Sch. Dist.*, No. 21-12760, 2022 WL 1195655 at *2 (11th Cir. Apr. 22, 2022). There, "*the mere possibility* that the state supreme court could have issued a writ of mandamus in [plaintiff's] favor was a sufficient process." *Id*. (emphasis added). "Thus, 'if adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process.'" *Flagship Lake Cnty.*, 559 F. App'x at 814-15 (quoting *Cotton*, 216 F.3d at 1331-33); *see also*, *e.g.*, *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1378-79 (11th Cir. 2019).

These decisions require dismissal of Miller's procedural due process claim. The facts pleaded in the second amended complaint establish that he could have sought a petition for writ of mandamus directed to the ADOC defendants in state

court. To qualify for the remedy of mandamus, a petitioner must show (1) a clear legal right to the order sought; (2) an imperative duty upon the Commissioner of the Alabama Department of Corrections to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court. *Ex parte Glover*, 801 So. 2d 1, 6 (Ala. 2001). For example, in Alabama, mandamus is a recognized means of securing from ADOC the constitutional right to adequate medical treatment. *Fountain v. State*, 648 So. 2d 591, 592 (Ala. Civ. App. 1994); *see also Perry v. State Dep't of Corr.*, 694 So. 2d 24, 25 (Ala. Civ. App. 1997). Despite this available state court procedure, as recently as October 13, 2022, Plaintiff's counsel informed the Court that Miller has no plans to seek to avail himself of this available state court remedy.

In an earlier ruling, this Court agreed "that Miller has an adequate postdeprivation remedy because he could seek a writ of mandamus in a state circuit court." (Doc. 62 at 53 n.21.) The Court's earlier finding would read more correctly if the term "postdeprivation" were replaced with "*pre*deprivation," for the remedy is available to him now. Mandamus does not become unavailable or merely a postdeprivation remedy merely because Miller refuses to avail himself of it. If his deprivation is execution by means other than nitrogen hypoxia, then he has a predeprivation remedy available. And if Miller's deprivation is Defendants' refusal to recognize his purported election, then that deprivation has already occurred and

he has a postdeprivation remedy available. Either way, he cannot attack the State's process on constitutional grounds. *Cotton*, 216 F.3d at 1333.

Additionally, as the second amended complaint does not allege facts that would prove Miller attempted to verify his election status and had his efforts rebuffed by state actors, the second amended complaint does not plead facts that, if true, would establish that the State refused to provide a post-deprivation remedy to the allegedly inadequate procedures used during the June 2018 nitrogen hypoxia election period.

### B.     Count One fails to state a valid procedural due process claim.

The second amended complaint accuses Defendants of losing, misplacing, or improperly collecting an election form completed and returned by Miller. (Doc. 85, ¶ 169.) This allegation of negligence is insufficient to allege a colorable constitutional violation. The Supreme Court has been unequivocal: "[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986). Moreover, predeprivation safeguard are inapplicable in situations where the State is "unable to prevent a random deprivation of a liberty interest." *Zinermon*, 494 U.S. at 132. "It would do no good for the State to have a rule telling its employees not to lose mail by mistake, and it 'borders on the absurd

to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct.'" *Id*. at 137.

To avoid this precedent, Miller appears to plead that ADOC's process was inadequate because there was no confirmation of election (or declination) provided to condemned inmates after the conclusion of the June 2018 election period. But this theory of relief only clarifies that the constitutional issue alleged is not the opportunity to make an election under Alabama's nitrogen hypoxia statute (indeed, he alleges that he made such an election); rather, the issue Miller raises involves the right to have such an election confirmed by ADOC officials after the fact.

If the Court accepts Miller's effort to shift the focus from what is pleaded as, at most, a negligent act by an ADOC employee, however, the Court must then recognize that the specific claim Miller raises can relate *only* to the alleged inadequate processes that would have detected and corrected such negligent actions. As noted previously, this requires dismissal because Miller has not, and cannot, plead facts that would establish that the State failed to provide him an adequate post-deprivation remedy. Additionally, as discussed below, Miller's claim becomes subject to dismissal under the applicable statute of limitations under such a theory.

**C.   Count One is due to be dismissed pursuant to the applicable statute of limitations.**

A plaintiff pursuing a procedural due process claim must plead facts that would establish "constitutionally-inadequate process." *Spencer v. Benison*, 5 F.4th

1222, 1232 (11th Cir. 2021). According to Miller, the State's process was inadequate because Defendants failed "to ensure an adequate procedure for protecting his election to be executed by nitrogen hypoxia," including a failure "to create and maintain an accurate accounting of who timely submitted election forms and failed to implement a reviewable process for determining whether an election had been made." (Doc. 85, ¶¶ 172-73.) The second amended complaint goes on to fault the Defendants for failing to put into place "any written rules or guidance whatsoever governing the election process," "for distributing election forms," "for collecting such forms," and "for storing such forms." (Doc. 85, ¶ 174.) All of these alleged shortcomings occurred, and existed, no later than June 2018.

As discussed previously, Miller alleges that Defendants lost his election form in a negligent manner. But negligence does not support a procedural due process cause of action. Thus, the only inadequate processes that are legally relevant as to Count One are those that would have "protected" Miller's alleged election by identifying the fact that it had not been received by the Warden as required by the statute. This is doubly important because the second amended complaint does not allege that Miller undertook any effort to confirm the Warden's receipt of his election form during the following four years. That is, Miller did nothing to protect himself from the inadequate procedures he alleges.

To the extent that the Court has previously expressed the belief that "the deprivation Miller complains of is about more than the negligent loss of a form" and that this claim relates to "the deprivation of his right to choose a nitrogen hypoxia execution" (Doc. 62 at 53 n.19), the Court's reasoning illustrates why the statute of limitations bars relief. The *only* time that Miller was statutorily entitled "to choose a nitrogen hypoxia execution" was the month of June 2018. The procedures Miller alleges should have been in place governing the election process, distributions of forms, and their collection and storage have been "inadequate" – by Plaintiff's own pleading – since June 2018. The alleged failure to implement adequate procedures and to properly collect and store election forms was complete by July 2018.

