IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALAN EUGENE MILLER,                 )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )      CASE NO. 2:22-cv-506-RAH
                                    )            [WO]
JOHN Q. HAMM, Commissioner,         )
Alabama Department of Corrections,  )
*et al.*,                           )
                                    )
        Defendants.                 )

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

On September 22, 2022, the Alabama Department of Corrections (ADOC) attempted to execute Alan Eugene Miller by lethal injection.  Before the execution warrant expired at midnight, the ADOC terminated its execution efforts because it had problems accessing Miller's veins to administer the lethal injection drugs. Before the ADOC terminated the execution, Miller says he experienced extreme pain and suffering, both physical and psychological, as execution team members repeatedly poked, prodded, and slapped various parts of his body for approximately 90 minutes to try to establish venous access.  Twelve days later, the State of Alabama moved the Alabama Supreme Court to reset Miller's execution date on an expedited basis.

Miller does not challenge his underlying conviction or death sentence. Instead, he seeks to vindicate his right to be executed by nitrogen hypoxia under the Eighth and Fourteenth Amendments to the United States Constitution.

On August 22, 2022, Miller filed this lawsuit under 42 U.S.C. § 1983 against Defendants John Q. Hamm, the Commissioner of the ADOC; Terry Raybon, the Warden at Holman; and Steve Marshall, Attorney General of the State of Alabama (collectively, the State or Defendants). All Defendants are sued in their official capacities.

In his Second Amended Complaint (the operative complaint) (Doc. 85), Miller alleges that the State violated his constitutional rights by failing to honor his election of a nitrogen hypoxia execution. Miller alleges that he timely made such an election in 2018, but the State cannot locate any record that he did so. Additionally, Miller asserts that a second attempt to execute him by lethal injection would violate the Eighth and Fourteenth Amendments to the United States Constitution as well as the Alabama Constitution's prohibition on cruel or unusual punishment. He seeks declaratory and injunctive relief, as well as nominal and punitive damages from Defendants Hamm and Raybon.

This matter is before the Court on the Defendants' Motion to Dismiss. (Doc. 99.) Miller filed a response in opposition, (Doc. 101), and the Defendants filed a reply, (Doc. 104). This matter is ripe for review.

2

For the following reasons, the Defendants' Motion is due to be granted in part and denied in part.

## II.     JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.     LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept well-pled facts as true, but the court is not required to accept a plaintiff's legal conclusions.  *Id.* at 664.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679 (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted

unlawfully." *Id.* at 678.   Conclusory allegations that fail to rise "above the speculative level" are insufficient to meet the plausibility standard.  *Twombly*, 550 U.S. at 555.  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). It is the plaintiff's responsibility to allege sufficient facts to support his claims. *Twombly*, 550 U.S. at 555.

## IV.   BACKGROUND

When ruling on a motion to dismiss, the Court accepts as true the Second Amended Complaint's factual allegations and construes them in the light most favorable to Miller.  *See Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 854, 864 (11th Cir. 2017).

Certain relevant procedural, factual, and statutory background is set forth in the Court's Memorandum Opinion and Order granting Miller's Motion for Preliminary Injunction (Doc. 62), and the Court will not repeat it here.  Additional procedural history and facts pertinent to resolving the Motion to Dismiss are set forth below.

On August 22, 2022, Miller sued the Defendants in their official capacities under 42 U.S.C. § 1983, seeking declaratory and injunctive relief with respect to his execution by lethal injection, which was set for September 22, 2022.  On September 19, 2022, this Court preliminarily enjoined the Defendants from executing Miller by any method other than nitrogen hypoxia.  In its Memorandum Opinion and Order, the Court concluded it was substantially likely that Miller timely elected nitrogen hypoxia, Miller was substantially likely to succeed on the merits of his equal protection and due process claims, Miller likely faced irreparable injury without an injunction, and the equities weighed in Miller's favor.  The Defendants appealed to the United States Court of Appeals for the Eleventh Circuit, and they filed a Motion to Stay this Court's injunction pending appeal in both this Court and the Eleventh Circuit.  This Court denied the Motion to Stay on September 21, 2022.  (Doc. 70.)  On September 22, 2022, the Eleventh Circuit denied the Motion to Stay filed in that court, upholding this Court's preliminary injunction on equal protection grounds and declining to address the due process claim.  *See* Order at 9 & n.2, 15, *Miller v. Comm'r, Ala. Dep't of Corr.*, No. 22-13136-P (11th Cir. Sept. 22, 2022).

In the afternoon of September 22, 2022, the Defendants filed an application in the United States Supreme Court to vacate this Court's injunction.  At approximately 9:00 p.m. that evening, the Supreme Court, by a 5–4 vote, vacated this Court's injunction without explanation.  *See Hamm v. Miller*, No. 22A258, 2022

WL 4391940, at *1 (U.S. Sept. 22, 2022).   Thereafter, the ADOC attempted to execute Miller by lethal injection.   However, the ADOC terminated its execution efforts sometime before midnight because it was unable to establish venous access. Much of the Second Amended Complaint centers on what Miller says occurred during the ADOC's unsuccessful attempt to execute him.

At approximately 9:55 p.m. on September 22, 2022, over a dozen ADOC correctional officers walked Miller from the execution holding cell to the execution chamber at Holman.   Several guards remained in the execution chamber during the execution attempt.   There was a clock in the execution chamber that Miller could sometimes, but not always, see.   Once inside the execution chamber, one of the guards asked Miller to lie down on the execution gurney, which Miller did.   At approximately 10:15 p.m., guards began to strap Miller into the gurney.   Because Miller is apparently shorter than the height the gurney was designed for, his arms were raised into a stress position above his head in order to be strapped into the gurney's arm rests.   According to Miller, this position immediately caused him pain in his chest, neck, and arms.

After Miller was strapped into the gurney, two men in medical scrubs walked into the execution chamber.   A third man in medical scrubs joined later.   According to Miller, these men punctured his skin multiple times and for approximately 90 minutes in an attempt to find a vein.   Miller identifies the men by the color of their

scrubs because the Defendants have not revealed the men's names: Aqua Scrubs, Green Scrubs, and Navy Scrubs.  The men in scrubs first tried to find a vein in the elbow pit (the inner right arm inside the elbow) of Miller's right arm.  Green Scrubs tied an "extremely tight" torniquet around Miller's right bicep and slapped Miller's elbow pit for long periods, and Aqua Scrubs punctured Miller's right elbow pit in multiple locations.  (Doc. 85 at 25.)  During the "repeated attempts" to find a vein in Miller's right elbow pit, Miller could "feel his veins being pushed around inside his body by needles, which caused him great pain and fear." (*Id.* at 26.)  After one of the needle punctures, Miller told the men in scrubs that what they were doing was excruciating, but the men did not respond.

After these attempts to find a vein failed, the men in scrubs tried to find a vein in Miller's right hand.  Aqua Scrubs punctured Miller's skin in several places on his right hand.  These efforts to find a vein were also unsuccessful.