Miller's challenge to the absence of adequate safeguards to protect his election should have been brought within two years after the completion of the election period. *Cf. McNair v. Allen*, 515 F.3d 1168, 1176-77 (11th Cir. 2008). Miller does not plead any facts suggesting that he requested confirmation that his election had been received and processed or any other facts that would extend or alter application of the statute of limitations in this case.

### D.   Count One Fails to Plead Facts That Could Plausibly Warrant Relief as to Defendant Marshall.[2]

In an official-capacity action, where the governmental entity is the real party in interest, the governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation of a constitutional right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Defendant Marshall's status as an official-capacity defendant places the Office of the Attorney General as the governmental agency against whom liability is alleged. But Defendant Marshall's role in requesting the execution of a lawful sentence of death at the conclusion of habeas corpus review has no relationship to the decision by the Alabama Department of Corrections as to the appropriate method of execution used to carry out that sentence, or as to how the nitrogen hypoxia election process was conducted in June 2018. Nor does the Office of the Attorney General's role as legal counsel for state officials – for example, defending Defendants Hamm and Raybon in this case – act as the "moving force" behind the procedural due process violation alleged in the second amended complaint.

Because Defendant Marshall is sued in his official capacity, the Eleventh Amendment provides immunity from suit, subject to the very limited exception set forth in *Ex parte Young*, 209 U.S. 123 (1908). Thus, Miller can proceed against

---

2. This ground is asserted by Defendant Marshall.

Defendant Marshall only *if* the Attorney General has authority that the Court can enjoin him from exercising in relation to an execution by *nitrogen hypoxia*. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534 (2021) ("While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S.B. 8 that a federal court might enjoin him from exercising."). The scope of the Attorney General's authority is an issue of law, not fact, *see Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021) (citing *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018)). As a matter of law, the Attorney General does not perform duties in relation to the determination of the method of execution to be used to carry out a sentence of death, as Alabama law places such decisions in the hands of the Commissioner of the Alabama Department of Corrections and the Warden of Holman Correctional Facility.

### E.  Count One should be dismissed on *Younger*-abstention[3] grounds.

There exists a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). Nonetheless, Plaintiff asks this Court to "[e]nter a motion [sic] to stay proceedings in the Alabama Supreme Court until the Court can resolve the merits of this

---

3. *Younger v. Harris*, 401 U.S. 37 (1971).

litigation, in the interest of judicial efficiency and comity, and under the principles of federalism." (Doc. 85 at 47.) Miller's stated intent to use this count in his second amended complaint as a means to interfere with the Alabama Supreme Court's performance of its duties under Rule 8(d) of the Alabama Rules of Appellate Procedure warrants dismissal on *Younger*-abstention grounds.

Proceedings to set an execution date in the Alabama Supreme Court are an extension of the original criminal prosecution. A sentence of death is automatically stayed at the time that it is imposed and Rule 8(d) assigns the responsibility for determining the appropriate time to lift the stay and to issue the execution warrant to the Alabama Supreme Court. Thus, the decision to set an execution date is an extension of the capital sentencing process in the underlying criminal case. But even if that were not true, the "policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved. *Middlesex Cty. Ethics Comm.*, 457 U.S. at 432 (citing *Moore v. Sims*, 442 U.S. 415, 423 (1979); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604-05 (1975)). Important state interests include those proceedings that "bear a close relationship to proceedings criminal in nature" or that are "necessary for the vindication of important state policies or for the functioning of the state judicial system." *Id*. The State's request to set Miller's execution date, and the Alabama Supreme Court's role in that process, involve important state interests, as recognized by the Supreme Court and the

Eleventh Circuit. *See Nelson v. Campbell*, 541 U.S. 637, 650 (2004) (recognizing "the State's significant interest in enforcing its criminal judgments"); *Bowles v. Desantis*, 934 F.3d 1230, 1248 (11th Cir. 2019) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)) (recognizing "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [valid] sentence"); *McNair v. Allen*, 515 F.3d 1168, 1175-76 (11th Cir. 2008) (quoting *Williams v. Allen*, 496 F.3d 1210, 1213 (11th Cir. 2007) ("It is well known in this circuit that 'it is common practice for the State to ask the Alabama Supreme Court to set an execution date for a death-row inmate shortly after the United States Supreme Court has denied certiorari review of the petitioner's federal habeas petition."); *Jones v. Allen*, 485 F.3d 635, 639 n.2 (11th Cir. 2007) (same); *Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983) ("Each delay, for its span, is a commutation of a death sentence to one of imprisonment."). Although Miller invokes the principles of comity and federalism in his prayer for relief, "'comity' includes 'a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Middlesex Cty. Ethics Comm.*, 457 U.S. at 431 (quoting *Younger*, 401 U.S. at 44).

In addition to considerations related to *Younger* abstention, Miller's request for this Court to stay proceedings in the Alabama Supreme Court is problematic because the justices of the Alabama Supreme Court have not been named as defendants in the lawsuit; thus, the *Young* exception to the Eleventh Amendment would not apply to injunctive relief directed to that Court. As the Court observed in *Whole Woman's Health*, "a federal court exercising its equitable authority may enjoin *named defendants* from taking specified unlawful actions … [but] no court may 'lawfully enjoin the world at large.'" 142 S. Ct. at 535 (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2nd Cir. 1930)). Accordingly, Count One should be dismissed on Eleventh Amendment immunity grounds because Miller cannot establish entitlement to the requested relief against the Alabama Supreme Court.

## COUNT TWO: VIOLATION OF MILLER'S RIGHT TO EQUAL PROTECTION

### A. As a matter of law, the class-of-one equal protection theory does not apply to the government conduct pleaded in the second amended complaint.