The men in scrubs also tried to find a vein in Miller's left arm.  Green Scrubs tied a torniquet, and Aqua Scrubs repeatedly punctured Miller's left elbow pit with needles.  Miller "felt the needles going deeper in his body than ever before, which caused intense physical pain." (*Id.* at 27.)  Miller says he told the men in scrubs he could feel that they were not accessing his veins but rather were stabbing around his veins, but the men did not respond.

The men in scrubs then decided to try to find a vein in Miller's right foot.  One of the men inserted a needle into Miller's right foot, which caused Miller sudden and severe pain.  Miller says he "felt like he had been electrocuted in this foot, and his entire body shook in the restraints."  (*Id.* at 28.)  Miller believes the men in scrubs hit a nerve.  The men in scrubs withdrew the needle and punctured many other locations on Miller's right foot.

Eventually the men in scrubs abandoned Miller's right foot and looked at Miller's left foot and leg.  One of the men in scrubs "shook his head in frustration" after inspecting Miller's left foot and leg.  (*Id.*)  Miller does not allege that the men punctured his left foot or left leg.  The men in scrubs returned to Miller's right arm, and Aqua Scrubs inserted needles into Miller's right inner forearm.  Then, Aqua Scrubs and Green Scrubs each began simultaneously puncturing different parts of Miller's body: Aqua Scrubs punctured Miller's left arm, while Green Scrubs punctured Miller's right arm.

Navy Scrubs then entered the execution chamber and examined the puncture sites on Miller's body.  Navy Scrubs then started feeling and slapping the skin on Miller's neck, which caused Miller to recoil out of intense fear of the men trying to insert a needle into his neck.  Miller asked the men in scrubs if they were going to insert a needle into his neck, but they refused to answer.

Soon after, there was a loud knock on the windowpane that borders the execution chamber and the State's observation room, at which point the men in scrubs left the execution chamber. One of the guards in the execution chamber raised the execution gurney from a horizontal to a vertical position using a foot pump at the base of the gurney. Miller was left hanging vertically from the gurney, strapped in by his arms, feet, and chest. Miller complained to the guards that this position was "giving [him] hell"; that his elbows, arms, and back were in pain; and that his foot was "killing [him]." (*Id.* at 29–30 (alterations in original).) Miller saw that the clock on the wall said 11:40 p.m. At this time, Miller still believed he was going to die.

Miller estimates that he was left hanging vertically from the execution gurney for 20 minutes, during which he experienced "a lot of pain" in his many puncture wounds—especially his right foot, which was throbbing in pain—and in his arms, chest, and neck from being in a painful stress position for 90 minutes. (*Id.* at 30.) Blood was leaking from some of his wounds. He felt "nauseous, disoriented, confused, and fearful about whether he was about to be killed." (*Id.*)

Suddenly, and immediately before midnight, an ADOC employee named Katrina Brown appeared by Miller's head and said, "Your execution has been postponed." (*Id.*) Confused by this comment, Miller asked for an explanation. Brown refused to answer and walked out of the execution chamber.

Eventually, an ADOC employee named Sergeant Earl told Miller the execution had not been "postponed" but was truly over because Miller's death warrant had expired.  The guards in the execution chamber then asked Miller to get off the gurney.  Miller's arms were so stiff and painful from having been extended above his head for 90 minutes that he was not able to bend them on his own—he had to ask one of the guards for help.  The guards then took Miller to the medical unit where a Holman nurse wiped the blood off of Miller's body.  Miller told the nurse that his right foot in particular was in great pain.  The nurse did not offer any medical assistance for Miller's physical and psychological pain.  Miller was then returned to the execution holding cell, where he curled into a fetal position on the cot in the cell for many hours.

Miller was returned to his cell on Holman's death row during the day on September 23, 2022.  Miller says he now spends much of his time in a fetal position on his bed, reliving the execution attempt and experiencing a great deal of physical and emotional pain.  His arms are still in pain from the execution attempt.  He is unable to extend his arms away from his body, as doing so gives him "flashbacks" to the execution.  Additionally, Miller has had "intense psychological symptoms," including going into a "'twilight mode' where he loses track of time and dissociates from reality." (*Id.* at 32.)  Miller also experiences intrusive thoughts of the execution

and being stabbed with needles.  His sleep has been greatly disturbed, and he often does not sleep more than a few hours at night.

On October 4, 2022, twelve days after the failed execution attempt, Defendant Marshall moved the Alabama Supreme Court to reset Miller's execution date on an expedited basis.  To date, that motion remains pending before the Alabama Supreme Court, to the best of this Court's knowledge.  According to Miller, the Defendants have not undertaken any review of what happened during the failed execution attempt.  Additionally, the Defendants allegedly have not taken any steps to ensure that a similar situation does not recur if and when they attempt a second lethal injection execution on Miller.

On October 6, 2022, Miller moved this Court for leave to file a Second Amended Complaint, which the Court granted on October 12, 2022.  Miller's Second Amended Complaint was filed on October 12, 2022.  Therein, Miller brings six causes of action against the Defendants in their official capacities.  In Count One, Miller claims the Defendants violated his procedural due process rights under the Fourteenth Amendment "by failing to ensure an adequate procedure for protecting his election to be executed by nitrogen hypoxia."  (*Id.* at 37.)  Miller alleges that the Defendants had established no process for distributing, collecting, or storing election forms.  Miller expressly references deposition testimony from ADOC officials that

was read into the record during the September 12, 2022 evidentiary hearing on Miller's motion for preliminary injunction.

In Count Two, Miller alleges the Defendants violated his right to equal protection under the Fourteenth Amendment by treating him differently from similarly situated death row inmates at Holman who, like Miller, timely submitted nitrogen hypoxia election forms.  Miller mentions by name two Holman death row inmates: Jarrod Taylor and Calvin Stallworth.  According to Miller, Taylor's and Stallworth's election forms were also lost, misplaced, or improperly collected, but the Defendants ultimately honored Taylor's and Stallworth's elections because they provided attorney–client privileged communications to corroborate their assertions that they elected nitrogen hypoxia.  By contrast, after a day-long evidentiary hearing in which Miller presented credible live testimony, and the State presented none, and where the Court determined it is substantially likely that Miller timely elected hypoxia, the Defendants still refuse to honor Miller's nitrogen hypoxia election. Miller asserts that no rational basis exists for the Defendants' differential treatment.

In Count Three, Miller alleges the Defendants violated his right to equal protection under the Fourteenth Amendment by treating him differently from Doyle Lee Hamm, a former death row inmate at Holman.  In 2018, the State attempted to execute Doyle Hamm by lethal injection, but its execution efforts were unsuccessful due to venous access issues.  Pursuant to a confidential settlement agreement, the

State did not undertake a second attempt to execute Doyle Hamm.  Nonetheless, the State is pursuing a second attempt to execute Miller.  Miller asserts that no rational basis exists for the State's differential treatment.

In Count Four, Miller claims the Defendants' decision to execute him by lethal injection rather than nitrogen hypoxia is arbitrary and capricious in violation of the Eighth Amendment.