In Count Two of the second amended complaint Miller alleges a "class of one" equal protection claim in which he seeks to compare himself to Calvin Stallworth and Jarrod Taylor. (Doc. 85 at 38-40.) As to the portion of this claim relating to Taylor, the second amended complaint alleges, "the situation involving Mr. Taylor's form came to light *after* Defendant Marshall moved the Alabama Supreme Court to schedule Mr. Taylor's execution." (Doc. 85, ¶ 60 (emphasis

added).) The second amended complaint further alleges that after receiving evidentiary items from Taylor, Defendant Marshall "moved to withdraw the motion to set Mr. Taylor's execution date," ending the proceedings in the Alabama Supreme Court. (Doc. 85, ¶ 62.) A challenge to a prosecutor's decision to seek termination of criminal legal proceedings based on the evidence received in that proceeding, but not in one's own criminal legal proceedings, is a matter that is not cognizable under a "class of one" equal protection theory.

As a starting point, the "broad discretion" granted to a prosecutor "rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). As noted in *Wayte*, "the Government's enforcement priorities, and [a] case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake" and such review "may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 608. As a result, review of prosecutorial decisions is limited to those where there is a discriminatory purpose and effect based on race, religion, or other protected class. *See Freeman v. Att'y Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Such intentional discrimination against an identifiable group is not alleged in Miller's second amended complaint.

14

"[T]he core concern of the Equal Protection Clause [is] as a shield against arbitrary classifications." *Enquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008). As such, there are certain activities, such as employment, where the government acts in a manner that does not classify citizens in its capacity as sovereign where the class-of-one equal protection theory does not apply. *Id.* A prosecutor's decision to terminate a criminal proceeding is one of those activities.

First, like the employment context that was the subject of *Engquist*, the termination of criminal proceedings by a prosecutor does not involve the government acting with "the power to regulate or license." *Engquist*, 553 U.S. at 598 (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)). Further, "[g]iven the 'common-sense realization that [prosecutorial] offices could not function'" if every decision to terminate a criminal proceeding "became a constitutional matter," constitutional review of such decisions "must rest on different principles than review of … restraints imposed by the government as sovereign." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983), and *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion)).

Second, federal "equal protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.'" *Engquist*, 553 U.S. at 601 (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)). More specifically, the "basic concern of the Equal Protection

Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes." *Id.* (quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 60 (1973) (Stewart, J., concurring)). Where the Supreme Court has permitted class-of-one equal protection claims, such as in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), it has been because the claim involved the government's power to regulate; in that case, "the government's regulation of property." *Engquist*, 553 U.S. at 602. The class-of-one theory is borne from the expectation that "legislative or regulatory classifications [] apply 'without respect to persons[.]'" *Id.* (quoting 28 U.S.C. § 453).

Where state actions "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualize assessments," the Court has noted "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. For example, "allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in [a police officer's] challenged action." *Id.* at 604. "It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.*

Third, it is beyond dispute that prosecutors possess prosecutorial discretion in performing their duties. Just last year, the Eleventh Circuit refused "to sanction a regime in which a federal court can order a federal prosecutor, presumably on pain of contempt, to conduct her criminal investigation in a particular manner" because it would "seriously 'impair … prosecutorial discretion." *In re Wild*, 994 F.3d 1244, 1260 (11th Cir. 2021). "Broadly defined, the term 'prosecutorial discretion' refers to the soup-to-nuts entirety of '[a] prosecutor's power to choose from the options available in a criminal case, such as filing charges, prosecuting, not prosecuting, plea-bargaining, and recommending a sentence to the court." *Id*. (quoting *Prosecutorial Discretion*, *Black's Law Dictionary* (10th ed. 2014)). There, the court noted that the "Supreme Court has repeatedly reaffirmed the principle – which dates back centuries – that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'" *Id*. (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

The Eleventh Circuit requires that a "presumption of regularity" attach to the prosecutorial decisions of federal prosecutors; a courtesy that federalism requires extend to those of state prosecutors. *See United States v. Cannon*, 987 F.3d 924, 936-37 (11th Cir. 2021). Thus, a "selective prosecution" claim – essentially what Miller asserts – requires evidence of a discriminatory effect and discriminatory purpose and this must be based on "an identifiable group." *Cannon*, at 937. Miller does not

identify himself with a protected class and he does not claim that he is the recipient of intentionally discriminatory prosecution decisions.

The fact that Miller cannot obtain relief on this claim is evidenced by the fact that after *Cannon* was decided, the Eleventh Circuit held that the Florida Attorney General's "decision to dismiss a *qui tam* lawsuit is also an essentially discretionary determination that, for the same basic reasons as those comprehended in the notion of prosecutorial discretion, requires consideration of a complex set of facts pertinent to each individual case." *Barati v. Fla. Att'y Gen.*, No. 18-13998, 2021 WL 2911729, at * 5 (11th Cir. July 12, 2021).

Finally, the fact that Miller's claim comparing himself to Stallworth and Taylor is the *second* class-of-one equal protection claim he has brought against Defendants speaks to another important consideration: "the 'common-sense realization that government offices could not function if every employment decision"—or plea bargain or dismissal of a prosecution—"became a constitutional matter.'" *Engquist*, 553 U.S. at 607 (citing *Connick*, 461 U.S. at 143). Just as in the employment context "an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful" refusal by a prosecutor to dismissal a prosecution, to agree to defer execution of sentence, or to offer the same plea bargain provided to another defendant. But, the "Equal Protection Clause does not require "[the] displacement of managerial discretion by judicial supervision," *id*.

18

at 608-09 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006)), nor does it permit the displacement of a state's attorney general prosecutorial discretion by judicial supervision.