In Count Five, Miller asserts that a second attempt to execute him by lethal injection would violate the Eighth Amendment, in light of the extreme physical and psychological pain and suffering he says he experienced during the first execution attempt and because nitrogen hypoxia is a feasible, readily available, and less painful alternative method of execution.

In Count Six, Miller asserts that a second attempt to execute him by lethal injection would violate the Alabama Constitution's prohibition on cruel or unusual punishment.

Miller asks the Court to declare that he "timely submitted his election form pursuant to Ala. Code § 15-18-82.1(b) and elected execution by nitrogen hypoxia," and that the Defendants' decision to execute Miller by lethal injection rather than nitrogen hypoxia violates his Eighth and Fourteenth Amendment rights.  (*Id.* at 47.) Additionally, Miller asks the Court to enter an injunction requiring the Defendants to honor his nitrogen hypoxia election and enjoining the Defendants from executing

him by any method other than nitrogen hypoxia.  (*Id.*)  Miller also requests nominal and punitive damages from Defendants Hamm and Raybon and that the Court stay the Alabama Supreme Court proceedings.

## V.     DISCUSSION

The Defendants argue that Miller's Second Amended Complaint is due to be dismissed in its entirety.  The Court will begin by addressing Miller's claims that carried over from the Amended Complaint (Counts One, Two, and Four), and then will address Miller's new claims (Counts Three, Five, and Six).

### A. Due Process (Count One)

The Defendants argue that Miller's procedural due process claim should be dismissed for multiple reasons: (1) Miller has an adequate state law remedy; (2) an allegation of negligence cannot state an actionable due process claim; (3) the claim is time-barred; and (4) *Younger*[1] abstention is warranted because Miller requests that the Court stay the Alabama Supreme Court proceedings.  The Defendants also argue that Defendant Marshall is not a proper defendant from whom Miller can obtain injunctive or declaratory relief.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of" the Fourteenth Amendment's Due Process Clause.  *Mathews v. Eldridge*, 424 U.S.

---

[1] *Younger v. Harris*, 401 U.S. 37 (1971).

319, 332 (1976).  A successful procedural due process claim requires "proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process."  *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).  The deprivation of which Miller complains is the loss of the right to a nitrogen hypoxia execution.  The Defendants do not argue that Miller lacks a constitutionally-protected interest or that the state action element is lacking.

Where the State can feasibly provide predeprivation process before depriving a person of liberty, it generally must do so regardless of the adequacy of a postdeprivation remedy.  *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990); *Barr v. Johnson*, 777 F. App'x 298, 301 (11th Cir. 2019) ("Generally speaking, procedural due process requires that the state give the individual notice and an opportunity to be heard *before* a deprivation." (emphasis added)).  "Conversely, in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process."  *Zinermon*, 494 U.S. at 132 (citation omitted).  Thus, predeprivation process is the general rule.  Turning to adequacy, courts consider three factors in determining whether the process provided is adequate:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *accord Worthy v. City of Phenix City*, 930 F.3d 1206, 1223 (11th Cir. 2019).

### 1. Adequate State Law Remedy

The Defendants argue that Miller's claim fails because he has an adequate state law remedy: a mandamus action in an Alabama state trial court. The Second Amended Complaint presents at least two different theories of when the alleged deprivation of Miller's right to a nitrogen hypoxia execution occurred: (1) in or around May 2022, when the Defendants made clear they were refusing to recognize Miller's nitrogen hypoxia election because they could not find his election form; or (2) Miller's future execution date, when he will be executed by lethal injection. The Defendants appear to agree that these two theories exist, as they argue Miller has an adequate remedy—a mandamus action in state court—under either scenario. (*See* Doc. 99 at 4–5 (arguing that if the deprivation is execution by lethal injection, then mandamus is an adequate *predeprivation* remedy, and that if the deprivation is the Defendants' refusal to honor Miller's election, then mandamus is an adequate *postdeprivation* remedy).)

The Federal Rules of Civil Procedure allow a plaintiff to plead alternative theories of liability. *See* FED. R. CIV. P. 8(d)(2) ("A party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count or defense or in separate ones. "); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014) ("It is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability."). Thus, if one of the plaintiff's theories presents a plausible claim for relief, dismissal for failure to state a claim is inappropriate. *See Adinolfe*, 768 F.3d at 1175–76 (holding that the district court erred in dismissing a complaint on the grounds that the plaintiffs presented "'different and contradictory theories' of causation" because one theory made it plausible that the defendant caused the damage); *see also* FED. R. CIV. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

As noted above, the Defendants argue that if "Miller's deprivation is Defendants' refusal to recognize his purported election, then that deprivation has already occurred and he has a postdeprivation remedy available"—mandamus. (Doc. 99 at 4–5.) The problem with this argument is that it fails to address whether Miller was entitled to *predeprivation* process and whether such process was constitutionally adequate.

Considering the *Mathews* factors, the Court finds it plausible that Miller was entitled to predeprivation process and that the predeprivation process allegedly afforded here, which is virtually none, is constitutionally inadequate. The private interest at stake is great—a person's choice in the way he will die at the State's hands. Given the procedures used, the risk of erroneous deprivations is high. According to the Second Amended Complaint, the Defendants knowingly failed to establish any process for collecting or storing election forms. Moreover, the Defendants have allegedly failed to create a process for determining which elections would be honored when the Defendants lost, misplaced, or improperly collected election forms. Additional safeguards would be of obvious value in ensuring that all properly submitted nitrogen hypoxia election forms are retained, that all properly submitted elections are honored, and that no inmate who properly elected nitrogen hypoxia is executed by lethal injection. The Defendants do not argue that predeprivation process was not feasible or that the process afforded was adequate under the *Mathews* analysis. Thus, Miller states a plausible due process claim based on the lack of constitutionally adequate predeprivation process, regardless of the adequacy of any postdeprivation remedy. *See Zinermon*, 494 U.S. at 132; *Barr*, 777 F. App'x at 301. Accordingly, dismissal on this ground is not warranted. *See Adinolfe*, 768 F.3d at 1175–76; FED. R. CIV. P. 8(d)(2).

### 2. Negligent Loss

The Defendants also argue that Miller's claim should be dismissed because an allegation of negligent loss does not present a viable due process claim.  The Defendants' position presupposes that the warden received Miller's form and the form was lost thereafter, which makes the need for predeprivation process all the more important.  Moreover, the Court has already explained—twice—that this argument fails because Miller's claim is not based solely on an alleged negligent loss.[2]  The Defendants do not argue that the Court's earlier analysis was incorrect or offer any persuasive new arguments on this issue.  Perhaps the third time will be the charm: the Defendants' argument fails because Miller's claim is not based solely on an alleged negligent loss.  Miller alleges that the Defendants established *no* process for distributing, collecting, or storing nitrogen hypoxia election forms.  Given the gravity of the interest at stake, Miller's allegations permit the reasonable inference that the Defendants acted recklessly or with deliberate indifference to the rights of death row inmates, including Miller, in the distribution, collection, and storage of the election forms.  And the deprivation flowing from the Defendants' conduct is more than a negligent loss of Miller's election form: it is the deprivation of Miller's "right to choose a nitrogen hypoxia execution and the State's plans to carry out his

---

[2] Although the Court's prior determinations were based on the First Amended Complaint and the evidence submitted at the evidentiary hearing, Miller's Second Amended Complaint contains substantially similar factual allegations concerning the due process claim.

execution by lethal injection in contravention of his choice." (Doc. 62 at 53 n.19; Doc. 70 at 8.) Thus, dismissal on this ground is not warranted.