There is a more practical reason why class-of-one equal protection claims cannot reach the settlement or resolution of criminal prosecutions. Unlike ineffective assistance of counsel claims – brought by a previously represented client who waives the attorney-client privilege to the extent prior legal actions by their attorney are challenged – a class-of-one equal protection claim seeking to prove a prosecutor improperly refused to settle a case in a manner similar to a comparator's case would involve intrusions into the prosecutor's discretion and confidential communications. If the State itself does not waive the attorney-client privilege (and it does not), then a plaintiff would never be able to obtain the evidence needed to establish such a class-of-one equal protection claim. For example, a prosecutor would not have to reveal the governmental factors and legal considerations leading her to agree to a three-year suspended sentence in one assault case while refusing to make such an offer in another assault case unless purposeful discrimination against an identifiable protected group was alleged.

Ultimately, a federal court has no business reviewing the settlement decisions of a state's attorney general in criminal prosecutions where intentional discrimination against a protected group has not been alleged. In *Pennhurst State*

*School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), the Court observed, "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Equally true, it is difficult to think of a greater intrusion on state sovereignty than for a federal court to decide the appropriateness of a state attorney general's decision to compromise in criminal litigation in a state court, where discriminatory intent and purpose are not alleged.

And even if the Court were to ignore the Attorney General's absolute discretion in handling such proceedings in the Alabama Supreme Court, the same result would be required if Defendant Hamm played a role. *See Block v. Rutherford*, 468 U.S. 576, 691 (1984) (reaffirming that "proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments") (internal citations omitted); *Turner v. Safley*, 482 U.S. 78, 84–85 (1987) (recognizing that "[r]unning a prison is an inordinately difficult undertaking" and emphasizing "deference to the appropriate prison authorities").

**B.    Miller has not pleaded sufficient facts to state a colorable class-of-one equal protection claim.**

As noted above, the second amended complaint asserts that Miller is being treated differently than condemned inmates Taylor and Stallworth, who Miller describes as similarly situated condemned inmates who claimed to have elected nitrogen hypoxia after the close of the statutory election period, but where the ADOC

possessed no election form for them. (Doc. 85, ¶¶ 184–85.) The second amended complaint challenges the fact that, unlike the instances involving Taylor and Stallworth, Defendants have refused to recognize his alleged election. (*Id.*) Miller's claim is a class-of-one equal protection claim, *see Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), because he does not (and cannot) allege that the differing treatment is the result of intentional discrimination against a protected group.

The premise behind a class-of-one equal protection claim is the recognition that "the purpose of the equal proception clause of the Fourth Amendment is to secure every person within the State's jurisdiction against intention and arbitrary discrimination." *Id.* If such a claim could be brought under these circumstances, Miller would have to show "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* Assuming, as required at this stage, that the facts alleged in his second amended complaint are true, Miller has not plead such facts; to the contrary, he complains that he has been treated precisely the same as Taylor. And, as noted in the previous section, the "presumption of regularity" that is due prosecutorial decisions essentially immunizes them from rational review analysis (unlike intermediate or strict scrutiny).

A class-of-one equal protection case occurs when there is "a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed."

*Engquist*, 553 U.S. at 602. That is, Miller must show a clear standard was applied to Taylor and Stallworth, but that a different standard was applied in his case. *See Olech*, 528 U.S. at 565 (conditioning water provision on a 33-foot easement for plaintiff but only 15-foot easements from other property owners); *Sioux City Bridge Co. v. Dakota Cty.*, 260 U.S. 441, 445–47 (assessing plaintiff's property at 100% of its value while assessing other properties at 55%). But the second amended complaint does not allege any facts that would establish Miller was treated differently than Taylor. And the facts in the complaint bear out that Stallworth is an improper comparator.

The second amended complaint references and incorporates Doc. 52-8, which shows that Stallworth's election form was stamped received by the Warden's office on June 28, 2022, *during the election period*.[4] Stallworth's form was undoubtedly in the possession of Holman's warden at the end of the election period, while the second amended complaint concedes that Holman's warden does not possess such a form for Miller. (Doc. 85, ¶¶ 57, 66 (incorporating Doc. 52-8).) The State did not move for Stallworth's execution in the Alabama Supreme Court, whereas it did in

---

4. Miller asserts that "Defendants received copies of privileged attorney-client communications from around the time of [] Stallworth's election." (Doc. 85, ¶ 185.) Contrary to that assertion, Stallworth's attorney mailed a letter to Holman, a means of communication that was not protected by the attorney-client privilege. As the second amended complaint incorporates by reference Document 52-8, the specificity of this document requires the Court disregard Miller's inaccurate characterization of this document as "privileged."

Miller's case due to the absence of any election form. As such, Stallworth is not an appropriate comparator for purposes of Miller's claim.[5]

As for Taylor and Miller, the second amended complaint makes clear that what both Miller and his comparator sought from the government was recognition of their nitrogen hypoxia election form after June 2018.[6] The relevant question for Miller's class-of-one equal protection claim according to *Olech*, then, is *what* did the government demand of Taylor for that recognition, versus *what* did it demand of Miller? According to the second amended complaint, the government required of Taylor (or accepted) "attorney-client communications in or around that time that Mr. Taylor submitted his election form." (Doc. 85, ¶ 62.) Miller concedes "he has not shown [Defendants] attorney-client communications at the time of his election" (Doc. 85, ¶ 190), meaning the different result is due to application of the very same standard the second amended complaint concedes the government applied to Taylor. Miller is not upset that Defendants asked him for something more or different than

---

5. For the same reason, the second amended complaint's reference to "all other men on death row who timely elected nitrogen hypoxia" does not state a valid class-of-one claim identifying all other death row inmates who elected nitrogen hypoxia as comparators. There is no doubt that a rational basis exists for government actors to distinguish between Holman death row inmates whose forms are in the possession of the Holman warden and other inmates who claim to have elected but whose purported election forms are not in the possession of the Holman warden.