### 3. Statute of Limitations

The Defendants also argue that Miller's due process claim is barred by the statute of limitations. The Defendants bear the burden to establish the applicability of a statute of limitations affirmative defense. *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990). A plaintiff is not required to negate a statute of limitations defense in his complaint. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). "[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *Id.* (citation omitted).

The statute of limitations for a § 1983 claim is governed by the personal injury law of the state in which the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). Here, the parties agree that, under Alabama law, the limitations period is two years. ALA. CODE § 6-2-38(1). The parties also agree that the statute begins to run, or a claim accrues, when Miller "knew or should have known of his injury and its cause." *Carter v. City of Montgomery*, 473 F. Supp. 3d 1273, 1307 (M.D. Ala. 2020) (quoting *Burt v. Martin*, 193 F. App'x 829, 830 (11th Cir. 2006)); *see also Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996) (holding that a claim accrues when "the facts which would support a cause of action [were] apparent or

should [have been] apparent to a person with a reasonably prudent regard for his rights"). The parties disagree, however, as to exactly when Miller "knew or should have known" that his claim had accrued.

The Court previously considered and rejected the Defendants' statute of limitations argument. The Court incorporates by reference its prior analysis on this issue. (*See* Doc. 62 at 46–50.)[3] The Defendants fail to persuade the Court that a different conclusion is warranted now. Thus, as before, the Court concludes that Miller's procedural due process claim accrued in May 2022 when a reasonable inmate in Miller's shoes would have known that he was injured and that he had a viable cause of action. And because Miller filed suit four months after his claim accrued, Miller's claim is within the applicable two-year statute of limitations and is not time-barred. Accordingly, the Defendants have failed to demonstrate that Miller's due process claim is time-barred.

### 4. Whether Attorney General Marshall Is a Proper Defendant

The Defendants also argue that Eleventh Amendment sovereign immunity bars Miller's due process claim against Defendant Marshall and that the *Ex parte Young*[4] exception does not apply. The Eleventh Amendment provides: "The Judicial

---

[3] Again, although the Court's prior determinations were based on the First Amended Complaint and the evidence submitted at the evidentiary hearing, Miller's Second Amended Complaint contains substantially similar factual allegations and references evidence submitted at the hearing.

[4] 209 U.S. 123 (1908).

power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  Although the amendment expressly forbids only suits brought against a State by citizens of a different State, the Supreme Court has long held that it similarly prohibits suits brought against a State by the State's own citizens.  *See Hans v. Louisiana*, 134 U.S. 1 (1890).  "Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment."  *McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001) (citation omitted).

The Eleventh Amendment's prohibition extends to suits against state officials in their official capacities where "the state is the real, substantial party in interest." *Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (per curiam) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)). And "a suit against a state official in his or her own official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  In *Ex parte Young*, the Supreme Court established an exception to this prohibition for suits against state officials seeking

prospective equitable relief to end ongoing and continuing violations of federal law. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336–37 (11th Cir. 1999).

The Defendants insist that Marshall is entitled to sovereign immunity because he has no authority to determine what method of execution will be used on an inmate. In response, Miller argues that on October 4, 2022, when Defendant Marshall moved to reset Miller's execution on an expedited basis, Marshall knew two things: (1) nitrogen hypoxia presently cannot be used to perform executions due to the lack of a final protocol,[5] and thus Miller's execution would be by lethal injection; and (2) the Court had made a factual finding that it is substantially likely Miller elected nitrogen hypoxia.   Despite knowing these facts, Defendant Marshall moved the Alabama Supreme Court to reset Miller's execution date.   At this stage, accepting the factual allegations as true and drawing all reasonable inferences in Miller's favor, it is plausible to infer that, practically speaking, Defendant Marshall has some authority to determine what method of execution is used, and that Defendant Marshall is using that authority to determine the method of Miller's execution— lethal injection—in the ongoing Alabama Supreme Court proceedings in contravention of Miller's federal due process rights.   Moreover, all parties agree that

---

[5] The Court concludes *infra* that nitrogen hypoxia is a feasible, readily implemented alternative for purposes of Miller's Eighth Amendment method of execution claim because the State of Alabama has statutorily authorized nitrogen hypoxia as an execution method.   *See Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1328 (11th Cir. 2019) (per curiam).   This legal conclusion is distinct from the factual question of whether the nitrogen hypoxia protocol is final, and the Alabama Attorney General's office has represented that the protocol is not final.

Defendant Marshall has the authority to move the Alabama Supreme Court to set a death row inmate's execution date.  Thus, at this stage, Marshall's involvement in an allegedly ongoing constitutional violation is distinguishable from the Texas Attorney General's involvement in enforcing a challenged state law in *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534 (2021) ("While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to *any enforcement authority the attorney general possesses* in connection with S. B. 8 that a federal court might enjoin him from exercising." (emphasis added)).  Thus, at this stage, the Court concludes that *Ex parte Young* permits Miller to include Attorney General Marshall as a defendant in  his due process claim for injunctive and declaratory relief.

### 5.  *Younger* Abstention

Finally, the Defendants argue that Miller's due process claim should be dismissed on *Younger* abstention grounds because in the Prayer for Relief of the Second Amended Complaint, he requests that this Court stay the Alabama Supreme Court proceedings.  But a stay of the Alabama Supreme Court proceedings is not the only relief Miller seeks.  Indeed, Rule 8 allows a plaintiff to demand "relief in the alternative or different types of relief."  FED. R. CIV. P. 8(a)(3).  "No election between or among remedies is necessary at the pleading stage."  5 Alan Wright, Arthur Miller, & A. Benjamin Spencer, 5 Fed. Prac. & Proc. Civ. § 1257 (4th ed.,

Apr. 2022 update).  The Defendants do not argue that granting any of Miller's other requests for relief would interfere with the ongoing Alabama Supreme Court proceedings.  Thus, the Court is not persuaded that it should dismiss the due process claim on the grounds that Miller may be unable to obtain one of the several forms of relief he seeks.  If and when Miller files a motion in this Court requesting a stay of the Alabama Supreme Court proceedings, the Defendants are free to raise their *Younger* abstention arguments in response.

Accordingly, the Defendants' Motion to Dismiss is due to be denied as to Count One.