6. The second amended complaint challenges the relevant Defendant's decision "refus[ing] to honor Mr. Miller's election" (Doc. 85, ¶ 57), while "honor[ing] Mr. Taylor's election" (Doc. 85, ¶ 64). (*See also* Doc. 85, ¶ 190.)

Taylor; he complains that they asked him for the very same thing they received from Taylor. For that very reason, the second amended complaint fails to allege a class-of-one equal protection claim as to Taylor.

Miller freely concedes that the government required (or accepted) documentation from "in or around the time that Mr. Taylor submitted his election form" as reason to withdraw the motion to set Taylor's execution date, so for purposes of the second amended complaint, that is "the clear standard against which departures, even for a single plaintiff, c[an] be readily assessed." *Engquist*, 553 U.S. at 602. Using the water easements at issue in *Olech* as an example, the Village (Defendants) connected the comparators to the municipal water supply (recognized their nitrogen hypoxia election) after receiving a 15-foot property easement, but the Village refused to connect the Olechs to the water supply (recognize their nitrogen hypoxia election) unless it received a 33-foot property easement. To state such a class-of-one equal protection claim here, Miller had to allege that Defendants demanded the equivalent of a 33-foot easement from him in order to recognize his nitrogen hypoxia election, but only required a 15-foot easement from Taylor. 528 U.S. 565. But again, Miller's second amended complaint alleges the exact opposite: that Defendants applied the exact same standard to him that they applied to Taylor and that he cannot or will not provide to the government materials in the manner

Taylor did. (Doc. 85, ¶ 190.) Such pleadings do not state a plausible class-of-one equal protection claim.

Perhaps recognizing this fact, Miller attempts to obfuscate his admission that the State treated Taylor and Miller the same as to what was expected in exchange for a recognition of their election, by questioning whether there was a rational basis for what the government accepted from Taylor and would have accepted from him. Using *Olech*'s facts, the second amended complaint admits that all similarly situated persons were asked by the government for a 15-foot easement—Miller simply questions whether a rational basis exists for the government to make such a request from him (and his comparator) in the first place. But a class-of-one equal protection claim does not require rational basis review of similar treatment of similarly situated individuals by the government. If Miller wishes to attack the legitimacy of the quantum of proof *accepted* by Defendants from Taylor and that would have been accepted from him, he must find a different mechanism than a class-of-one equal protection claim.

Thus, it is irrelevant that the second amended complaint makes the bald assertion that the alleged "disparate treatment . . . is not rationally related to a legitimate government interest" without further discussion. (Doc. 85, ¶ 191) Notably, Defendants have "no obligation to produce evidence to sustain the rationality" of their distinctions," *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993);

rather, it is Miller's burden "to negative every conceivable basis which might support it." *Madden v. Cmmw. of Kentucky*, 309 U.S. 83, 88 (1940). Miller has made no effort to do so in his complaint.

Even if the Court ignores the fact that a class-of-one equal protection claim requires that Taylor and Miller have been treated differently in what was asked (or accepted) in return for a recognition of each person's election, rational basis review "is a paradigm of judicial restraint." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). The question is *not* whether the Court personally believes that the decision furthered a state objective, so long as a "rational policymaker could believe" the decision would further a legitimate state objective the decision must be upheld. *Cook v. Bennett*, 792 F.3d 1294, 1301 (11th Cir. 2015). This requires the Court to consider the "full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision," *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007), and whether any rational basis could support a legitimate state objective Miller's claim must fail.

This is fatal to Miller's cause of action because the State may reasonably differentiate between individuals based on its confidence in their credibility. In *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1316-17 (11th Cir. 2006), the city was skeptical of plaintiffs' building proposal because plaintiffs consistently failed to bring a sketch of the proposed building to Planning Commission meetings. Ultimately, "the nature of the presentations the Echols made would inspire more confidence than the [plaintiffs'] rather nonchalant approach," and this difference provided a rational basis for approving one project but not the other. *Id*. On the other hand, the relevant question is not whether this Court might believe Miller. The Court's personal assessment is not relevant because a rational decisionmaker can determine that self-serving declarations, alone, are not trustworthy and require additional corroboration. For example, the Supreme Court has suggested that self-serving "protestation from a [jury] commissioner that racial considerations played no part" in a selection process might not be enough to rebut a claim of intentional discrimination, a view that has been repeated by the Eleventh Circuit. See *Castaneda v. Partida*, 430 U.S. 482, 498 n.19 (1977); *Williams v. City of Dothan*, 745 F.2d 1406, 1415 n.9 (11th Cir. 1984). Just as federal courts can refuse to be bound by bald, self-serving statements when they act as the decisionmaker, state officials may refuse to be bound by them when the State acts as the decisionmaker.

Furthermore, this Court is "compelled under rational basis review to accept a legislature's generalizations *even when there is an imperfect fit between means and ends.*" *Heller*, 509 U.S. at 321 (emphasis added). Because a rational decisionmaker could choose to require a quantum of evidence beyond a self-serving statement, Miller cannot prevail on his equal protection claim even if this Court found his testimony early in the proceeding to be credible.

Even assuming for argument's sake that Defendants treated Miller differently from Taylor in what was required from each despite the second amended complaint's concession to the contrary, Defendants had an eminently rational basis to treat Miller differently from Taylor and Stallworth. It is undisputed that ADOC does not have the form Miller allegedly submitted and it is undisputed that if such a form (or a copy) is in the possession of Miller's attorneys he will not provide it to Defendants. This suggests that Miller—unlike Taylor and Stallworth—did not complete the form at all. The second amended complaint incorporates a physical election form from Taylor and from Stallworth. (Doc. 51-2 at 3 (Taylor's election form dated June 28, 2018); Doc. 52-8 at 3 (Stallworth's election form dated June 28, 2018, and stamped into the warden's office on June 29, 2018).)[7] While Defendants possess elections forms dated *during* the election period for both of Miller's named comparators,

---

7. Document 51-2 is incorporated by reference in paragraph 61 of the second amended complaint. Document 52-8 is incorporated by reference in paragraph 66 of the second amended complaint.