### B. Equal Protection (Count Two)

The Defendants also argue that Miller's equal protection claim in Count Two should be dismissed.  They contend that they had a rational basis to treat Miller differently from Taylor and Stallworth because, according to the Defendants, Taylor and Stallworth corroborated their contentions that they timely elected nitrogen hypoxia with attorney–client privileged communications, whereas Miller only provided his own self-supporting statement that he elected.  But the Defendants ignore the Second Amended Complaint's allegations pertaining to (1) the Court's earlier factual finding that it is substantially likely Miller actually timely elected nitrogen hypoxia, and (2) the Court's determination that Miller was substantially likely to succeed on the merits of his equal protection claim.  The Court incorporates

by reference its findings and analysis on these issues. (*See* Doc. 62 at 21–45.) According to Miller, in light of the Court's finding that it is substantially likely Miller timely elected nitrogen hypoxia, the Defendants have no rational basis for treating Miller differently from other Holman death row inmates, such as Taylor and Stallworth, who also timely elected nitrogen hypoxia. The Defendants do not argue that the Court's factual finding was wrong, that the Court should not have made the finding,[6] or that the Court's legal analysis on the equal protection claim in light of the finding was wrong.[7]  Because the Court previously determined Miller was substantially likely to succeed on the merits of this claim, it follows that Miller has stated a plausible claim.  Accordingly, the Motion to Dismiss is due to be denied as to Count Two.

## C. Eighth Amendment Arbitrary and Capricious Claim (Count Four)

The Defendants argue Miller fails to state a plausible claim in Count Four that their decision to execute him by lethal injection rather than nitrogen hypoxia is

---

[6] The Defendants do contend, in passing, that this Court's "personal assessment is not relevant." (Doc. 99 at 27.)  To the extent this passing statement can be construed as an argument that the Court should not have made the factual finding, the Defendants' position is inconsistent with their earlier position in this litigation that this Court can and should make a factual determination regarding whether Miller timely elected, and the Defendants have made no effort to explain or justify their change in position.

[7] While the Supreme Court vacated the Court's preliminary injunction, the Supreme Court did not hold that this Court's factual finding was clearly erroneous, nor did it hold that this Court erred in determining that Miller was substantially likely to succeed on the merits of his equal protection claim.  As noted above, the Supreme Court provided no explanation for its decision to vacate the injunction.

arbitrary and capricious in violation of the Eighth Amendment.  The Supreme Court has held that the Eighth Amendment forbids the arbitrary and capricious imposition of a death sentence.  *E.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 427–28 (1980); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  According to the Supreme Court, the arbitrary and capricious imposition of a death sentence flows from nonexistent, vague, or otherwise inadequate sentencing standards guiding the jury in their deliberations.  *See Godfrey*, 446 U.S. at 427–29; *Gregg*, 428 U.S. at 192–95 & nn.46–47.[8]  In *Godfrey*, the Supreme Court held that a Georgia inmate's death sentence was unconstitutionally arbitrary and capricious where the sentence was "based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman,'" explaining that "nothing in these few words, standing alone, . . . implies any inherent restraint on the arbitrary and capricious infliction of the death sentence."  446 U.S. at 428.  Similarly, in *Foster v. Strickland*, the Eleventh Circuit reversed a Florida inmate's death sentence "because of the trial judge's inadequate findings of fact on the mitigating circumstances" as required by the state's death

---

[8] In *Godfrey*, the Court reiterated that a death sentence "may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner."  446 U.S. at 427.  The Court explained that a part of the State's responsibility in "avoid[ing] the arbitrary and capricious infliction of the death penalty" is "to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'"  *Id.* at 428 (second alteration in original) (quoting *Gregg*, 428 U.S. at 196 n. 47).  This was because "a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* [*v. Georgia*, 408 U.S. 238 (1972)] could occur.'"  *Id.* (quoting *Gregg*, 428 U.S. at 196 n.46).

penalty statute, explaining that it was "impossible to determine whether [the death] sentence was the product of reasoned judgment rather than of caprice and arbitrariness, and thus whether it comports with the constitutional requirements expressed by the Supreme Court."  707 F.2d 1339, 1340–41 (11th Cir. 1983) (citing *Gregg*, 428 U.S. 153).

The above cases demonstrate that the Supreme Court and the Eleventh Circuit have interpreted the Eighth Amendment to prohibit the arbitrary and capricious imposition of a death sentence, with a focus on standardless sentencing discretion. But Miller does not claim that his death sentence was arbitrarily or capriciously imposed, nor does he argue that the sentencing standards under which the jury imposed his death sentence were deficient.  Instead, he claims that the Defendants are arbitrarily and capriciously using a particular method of execution (lethal injection) in order to carry out his death sentence, even though he chose a different method (nitrogen hypoxia).

The Court could not find a Supreme Court decision analyzing this type of Eighth Amendment arbitrary and capricious claim.  However, the Eleventh Circuit has considered—and rejected—arbitrary and capricious claims challenging state action in contexts different from those the Supreme Court addressed in *Godfrey* and *Gregg*.  For example, the Eleventh Circuit rejected an inmate's claim that the State of Georgia's clemency process was unconstitutionally arbitrary and capricious due

to the clemency board having "unfettered discretion" in its decisions. *Smith v. Snow*, 722 F.2d 630, 632 (11th Cir. 1983) (per curiam). The court reasoned that this "unfettered discretion" did not "render the *imposition* of the death penalty on [the plaintiff] arbitrary and capricious in violation of the Eighth Amendment," explaining that "[t]he discretion involved at the clemency stage can never cause the *imposition* of the death sentence; it serves only as an act of grace to relieve that sentence even when the sentence has been legally imposed." *Id.* (emphases added). More recently, the Eleventh Circuit rejected an inmate's argument that the State had "'violated his Eighth Amendment rights by targeting him for speedier execution' based on his refusal to select nitrogen hypoxia." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1295 (11th Cir. 2020) (affirming the district court's denial of a motion for a stay of execution). The Eleventh Circuit concluded that the district court had "correctly rejected [the inmate's] attempt to equate his situation—the *carrying out* of his death sentence—with the *imposition* of a death sentence." *Id.*

The Court is not persuaded that Miller's arbitrary and capricious claim is within the scope of the Supreme Court's or the Eleventh Circuit's decisions finding an Eighth Amendment violation. Miller emphasizes that setting an execution date is an extension of the sentencing process. From that, Miller extrapolates that a change in the method of execution can give rise to an Eighth Amendment arbitrary and capricious claim. But even assuming that changing the method of execution is

an extension of the sentencing process, the decision to execute a person by a particular method simply does not "cause the imposition of the death sentence." *See Smith*, 722 F.2d at 632.  Here, Miller equates the carrying out of his death sentence with the imposition of a death sentence—the precise argument the Eleventh Circuit rejected in *Woods*. *See* 951 F.3d at 1295.  True, in *Woods*, the Eleventh Circuit was reviewing the district court's denial of a motion to stay, which is governed by the substantial-likelihood-of-success-on-the-merits standard, whereas here the Court is evaluating whether Miller has stated a plausible claim for relief.  And the Court does not deny that the Defendants' alleged conduct could be considered arbitrary and capricious in a general sense.  However, based on the Supreme Court and Eleventh Circuit precedent discussed above, the Defendants' alleged conduct cannot be considered arbitrary and capricious in violation of the Eighth Amendment, and thus the Court concludes that Miller's claim is not legally plausible.  Accordingly, the Defendants' Motion to Dismiss Count Four is due to be granted.