Miller is the only condemned inmate claiming to have elected for which no copy of such a form exists.

Not only does this evidentiary distinction distinguish Miller from Taylor and Stallworth, ADOC's interest in verifying the bald claims of its inmates is, at a minimum, self-evidently rational. *See, e.g., Superintendent of Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454–55 (1985) (recognizing "the legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation"). Defendants have a right to assess the credibility of an individual's self-serving, uncorroborated statement, and they had a need to do so here before Miller filed his Equal Protection Claim. And relatedly but independently, Defendants have a right to require corroborating evidence beyond an inmate's own statements, no matter how credible those statements might appear to be. A rational decisionmaker could—consistent with the Constitution—decide that those considerations set Miller apart from Taylor (or Stallworth), even if another decisionmaker could conceive of a different means for categorizing inmates.

## COUNT THREE: VIOLATION OF MILLER'S RIGHT TO EQUAL PROTECTION: DOYLE HAMM

### A.    Count Three fails to state a claim upon which relief may be granted.

Count Three of the second amended complaint alleges a class-of-one equal protection claim in which Miller (again) alleges that his equal protection rights have been violated due to the Attorney General's exercise of his discretion in the handling of litigation on behalf of the State. In this instance, the second amended complaint identifies Doyle Lee Hamm as his comparator and alleges that the State is constitutionally required to reach the same legal settlement with Miller that the State entered into in with Hamm.

But as explained above "the core concern of the Equal Protection Clause [is] as a shield against arbitrary classifications," *Engquist*, 553 U.S. at 598, and thus there are certain activities where the government acts yet the class-of-one equal protection theory does not apply. *Id*. The defense of the government in civil litigation is one of those activities where the class-of-one equal protection theory does not apply.

Just like the employment context that was the subject of *Engquist*, the defense of civil litigation does not involve the government acting with "the power to regulate or license," but rather "as proprietor, to manage [its] internal operation." *Engquist*, 553 U.S. at 598. Further, "[g]iven the 'common-sense realization that government offices could not function'" if every settlement of a lawsuit "became a constitutional matter," constitutional review of such decisions "must rest on different principles

30

than review of … restraints imposed by the government as sovereign." *Id*. "It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id*. at 604.

In *Engquist*, the at-will nature of government employment illustrated the incompatibility of government employment actions and the class-of-one equal protection theory. And here, the fact that no plaintiff is entitled to a legal settlement in a lawsuit brought against a state illustrates the legal incompatibility of such a claim to a defense of the government in civil litigation which led to the settlement of litigation under the facts of that particular case.

As with Miller's other class-of-one equal protection, "government offices could not function if every" government legal settlement "became a constitutional matter.'" *Engquist*, 553 U.S. at 607. The Equal Protection Clause does not require "[the] displacement of managerial discretion by judicial supervision," *id*. at 608-09, nor does it require the displacement of the independent legal advice provided by a State's Attorney General by judicial supervision.

Unlike ineffective assistance of counsel claims – brought by a previously represented client who waives the attorney-client privilege to the extent prior legal actions by their attorney are challenged – the type of class-of-one equal protection claim Miller asserts would necessarily involve intrusions into the legal advice given to state officials as part of the decision to settle (or not settle) litigation. If the State

itself does not waive the attorney-client privilege (and it does not), then the plaintiff would never be able to obtain evidence needed to establish such a class-of-one equal protection claim. Federal courts cannot be part of a process that purports to intrude, at the request of an unhappy litigant, into the legal representation of state officials to determine the reasonableness of legal settlements in cases where discriminatory intent and purpose against a protected class are not alleged.

## COUNT FOUR: VIOLATION OF THE EIGHTH AMENDMENT (ARBITRARY AND CAPRICIOUS)

Miller's fourth claim for relief in the second amended complaint is an Eighth Amendment claim brought under an "arbitrary and capricious" theory. Dismissal is warranted because that Eighth Amendment theory is concerned with the imposition of the sentence of death, something that Miller pleads (admits) occurred more than two decades ago. (Doc. 85, ¶¶ 30, 34.) As noted in *Godrey v. Georgia*, 446 U.S. 420, 427 (1980), the Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), "held that the penalty of death *may not be imposed under sentencing procedures* that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." (emphasis added). The Court noted that this holding was repeated in *Gregg v. Georgia*, 428 U.S. 153 (1976). *Id*. Thus, if a change in a method of execution is not equivalent to the imposition of the death penalty, Miller's fourth cause of action fails to state a claim upon which relief may be granted.

The addition of nitrogen hypoxia as a method of execution "did not change the penalty" for capital murder in Alabama, "but only the mode of producing" the penalty. *Malloy v. South Carolina*, 237 U.S. 180, 185 (1915). Though *Malloy* was decided in the context of an *ex post facto* challenge to a change in a state's method of execution, the Court's reasoning has direct application to its later Eighth Amendment jurisprudence. The Court's more recent Eighth Amendment cases pertaining to the arbitrary and capricious *imposition* of the death penalty are undoubtedly subject to the Court's prior decisions noting that a change in the method of execution is (1) not a change in the penalty or sentence imposed and (2) does not jeopardize a person's substantial personal rights against *arbitrary* legislative action. *Collins v. Youngblood*, 497 U.S. 37, 46 (1990) (quoting *Malloy*, 237 U.S. at 183) (emphasis added).