### D. Equal Protection – Treated Differently from Doyle Hamm (Count Three)

The Defendants also ask the Court to dismiss Miller's equal protection claim in Count Three, where Miller alleges that the Defendants are treating him differently from Doyle Hamm.  The Defendants previously attempted to execute Doyle Hamm by lethal injection, but this attempt was unsuccessful.  Thereafter, the Defendants decided not to subject Doyle Hamm to another lethal injection execution, allegedly

pursuant to a confidential settlement agreement.  The Defendants do not argue that Doyle Hamm and Miller are not similarly situated, nor do they argue that there is a rational basis for their differential treatment.  Instead, the Defendants argue that a viable equal protection claim cannot be premised upon the settlement of another lawsuit because it would necessarily involve intrusions into the legal advice given to state officials in deciding whether to settle a claim.

This argument fails for two reasons.  First, the Defendants construe Miller's claim too narrowly.  Viewed in the light most favorable to him, Miller does not claim to be constitutionally entitled to a settlement.  Instead, Miller claims that the Defendants are treating him differently from Doyle Hamm because they are pursuing a second lethal injection execution on Miller even though they did not attempt a second lethal injection execution on Doyle Hamm.  Miller is correct that the Defendants need not enter into a settlement with him in order to afford him the same treatment as was afforded to Doyle Hamm; instead, the Defendants can, for example, honor Miller's nitrogen hypoxia election.

Second, to the extent Miller's claim touches upon the Defendants' decision to *settle* Doyle Hamm's case but not Miller's case, the Court is not persuaded that such a claim would require state officials to divulge attorney–client privileged communications.   The privilege protects from disclosure confidential communications between a lawyer and his or her client "made for the purpose of

securing legal advice." *In re Slaughter*, 694 F.2d 1258, 1260 (11th Cir. 1982). But it does not protect from disclosure the underlying facts about which such communications were had. *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981). Here, the relevant inquiry centers on the factual rationality *vel non* of pursuing a second lethal injection execution on Miller but not Doyle Hamm, as well as whether Miller and Doyle Hamm are indeed similarly situated—which are facts, not confidential communications. Because the Court finds unavailing the Defendants' arguments for dismissal, the Motion to Dismiss is due to be denied as to Count Three.

### E. Eighth Amendment Method of Execution Claim (Count Five)

The Defendants argue that Miller's Eighth Amendment method of execution claim is due to be dismissed for three reasons: (1) the claim is time-barred, (2) Miller fails to state a plausible claim for relief, and (3) Miller's request for nominal and punitive damages from Defendants Hamm and Raybon are barred by Eleventh Amendment sovereign immunity. The Court will address each argument.

#### 1. Statute of Limitations

The Defendants argue that Miller's method of execution claim is barred by the applicable statute of limitations. To reiterate, the Defendants bear the burden to establish the applicability of a statute of limitations affirmative defense. *See Weitz*, 913 F.2d at 1552.

An Eighth Amendment method of execution claim typically "accrues on the later of the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." *McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008). In support of their argument that Miller's claim is time-barred, the Defendants point out that needles have been a necessary part of Alabama's lethal injection protocol since its adoption as an execution method in 2002 and that, according to the Second Amended Complaint, Miller has had a lifelong fear of needles and longstanding issues where medical personnel have had difficulty accessing his veins. Thus, according to the Defendants, Miller knew or should have known of his injury much earlier and should have brought his method of execution challenge much earlier.

The sole authority the Defendants cite in support of their argument is *McNair*, where the Eleventh Circuit established the rule for when method of execution claims accrue. But *McNair* is readily distinguishable. In *McNair*, an Alabama death row inmate filed a § 1983 action alleging that Alabama's lethal injection protocol violated his Eighth Amendment rights. *Id.* at 1171. In considering whether the inmate's claim was time-barred, the court explained there were "*at least* four potentially viable dates on which [the inmate's] claim could accrue": (1) the date his death sentence became final; (2) the date on which it became clear he would die by

lethal injection; (3) the date the denial of his federal habeas petition became final; and (4) the day of his execution. *Id.* at 1173–74 (emphasis added).

The court then acknowledged the "well established" principle that "a federal claim accrues when the prospective plaintiff 'knows or has reason to know of the injury which is the basis of the action.'" *Id.* at 1174 (quoting *Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 588 (11th Cir. 1990)). "Applying that principle *to the facts of this case*," the court "reject[ed] execution and the completion of federal habeas review as the points from which to measure the limitations period in a method of execution challenge." *Id.* (emphasis added). The court held that "a method of execution claim accrues on the later of the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." *Id.* The state review of the inmate's death sentence was complete in 1990. *Id.* at 1177. The court held that the limitations period began to run on July 31, 2002, when the inmate became subject to execution by lethal injection. *Id.* "[T]herefore, absent a significant change in the state's execution protocol (which did not occur in this case), [the inmate] was required to file his Eighth Amendment challenge by July 31, 2004—more than two years before his complaint was filed." *Id.*

*McNair* does not control the outcome at this stage because Miller alleges facts "that are materially different from those presented in [*McNair*]." *See Gissendaner*

*v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1282 (11th Cir. 2015) (explaining that a case finding a claim to be time-barred is not binding in a different case that presents materially different facts). The inmate in *McNair* did not allege that the state had unsuccessfully tried to execute him within two years of his lawsuit being filed. Moreover, the Eleventh Circuit did not address how a state's attempt to execute the plaintiff himself within two years of his lawsuit would impact the statute of limitations analysis, and the court certainly did not hold that a plaintiff's claim based on a recent failed execution attempt of the plaintiff nonetheless accrued either when state review was complete or when the inmate became subject to the execution protocol.

Fundamentally, the Defendants' argument ignores the nature of Miller's claim: that it would be cruel and unusual punishment for the State to attempt to execute him by lethal injection a second time. And their argument similarly ignores the factual allegations upon which Miller's claim is based, in particular that the Defendants first attempted to execute Miller by lethal injection on September 22, 2022, during which execution team members punctured Miller's body with needles for approximately 90 minutes, causing him severe physical and psychological pain. Contrary to the Defendants' interpretation, Miller is not challenging the use of needles per se but rather the application of numerous needle punctures for approximately 90 minutes, among others. The Court agrees with Miller that he

"could not have known, when lethal injection became the default method of execution in Alabama back in 2002, that one day Defendants would try *and fail* to execute him by that method." (Doc. 101 at 31.) Accepting the Second Amended Complaint's allegations as true, Miller's claim accrued on September 22, 2022 at the earliest, when he knew or had reason to know of his injury. Miller filed his Second Amended Complaint on October 12, 2022, well within the applicable two-year limitations period. Thus, the Defendants have failed to demonstrate that Count Five is time-barred.