In *Smith v. Snow*, 722 F.2d 630, 632 (11th Cir. 1983), the Eleventh Circuit rejected an Eighth Amendment § 1983 claim predicated on the "arbitrary and capricious" application of the death penalty where plaintiff's application for clemency had been denied by a board acting with "unfettered discretion." Because that unfettered discretion could never result in the imposition of the death sentence as to the plaintiff, as he had already been sentenced to death, such unfettered discretion could not render the plaintiff's death sentence arbitrary and capricious in violation of the Eighth Amendment. *Id*. Here, because Miller had already been

sentenced to death by lethal injection at the time nitrogen hypoxia was added as a statutory method of execution in Alabama, the election process he challenges cannot establish that the imposition of the death penalty in his case was arbitrary and capricious.

## COUNT FIVE: VIOLATION OF THE EIGHTH AMENDMENT (CRUEL AND UNUSUAL PUNISHMENT)

### A.   The Eleventh Amendment requires dismissal of Count Five.[8]

Miller's second amended complaint concedes that Defendants Hamm and Raybon are being sued in their official capacities, not in their individual capacities. (Doc. 85, ¶¶ 11, 15.) Nonetheless, Miller seeks "both nominal and punitive damages against Defendant Raybon and Defendant Hamm" for the conduct of the attempt to establish intravenous access on September 22, 2022, and for seeking another execution date to carry out Plaintiff's lawful sentence. (Doc. 85 at 47 & ¶ 3.) A "suit against a state official is not a suit against the official but rather is a suit against the official's office." *Will v. Mich Dep't of State Police*, 491 U.S. 58, 71 (1989) (noting the sole exception (*Young*) for suits seeking prospective injunctive relief). Thus, any relief that "in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred

---

8. This ground is asserted by Defendants Raybon and Hamm.

even when the state official is the named defendant." *Papasan v. Allain*, 478 U.S. 265, 278 (1986).

### B.      Count Five is barred by the applicable statute of limitations.

Count Five of Miller's second amended complaint attacks (1) the Alabama Department of Corrections' use of needles to obtain intravenous access (Doc. 85, ¶¶ 113), (2) the use of a gurney to restrain the condemned inmate (Doc. 85, ¶¶ 104-05), (3) the brightness of the lights inside the execution chamber (Doc. 85, ¶ 107), and (4) the use of tourniquets as part of obtaining intravenous access (Doc. 85, ¶ 112-113). The two-year statute of limitations governing this claim began to run when Miller's conviction became final, when he became subject to lethal injection. *McNair v. Allen*, 515 F.3d 1168, 1176-77 (11th Cir. 2008).

Notably, Miller's second amended complaint opens with, "For Alan Miller's *entire adult life*, medical professionals have struggled to access his veins. Drawing blood *has always* been an [sic] long and painful affair for Mr. Miller." (Doc. 85, ¶ 1 (emphasis added).) According to the second amended complaint, Miller's conviction became final no later than May 19, 2006, and he became subject to execution by lethal injection from that time. (Doc. 85, ¶¶ 30-31.) Accepting these allegations as true, as this Court must, Miller's Eighth Amendment challenge must be dismissed pursuant to the applicable statute of limitations as his lifelong fear of needless and

problematic veins existed at the time he became subject to lethal injection as a method of execution.

While it should go without saying, Alabama has used needles (cannula) to obtain intravenous access as part of its lethal *injection* method of execution since that method of execution was adopted in 2002. Giving Miller the most favorable reading of the facts pleaded in his second amended complaint, any challenge to the State's intent to use needles to conduct a lethal injection – based on the unique veinous access issues that he has suffered *his entire adult life* – would have had to been filed within two years of his becoming subject to lethal injection as a method of execution. *See, e.g.*, *McNair*, 515 F.3d 1168.

Similarly, Alabama's use of bright lighting, tourniquets, and a gurney to carry out lethal injections is not the product of a recent, material change to Alabama's protocol. These aspects of the lethal injection procedure have existed since the method of execution was adopted, and the second amended complaint does not allege any facts that would establish circumstances that would permit Miller's Eighth Amendment challenge at this late hour.

### C.   Count Five fails to plead any facts upon which relief may be granted.

The Eighth Amendment does not guarantee a condemned inmate like Plaintiff Miller a painless death, just as that was not provided to his three victims. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) ("For one thing, it tells us that the Eighth

Amendment does not guarantee a prisoner a painless death – something that, of course, isn't guaranteed to many people, including most victims of capital crimes."). The relevant question, for Eighth Amendment purposes, is whether "the State's chosen method of execution cruelly superadds pain to the death sentence." *Id* at 1125. The superaddition of pain must be "well beyond what's needed to effectuate a death sentence." *Id*. at 1127.

To state the obvious, venous access (an injection) is necessary to perform a lethal injection execution. And to minimize the risk of unnecessary pain should an IV line infiltrate or become unusable, ADOC protocol provides for intravenous access at *two* different locations before lethal injection is administered. Thus, the act of inserting an intravenous cannula to establish intravenous access is an act that is a necessary part of carrying out a lethal injection.[9] Nowhere does Miller's second amended complaint allege that needle sticks are unnecessary to obtain the intravenous access required for a lethal injection. Additionally, the second amended complaint does not allege that the effort to obtain IV access at a second location was done in a manner that superadded pain to the process, or that Miller offered or agreed to have the procedure proceed with only one point of established access to avoid additional needle sticks. Because the constitutional inquiry is on whether Miller was

---

9. The second amended complaint omits any factual averment acknowledging that veinous access for Miller was obtained in one location. Because this is a material fact, that omission is notable.

subjected to "needless suffering," the fact that he alleges he was subjected to the discomfort of attempts at veinous access does not state a colorable Eighth Amendment claim.

The second amended complaint does not plead the number of times Plaintiff Miller was stuck with a needle on September 22, 2022. While it employs words like "repeated attempts," "several places," and "many punctures," Miller does not even approximate the number of times *he* alleges correctional employees attempted to gain intravenous access. He only offers a suggestion that the number of used needles will be less than the number of times he was stuck. (Doc. 85 at 26 n.15.) He complains about bright lights being used in the execution chamber, but the second amended complaint does not allege that they superadded pain or were otherwise unnecessary to the conduct of a judicial execution. Similarly, the second amended complaint complains about the tight application of tourniquets used during the attempts to obtain venous access, but it does not allege that tight tourniquets are unnecessary to the process of finding veins or that tourniquets were used to superadd pain to the process.