### 2. Plausible Claim for Relief

The Defendants also argue that Miller fails to state a plausible Eighth Amendment method of execution claim. "[T]he Eighth Amendment does not guarantee a prisoner a painless death . . . ." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019). Instead, the relevant Eighth Amendment inquiry is whether the State's chosen method of execution "'superadds' pain well beyond what's needed to effectuate a death sentence." *Id.* at 1126–27. And "[t]o determine whether the State is cruelly superadding pain," the Supreme Court requires "asking whether the State had some other feasible and readily available method to carry out its lawful sentence that would have significantly reduced a substantial risk of pain." *Id.* at 1127; *see also Boyd*, 856 F.3d at 858 (explaining that a plaintiff asserting an Eighth Amendment method of execution challenge "must plausibly plead, and ultimately

prove, that there is an alternative method of execution that is feasible, readily implemented, and in fact significantly reduces the substantial risk of pain posed by the state's planned method of execution").  The plaintiff must establish that the challenged method poses a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (citation omitted).

First, the Defendants argue Miller cannot show that a lethal injection execution cruelly superadds pain because using needles to establish venous access is a necessary part of carrying out an execution.  But Miller does not claim that the use of needles or venous access per se is cruel and unusual punishment.  Rather, "[t]he cruel and unusual punishment is Defendants subjecting Mr. Miller to the same traumatic and painful experience *for a second time*."  (Doc. 101 at 30; Doc. 85 at 46, ¶ 225.)  Miller alleges that he was painfully punctured with needles over various parts of his body for approximately 90 minutes during the first execution attempt.  For approximately 90 minutes, Miller says he experienced extreme physical pain as well as psychological pain in light of his longstanding fear of needles.  *Cf. Bucklew*, 139 S. Ct. at 1133 ("[T]he relevant question isn't how long it will take for [the inmate] to die, but how long he will be capable of feeling pain.").

Additionally, after being painfully punctured with needles, Miller was left hanging vertically from the execution gurney for approximately 20 minutes. During this time, blood was leaking from some of Miller's wounds, and he experienced "a lot of pain" in his many puncture wounds and in his arms, chest, and neck. *Cf. id.* While additional factual development may reveal a legitimate reason why Miller was left hanging from the gurney in this manner, such a reason is not apparent from the Second Amended Complaint. *Cf. id.* at 1126–27 (explaining that the relevant Eighth Amendment inquiry is whether the State's chosen method of execution "'superadds' pain *well beyond what's needed to effectuate a death sentence*" (emphasis added)). Moreover, Miller alleges that he continues to have pain in his arms as well as psychological and emotional pain from the failed execution attempt, including disturbed sleep and intrusive thoughts, compounding the pain he says he experienced during the execution attempt itself. Miller's allegations are thus distinguishable from *Bucklew*, where the Supreme Court rejected Bucklew's argument that lethal injection would expose him to a substantial risk of severe pain because "nothing in the record . . . suggest[ed] that Mr. Bucklew will be capable of experiencing pain for significantly more than *20 to 30 seconds* after being injected with pentobarbital." *Id.* at 1132 (emphasis added).

Additionally, Miller alleges that the repeated attempts to establish venous access were undertaken despite the Defendants' knowledge of the difficulty

accessing Miller's veins and the availability of an alternative method—nitrogen hypoxia—that Miller elected.  Now, the Defendants are pursuing a lethal injection execution that has already failed on Miller and caused him extreme pain and suffering, allegedly "without having undertaken any review of what went wrong in his case, or how to avoid such gratuitous pain and suffering in his second execution." (Doc. 85 at 44–45, ¶ 220.)  At this stage, it is plausible to infer that a second attempt to execute Miller by lethal injection will likely expose him, for a second time, to the same extreme pain and suffering over the same period, if not longer, that he says he experienced during the first attempt.  After all, according to the Second Amended Complaint, the execution team eventually stopped trying to find a vein due to time constraints posed by the death warrant expiring at midnight.  It is thus plausible to infer that, if the execution team had additional time, they likely would continue puncturing Miller with needles to try to find a vein for an even longer period, thereby resulting in additional pain.

Accepting his allegations as true, Miller has adequately demonstrated that exposing him to a second lethal injection execution poses "an 'objectively intolerable risk of harm.'"  *See Glossip*, 576 U.S. at 877 (citation omitted).  In so concluding, the Court makes no attempt to determine when, in terms of duration or number of needle punctures, a lethal injection execution crosses the line from constitutional to unconstitutional.  But at this stage, given Miller's allegations, which

must be assumed true, that he suffered extreme physical and psychological pain during and after the first execution attempt, that the Defendants have not undertaken any review of what occurred or how to avoid a similar situation with Miller in the future, and that Miller identifies a feasible and readily implemented alternative execution method—nitrogen hypoxia—that would significantly reduce the risk of pain by avoiding the use of needles entirely,[9] Miller has plausibly alleged that a second lethal injection execution cruelly superadds pain because "the State had some other feasible and readily available method to carry out its lawful sentence that would . . . significantly reduce[] a substantial risk of pain." *See Bucklew*, 139 S. Ct. at 1127. The Court does not suggest that an inmate necessarily states a plausible method of execution claim by identifying one recent execution (or execution attempt) that allegedly caused another inmate severe pain. Rather, Miller's claim is plausible because he himself allegedly experienced extreme pain during his first execution attempt, coupled with his allegations that the Defendants have not taken steps to review what happened or to prevent a similar occurrence with Miller in the future. Thus, it is plausible, rather than merely possible, that a second lethal injection execution poses a substantial risk of severe pain to *Miller*.

---

[9] The Court addresses the feasible-and-readily-implemented prong in more detail below. The Defendants do not argue that Miller has not adequately pled that nitrogen hypoxia would significantly reduce the risk of pain.

In their reply brief, the Defendants argue that "[i]f Miller's 'suggestion is that because he once underwent the psychological strain of preparation for' lethal injection, and that 'to require him to undergo this preparation again subjects him to a lingering or cruel and unusual punishment,' such a claim is foreclosed by Supreme Court precedent."  (Doc. 104 at 22 (quoting *State of La. ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)).)   But Miller's allegations concern much more than any purported "psychological strain" related to preparing for a second execution attempt. As explained above, Miller alleges that he experienced severe physical pain for approximately 90 minutes during the first execution attempt—and it could have been longer but for the expiration of the death warrant at midnight.  Moreover, because the Defendants allegedly have not undertaken any review of what happened or how to avoid a similar situation with Miller in the future, it is plausible to infer that a second attempt to execute him by lethal injection will likely expose him to the same severe pain over the same period, if not longer.  Thus, the Defendants' argument is unpersuasive.