These omissions require dismissal because the fact that "an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze v. Rees*, 553 U.S. 35, 50 (2008). To prevail on an Eighth

Amendment claim, Miller must plead "a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 & n.9 (1994)). Instead, the second amended complaint pleads the opposite.

As noted previously, Miller's second amended complaint opens with reference to an alleged lifelong problem with veinous access. (Doc. 85 at 1.) Miller attempts to shift "subjective blame" for Eight Amendment purposes to ADOC when he pleads "Defendants were already on notice of the problems medical professionals have … as he resides in ADOC custody." (Doc. 85, ¶ 98.) But the second amended complaint admits that ADOC attempted to address this issue by having Miller's veins assessed prior to his execution. (Doc. 85, ¶ 110.) It was Miller who "declined to extend his arms through the bean hole, explaining that this Court's preliminary injunction against a lethal injection was in place, and it was inappropriate to begin the lethal injection protocol." (*Id.*) Miller admits that ADOC is subjectively blameless for Eighth Amendment purposes. Defendants tried to address Miller's concerns about veinous access, and he refused to cooperate with their efforts. Dismissal is warranted on this basis, alone.

The allegation in the second amended complaint that "Defendants had an opportunity to take reasonable steps in advance of the September 22, 2022 execution

to prepare for difficulty accessing Mr. Miller's veins" is not a factual allegation, but rather a conclusory statement. That Miller refused to cooperate with "green scrubs" when "green scrubs" asked Miller to permit an inspection of his veins is a specific factual pleading. Under the applicable rules of pleading, the specific factual pleading must be given effect to the exclusion of conclusory allegations.

The fact that Miller was presented with a readily-implementable and feasible alternative – a lethal injection procedure in which the IV team was permitted to prepare by performing an inspection of Plaintiff's veins well in advance of the execution date – and rejected that alternative places the blame for the alleged Eighth Amendment issues on Miller's own shoulders. In *Oliver v. Warden*, 761 Fed. App'x 960, 964 (11th Cir. 2019), the court noted that the inmate's deliberate indifference claim under the Eighth Amendment was subject to dismissal where a chronic-care medical appointment could not be completed due to the inmate's refusal to cooperate. The Seventh Circuit has reached the same conclusion. *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (finding no deliberate indifference to an inmate's need for medical treatment where the inmate was "most uncooperative with medical staff and refus[ed] medical assistance when it was offered to him").

The second amended complaint alleges that "Defendants were aware of Mr. Miller's belief that executing him by nitrogen hypoxia would be more humane than executing him by lethal injection." (Doc. 85, ¶ 214.) But the existence of an alternate

method of execution is relevant only if a defendant identifies a risk of substantial pain that is superadded or *unnecessary* to the method of execution challenged. And while Miller alleges in the second amended complaint that nitrogen hypoxia will remove the pain necessarily associated with lethal injection, he faces the same obstacle as did Bucklew. The Eighth Amendment does not require the State to use a new method as an alternative until the State has determined the method is ready. *Bucklew*, 139 S. Ct. at 1130 & n.1.

Finally, Miller's fear of needles and the process of being prepared for execution (Doc. 85, ¶ 98) do not alter that Eighth Amendment analysis. "Some risk of pain"—and some related fear—are "inherent in any method of execution." *Baze*, 553 U.S. at 47. They do not render Miller's execution cruel and unusual.

## COUNT SIX: VIOLATION OF THE CONSTITUTION OF ALABAMA OF 1901

The Eleventh Amendment requires dismissal of Count Six. Count Six of the second amended complaint asserts a claim against Defendants, in their official capacities, arising under the Constitution of Alabama of 1901. "Alabama grants sovereign immunity to its state executive officers pursuant to Article I, Section 14 of the Alabama Constitution of 1901." *Tinney*, 77 F.3d at 383. Defendants have not, and do not, consent to being sued in this forum. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 99 & n.9.

Dismissal of this claim is required even if Miller asserts that he seeks only prospective injunctive relief. The limited Eleventh Amendment waiver encompassed within the *Young* doctrine does not apply to this claim. *Id.* at 106. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id*. Because such a result "conflicts directly with the principles of federalism that underlie the Eleventh Amendment," the Supreme Court has concluded "that *Young* and *Edelman*[10] are inapplicable in a suit against state officials on the basis of state law." *Id*.

Accordingly, Defendants are entitled to the dismissal of Count Six of the second amended complaint on Eleventh Amendment grounds.

## CONCLUSION

For the above-mentioned reasons, Defendants pray this Court will dismiss Miller's second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

10. *Edelman v. Jordan*, 415 U.S. 661 (1974).

Respectfully submitted,

Steve Marshall
*Attorney General*
BY—


**<u>s/ James R. Houts</u>**
James R. Houts
*Assistant Attorney General*


**<u>/s Audrey Jordan</u>**
Audrey Jordan
*Assistant Attorney General*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 21, 2022, I electronically filed the foregoing

with the Clerk of the Court using CM/ECF system, which shall cause an electronic

copy of the same to be served upon counsel for Plaintiff Miller:

James Bradley Robertson                Kelly Huggins
brobertson@bradley.com                 khuggins@sidley.com

Daniel J. Neppl
dneppl@sidley.com

Marisol Ramirez
Marisol.ramirez@sidley.com

Stephen Spector
sspector@sidley.com


                                       *s/ James R. Houts*
                                       James R. Houts
                                       *Assistant Attorney General*


ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Office (334) 353-1513
Fax (334) 353-8400
James.Houts@AlabamaAG.gov