The Defendants advance two additional arguments why Miller's claim is not plausible, neither of which the Court finds persuasive.  *First*, the Defendants argue dismissal is warranted because they "tried to address Miller's concerns about veinous access" but he "refused to cooperate with their efforts," and thus the "blame for the alleged Eighth Amendment issues" with the attempted execution fall "on

41

Miller's own shoulders." (Doc. 99 at 39–40.) The Defendants reference Miller's allegation that on September 20, 2022, he declined an ADOC official's request to extend his arms through the "bean hole" in his cell so that a member of the execution team could look at his veins. This argument is unavailing for at least two reasons. First, it rests on an inference that, but for an execution team member's inability to look at Miller's veins on September 20, 2022, the execution team would have been able to successfully carry out Miller's execution on September 22, 2022, without subjecting him to the severe pain caused by having his skin punctured with needles in different parts of his body for approximately 90 minutes. Assuming without deciding it would even be reasonable to draw this inference, the Court declines to draw such an inference because it is not in Miller's favor. Second, the argument rests on an inference that September 20, 2022, was the only feasible time an execution team member could have examined Miller's veins prior to the execution. But nothing in the Second Amended Complaint suggests that this is a case. Indeed, such an inference is undermined by Miller's allegation that a nurse examined his veins on the day of the execution. And assuming without deciding it would even be reasonable to draw the inference, the Court declines to draw it because it is not in Miller's favor. Instead, it is reasonable to infer from the allegations that the ADOC simply gave up on trying to examine Miller's veins upon his verbally rebuffing a

single request.  Suggesting that Miller is thus to blame for the alleged problems with the execution attempt requires a causal leap the Court declines to make at this stage.

*Second*, the Defendants attack Miller's allegation that nitrogen hypoxia is an available alternative method of execution, arguing that "[t]he Eighth Amendment does not require the State to use a new method as an alternative until the State has determined the method is ready."  (Doc. 99 at 41.)   The Court construes the Defendants' statement as an argument that nitrogen hypoxia is not feasible and readily implemented.  But as Miller correctly points out, this argument is foreclosed by *Price v. Commissioner, Department of Corrections*, 920 F.3d 1317 (11th Cir. 2019) (per curiam).  As the Eleventh Circuit explained, a state may not statutorily authorize a particular method of execution and simultaneously deny it as "available." *Id.* at 1328.   Thus, because the State of Alabama voluntarily adopted nitrogen hypoxia by statute, *Price* rejected the State's argument that nitrogen hypoxia is not available "simply because the State has not yet developed a protocol to administer this method of execution."  *Id.*  And where, as here, "the State by law previously adopted nitrogen hypoxia as an official method of execution," an inmate "may satisfy his burden to demonstrate that the method of execution is feasible and readily implemented by pointing to the executing state's official adoption of that method of execution."  *Id.*  Thus, because the State of Alabama has statutorily adopted nitrogen hypoxia as an official method of execution, Miller has satisfied his burden to

43

demonstrate that nitrogen hypoxia is feasible and readily implemented.  *See id.*  And because the "State, on its own, had already adopted nitrogen hypoxia as an alternative to lethal injection," the State—not Miller—"bears the responsibility to formulate a protocol detailing how to effectuate execution by nitrogen hypoxia." *See id.* at 1329.  Thus, on this record, Miller has stated a plausible Eighth Amendment method of execution claim.

### 3. Money Damages

The Defendants also argue that the Eleventh Amendment bars Miller's Eighth Amendment method of execution claim because he requests nominal and punitive damages from Defendants Hamm and Raybon, who are sued only in their official capacities.  Miller correctly concedes that state officials sued only in their official capacities are immune from money damages.  *See Cross v. State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995); *Colvin v. McDougall*, 62 F.3d 1316, 1319 (11th Cir. 1995) (reversing award of punitive damages against sheriff in his official capacity); *Simmons v. Conger*, 86 F.3d 1080, 1084–85 (11th Cir. 1996) (reversing award of nominal damages against judge in his official capacity).  However, Miller argues that dismissal on this ground is not warranted because it does not impact whether he has stated a plausible claim for relief.

The Court agrees with Miller.  "[T]he selection of an improper remedy in the Rule 8(a)(3) demand for relief will not be fatal to a party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type."  5 Alan Wright, Arthur Miller, & A. Benjamin Spencer, Fed. Practice & Proc. § 1255 (4th ed., Apr. 2022 Update); *accord Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp.*, 835 F.3d 1106, 1108 (8th Cir. 2011) (per curiam).  Miller requests not only damages from Hamm and Raybon but also declaratory and injunctive relief against Hamm, Raybon, and Marshall.  Having concluded that Miller states a plausible claim for relief, dismissal is not warranted on the ground that Miller is not entitled to one of the several forms of relief he requested.

Accordingly, to the extent the Defendants' Motion to Dismiss asks the Court to dismiss or strike Miller's request for money damages, the Motion is granted.  In all other respects, the Defendants' Motion is due to be denied as to Count Five.

### F. Violation of Alabama State Constitution's Prohibition on Cruel or Unusual Punishments (Count Six)

The Defendants argue that Count Six, which alleges a violation of the Alabama Constitution, is barred by the Eleventh Amendment because it asks a federal court to instruct state officials on how to comply with state law.  The Eleventh Amendment bars suits for injunctive relief against state officials premised on their alleged violations of state law alone.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 121 (1984).  This bar applies to injunctive relief

claims against state officials based on their alleged violations of a state constitution. *See Silver v. Baggiano*, 804 F.2d 1211, 1215 (11th Cir. 1986), *abrogated in part on other grounds by Lapides v. Bd. of Regents*, 535 U.S. 613, 618 (2002).

The Eleventh Amendment plainly bars Miller's claim that the Defendants' conduct violates the Alabama Constitution. Miller does not argue otherwise, but he requests that Count Six be dismissed without prejudice as opposed to with prejudice. The Court finds dismissal without prejudice to be appropriate. *See Warnock v. Pecos Cnty.*, 88 F.3d 341, 343 (5th Cir. 1996) (explaining that claims barred by Eleventh Amendment sovereign immunity cannot be dismissed with prejudice). Accordingly, Count Six is due to be dismissed without prejudice.

### G. Article III Standing

Finally, the Court addresses an argument the Defendants raised for the first time in their reply brief: Miller lacks Article III standing to sue Defendant Marshall for violations of Miller's due process rights (Count One) and equal protection rights (Counts Two and Three). (*See* Doc. 104.) Ordinarily courts do not consider arguments raised for the first time in a reply brief. *See Singleton v. Taylor*, No. 20-CV-99, 2021 WL 3862001, at *9 n.15 (M.D. Ala. Aug. 25, 2021). But "federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *United States v. Hays*, 515 U.S. 737, 742 (1995) (alteration in original) (citation omitted).

Having considered the Defendants' arguments in their reply brief, the Court discerns no Article III standing problem at this time.  Of course, the Court must dismiss a claim if it determines "at any time" that it lacks subject matter jurisdiction, *see* FED. R. CIV. P. 12(h)(3), and so the Defendants are free to properly raise Article III standing arguments at a later date, at which time Miller will have an opportunity to respond.  Thus, to the extent the Defendants seek to dismiss certain counts against Defendant Marshall for lack of Article III standing, the Motion is denied without prejudice.

## VI.  CONCLUSION

For the reasons stated, the Defendants' Motion to Dismiss (Doc. 99) is GRANTED IN PART to the extent Miller's Eighth Amendment arbitrary and capricious claim (Count Four) is DISMISSED WITH PREJUDICE, Miller's claim under the Alabama Constitution (Count Six) is DISMISSED WITHOUT PREJUDICE, and Miller's request for money damages in the Second Amended Complaint's prayer for relief is STRICKEN.  The Motion is DENIED in all other respects.

DONE, on this the 4th day of November, 2022.

        /s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE